BENJAMIN D. BROWN (SBN 202545)
bbrown@cohenmilstein.com
**COHEN MILSTEIN SELLERS & TOLL, PLLC**
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC  20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

[Additional Counsel listed on signature page]

*Counsel for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

| | |
|---|---|
| GERALD CARLIN, JOHN RAHM, PAUL ROZWADOWSKI and BRYAN WOLFE, individually and on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>DAIRYAMERICA, INC. and CALIFORNIA DAIRIES, INC.,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Individual and Representative Plaintiffs Gerald Carlin, John Rahm, Paul Rozwadowski and Bryan Wolfe, on behalf of themselves and all others similarly situated, allege:

1. This class action is brought on behalf of dairy farmers located in Wisconsin, Pennsylvania, New Mexico, Minnesota, Texas, Michigan, Washington, Ohio, Iowa, Arizona, Vermont, Colorado, Kansas, Florida, Illinois, Missouri, Georgia, Kentucky, South Dakota, Tennessee, Nebraska, North Carolina, Oklahoma, Maine and California who sold raw milk that was priced according to a Federal Milk Marketing Order ("FMMO") during the period January 1, 2002 through April 30, 2007.

2. Plaintiffs and tens of thousands of other dairy farmers sold raw milk that was

priced according to a FMMO during the period January 1, 2002 through April 30, 2007. The raw milk prices paid to those dairy farmers were set using FMMO formulas that factor in dairy product prices obtained by the National Agricultural Statistics Service ("NASS"), a division of the United States Department of Agriculture ("USDA"). NASS obtained dairy product prices by regularly surveying firms that produce one million or more pounds of manufactured dairy products. One of the largest dairy firms surveyed by NASS was DairyAmerica, Inc. ("DairyAmerica"). From January 1, 2002 through April 30, 2007, DairyAmerica negligently and incorrectly reported dairy product prices to NASS. As a result, the raw milk prices set by the FMMOs were lower than they should have been, and Plaintiffs and the other members of the proposed class of dairy farmers were deprived of millions of dollars of income.

3. Prior to and throughout the Class Period, DairyAmerica was provided instructions that identified precisely which dairy product prices to report to NASS. At all times relevant to this Complaint, DairyAmerica was aware that the dairy product prices it reported to NASS would be, and were intended to be, incorporated into the raw milk prices set by FMMOs and paid to dairy farmers. Yet, by its own admission, DairyAmerica failed to properly report its dairy product prices to NASS. A federal government investigation found that dairy farmers were deprived of millions of dollars in income as a result of DairyAmerica's reporting errors. Defendants profited substantially from DairyAmerica's misreporting of dairy product prices to NASS.

4. Plaintiffs seek, on behalf of themselves and all others similarly situated, compensatory and consequential damages.

**JURISDICTION AND VENUE**

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d) in that Plaintiffs and Defendant are citizens of different states and the amount in controversy exceeds the value of $75,000, exclusive of interest and costs. This Court has personal jurisdiction over both Defendants in that both Defendants are incorporated in, and have their principal place of business in, the State of California and both Defendants engaged in the misconduct alleged herein in the State of California.

6.   Venue for this action is proper in the Eastern District pursuant to 28 U.S.C. §1391(a) in that Defendants have their principal place of business in and are subject to the personal jurisdiction of this judicial district.

## THE PARTIES

7.   Individual and representative Plaintiff Gerald Carlin is a dairy farmer and a resident of Meshoppen, Pennsylvania.  Mr. Carlin sold raw milk that was priced according to FMMO formulas during the period January 1, 2002 through April 30, 2007.

8.   Individual and representative Plaintiff John Rahm is a dairy farmer and a resident of Versailles, Ohio.  Mr. Rahm sold raw milk that was priced according to FMMO formulas during the period January 1, 2002 through April 30, 2007.

9.   Individual and representative Plaintiff Paul Rozwadowski is a dairy farmer and a resident of Stanley, Wisconsin.  Mr. Rozwadowski sold raw milk that was priced according to FMMO formulas during the period January 1, 2002 through April 30, 2007.

10.   Individual and representative Plaintiff Bryan Wolfe is a dairy farmer and a resident of Rome, Ohio.  Mr. Wolfe sold raw milk that was priced according to FMMO formulas during the period January 1, 2002 through April 30, 2007.

11.   Defendant DairyAmerica is a not-for-profit corporation organized and existing under the laws of the State of California with its principal place of business in Fresno, California. DairyAmerica markets and sells approximately 75 percent of all the nonfat dry milk ("NFDM") produced in the United States and has exported NFDM to over 40 countries worldwide.  Since 1998, DairyAmerica has reported dairy product prices to NASS.  DairyAmerica is owned, controlled and operated by nine dairy cooperatives.

12.   Defendant California Dairies, Inc. ("California Dairies") is a for-profit corporation organized and existing under the laws of the State of California with its principal place of business in Visalia, CA. California Dairies owns six milk processing plants that produce butter, buttermilk powder, NFDM, and cheddar cheese.  It ships over 18 billion pounds of milk to be processed and sold annually and sells dairy products in all 50 states and around the world. California Dairies is the major shareholder in and majority owner of DairyAmerica.  On

information and belief, California Dairies directs and controls the activities of DairyAmerica.

## AGENCY AND JOINT VENTURE

13. DairyAmerica is an agent of California Dairies.

14. DairyAmerica is a joint venture between California Dairies and the other dairy cooperatives that own DairyAmerica.

15. DairyAmerica was formed in 1995 by California Milk Producers, Danish Creamery Association and Dairyman's Cooperative Creamery Association to jointly market their powdered milk. In 1999, California Milk Producers and Danish Creamery Association merged to form California Dairies.

16. On March 16, 2005, Richard K. Lewis, COO of DairyAmerica, testified before Congress, "DairyAmerica is a non-profit marketing cooperative representing eight Cooperatives located throughout the United States. DairyAmerica was incorporated on May 18, 1995 to market NFDM, Buttermilk and Whole Milk Powder production for its Members in a manner consistent with the articles of incorporation and by-laws that allow diversity of sales and the greatest return to Members."

17. When DairyAmerica was formed, its management and staff were provided by Challenge Dairy Products, Inc., which is wholly owned by California Dairies.

18. During the relevant time period, California Dairies had one or more positions on DairyAmerica's governing Board of Directors. For example, Richard Cotta, President and CEO of California Dairies, served as Chairman of the Board of Directors of DairyAmerica; Gerben Leyendekker, Treasurer and Executive Committee Member of California Dairies, serves on the Board of Directors of DairyAmerica; and Steve Maddox, Secretary of California Dairies, served on the Board of Directors of DairyAmerica.

19. Upon information and belief, during the relevant time period, the officers of DairyAmerica were employees of California Dairies and the other dairy cooperatives that own DairyAmerica. For example, in 2007, Keith Gomes was simultaneously President of DairyAmerica and Senior Vice-President and COO of California Dairies.

20. Even though DairyAmerica is a nonprofit corporation, DairyAmerica's singular

purpose is commercial: to maximize the profit of California Dairies and the other dairy cooperatives that own it. In comments submitted to the USDA on September 4, 2007, DairyAmerica wrote that it "owes a duty to its members to maximize overall profit and not engage in transactions that might benefit one member at the expense of others or DairyAmerica as a whole." On August 28, 2007, during a public hearing held by California's Department of Food and Agriculture, Joe Heffingtion, Senior Vice-President and CFO of California Dairies, testified that DairyAmerica was "formed for the single purpose of marketing the powder milk products produced by DairyAmerica's member owners."

21. DairyAmerica sells 100% of the milk powder produced by California Dairies and the other dairy cooperatives that own it.

22. DairyAmerica and the nine dairy cooperatives that own it, including California Dairies, characterize DairyAmerica as an agent of the nine dairy cooperatives. In comments submitted to the USDA on September 4, 2007, DairyAmerica wrote, "DairyAmerica operates as a marketing agent on behalf of all of its members." Richard Cotta, President and CEO of California Dairies, described DairyAmerica as a "group that markets milk powders for us."

23. DairyAmerica and the nine dairy cooperatives that own it, including California Dairies, characterize DairyAmerica as a joint venture between the nine dairy cooperatives. Dairy Farmers of America, Inc., one of the nine dairy cooperatives that own DairyAmerica, described DairyAmerica as "a joint venture to market non-fat dry milk, domestically and internationally." DairyAmerica describes itself as "an association of nine producer-owned dairy cooperatives who work together to market and supply quality dairy products to a diverse and expansive customer base."

24. California Dairies is liable for the conduct of DairyAmerica alleged herein because DairyAmerica is an agent of California Dairies, because DairyAmerica is a joint venture between California Dairies and the other dairy cooperatives that own it, and because California Dairies actively participated in DairyAmerica's decision-making.

**CLASS ACTION ALLEGATIONS**

25. Plaintiffs seek to bring this case as a class action pursuant to Federal Rule of Civil

Procedure 23 on behalf of themselves and all others similarly situated as members of a proposed Class, defined as follows:

> All dairy farmers located in Wisconsin, Pennsylvania, New Mexico, Minnesota, Texas, Michigan, Washington, Ohio, Iowa, Arizona, Vermont, Colorado, Kansas, Florida, Illinois, Missouri, Georgia, Kentucky, South Dakota, Tennessee, Nebraska, North Carolina, Oklahoma, Maine, or California who sold raw milk at prices set by a Federal Milk Marketing Order during the period January 1, 2002 through April 30, 2007.

Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest, and their legal representatives, heirs, and successors.

**NUMEROSITY**

26. The proposed class is so numerous and geographically dispersed that joinder of all of its members is impractical. Tens of thousands of dairy farmers located in 25 states are members of the proposed class and sold raw milk at prices set according to a FMMO.

**COMMON QUESTIONS OF LAW AND FACT**

27. Virtually all of the issues of law and fact in this class action are common to the class and include at least the following:

    a.    whether DairyAmerica improperly reported dairy product prices to NASS;

    b.    whether DairyAmerica failed to exercise reasonable care when reporting dairy product prices to NASS;

    c.    whether dairy farmers were foreseeable and intended recipients of DairyAmerica's misrepresentations;

    d.    whether DairyAmerica's misrepresentation of dairy product prices deprived income from dairy farmers;

    e.    the nature of relief available by reason of Defendants' violations of law.

28. Plaintiffs' claims are typical of the class members' claims. Plaintiffs and all other members of the class have sustained monetary damages arising out of Defendants' violations of common and statutory law as alleged herein.

**ADEQUACY OF REPRESENTATION**

29. Plaintiffs can and will fairly and adequately represent and protect the interests of the class and have no interests that conflict with or are antagonistic to the interests of class members. Plaintiffs have retained attorneys competent and experienced in class actions. No conflict exists between the Plaintiffs and class members.

**SUPERIORITY**

30. A class action is superior to any other available method for the fair and efficient adjudication of this controversy and common questions of law and fact predominate over any individual questions that may arise.

31. In the absence of a class action, dairy farmers will be deprived of income they should have received.

## FACTUAL ALLEGATIONS

**PRICING OF RAW MILK**

32. FMMOs were first established in 1937 by the Agricultural Marketing Agreement Act, and ten FMMOs govern different regions of the country. FMMOs establish the minimum prices for the sale of raw, Grade A milk from the dairy farmer to the processor or manufacturer. Approximately 65 percent of all milk marketed in the United States is marketed under FMMOs, and approximately 50,000 dairy farmers sell raw milk at prices set by FMMOs.

33. According to the USDA, the three major objectives of FMMOs are to: (1) assure consumers of an adequate supply of wholesome milk at a reasonable price; (2) promote greater producer price stability and orderly marketing; and (3) provide adequate producer prices to ensure an adequate current and future Grade A milk supply.

34. FMMOs employ a four-tiered, classified pricing system to set monthly minimum milk prices based upon the intended use of the raw milk. The four classes of milk are: Class I, for beverage products; Class II, for soft manufacturing products such as ice cream, cottage cheese, sour cream, and yogurt; Class III, for hard cheese and cream cheese; and Class IV, for butter and dry milk products.

35. FMMO formulas tie the monthly minimum prices for each class of raw milk to

wholesale market prices of particular dairy products, which are collected by NASS. NASS obtains the dairy product prices by conducting a weekly survey of dairy firms that produce one million or more pounds of manufactured dairy products.

36. Class III and Class IV values are calculated based on FMMO formulas that directly rely on the weekly price data published by NASS. The Class III pricing formula incorporates NASS survey prices for cheese, butter, and dry skim whey, and the Class IV pricing formula incorporates NASS survey prices for NFDM and butter. The formulas for Class III and Class IV milk prices incorporate the monthly averages of weekly NASS survey prices that are released prior to the fifth of the following month. For example, NASS survey data from October 23 to October 28 that was released on November 3 would be used in the October price calculation for Class III and Class IV milk.

37. Class I prices are determined by adding a differential value to the higher of either an advanced Class III or Class IV skim milk value, plus a multiple of butterfat prices. Class II prices are basically calculated by adding a differential of $0.70 per hundred pounds of milk to the advanced Class IV skim milk price, plus a multiple of butterfat prices.

38. Class II, III and IV prices are the same across each of the ten FMMOs.

39. Although raw milk is priced by FMMOs according to its use, dairy farmers are paid a weighted average or ''blend'' price for the sale of milk priced according to FMMOs. The blend price is derived by pooling all classes of milk sold in the same marketing area or by the same dairy cooperative. Mathematically, this process involves calculating the weighted average value of milk based on the proportion of total milk pooled from each of the four classes. Under this pricing system, each dairy farmer within the same FMMO or dairy cooperative receives an equal share of each class of milk and is indifferent to the actual class for which his particular milk was used.

40. Thus, approximately 50,000 dairy farmers are paid for their raw, Grade A milk according to a formula with a limited number of inputs, and NFDM is one of those key inputs.

**NASS SURVEY**

41. The Dairy Market Enhancement Act of 2000 obligates each manufacturer of one

million or more pounds of dairy products to report the price, quantity, and moisture content of the dairy products sold by the manufacturer.

42. On a weekly basis, NASS surveys these dairy firms and publishes dairy product prices in the *Dairy Products Prices* report. Those published dairy product prices are used by the USDA's Agriculture Marketing Service ("AMS") to calculate components of the FMMO formulas.

43. Each reporting dairy firm submits its weekly NASS survey information using either a paper questionnaire or an electronic reporting system. The instructions section for both of these reporting methods contains a list of items that are to be included and excluded. The instructions exclude any information from sales contracts in which the selling price is set 30 days or more before the transaction is completed, except for sales conducted via the Dairy Export Incentive Program (DEIP). Specifically, the instructions list the following as an exclusion: "Forward pricing sales: sales in which the selling price was set (and not adjusted) 30 or more days before the transaction was completed. This exclusion does not include sales through the Dairy Export Incentive Program."

44. The NASS reporting instructions are not difficult to understand. The USDA's Office of the Inspector General conducted an investigation of DairyAmerica's misreporting of dairy product prices and found that "the wording on the data collection instrument is clear." An April 2007 press release issued by NASS states that the "guidelines explicitly exclude the reporting of forward pricing sales in which the selling price was set 30 days or more before the transaction was completed."

45. NASS also requires firms that provide data for the *Dairy Products Prices* report to complete an Annual Validation Worksheet. The Annual Validation Worksheet requires reporting dairy firms to warrant that they excluded forward pricing sales (sales in which the selling price is established 30 or more days before the transaction is completed) from their reports to NASS.

**DAIRYAMERICA MISREPORTING PRICES**

46. From approximately January 2002 through April 2007, DairyAmerica improperly reported volumes and prices to NASS. In its weekly reports to NASS, DairyAmerica

systematically included volumes and prices from the sale of NFDM in contracts in which the selling price was set more than 30 days before the completion of the transaction. DairyAmerica included these prices even though the sales contracts were transacted outside of the DEIP.

47. From January 2006 through April 2007, approximately 90 percent of DairyAmerica's contracts for the export of NFDM were transacted outside of DEIP and established selling prices more than 30 days before the completion of the transaction.

48. The NFDM prices from long-term contracts that DairyAmerica improperly reported to NASS were typically lower than the NFDM prices that were properly reported to NASS. As a result, DairyAmerica's improper reporting of NFDM prices reduced the value of raw milk prices set by FMMOs.

49. DairyAmerica misreported the weekly NFDM prices from approximately January 2002 through April 2007 despite filling out Annual Validation Worksheets from 2000 through 2007. In each of the Annual Validation Worksheets that it completed, DairyAmerica responded "yes" to the question: "When reporting nonfat dry milk sales data to NASS, did you or can you: exclude forward pricing sales (sales in which the selling price is established, and not adjusted, 30 or more days before the transaction is completed)?"

50. DairyAmerica misreported weekly NFDM prices even though NASS reminded DairyAmerica of the reporting instructions on several occasions during the Class Period. According to Lowell Randel, Director for Legislative and Intergovernmental Affairs for USDA's Research, Education and Economics Mission Area, NASS representatives reminded DairyAmerica representatives of "what to include in these reports and what to exclude from these reports" every year. In October 2006, for example, NASS representatives and DairyAmerica representatives discussed the reporting guidelines, and during that conversation, DairyAmerica representatives claimed to be in compliance with the reporting guidelines.

51. DairyAmerica misreported weekly NFDM prices even though a substantial majority of the dairy firms that reported to NASS complied with the reporting requirements. In April 2007, NASS asked 39 reporting dairy firms to revise any weekly dairy product prices that were improperly reported between April 29, 2006 and April 14, 2007. A January 30, 2008 letter

from Joe Reilly, the Administrator of NASS, states, "Our review of resubmitted reports for the earlier 51-week period showed that incorrect reporting was not a widespread problem." NASS's Advisory Committee on Agriculture Statistics characterized DairyAmerica's misreporting as "an isolated event."

**MISREPRESENTATIONS TO DAIRY FARMERS**

52. The dairy product prices reported by DairyAmerica to NASS were intended to guide dairy farmers in their business transactions. The misreported prices were key components of the FMMO formulas that determined the price of raw milk for dairy farmers across the country.

53. DairyAmerica supplied the dairy product prices to NASS with the full knowledge that the USDA would, in turn, use the information to set raw milk prices for dairy farmers subject to FMMOs. In comments submitted to the USDA on September 4, 2007, DairyAmerica wrote, "The issue of what contracts will be reportable to NASS is not academic. Prices reported to NASS are used by AMS to establish and announce minimum prices paid by handlers pursuant to 7 C.F.R. §§ 1000.50 and 1000.53. There is a direct relationship between the NASS prices reported and the prices announced by AMS for regulated minimum price purposes."

54. The Dairy Market Enhancement Act of 2000, which requires DairyAmerica and other large dairy firms to report dairy product prices to NASS, was enacted to ensure that dairy farmers were paid an accurate, fair-market value for the sale of raw milk. When introducing the legislation on October 25, 2000, Congressman Nick Smith said, "[I]t will go a long way toward assuring an accurate Federal order price and stabilizing month-to-month fluctuations for farmers. … Because the determination of the federal order price is based on the price of components such as butter, cheese, and dry milk, it is important to have processors report price and inventories. This bill makes such reporting mandatory to assure that farmers are paid a price that reflects the current demand for milk and milk products." On October 25, 2000, Congressman Charles Stenholm said, "The bill represents a consensus among processor and producer groups. … [B]ecause the determination of accurate market prices is key to establishing milk orders that are reflective of supply and demand, processors have agreed to subject themselves to the

1  requirements that will result from the passage of this bill." On October 25, 2000, Congressman Ron Kind said, "This legislation will foster a more accurate price and inventory reporting system for dairy products and enable farmers to base business decisions on the most accurate information. By requiring mandatory reporting, dairy producers will be given more accurate, complete and timely market information. … [S]ince the beginning of the calendar year, dairy farmers have experienced excruciating low milk prices. These inhospitable market conditions have resulted in the loss of 3-to-4 family dairy farmers in my home state of Wisconsin each day. … While this legislation is no panacea for ailing milk prices, it will go a long way in improving prevailing attitude and restore some much needed optimism."

55. A June 28, 2007 report issued by NASS states, "The Dairy Market Enhancement Act of 2000, U.S. Code Title 7, Section 1627, requires mandatory reporting of the price, quantity, and moisture content of butter, nonfat dry milk, cheddar cheese, and dry whey. Dairy products prices data, collected weekly by NASS, are used by USDA to assist in the determination of the fair market value of raw milk."

56. The NASS website states, "Each week, NASS contacts plants that commercially produce 1 million or more pounds of manufactured dairy products to collect specific information about price trends in the market. The Agricultural Marketing Service (AMS) uses the data to establish minimum values for milk under the Federal Milk Marketing Order program."

57. DairyAmerica's misreporting of dairy product prices undermined the fundamental purpose of the Dairy Market Enhancement Act of 2000. On October 25, 2000, Congressman Ron Kind said that the legislation was "urgently needed to restore producer confidence" in the wake of "reporting fiascoes that sent markets plunging." On June 29, 2000, Senator Russ Feingold explained that the Dairy Market Enhancement Act of 2000 was intended to eliminate "reporting errors" and "costly mistakes."

**EFFECT ON DAIRY FARMERS**

58. DairyAmerica's misreporting of dairy product prices directly resulted in dairy farmers receiving lower payments for the sale of raw milk. DairyAmerica's improper inclusion of long-term, non-DEIP contract prices for the sale of NFDM in the weekly reports to NASS

resulted in lower prices for Class I, II and IV milk sold by dairy farmers across the country.

59.     Because DairyAmerica marketed and sold approximately 75 percent of the NFDM produced in the United States during the relevant time period, and because NFDM was and is a critical component of Class I, II and IV milk prices, DairyAmerica was uniquely positioned to artificially depress raw milk prices paid to dairy farmers by misreporting NFDM prices to NASS.

60.     In April 2007, AMS asked dairy firms that reported to NASS to revise any improper prices reported between April 29, 2006 and April 14, 2007.  As a result of the revisions submitted to AMS, AMS concluded that over the 51-week revision period, the value of milk regulated under the FMMO program had been understated by millions of dollars.

61.     *The Milkweed*, a monthly publication focused on the dairy industry, reviewed the revisions submitted to NASS and calculated that for the period between August 2006 and January 2007, dairy farmers had been deprived of millions of dollars in income due to the reporting errors.

62.     When DairyAmerica halted the misreporting of dairy product prices in the spring of 2007, the monthly price of raw milk set by FMMO formulas increased substantially.

**EFFECT ON DAIRYAMERICA AND CALIFORNIA DAIRIES**

63.     As a result of DairyAmerica improperly reporting dairy product prices from long-term contracts to NASS, the Defendants directly benefitted financially.  The lower dairy product prices improperly reported by DairyAmerica reduced the prices that owners of DairyAmerica paid to purchase raw milk from dairy farmers.  Defendants had a substantial pecuniary interest in keeping dairy product prices that DairyAmerica reported lower, as those prices determined the value of DairyAmerica's primary costs.

64.     During the first half of 2006, for example, DairyAmerica entered into substantial, long-term contracts to export NFDM at low prices with Fonterra, a global dairy company based in New Zealand.  Soon thereafter, during the summer of 2006, global NFDM prices rose significantly.  Had DairyAmerica complied with the NASS reporting requirements and excluded the NFDM prices from the contracts with Fonterra, DairyAmerica's cost for obtaining milk from dairy farmers would have greatly increased, which would have potentially reduced or eliminated any profit, or even resulted in losses, for the owners of DairyAmerica, including California

Dairies, when the long-term contracts with Fonterra were executed.

65. On August 1, 2007, nine Senators signed a letter to the Secretary of Agriculture calling for an investigation of the misreporting of dairy product prices to NASS. The letter states, "[I]t appears that this misreporting involved long term fixed price contracts during a period of rapid increases in NDM prices that in turn resulted in higher input prices for the NDM producers through higher milk prices. There seems to have been a potential financial motive to misreport the relatively low NDM prices of the fixed price contracts and therefore lessen the increases in input costs for the NDM producers."

**GOVERNMENT INVESTIGATION**

66. An article in the March 2007 issue of *The Milkweed* broke the story of DairyAmerica improperly reporting long-term NFDM prices. The USDA's Office of the Inspector General found that the misreporting "was only discovered because of the impact of the article in *The Milkweed* and that the error was not detected by NASS' existing survey and estimation process."

67. *The Milkweed* article prompted DairyAmerica's CEO to contact NASS to discuss the reporting requirements for NFDM. An April 11, 2007 discussion between NASS and the CEO confirmed that DairyAmerica had improperly included long-term forward contract price data in its weekly NASS submissions. According to the USDA, April 11, 2007 is "the date that [the government] determined that there was in fact a price reporting error."

68. On April 20, 2007, NASS issued a press release that states, "NASS has determined that one nonfat dry milk plant erroneously included some long-term, fixed prices sales data in its weekly reports."

69. The USDA's Inspector General launched an investigation of DairyAmerica's reporting errors. The Inspector General conducted site visits, interviews and document reviews. On February 14, 2008, the Inspector General issued a report which found:

> A large dairy firm inappropriately included long-term forward contracted nonfat dry milk volume and price information in their weekly submissions to NASS. We found that this dairy firm has been including data for sales of this type since 2002. NASS then aggregated the misreported data from this large dairy firm with the

weekly data submitted by other dairy firms for the same reporting period. This caused inaccurate nonfat dry milk aggregated volume and price statistics to be published weekly. … NASS' published nonfat dry milk price statistics are utilized by AMS as a component of its formula for establishing federal milk marketing order (FMMO) prices. Given that incorrect nonfat dry milk prices were factored into the FMMO formula, the published FMMO prices were also incorrect. … The long-term forward contract data were consistently included in the firm's weekly submissions with no exclusions. … A representative from the large dairy firm has stated that long-term forward contract sales began in 2002 and that they inappropriately included data relating to these sales in their weekly submissions to NASS.

70. Neither NASS nor the USDA's Inspector General directly identified which "large dairy firm" had misreported NFDM prices to NASS.

71. In February 2008, NASS's Advisory Committee on Agriculture Statistics indirectly revealed the identity of the misreporting firm in a set of meeting minutes. Minutes from the February 2008 meeting of NASS's Advisory Committee state, "Carol worked with the Inspector General (IG), and she informed the Inspector General's Office that this was a confidential survey, and she would not release the name of the firm that had misreported. The misreported firm did identify themselves to IG. The IG Office mentions the name of the firm in their report." The only dairy firm named in the Inspector General's report is DairyAmerica. The Inspector General's report quotes the following sentence from the March 2007 *Milkweed* article: "The major seller of nonfat dry milk–DairyAmerica–has improperly reported values of weekly nonfat dry milk sales for the past six months to USDA."

72. In April 2007, AMS requested that dairy firms revise any improper prices that were reported to NASS between April 29, 2006 and April 14, 2007. AMS published the revised figures on June 28, 2007 and calculated that, on average, the 2-week price of NFDM increased by $0.0218 per pound and the 4-5 week price of NFDM increased by $0.0193 per pound. Considering that DairyAmerica markets and sells approximately 75 percent of all the NFDM produced in the United States, such sizable revisions to the NFDM prices were only mathematically possible if DairyAmerica was the "large dairy firm" that misreported NFDM prices to NASS.

## CONCEALMENT AND TOLLING

73. Throughout the relevant time period, Defendants affirmatively concealed from Plaintiffs and class members the misrepresentations alleged herein and the identity of the dairy firm which negligently made such misrepresentations. DairyAmerica misrepresented dairy product prices in reports that were concealed from public review, and Defendants concealed the contents of the reports throughout the relevant time period. When NASS, AMS and the Inspector General investigated or announced the misreported dairy product prices, Defendants continued to conceal the identity of the misreporting dairy firm.

74. As a result of Defendants' concealment, any applicable statute of limitations affecting the rights of Plaintiffs and class members has been tolled. Plaintiffs exercised due diligence to learn of their legal rights, and, despite the exercise of due diligence, did not discover and could not have discovered the unlawful conduct alleged herein at the time it occurred. Plaintiffs could not have discovered the unlawful conduct alleged herein until February 2008, when the identity of the misreporting dairy firm was indirectly disclosed in the minutes of a meeting held by NASS's Advisory Committee on Agriculture Statistics.

## FIRST CAUSE OF ACTION

### (Negligent Misrepresentation)

75. Plaintiffs reallege each allegation in each of the paragraphs above as if fully set forth herein.

76. At all relevant times, the Dairy Market Enhancement Act of 2000 obligated DairyAmerica, among others, to report to NASS the price, quantity and moisture content of the dairy products it sold. NASS provided instructions for reporting such information. The instructions required DairyAmerica and the other reporting firms to exclude sales in which the selling price was set (and not adjusted) 30 or more days before the transaction was completed, unless the sale was through the DEIP.

77. From approximately January 2002 through April 2007, DairyAmerica negligently and in violation of the NASS instructions included long-term, non-DEIP, forward contracted NFDM volume and price information in its weekly submissions to NASS.

78. The improperly-reported NFDM prices had the effect of lowering the raw milk prices set by USDA using the FMMO formulas.

79. DairyAmerica knew that the prices it reported to NASS were intended to be, and would be, used in FMMO formulas to set the prices that were paid to Plaintiffs and the other class members for the purchase of raw milk.

80. When including long-term forward contracted NFDM volumes and prices in their weekly submissions to NASS, DairyAmerica failed to exercise reasonable care. The facts available to DairyAmerica did not reasonably lead to the conclusion that said conduct was proper.

81. Plaintiffs and the other members of the class justifiably and reasonably relied to their detriment on the prices set by USDA under the FMMOs as being the price calculated based on the correct reporting of prices and volumes to NASS. Such reliance was foreseeable and intended by Defendants.

82. As a direct and proximate result of DairyAmerica' negligent conduct and statements, Plaintiffs and the other class members have suffered and are entitled to compensatory and consequential damages, in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**

**(Unlawful, Unfair and/or Fraudulent Business Practices in**
**Violation of Cal. Bus. & Prof. Code §§ 17200, et seq.)**

83. Plaintiffs reallege each allegation in each of the paragraphs above as if fully set forth herein.

84. The acts and practices engaged in by Defendants, and described herein, constitute unlawful, unfair and/or fraudulent business practices, in that: (a) Defendants' practices, as described herein, violate the Dairy Market Enhancement Act of 2000, and/or (b) the justification for Defendants' conduct is outweighed by the gravity of the consequences to the Plaintiffs and class members, and/or (c) Defendants' conduct is immoral, unethical, oppressive, unscrupulous or substantially injurious to Plaintiffs and class members, and/or (d) the conduct of Defendants constitutes fraudulent, untrue or misleading actions in that such conduct has a tendency to deceive Plaintiffs and class members. Such conduct violates Business and Professions Code §§ 17200, et

1 seq.

2     85.    Under California Business and Professions Code § 17204, Plaintiffs and class members have suffered injury in fact and have lost money as a result of such unfair competition.

    86.    Defendants' unlawful, unfair and/or fraudulent business acts and practices are described herein and include, but are not limited to, DairyAmerica's misreporting of long-term, forward contracted NFDM prices to NASS which deprived tens of thousands of dairy farmers of the fair market value for the sale of raw, Grade A milk and which directly benefited Defendants financially.

    87.    Pursuant to California Business and Professions Code § 17203, Plaintiffs and class members are therefore entitled to such orders or judgments as are necessary to prevent the Defendants' use or employment of practices which constitute unfair competition, including orders or judgments for restitution, disgorgement of all profits traceable to the class and accruing to Defendants because of its unlawful, unfair and/or fraudulent business practices, appropriate relief, as alleged herein, and any other relief the Court deems appropriate.

## THIRD CAUSE OF ACTION

### (Unjust Enrichment)

    88.    Plaintiffs reallege each allegation in each of the paragraphs above as if fully set forth herein.

    89.    As a result of the conduct described above, Defendants have been unjustly enriched at the expense of Plaintiffs and members of the class. Specifically, DairyAmerica's negligent actions as described above enabled Defendants to pay below market prices to Plaintiffs and other class members for the purchase of raw milk, thus unjustly providing considerable economic benefits to Defendants.

    90.    Defendants should be required to disgorge these economic benefits. It would be unjust to permit Defendants to retain economic benefits, and to deprive Plaintiffs and other class members of those economic benefits, which were obtained as a result of DairyAmerica's negligence.

**PRAYER FOR RELIEF**

WHEREFORE, Individual and Representative Plaintiffs, on behalf of themselves and all others similarly situated, request of this Court the following monetary and equitable relief:

A. An order certifying that the action may be maintained as a class action and appointing Plaintiffs and Plaintiffs' undersigned counsel to represent the class;

B. Compensatory and consequential damages suffered by Plaintiffs and members of the class in an amount to be determined at trial, including any damages as may be provided for by statute;

C. Reasonable attorneys' fees;

D. Costs of suit;

E. Pre-and post-judgment interests; and

F. Such other and further relief as this Court may deem necessary or proper.

DATED:  March 6, 2009

/s/ Benjamin D. Brown
BENJAMIN D. BROWN (SBN 202545)

DANIEL A. SMALL
VICTORIA S. NUGENT
GEORGE F. FARAH
**COHEN MILSTEIN SELLERS & TOLL, PLLC**
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC  20005
Telephone:   (202) 408-4600
Facsimile:    (202) 408-4699
bbrown@cohenmilstein.com
dsmall@cohenmilstein.com
vnugent@cohenmilstein.com
gfarah@cohenmilstein.com

JOSEPH J. TABACCO, JR. (SBN 75484)
jtabacco@bermandevalerio.com
CHRISTOPHER T. HEFFELFINGER (SBN 118058)
cheffelfinger@bermandevalerio.com
ANTHONY D. PHILLIPS (SBN 259688)
aphillips@bermandevalerio.com
**BERMAN DeVALERIO**
425 California Street, Suite 2100
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382

*Counsel for Plaintiffs and the Proposed Class*