IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GERALD CARLIN, JOHN RAHM, PAUL ROZWADOWSKI, and BRIAN WOLFE, individually and on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>DAIRY AMERICA, INC., and CALIFORNIA DAIRIES, INC.,<br><br>Defendants. | NO. 1:09-CV-00430-AWI-DLB<br><br>ORDER ON DEFENDANTS' MOTION TO DISMISS<br><br>[Document # *50*] |

This is a putative class action in diversity arising from the alleged misreporting of pricing data by Defendants Dairy America, Inc., ("Dairy America") and California Dairies, Inc. ("California Dairies") (collectively "Defendants") which resulted in depressed prices paid to plaintiffs for raw milk during the period between January 1, 2002, through April 30, 2007. This case is the lead case of four cases that were consolidated by an order filed on May 29, 2009. In this memorandum opinion and order, the court considers the separate motions of Dairy America and California Dairies to dismiss all claims set forth in the First Amended Complaint ("FAC") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Diversity jurisdiction exists pursuant to 28 U.S.C. § 1391(a). Venue is proper in this court.

///

///

**FACTUAL BACKGROUND**

I.   **The Parties**

The named plaintiffs are five dairy farmers located in states other than California who sold raw milk that was priced according to Federal Milk Marketing Orders ("FMMO's") during the time period between January 1, 2002, and April 30, 2007. The FAC asserts claims on behalf of a class of plaintiffs that sold raw milk under the same FMMO's during the same time period. The Plaintiffs in the cases that were consolidated by the court's order of May 29, 2009, are similarly situated dairy farmers whose complaints allege claims that are substantially similar to those set forth in the FAC.

Although there is some disagreement as to the specific details of its business identity, it is not disputed that Dairy America is an entity established by a group of nine dairy cooperatives for the purpose of marketing dairy products manufactured by the cooperatives. Relevant to this action, the products manufactured by the cooperatives and marketed by Dairy America include nonfat dry milk ("NFDM"), buttermilk and whole milk powder. California Dairies is a dairy cooperative formed in 1999 as a result of the merger of California Milk Producers and Danish Creamery Association. The parties agree that California Dairies is a major, but not the sole, stakeholder in the Dairy America marketing cooperative. Plaintiffs allege, and California Dairies vigorously disputes, that Dairy America is an agent of California Dairies.

II.   **Raw Milk Pricing Procedures**

Pursuant to the Agricultural Marketing Agreement Act of 1937 ("AMAA"), the United States Department of Agriculture supports milk prices by establishing a minimum price structure for milk and milk products. The method by which this is accomplished is admittedly complex. The FAC, as well as the parties' pleadings describe the system in a level of detail that need not be repeated here. The parties appear to agree at least as to the general means by which the minimum price for raw milk is determined. The following is an abbreviated version of that process drawn primarily from the FAC.

The AMAA establishes ten geographical regions in which minimum milk pricing structures are determined by separate FMMO's[1] for each area. FMMO's set minimum prices for categories of products made from raw milk. Class I includes beverage products; Class II includes soft manufactured products, such as ice cream, cottage cheese and yoghurt; Class III includes hard cheese and cream cheese; and Class IV includes butter and dry milk products. Although FMMO's set minimum prices according to a tiered pricing system that is based on end use of the milk, a region-specific single minimum price for raw milk at the farm is determined by a weighted average of prices for milk products in categories I through IV.

During the period of time relevant to this action, the methods for calculating the minimum prices reflected in the FMMO's were mandated through the Dairy Market Enhancement Act of 2000 ("DMEA"). Pursuant to the DMEA, weekly surveys are conducted by the National Agricultural Statistics Service ("NASS") to collect wholesale prices for representative products within each category. The survey information is gathered from product manufacturers (sometimes referred to in pleadings as milk "handlers") who produce a million pounds or more of manufactured product per year. The FMMO minimum prices for milk for class III (hard cheese) and IV (dry milk and butter) products are determined by applying the wholesale prices reported in the weekly surveys to formulae specified by the FMMO. The FMMO minimum prices for products in Classes I and II are derived by mathematic formulae from the prices determined in Classes III and IV.

Of significance to this action, one of the major wholesale pricing inputs collected by NASS for computation of the FMMO minimum price for milk for Class IV products is the wholesale price for NFDM. The DMEA requires handlers to submit NASS survey information according to instructions that, among other things, direct the handler to exclude from the survey wholesale prices for NFDM for forward sales contracts. Forward sales contracts are defined as

---

[1] The court infers from the facts set forth in the FAC that the term FMMO refers to both the geographical area and the Federal Milk Marketing Order that sets the minimum pricing structure in that area.

contracts in which the selling price is set more than 30 days before the completion of the transaction. It appears undisputed that forward sales contracts generally reflected lower prices for NFDM than were reflected in contracts that were completed at or near the time of the transaction during the time period in question.

It is not disputed that, during the time in question, Dairy America submitted pricing information to the NASS survey that improperly included wholesale prices for forward contracts for NFDM. Plaintiffs allege, and Defendants do not appear to dispute, that approximately ninety percent of the contracts executed by Dairy America and reported in the weekly NASS surveys were forward contracts that should not have been reported in the NASS surveys according to DMEA procedures. Plaintiffs contends that, because forward contract prices were significantly below spot prices during the time period in question, the minimum prices set by the FMMO's for raw milk were significantly lower than would have been the case if the information provided by Dairy America to NASS had been provided according to instructions.

The FAC alleges four claims for relief; each claim appears to be alleged against both Defendants. The first and second claims for relief allege negligent misrepresentation and Negligent Interference with Prospective Economic Advantage, respectively, both under California common law. Plaintiffs' third claim for relief alleges violation of California's Unfair Business Practices Law, California Business and Professions Code § 17200, et seq. Plaintiffs' fourth claim for relief alleges unjust enrichment under California common law.

## PROCEDURAL HISTORY

The complaint in this action was filed on March 6, 2009. The currently operative FAC was filed on April 3, 2009. On April 15, 2009, Plaintiffs in this case moved for consolidation of five related cases: 09-CV-0607, 09-CV-0558, 09-CV-0237, 09-CV-0556, and 09-CV-0233. Plaintiffs' motion to consolidate was granted on May 29, 2009. Defendants California Dairies and Dairy America filed separate motions to dismiss on June 2, 2009. Defendant Dairy America filed a request for judicial notice on the same date. Plaintiffs filed separate oppositions to both

4

1 motions on July 16, 2009. Defendants' replies were filed on August 13, 2009. Plaintiffs moved to file a sur-reply to address additional case authority on August 31, 2009. California Dairies filed an opposition to Plaintiffs' sur-reply on September 2, 2009. The hearing on Defendants' motion to dismiss was vacated and the matter was taken under submission as of August 31, 2009.

**LEGAL STANDARD**

A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure can be based on the failure to allege a cognizable legal theory or the failure to allege sufficient facts under a cognizable legal theory. Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 533-34 (9th Cir. 1984). To withstand a motion to dismiss pursuant to Rule 12(b)(6), a complaint must be set forth factual allegations sufficient "to raise a right to relief above the speculative level." Bell Atlantic Corp. V. Twombly, 550 U.S. 544, 555 (2007) ("Twombly"). While a court considering a motion to dismiss must accept as true the allegations of the complaint in question, Hospital Bldg. Co. V. Rex Hospital Trustees, 436 U.S. 738, 740 (1976), and must construe the pleading in the light most favorable to the party opposing the motion, and resolve factual disputes in the pleader's favor, Jenkins v. McKeithen, 395 U.S. 411, 421, reh'g denied, 396 U.S. 869 (1969), the allegations must be factual in nature. See Twombly, 550 U.S. at 555 ("a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"). The pleading standard set by Rule 8 of the Federal Rules of Civil Procedure "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) ("Iqbal").

The Ninth Circuit follows the methodological approach set forth in Iqbal for the assessment of a plaintiff's complaint:

> "[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly

5

give rise to an entitlement to relief."

Moss v. U.S. Secret Service, 572 F.3d 962, 970 (9th Cir. 2009) (quoting Iqbal, 129 S. Ct. At 1950).

"As a general rule, 'a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion.' [Citation.]" Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001). However, a district court may consider materials in a 12(b)(6) motion to dismiss that are not part of the pleadings but that are 'matters of public record' of which the court may take judicial notice pursuant to Federal Rule of Evidence 201. Id. Specifically, a district court may take judicial notice of public records related to legal proceedings in both state courts and in the district court. See Miles v. State of California, 320 F.3d 986, 987 (9th Cir. 2003) (district court taking judicial notice of related state court proceedings); Scott v. Kuhlmann, 746 F.2d 1377, 1378 (9th Cir. 1894) (district court takes notice of prior related proceedings in the same court).

**DISCUSSION**

Defendant Dairy America asserts five grounds for dismissal of Plaintiffs' claims generally and also asserts grounds for dismissal of each of Plaintiffs' state law claims individually. In moving for dismissal of the entirety of the complaint, Dairy America contends Plaintiffs' action: (1) is barred by the filed rate doctrine; (2) must be dismissed because the DMEA confers no right of private enforcement; (3) must be dismissed for failure to join USDA, an "indispensable party immune from suit;" (4) must be dismissed because the price reporting program created no legal obligation on Defendants' part; and (5) Plaintiffs' state law claims are preempted by DMEA. For the reasons that follow, the court will find that Plaintiffs are barred from recovering damages against Defendants under the filed rate doctrine. Because the court will find that the issues presented by Defendants' motion to dismiss are settled by reference to the filed rate doctrine, the other bases Defendants advance in support of their motion to dismiss will not be addressed.

## I. Filed Rate Doctrine

"The [filed rate] doctrine is a judicial creation that arises from decisions interpreting federal statutes that give federal agencies exclusive jurisdiction to set rates . . . ." E. & J. Gallo Winery v. Encana Corp, 503 F.3d 1027, 1033 (9 Cir. 2007) ("Gallo"). The doctrine is closely related to principles of federal preemption in that it bars "challenges under state law and federal antitrust laws to rates set by federal agencies. Id. "At its most basic, the filed rate doctrine provides that state law, and some federal law (e.g. antitrust law), may not be used to invalidate a filed rate nor to assume a rate would be charged other than the rate adopted by the federal agency in question. [Citation.]" Ark. La. Gas Co. v. Hall, 453 U.S. 57, 580 (1980); Transmission Agency of N. Ca. V. Sierra Pacific Power Company, 295 F.3d 918, 929 (9th Cir. 2002). "Since the 1920s, the 'filed rate' or 'filed tariff' doctrine has barred antitrust recovery by parties claiming injury from the payment of a filed rate for goods or services. [Citation.]" County of Stanislaus v. Pacific Gas and Electricity Co., 114 F3d 858, 862 (9th Cir. 1997). The filed rate doctrine was first formally recognized in the context of rates set by the Interstate Commerce Act. See Keogh v. Chicago & Nw. Ry. Co., 260 U.S. 156 (1922). Since then, the doctrine has been applied in the context of challenges to rates set by the Natural Gas Act, the Federal Power Act, and the Communications Act, among others. Gallo, 503 F.3d at 1033.

From the court's perspective, Defendants' contention that the filed rate doctrine bars Plaintiffs' claims resolves into two separate questions: first, whether the minimum rates for raw milk set by the Secretary are the sort of rates that would generally be insulated from challenge by the filed rate doctrine; and second, whether the filed rate doctrine should apply in the particular factual circumstances of this case.

### *A. The Filed Rate Doctrine Applies Generally to Minimum Rates for Raw Milk*

The duty and authority of the Secretary of the Department of Agriculture (hereinafter, the "Secretary") to determine and enforce minimum prices for milk and milk products arises from the enforcement provisions of the Agricultural Adjustment Act, 7 U.S.C. § 601 et seq.

Specifically, the Secretary's authority to set and enforce minimum prices is found in section 608c. See United States v. Rock Royal Co-op, Inc., 307 U.S. 533, 574-575 (1939) (noting purpose of act to maintain orderly markets in commodities); United States v. Mills, 315 F.2d 828, 833 (4th Cir. 1963) (noting obligation of Secretary to set reasonable minimum commodity prices in consideration of price levels for farm inputs). It is important to note that the authority granted in section 608c is broad and an order promulgated pursuant to that section may contain, in addition to rates, other provisions that are not the subject of the filed rate doctrine. Thus, while the court may use the term "FMMO" in reference to a minimum rate contained therein, the court does not mean to imply that the FMMO and the rate set forth in it are the same thing.

Since the filed rate doctrine was first articulated in the Keogh decision in 1922, it has been applied in a variety of contexts. However, case authority supporting the application of the doctrine in the context of the Agricultural Adjustment Act is, at best, sparse and federal cases that apply the doctrine in the context of FMMO's are non-existent. See In re Southeastern Milk Antitrust Litigation, 2008 WL 2368212 (E.D. Tenn. 2008) at *7 (noting the lack of binding or persuasive authority applying doctrine to preclude challenge to rates paid for raw milk sales). As in Southeastern Milk Antitrust Litigation, the only case cited by Defendants that illustrates the use of the filed rate doctrine to preclude an action attacking a rate set by a governmental agency for the sale of raw milk is found in a Wisconsin State case that borrowed the doctrine for application in an action that challenged a rate set by a state agency under a state marketing law. See id. (Citing Servais v. Kraft Foods, Inc., 631 N.W.2d 629 (Wis.App. 2001).

While case authority affirmatively applying the filed rate doctrine in the context of wholesale of raw milk is lacking, cases that mention the doctrine without applying it are instructive. In Southeastern Milk Antitrust Litigation, the court declined to apply the filed rate doctrine where the rates being challenged were not the minimum blend rate determined by the Secretary, but were over-order premiums above the minimum rates that were allegedly manipulated by the defendants anti-competitive behavior. Id. at *7. Similarly, in Ice Cream

Liquidation, Inc., v. Land O'Lakes, Inc., 253 F. Supp.2d 262 (D.Conn. 2003), the court declined to apply the filed rate doctrine to preclude an action alleging antitrust manipulation of prices charged by handlers to wholesale purchasers of manufactured, finished, dairy products where the rates for such charges were not set as part of the FMMO. Id. at 275-276. Of some significance, the court in Ice Cream Liquidation acknowledged in dictum that "any claim challenging [rates actually set by an FMMO] would be barred by the filed rate doctrine." Id. at 275-276.

Legal authority points to two possible sources of immunity from liability for actions, such as those alleged against Defendants, that affect wholesale milk commodity prices. The first source is statutory immunity under the DMEA and the second is the filed rate doctrine. For the sake of clarity, the court will briefly address statutory immunity under the DMEA and why it does not apply in this case. Section 608(b) of title 7 grants antitrust immunity to "marketing agreements" between the Secretary and milk producers. In Cow Palace, Ltd. V. Associated Milk Producers, 390 F.Supp. 696 (D. Colo. 1975), and In re Midwest Milk Monopolization Litigation, 380 F.Supp 880 (W.D. Mo. 1974), district courts demonstrated reluctance to extend the immunity from liability under the Sherman Act to anti-competitive activities by defendants that did not directly involve marketing agreements between the Secretary and producers or handlers. Both cases noted that the Supreme Court's decision in United States v. Borden Co., 308 U.S. 188 (1938), later affirmed by Maryland & Virginia Milk Producers Ass'n, Inc. v. United States, 362 U.S. 458 (1960), held that the antitrust immunity provided by section 608(b) extends no further than to the marketing agreements. Other forms of anti-competitive behavior may be challenged under the Sherman Act or similar antitrust law. See Midwest Milk, 380 F.Supp. at 885-886; Cow Palace, 390 F.Supp. at 699-700 (both refusing to extend immunity where alleged antitrust violations were not alleged to have involved marketing agreements).

While neither Cow Palace or Midwest Milk directly address the issue of whether a minimum price set pursuant to section 608(c) is a "marketing agreement" within the meaning of section 608(b), both strongly suggest that the two are distinct. The court concludes that for

9

purposes of application of the filed rate doctrine, the minimum raw milk prices set by the FMMO's are not marketing agreements within the meaning of section 608(b). This conclusion neither negates or supports the application of the filed rate doctrine in the instant case, it merely serves the interest of clarity.

As Plaintiffs point out in their opposition to Defendants' motion to dismiss, "[t]he 'animating purposes' of the filed rate doctrine are to address: '(1) a concern with potential discrimination in rates between ratepayers, also known as the "nondiscrimination" strand,' and '(2) a concern with preserving the exclusive role of agencies in approving reasonable rates, the "nonjusticiability" strand.' [Citation.]" Doc. # 65 at 12:4-7 (quoting Blaylock v. Firm Am. Title Ins. Co., 504 F.Supp.2d 1091, 1102 (W.D. Wash. 2007). The power of the Secretary to regulate market conditions for the sale of raw milk is rooted in the Commerce Clause as expressed in the Declaration of Conditions for the Agricultural Adjustment Act at 7 U.S.C. § 601. Section 602 sets forth the policy considerations that animate the exercise of that regulatory power. Among other purposes, the Act seeks to "maintain such orderly marketing conditions for agricultural commodities in interstate commerce as will establish, as the prices to farmers, parity prices as defined by section 1302 (a)A(1) of this title." 7 U.S.C. § 602(1). At the same time the Act seeks to "protect the interests of the consumer" by "authorizing no action under this chapter which has for its purpose the maintenance of prices to farmers above the level which it is declared to be the policy of Congress to establish in subsection (1) of this section." § 602(2).

Application of the filed rate doctrine to rates set by the Secretary for minimum prices for raw milk is consistent with both the purposes of the Agricultural Adjustment Act and the animating purposes of the filed rate doctrine. The purpose of the Act to achieve both parity pay for farmers and reasonable prices for consumers is consistent with the purpose of the filed rate doctrine to avoid discriminatory or predatory pricing arrangements. Likewise, the nonjusticiability strand of the filed rate doctrine supports Congress's right to allocate jurisdiction, and therefore justiciability, of commodity pricing for goods flowing in interstate commerce away

from courts and to an agency of the federal government.

The court concludes that, in general, the filed rate doctrine does apply narrowly to bar claims challenging only minimum rates set pursuant to the Agricultural Adjustment Act.

Plaintiffs oppose the general applicability of the filed rate doctrine to minimum milk prices set by FMMO's by contending that the doctrine itself stands on shaky ground and should not be "expanded" to cover minimum rates for the sale of raw milk. The court disagrees. First, notwithstanding Plaintiffs' contention that the filed rate doctrine should not be "expanded," there is no indication that courts have been reluctant to apply the filed rate doctrine in any context where legislature has allocated rate-setting authority to a federal agency. Second, there is no basis upon which the court can make a distinction between rate-setting in the context of minimum prices for raw milk pursuant to 7 U.S.C. § 608c and rate setting in any other context where courts have historically applied the doctrine. Third, the court can find nothing in existing case authority to suggest that courts of this circuit would be reluctant to apply the filed rate doctrine in an instance where an action challenged a rate for raw milk that was set by the Secretary pursuant to section 608c.

### B.     *The Filed Rate Doctrine Applies Under the Facts of this Case*

Plaintiffs' claims for monetary damage are, so far as the court can discern, solely the product of minimum prices for raw milk set by FMMO's that were artificially depressed by Defendants' misreporting of prices for NFDM. The crux of Plaintiffs' claims is that the minimum raw milk prices set forth in the FMMO's would have been higher had Defendants not misreported forward contract prices for NFDM. The monetary damages Plaintiffs' claim are to be determined, as the court understands it, by calculating the difference between raw milk minimum prices as set forth in the FMMO's and what those prices would have been had Defendants not submitted unauthorized forward contract sales prices. In other words, Plaintiffs' damages can only be ascertained by reference to rates set by the Secretary pursuant to the FMMO's during the time period in question.

1 | This is precisely what the filed rate doctrine forbids.

Plaintiffs argue that, notwithstanding the general applicability of the filed rate doctrine to raw milk prices set in FMMO's, the filed rate doctrine should not be applied to bar Plaintiff's claims in *this* case. Plaintiffs' first argument is that the filed rate doctrine should not apply because the USDA "never meaningfully approved the NFDM prices submitted by Defendants nor the monthly minimum milk prices." The crux of Plaintiffs' argument is that the Secretary never meaningfully approved the rates because the Secretary did not audit Defendants' submitted pricing reports to determine if the reports represented proper pricing inputs. In a similar vein, Plaintiffs' contend the filed rate doctrine should not apply here because the rates were improperly filed. Finally, Plaintiffs contend the filed rate doctrine should not apply in this case because the Secretary, upon notification that Defendants' pricing inputs were improperly submitted, disapproved the rates for the time period in question. The court will consider each contention in turn.

### *1. Meaningfully Reviewed*

Although the "meaningfully reviewed" requirements has been recognized as a basis for refusing application of the filed rate doctrine, In re Southeastern Milk Antitrust Litigation, 2008 WL 2368212 (2008 E.D. Tenn) at *7, the cases applying the "meaningfully reviewed" requirement are distinguishable from the instant case. The common theme that appears in cases where the filed rate doctrine is not applied because the rates filed are not meaningfully reviewed is the existence of some feature of the regulatory system itself that prevents review of those rates. For example, in Brown v. Ticor Title Ins. Co., 982 F.2d 386 (9th Cir. 1992), the Ninth Circuit held the filed rate doctrine did not apply where rates were filed in accordance with state regulations where some of the states required only non-disapproval of filed rates. Id. at 393. The Brown court noted that "'[t]he *mere fact of failure to disapprove, however, does not legitimize otherwise anticompetitive conduct . . . .'"* Id. (quoting Wileman Bros. & Elliott, Inc. v. Giannini, 909 f.2d 332, 337-338 (9th Cir. 1990). Similarly, in Security Servs., Inc. v. Kmart

Corp., 511 U.S. 431 (1994) (Kmart), the Supreme Court held the filed rate doctrine inapplicable were filed rates were "'void-for-nonparticipation'" under the rules of the governing commission where the carrier seeking to apply the filed rate was not a participant. Id. at 438 - 439; but see Northwest Transportation, Inc. v. Horn's Poultry, Inc., 37 F.3d 1237, 1238 - 1239 (7th Cir. 1994) (holding Kmart inapplicable where there was no commission rule voiding filed tariffs for non-participation).

In their sur-reply, Plaintiffs elaborate on their "not meaningfully reviewed" argument as well as on their "not properly filed" argument. Plaintiffs' sur-reply attaches two cases which Plaintiffs claim provide recent authority supporting their contention that the filed rate doctrine should not apply under the facts of this case. The cases submitted as attachments to Document # 72 are In re: Pennsylvania Title Ins. Antitrust Litig., 2009 Lexis 62648 (E.D. Penn. 2009) ("Penn. Title"), and McCray v. Fidelity Nat'l Title Ins. Co., 2009 Lexis 60329 (D.Del. 2009). The court has reviewed both cases and finds neither lends support for Plaintiffs' contentions. To the contrary, as this court sees it, it is Defendants' contentions that appear to be supported.

Both McCray and Penn. Title, are cases that examine the impact of the filed rate doctrine on claims challenging rates for mortgage title insurance policies. In McCray, plaintiffs claimed insurance rates promulgated by a state regulatory agency were unlawfully inflated because they included costs of "kickbacks," gifts and "other financial enticements." While the McCray courted noted that some courts have declined to apply the filed rate doctrine where the reviewing agency's role is confined to disapproval only of filed rates, McCray, 2009 Lexis 60329 at *16 - *17 (citing Brown v. Ticor and Wileman Bros. as examples of court decision denying application of filed rate doctrine in "file and use" regulatory schemes); the court declined to apply the Ninth Circuit's holdings in those cases to the file and use regulatory scheme in force in Delaware. Id. at *17 - *18.

The Penn. Title court similarly addressed contentions that the filed rate doctrine should not apply to the "file and use" regulatory scheme in question in that case. The court observed

13

that for meaningful review to occur, a "statutory scheme must provide the regulatory agency with authority to assess rates' compliance with the statutory requirements for filed rates." Penn. Title, 2009 Lexis 63648 at *32 (citing Tex. Commercial Energy v. TXU Energy, Inc., 431 F.3d 503, 510 (5th Cir. 2005). However, the Penn. Title court also observed that no particular level of assessment was required by case law, id. at *40, and concluded that "as long as the regulatory scheme requires the filing of rates with a government agency that has legal authority to review those rates, the filed rate doctrine applies regardless of the actual degree of agency review of those filed rates. Id. at *33. The essence of Plaintiffs' contention that the filed rate doctrine should not apply for lack of meaningful review is that USDA lacked authority to audit Defendants' pricing inputs. There is absolutely no support, in Penn. Title, McCray, or any other source cited by Plaintiffs to indicate that authority to conduct meaningful review must include authority to audit.

### *2. Procedurally/Technically Improper*

The issue of whether the filed rate doctrine applies where, as here, rate data is improperly filed with the regulatory agency is closely related to the issue of failure of the regulatory agency to conduct meaningful review. As the court in Penn. Title points out, the Supreme Court's decision in Kmart delineated the scope of the "properly filed requirement." See Penn. Title, 2009 Lexis 62648 at *45 (finding that, pursuant to Kmart, filed rate "doctrine does not apply where improperly filed rates: (1) make it impossible for the purchaser to calculate the rate to be charged [. . .]; or (2) are void per se under a statutory or regulatory scheme"). The Kmart Court held that "neither procedural irregularity nor unreasonableness nullifies a filed rate; . . . ." Kmart, 511 U.S. at 441. Courts in this circuit have relied on this holding in Kmart to support the conclusion that a rate that is merely improperly filed does not render the filed rate doctrine inapplicable. See, e.g., In re Hawaiian & Guamanian Cabotage Antitrust Lit., 2009 WL 2581510 (W.D. Wash. 2009) at *12. Indeed, if, as was held in County of Stanislaus v. Pac. Gas & Elec. Co., 114 F.3d 858 (9 Cir. 1997), the filed rate doctrine barr's a plaintiff's recovery where the

rates filed were deliberately inflated in a price fixing scheme, there is no logical justification for holding the filed rate doctrine inapplicable where the defendant's conduct is merely erroneous. See id. at 1043; See also AT&T Corp. v. JMC Telecom, LLC, 470 F.3d 525, 535 (3rd Cir. 2006) ("there is no fraud exception to the filed rate doctrine'").

The conduct complained of here amounts to the filing of rates that were technically improper. In the instant case, there are no agency regulations that invalidate filed rates or tariffs nor is there any indication that the misreported data invalidated the minimum rates calculated by the Secretary as a matter of law. There is nothing in the statutory scheme that indicates that the misfiling of pricing information with the USDA invalidates the rates promulgated in FMMO's or makes the minimum rates for raw milk per se invalid.

Plaintiffs' reliance on E. & J. Gallo Winery v. Encana Corp, 503 F.3d 1027 (9th Cir. 2007) ("Gallo") is similarly unavailing. In Gallo, the rates in question were based on indices calculated by the publisher of a trade magazine according to proprietary formulae based on pricing inputs that were voluntarily submitted by natural gas wholesalers. See id. at 1031 (discussing the role and origin of the natural gas price indices). Notwithstanding the degree of separation between actual administrative oversight by the Federal Energy Regulatory Commission ("FERC") and the rates themselves, the Ninth Circuit held that the rates published in the indices could not be challenged under the filed rate doctrine to the extent those rates were the result of price inputs from *jurisdictional* sales. However, the Gallo court also held that the defendants in that case had failed to prove that all of the pricing inputs into the indices were the result of sales subject to FERC's jurisdiction. Specifically, the Gallo court held that certain sales of natural gas, such as first sales and so-called "wash trades" were not FERC-authorized sales and that index rates could be challenged to the extent they reflected such non-jurisdictional sales. See id. at 1045 - 1048 (discussing whether the filed rate doctrine applies to damage claims based on natural gas price indices).

The facts of the instant case bear little resemblance to those in Gallo. There is no

allegation that any of the pricing inputs in this case were outside USDA's jurisdiction, nor is there any indication that any portion of the process by which the rates were established outside USDA's jurisdiction. The court concludes the filed rate doctrine is not inapplicable in this case on the ground that the rates filed were improperly filed.

### *3. Disapproval of the Rates by the Secretary Due to Defendants' Mis-filings*

The third reason Plaintiffs advance to support their contention that the filed rate doctrine should not apply under the particular facts of this case is that the filed rate doctrine does not apply to rates that are disapproved by the regulating agency as unreasonable. Plaintiffs' complaint alleges that Defendants' misreporting of NFDM forward pricing contracts was discovered on or about April 12, 2007, and that subsequent correction of the pricing inputs produced corrected prices for NFDM for the period from April 29, 2006, through April 14, 2007, that were higher by about two cents per pound than were the prices that had been calculated using Defendants' erroneous pricing data. These facts are not disputed by Defendants.

It is not disputed that USDA determined that the rates calculated in the FMMO's between April 29, 2006, and April 14, 2007, were erroneous and that other rates should have applied based on corrected pricing inputs. It is also true, as Plaintiffs contend, that filed rates are not enforceable where the regulating agency disapproves those rates. City of Groton v. Connecticut Light & Power Co., 662 F.2d 921, 931 (2nd Cir. 1981). However, as the court in City of Groton observed, under the filed rate doctrine, rates that have been published but not acted upon by the regulatory agency may not be challenged because those rates "are the legal rates until suspended or set aside." Id. at 929. Thus, the issue raised by Plaintiffs' argument is not whether the filed rate doctrine applies to rates that have been disapproved, rather the issue before the court is whether the disapproval of rates by the regulating agency can be held by the courts to operate retroactively. For the reasons that follow, the court concludes that the USDA's disapproval of rates cannot be applied retroactively by the court to make the filed rate doctrine inapplicable over the time period in question.

In Interstate Commerce Comm'n v. American Trucking Ass'n, 467 U.S. 354 (1984) ("American Trucking"), the Supreme Court addressed the issue of whether the Interstate Commerce Commission ("ICC") could implement regulations pursuant to the Motor Carrier Act of 1980, Pub.L. 96296, 94 Stat. 793, that would allow the ICC to retroactively "reject" filed tariffs "submitted in substantial violation of a rate-bureau agreement once that tariff ha[d] gone into effect." Id. at 360. The American Trucking Court differentiated "rejection" from other actions the ICC could take with respect to tariffs – such as recision, modification or cancellation – by noting that "rejection" renders a tariff void *ab initio*. Id. at 358. The American Trucking Court held that the ICC was not empowered under the Motor Carrier Act to reject effective tariffs, id. at 363 - 364, but held the ICC could reject a tariff that was submitted in "substantial violation of rate-bureau agreements." Id. at 370 - 371; see also Cooperative Power Ass'n v. FERC, 739 F.2d 390, 391 n.3 (8th Cir. 1984) (noting the American Trucking Court "approved retroactive tariff rejection as a sanction for knowing violation of agreements." The Supreme Court later noted in Security Servs., Inc. v. K Mart Corp., 511 U.S. 431, 441 (1994), that the Court's decision in American Trucking "held that the [ICC] could retroactively void effective tariffs *ab initio* only if the action 'further[s] a specific statutory mandate of the Commission' and is 'directly and closely tied to that mandate.'" Id. at 441 (quoting American Trucking 476 U.S. at 367).

The case at bar is distinguishable from American Trucking in a number of critical ways. First, in the instant case, while the DMEA sets forth procedures for the submission and collection of milk pricing survey data, there is nothing to indicate a "statutory mandate" that would be furthered by the retroactive "rejection" of the minimum pricing structures set forth in the FMMO's in question. Further, even if there were such a statutory basis for application of the holding in American Trucking in the context of milk pricing, there is no allegation that the misreporting alleged against Defendants rises to the level of "knowing violation" that would justify the rejection of the minimum prices set forth in the FMMO's. Finally, and most

17

significantly, there is no indication of the intent of the regulatory agency, in this case the Department of Agriculture, to establish a disciplinary sanction for violations of the sort that are alleged against Defendants.

It is highly significant that the action in American Trucking was brought by an association of haulers as a response and a challenge to the announced intent of the ICC to establish the retroactive rejection of tariffs as a sanction for collusive pricing activities that were specifically prohibited by the Motor Carrier Act. Here, in contrast, Plaintiff is asking the court to administer such a sanction on its own, without any indication of the intent of the Secretary to make such a sanction generally applicable. While American Trucking stands for the proposition that a regulatory agency may sanction knowing violation of established rules governing the filing of tariffs by retroactively rejecting the filed tariffs, there is absolutely no support for the proposition that courts could impose such sanctions.

Based on the available authority, the court concludes that American Trucking constitutes the only exception to the generally established principle that the impact of the invalidation, recision, modification, or disapproval of filed rates is prospective only. The court concludes that the facts of this case are distinguishable from those of American Trucking and that the holding of American Trucking does not apply in this case. The court further concludes that it lacks authority to invalidate minimum rates for raw milk that were in force prior to the time those rated were disapproved or modified by the Secretary.

The court finds that, contrary to Plaintiffs' assertions, the filed rate doctrine operates to bar state claims that challenge minimum rates for raw milk established by FMMO's during the time period in question and that the application of the filed rate doctrine is not prevented because of the failure of the USDA to adequately audit pricing inputs or because of the USDA's ultimate disapproval of those rates. The court further finds that, because all of Plaintiffs' claims for money damages are state law claims that challenge the validity of minimum rates approved by the Secretary those claims are barred by the filed rate doctrine. Plaintiffs' claims for money

damages will therefore be dismissed.

**III. Injunctive Relief**

The filed rate doctrine does not bar claims for equitable relief. Georgia v. Pennsylvania R.R. Co., 324 U.S. 439 (1945). Plaintiffs' third claim for relief for unfair business practices under Cal. Bus. & Prof. Code §§ 17200 et seq. includes a request for injunctive relief. Plaintiffs' claim does not set forth any specifics regarding what injunctive relief is requested nor can the court guess what might be warranted given the fact Defendants' erroneous pricing inputs have been corrected and the rates recalculated. Neither party addresses Plaintiffs' request for injunctive relief in their pleadings. The court will therefore dismiss Plaintiffs' request for injunctive relief as inadequately pled with leave to amend.

**CONCLUSION AND ORDER**

So long as Plaintiffs' claims for monetary relief are predicated on the assertion that the prices Plaintiffs received for raw milk were the minimum prices set in FMMO's approved by the Secretary, and so long as the basis for Plaintiffs' claims for damages are based on the assertion that those prices would have been higher but for Defendants' misreporting of NFDM prices, Plaintiffs' state law claims are barred by the filed rate doctrine. While the court is mindful that this state of affairs leaves Plaintiffs without a means of redress under the FAC, the court observes that the non-justiciability of Plaintiffs' claims for monetary damages is the price the filed rate doctrine extracts for the administration of a scheme of federal price supports that provides necessary market security for milk producers. Because the filed rate doctrine renders Plaintiffs' state law claims for money damages non-justiciable under the currently-pled facts, the court declines to address Defendants' other grounds for dismissal.

"If a complaint is dismissed for failure to state a claim, leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." Schreiber Distributing Co. v. Serv-Well Furniture Co., Inc., 806 F.2d 1393, 1401 (9th Cir. 1986). The claims for money damages

Plaintiffs have alleged are non-justiciable under the facts that have been alleged in the FAC. Because the filed rate doctrine applies narrowly to bar only claims that are based on minimum prices paid for raw milk, the court is not willing at this point to make the determination that there are no other facts that Plaintiffs could possibly plead that would cure the deficiency. Further, as noted, the court cannot determine at this point that there is no non-money equitable remedy available to Plaintiffs. For that reason the FAC will be dismissed with leave to amend.

The court is also mindful that the filed rate doctrine consists of a body of law that has been the subject of conflicting interpretations. The court will therefore give favorable consideration to the motion of either party for interlocutory appeal on the issue of whether the filed rate doctrine bars Plaintiffs' claims in this case.

THEREFORE, Defendants' motion to dismiss Plaintiffs First Amended Complaint in its entirety is hereby GRANTED. Plaintiffs' First Amended Complaint is hereby DISMISSED in its entirety. Leave to amend is granted. Any amended complaint or motion for interlocutory appeal shall be filed and served not later than thirty (30) days from the date of service of this order.

IT IS SO ORDERED.

**Dated:    February 8, 2010**              **/s/ Anthony W. Ishii**
                                            CHIEF UNITED STATES DISTRICT JUDGE