1
2
3
4
5
6
7

8               **UNITED STATES DISTRICT COURT**

9               **EASTERN DISTRICT OF CALIFORNIA**

10

11    **GERALD CARLIN, JOHN RAHM,**            **1:09-cv-0430  AWI DLB**
      **PAUL ROZWADOWSKI AND BRIAN**
12    **WOLFE, individually and on behalf of**   **1:09-cv-0556  AWI DLB**
      **themselves and all others similarly**    **1:09-cv-0558  AWI DLB**
13    **situated,**                               **1:09-cv-0607  AWI DLB**

14               **Plaintiffs,**

15         **v.**                                **ORDER ON DEFENDANTS' RENEWED**
                                                 **MOTION TO DISMISS  PLAINTIFFS'**
16    **DAIRYAMERICA, INC. and**                 **FIRST AMENDED COMPLAINT**
      **CAIFORNIA DAIRIES, INC.,**
17                                               **Doc. Nos. 46,49, 121**
                 **Defendants.**
18

19

20

21         In this action in diversity for damages, defendants Dairy America, Inc. ("DairyAmerica")

22    and California Dairies, Inc. ("California Dairies") (collectively "Defendants") moved on June 2,

23    2009, to dismiss the First Amended Complaint of Plaintiffs Gerald Carlin, John Rahm, Paul

24    Rozwadowski, and Brian Wolfe ("Plaintiffs").  Defendants' motion to dismiss alleged, among

25    other defenses, that each of Plaintiffs' claims is barred by the judicially-created "filed rate

26    doctrine."  On February 9, 2010, the court granted Defendants' motion to dismiss solely on the

27    basis of Defendants' filed rate doctrine argument with the understanding that the contours of the

28    filed rate doctrine were unclear in the context of federal programs for dairy product price support

                                              1

1    and regulation and that the applicability of that doctrine to the facts of Plaintiffs' action should be

2    settled by the appellate court before the action could proceed further.  On August 7, 2012, the

3    Ninth Circuit Court of Appeals issued its decision holding that the filed rate doctrine applies

4    generally to minimum prices for milk and milk products set by the United States Department of

5    Agriculture ("USDA") pursuant to the Agricultural Marketing Agreement Act of 1937 (7 U.S. §

6    601 et seq.) ("AMAA").  The appellate court ruled however that where, as in this action, the

7    USDA later repudiates the minimum price determination because excludable pricing inputs were

8    wrongly submitted by dairy product producers, the filed rate doctrine does not bar state law

9    claims as are alleged in this action.  See generally, Carlin v. Dairy America, 688 F.3d 1117 (9th

10   Cir. 2012) and as amended by Carlin v. Dairy America, 705 F.3d 856 (9th Cir. 2013).

11         Currently before the court are Defendants' renewed motions to dismiss Plaintiffs' First

12   Amended Complaint ("FAC") on the legal theories other than filed rate doctrine that were argued

13   in Defendants' original motions to dismiss.  Diversity jurisdiction exists pursuant to 28 U.S.C. §

14   1332.  Venue is proper in this court.

15                              **PROCEDURAL HISTORY**

16         The FAC was filed in this court on April 3, 2009.  On May 29, 2009, the Magistrate Judge

17   granted Plaintiffs' motion to consolidate this case with cases numbered 09cv0556, 09cv0558 and

18   09cv0607.  The motions to dismiss which are the subject of this order were filed by California

19   Dairies on June 2, 2009, and by DairyAmerica on June 2, 2009, in a pleading that was amended

20   on June 4, 2009.  Plaintiffs filed oppositions to Defendants' motions to dismiss on July 16, 2009,

21   and Defendants filed their replies on August 13, 2009.  This court's decision granting

22   Defendants' motion to dismiss as barred by the filed rate doctrine was filed on February 9, 2010.

23   Pursuant to the stipulation of the parties, the court, which had granted the prior motion to dismiss

24   without prejudice, granted the parties' stipulated motion to dismiss the action with prejudice and

25   entered judgment on June 25, 2010.  The mandate of the appellate court's decision reversing this

26   court's dismissal was filed on January 22, 2013.  On March 29, 2013, Defendants filed pleadings

27   renewing and supplementing their motions to dismiss.  Plaintiffs filed responses and to

28   Defendants' supplemental filing and opposition to the renewed motion to dismiss on April 19,

                                            2

1   2013.  Defendants filed their reply on April 26, 2013.  The matter was taken under submission as

2   of May 13, 2013.

3   **FACTUAL BACKGROUND**

4   The facts of this case have been summarized on several occasions, but the most complete

5   summary is set forth in the Ninth Circuit case, <u>Carlin</u>, 705 F.3d at 856.  For purposes of this

6   discussion the court will draw upon the facts alleged in Plaintiff's FAC and on the facts as

7   compiled by the appellate court in <u>Carlin</u>.

8   This action concerns parties participating in a federal program that regulates the minimum

9   price paid to dairy farmers who produce raw milk ("Producers") by those who receive and handle

10   the raw milk for the purpose of producing dairy consumer products such as liquid milk, ice

11   cream, cheese, butter, and other milk products ("Handlers").  In this action, Plaintiffs are several

12   milk Producers from states other than California.  Defendant DairyAmerica is a nonprofit

13   agricultural cooperative association that functions as a sales agent for Defendant California

14   Dairies and eight other dairy Handler associations.

15   Under the AMAA, the means for regulating prices paid to Producers, and thereby

16   achieving a more even distribution of profits between Producers and Handlers are the Federal

17   Milk Marketing Orders ("FMMOs").  Pursuant to the AMAA, the promulgation of FMMOs is

18   delegated by the Secretary of the Department of Agriculture to the Administrator for the

19   Agricultural Marketing Service ("AMS").  Standard rule-making procedures apply to the

20   formulation of FMMO's, including hearings and input from stake-holders.  The AMS requires

21   that FMMOs "contain provisions which: (1) classify milk in accordance with the purpose for

22   which it is used, (2) set minimum prices for each *use* that a *handler* must pay, (3) require that said

23   process be uniform except that adjustments cam be made for production differentials, grade or

24   quality of the milk and locations of delivery, and (4) provide for the use of "blended" prices such

25   that all *Producers* of milk subject to a particular FMMO receive a uniform price for the milk

26   delivered to Handlers regardless of the ultimate use of the milk.  <u>Carlin</u>, 705 F.3d at 859 (citing 7

27   U.S.C. § 608c(5)) (italics added).

28   While all parties have agreed that the actual administration of the program involves fairly

3

1   complex data manipulation, the overall plan by which Producers receive payment for the raw

2   milk they sell to Producers is fairly straightforward.  Milk products are divided into four classes:

3   Class I milk is milk to be sold in liquid form, Class II is milk used to make ice cream, soft cheeses

4   and related products, Class III milk is used to produce harder cheeses, and Class IV milk is used

5   to make butter and related products.  Each Handler purchasing raw milk pays a price that is

6   specific to the class of products for which the milk is to be used and that is calculated by the

7   application of average wholesale prices of certain dairy consumer products during the previous

8   two months to formulas set within the FMMO.  The Handlers' payments do not go directly to the

9   Producers from whom the raw milk is purchased, but go to a payment pool called the "producers'

10  settlement fund."  Milk Producers are paid a "blended price" from the fund.  The price paid to the

11  Producers may vary according to qualities of the milk such as butterfat and protein content, but

12  the rate paid for a given quality of milk is the same within the same geographic area regardless of

13  the end use of the milk.  The blended price set by the FMMO is a *minimum* price that can be

14  adjusted upward based on premiums set by the Handlers.  Funds remaining in the settlement fund

15  after the producers are paid are distributed according to formulas that are governed by the end use

16  of the raw milk and are not important to this discussion.

17          Prior to the enactment of the Dairy Market Enhancement Act of 2000 ("DMEA"), 7

18  U.S.C. § 1637, wholesale price inputs used to calculate blended payment rates for milk were

19  collected from monthly average prices on the Chicago and New York Mercantile Exchanges.

20  Following the enactment of the DMEA, and during the time period relevant to this action,

21  wholesale price inputs for FMMOs were collected by the National Agricultural Statistical Service

22  ("NASS") through weekly surveys of Handlers who produced more than one million pounds of

23  manufactured product per year.  Each year between 2000 and 2008, the relevant time period for

24  this action, NASS required each producer submitting wholesale price and volume information

25  through the weekly surveys to complete an "'Annual Validation Worksheet' which included the

26  question '[w]hen reporting nonfat dry milk sales data to NASS, did you or can you: exclude

27  forward pricing sales (sales in which the selling price is established, and not adjusted, 30 or more

28  days before the transactions is completed)?'"  Carlin, 705 F.3d at 863.

The appellate court summarized the enforcement obligations/powers under the 2000 version of the DMEA as follows:

> For enforcement purposes, the DMEA provides that "[e]ach [reporting firm] . . . shall maintain, and make available to the Secretary, on request, original contracts, agreements, receipts, and other records associated with the sale or storage of any dairy products during the 2-year period beginning on the date of the creation of the records." 7 U.S.C. § 1637b(c)(6). The 2000 version of the DMEA also provided that "[t]he Secretary shall take such actions as the Secretary considers necessary to verify the accuracy of the information submitted or reported under this subtitle." Pub. L. No. 106-532, § 273(c)(3), 114 Stat. 2541.

Id.

Whether USDA had the authority to conduct audits of information submitted under the DMEA prior to 2008, it was not until 2008 that the DMEA was amended to require the "Secretary [to] quarterly conduct an audit of information submitted or reported under this subtitle and compare such information with other related dairy market statistics." Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-234, § 1510(b), 122 Stat. 9237 (codified at 7 U.S.C. § 1637b(c)(3)(B)). In Carlin, the Court of Appeals noted that the misreporting DairyAmerica is alleged to have committed was first reported in a March 2007 trade publication called "*The Milkweed*." In February 2008, "the USDA Office of the Inspector General ('OIG') issued a report regarding 'the April 2007 discovery of the error in the reporting of the nonfat dry milk prices.'" 705 F.3d at 864. The Carlin decision quotes extensively from the OIG's report, noting that it was determined in the report that the reporting error went undetected from 2002 until April 2007 resulting in the understatement of the "total classified value of mild regulated under the FMMO program for the period [from 2002 to 2007] was understated by $50 million." Id. at 865. The appellate court further noted that "AMS did not have the authority to audit a reporting firm's books when the misreporting occurred." Id.

## LEGAL STANDARD

A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure can be based on the failure to allege a cognizable legal theory or the failure to allege sufficient facts under a cognizable legal theory. Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 533-34 (9th Cir.1984). To withstand a motion to dismiss pursuant to Rule 12(b)(6), a complaint must set

5

forth factual allegations sufficient "to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) ("Twombly"). While a court considering a motion to dismiss must accept as true the allegations of the complaint in question, Hospital Bldg. Co. v. Rex Hospital Trustees, 425 U.S. 738, 740 (1976), and must construe the pleading in the light most favorable to the party opposing the motion, and resolve factual disputes in the pleader's favor, Jenkins v. McKeithen, 395 U.S. 411, 421, reh'g denied, 396 U.S. 869 (1969), the allegations must be factual in nature. See Twombly, 550 U.S. at 555 ("a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"). The pleading standard set by Rule 8 of the Federal Rules of Civil Procedure "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) ("Iqbal").

The Ninth Circuit follows the methodological approach set forth in Iqbal for the assessment of a plaintiff's complaint:

> "[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."

Moss v. U.S. Secret Service, 572 F.3d 962, 970 (9th Cir. 2009) (quoting Iqbal, 129 S.Ct. at 1950).

Claims sounding in fraud are subject to heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) requires that a claim sounding in fraud "must state with particularity the circumstances constituting fraud."

## DISCUSSION

Plaintiffs' FAC alleges four claims for relief. In order these are (1) negligent misrepresentation; (2) negligent interference with prospective economic advantage; (3) violation of California's Unfair Business Practices statute, Bus. & Prof. Code §§ 17200, et seq.; and (4) unjust enrichment. DairyAmerica's motion to dismiss argues that each of the individual claims

for relief is inadequately pled and, in addition, asserts general defenses against all of the claims. The general defenses alleged by DairyAmerica are: (1) the Dairy Market Enhancement Act of 2000 ("DMEA"), which DairyAmerica contends Plaintiffs' claims rely on, does not provide a private right of action for violation of its terms; (2) the USDA is a necessary party to Plaintiffs' action and cannot be joined; (3) the price reporting program that Plaintiffs allege was violated lacks the force of law; and (4) Plaintiffs' state law claims are preempted by the DMEA. California Dairies joins DairyAmerica's motion to dismiss and further contends that it is immune from Plaintiff's suit under California law in its capacity as a non-profit state commodity marketing association.

For purposes of this analysis, the court will determine first if each of Plaintiffs' state law claims are adequately pled.  The court will then determine if the claims that are adequately pled are subject to Defendants' general defenses.

**I. Individual Claims – Sufficiency of Pleading**

      *A.  Negligent Misrepresentation*

The elements of negligent misrepresentation are: (1) the defendant made a false representation as to a past or existing material fact; (2) the defendant made the representation without reasonable ground for believing it to be true; (3) in making the representation, the defendant intended to deceive the plaintiff; (4) the plaintiff justifiably relied on the representation; and (5) the plaintiff suffered resulting damages.  See West v. JP Morgan Chase Bank, 214 Cal.App.4th 780, 792 (4th Dist. 2013) (elements are identical to the elements of fraud except that the defendant need not have knowledge the representation is false).

        *1.  False Representation of Material Fact*

During the class period, Defendant DairyAmerica submitted prices and volumes of nonfat dry milk ("NFDM") sales to the NASS, a division of the USDA, as part of a federal program that sets minimum prices for milk from dairies.  The parties do not dispute that the prices and volumes that DairyAmerica submitted were supposed to *exclude* prices and volumes from sales that represented "forward contracts" – that is, sales contracts where the prices were set more than 90 days from the completion of the sale – and that the actual information submitted by Dairy

1   America *included* prices and volumes from forward sales contracts.

2   Defendants contend that Plaintiffs' FAC does not allege a false representation by

3   Defendant because the volumes and prices recorded on the forms submitted by DairyAmerica

4   were the actual volumes and prices contracted for sale during the reporting period.  Defendants

5   contend that the inclusion of price and volume inputs that were supposed to have been excluded

6   does not render the reports false.  Further, Defendants contend that Plaintiffs' FAC merely alleges

7   that the price and volume reports were "erroneous," rather than false.  The court finds

8   Defendants' arguments unpersuasive.

9   Plaintiffs have adequately alleged a false representation on two grounds.  First, Plaintiffs'

10  FAC alleges Defendants purported to report the price and quantity of nonfat dry milk ("NFDM")

11  sold during each reporting period *excluding* NFDM that was sold pursuant to a forward contract

12  under which the price was set more than 30 days before the transaction was completed.  What

13  DairyAmerica submitted on the forms was the price and volume of NFDM sold during the

14  reporting period that *included* forward contract sales that were completed in that reporting period.

15  Thus, the prices DairyAmerica reported, whether correctly calculated or not, represent something

16  significantly different than what the label applied to the prices indicates.  If USDA had requested

17  pricing inputs for apples and received instead the pricing inputs for oranges labeled as apples, the

18  price reported would not be true simply because the price for oranges was accurately recorded.

19  Second, and perhaps more important, Plaintiffs alleged that DairyAmerica certified both

20  in writing and orally, that its reports of NFDM prices and volumes properly reflected the

21  exclusion of information from forward sales contracts when, in fact, they did not.  Thus, both the

22  prices reported and the attestations that the reports were completed according instructions were

23  false.  The court finds Plaintiffs' FAC adequately alleges the false representation of a past or

24  existing material fact.

### *2. No Reasonable Ground to Believe Truth of Representations*

26  Defendants contend, without much elaboration, that the FAC fails to allege that Dairy

27  America did not have a reasonable basis for believing that the representations made were true.

28  The FAC alleges that the directions for the completion for the forms submitted to NASS were

"not difficult," that DairyAmerica affirmatively asserted that they had properly excluded price and volume inputs from forward contracts when they had not.  The court is willing to infer that whether a contract for sale of NFDM is a forward contract or a spot contract should be easily ascertainable.  From that it is clear that Plaintiffs have adequately alleged that DairyAmerica had no reasonable ground for believing that their reported NFDM volumes or prices or the certifications of accuracy were true.

### 3. Reasonable Reliance

Whether Plaintiffs FAC adequately alleged reasonable reliance on DairyAmerica's improper price and volume representations is the issue to which the parties devote the majority of their argument.  Before embarking on an analysis of Defendants' contentions, a reiteration of the salient features of the regulatory framework within which Defendants' conduct is alleged to have occurred is appropriate.  This framework is extensively set forth in the Ninth Circuit's decision in Carlin.

> Congress passed the Agricultural Marketing Agreement Act of 1937 (7 U.S.C. § 601 et seq.) ("AMAA") "in order to establish and maintain orderly marketing conditions and fair prices for agricultural commodities. [Citation.]   Section 8c of the AMAA (7 U.S.C. § 608c) authorizes the Secretary of Agriculture to issue "orders" applicable to "handlers" who receive, process, package, or redistribute milk or milk products. "Marketing orders promulgated pursuant to the AMAA are a species of economic regulation that has displaced competition in a number of discrete markets . . . ."

Carlin, 705 F.3d at 858-859.

Federal Milk Marketing Orders ("FMMOs") are the means by which the USDA sets minimum "blended" price that applies to raw milk from dairy producers within the area governed by the FMMO.

> Under the FMMOs, a dairy plant pays, and a dairy producer receives, minimum prices in the form of federally established "component prices" for butterfat, protein, solids not fat, and other solids, or skim-fat prices that are derived from those component prices.  *See* 7 C.F.R. §1000.50.  There are three factors that are used in the pricing formulas: (1) prices of dairy products surveyed by the [NASS]; (2) a make allowance; and (3) a yield. *See id.*

Carlin, 705 F.3d at 861 (citing Ark. Dairy Coop., Inc. v. U.S. Dep't of Agric., 576 F.Supp.2d 147, 152 (D.D.C. 2008)).  "Of significance to this action, one of the major wholesale pricing inputs

1   collected by NASS for computation of the FMMO minimum price for milk for Class IV Products

2   is the wholesale price for NFDM." Id. at 863.

3        The crux of Defendants' argument regarding reasonable reliance is that Plaintiffs, in order

4   to state a claim for negligent misrepresentation, must allege they actually relied on Defendants'

5   alleged misrepresentation.  Defendants contend Plaintiffs cannot make this allegation because

6   they were not addressees of the weekly price and volume reports submitted by DairyAmerica and

7   submitted confidentially to NASS.  Defendants contend that "justifiable reliance is the same

8   'causation,' thus '[r]eliance exists when the misrepresentation was an **immediate** cause of the

9   plaintiff's conduct which altered his or her legal relations, and when without such

10  misrepresentation or nondisclosure he or she would not, in all reasonable probability, have

11  entered into the contract or other transaction.' [Citation.]" Doc. # 70 at 20:20-24 (citing

12  Goehring v. Chapman Univ., 121 Cal.4th 353, 369 (2004).

13       Both parties appear to recognize the contours of negligent misrepresentation described in

14  Bily v. Arthur Young & Co.., 3 Cal.4th 370 (1992).  The decision in Bily differentiated the tort of

15  negligence from negligent misrepresentation with regard to the scope of parties to whom the

16  tortfeasor could be liable.  With regard to the tort of negligence in the context of misinformation

17  provided in an audit, Bily held that the client for whom the audit report was prepared is the only

18  party to whom the auditor may be held liable.  Id. at 406.  However, with regard to the liability to

19  third parties in the context of claims for negligent misrepresentation, the California Supreme

20  Court held that the scope of liability was guided by the approach suggested by section 552 of the

21  Restatement Second of Torts, subdivision (b).  Id. at 408.  Section 552 provides:

22      (1)  One who, in the course of his business, profession or employment, or
    in any other transaction in which he has a pecuniary interest, supplies false

23      information for the guidance of others in their business transactions, is
    subject to them by their justifiable reliance upon the information, if he fails

24      to exercise reasonable care or competence in obtaining of communicating
    the information.

25

26      (2)  Except as stated in Subsection (3), the liability stated in Subsection (1)
    is limited to loss suffered (a) by the person or one of a limited group of

27      *persons for whose benefit and guidance* he intends to supply the
    information or knows that the recipient intends to supply it; and (b) through

28      reliance upon it in a transaction that he intends the information it influence
    or knows that the recipient so intends or in a substantially similar

transaction.

(3)  the liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

Restatement (Second) of Torts § 552 (1977) (italics added).

In addition to the framework set forth in Section 552, a few cases have referenced the framework cited in Section 533 of the Restatement Second of Torts.  See Mirkin v. Wasserman, 5 Cal.4th 1082, 1095 (1993) (reviewing "indirect communications cases" under Section 533). Section 533 of the Restatement is quoted in Mirkin as follows: "'the maker of a fraudulent misrepresentation is subject to pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved.'"  5 Cal.4th at 1095.

One Ninth Circuit case, Shroyer v. New Cingular Wireless Svcs, Inc., 622 F.3d 1035 (9th Cir. 2010), has referred to the analysis under Section 533 in Mirkin as a "fraud on the regulator theory" of third-party claim for negligent misrepresentation.  Id. at 1043.  While this court finds the term attractive in the circumstances of this case, it does not appear that there is sufficient case authority to use the term "fraud on the regulator" as shorthand for a type of reliance.  Rather, what Mirkin references directly, and Shoyer references indirectly, is a limited set of cases, typified by Vasquez v. Superior Court, 4 Cal.3d 355 (1971) and Occidental Land, Inc. v. Superior Court, 18 Cal.3d 355 362, 363 (1976), in which the California Supreme Court held that "*when the same actual misrepresentations have actually been communicated to each member of a class*", an inference of reliance arises as to the entire class."  Mirkin 5 Cal. 4th at 1095 (italics in original). Notably, in both Mirkin and Shover, the plaintiffs' efforts to analogize their claims to the claims in Vasquez and Occidental Land were rejected because the plaintiffs in those cases could not show that the same actual misrepresentation was communicated to each plaintiff or member of the class of plaintiffs.

11

What is apparent from a review of the case authority cited by the parties and from the court's own research is that the body of case law that defines the contours of California's approach to negligent misrepresentation fits uncomfortably with the facts of this case.  In all of the case authority before the court, the material misrepresentation at issue pertains to the assessed value of a product or service that is *offered directly for sale* to potential buyers who are misled in *their* assessment of its value by the misrepresentation.  In contrast, at issue here are alleged material misrepresentations made by one or more co-participants in an integrated regulatory scheme that is intended to displace the usual process of price negotiation within context of sales between milk Producers and milk Handlers.  The alleged misrepresentations do not pertain to the valuation of products that are bought and sold between the participants; rather they represent retrospective market data for sales that were transacted between dairy product handlers and consumers that are outside of the regulatory scheme.  As outlined above, the regulatory scheme receives inputs regarding the sales between the handlers of milk products and consumers and translates that data *directly through formulae* into the compensation the milk producers receive for their product.

Defendants are not strictly incorrect when they observe that Plaintiff's do not "rely directly" on the volume and price data that were submitted confidentially by DairyAmerica to NASS.  In the context of DairyAmerica's pricing inputs as being the alleged "material misrepresentation," it may be considered a stretch to say that Plaintiffs altered their conduct in reliance on *pricing inputs* that they never actually saw.  However, the court finds this to be a formalistic argument that evades the fundamental nature of the regulatory program in which both Plaintiffs and Defendants participate.  The line of reasoning that leads to this conclusion focuses on the nature of the alleged misrepresentation.  During the time relevant to this action, authority to audit Defendants' submissions of pricing inputs was lacking and, as a consequence, the regulatory scheme functioned on the faith of the participants on the integrity of the system of pricing inputs.  DairyAmerica, as previously noted, is alleged to have made representations, both orally and in writing, regarding the integrity of its inputs.  Defendants do not allege that these representations of data validity were not available to Plaintiffs.  In the context of the regulatory

1    scheme at issue, it is these assurances of integrity that constitute the falsity upon which Plaintiff's
2    relied.

3         As noted, parties to the regulatory scheme participate in and ultimately approve the set of
4    formulas that ultimately constitute the FMMO's for each region.  Thus, price inputs that are false
5    because they include disallowed transaction inputs influence the quantity of the milk producers'
6    allowance in a way that is both known to the parties and is precisely determined by the formulas
7    that constitute the FMMO.  Thus, there is a one-to-one correlation between the degree to which
8    the average wholesale price of NFDM is artificially depressed by DairyAmerica's wrongful
9    inclusion of forward contract prices and the Plaintiffs' total compensation for raw milk sold.
10   While the attempt to draw parallels between the components of NDMA and the type of reliance
11   reflected in Restatement Second of Torts, Section 552 may be strained, the congruence between
12   the facts of this case and with the statement of third party liability set forth in Section 533 of the
13   Restatement is clear.

14        Section 533 contemplates communication of the material fact to a third party with the
15   expectation that the third party will repeat the material fact "*or its substance*" and that the
16   communication by the third party will influence the plaintiff's conduct "in the transaction *or type*
17   *of transaction involved*."  Section 533 (italics added).  When DairyAmerica represented to NASS
18   that its volume and price reports were properly completed, the substance that representation was
19   repeated to all parties by the acceptance of the data and the inclusion of the data in the FMMO.
20   Plaintiffs changed their conduct with respect to the type of transaction involved by accepting
21   prices for raw milk that would certainly have been challenged in the absence of the reassurances.

22        The court concludes that California case authority supports a court's discretion to find an
23   analytical framework for the analysis of the elements of negligent misrepresentation by reference
24   to the most applicable section of the Restatement Second of Torts.  The court further concludes
25   that section 533 of that Restatement provides the guidance most appropriate to the factual
26   situation at hand.  The court finds that Plaintiffs have adequately alleged justifiable reliance
27   pursuant to Section 533 of the Restatement Second of Torts.  There being no other grounds
28   alleged for dismissal of Plaintiffs' claim for negligent misrepresentation, the court finds that

1  Plaintiffs' have adequately stated their claim under California common law.

2  **B. Negligent Interference With Prospective Economic Advantage**

3  To state a claim for negligent interference with prospective economic advantage, a

4  plaintiff must show (1) the existence of an economic relationship between itself and a third party

5  containing the probability of future economic benefit to the plaintiff; (2) the defendant's

6  knowledge of the existence of the relationship; (3) negligent acts by the defendant designed to

7  disrupt the relationship; (4) actual disruption of the relationship; and (5) damages proximately

8  caused by the acts of the defendant.  Della Penna v. Toyota Motor Sales, USA, Inc., 11 Cal.4th

9  376, 389 (1995); Pfeiffer Venice Properties v. Bernard, 2005 WL 2764336 (Cal.App. 2nd Dist.

10 2005) at *5 (noting that elements of negligent interference are the same as for intentional

11 interference except that plaintiff need only prove negligence).  Because the tort of negligent

12 interference with prospective economic advantage is a form of claim of the tort of negligence, a

13 plaintiff must demonstrate the existence of a duty of care owed to the plaintiff by the defendant.

14 J'Aire Corp. v. Gregory, 24 Cal.3d 799, 803 (1979).

15 Defendants assert a number of grounds for dismissal of Plaintiffs' negligent interference

16 claim.  In particular, the parties argue vigorously whether DairyAmerica owed a duty of care to

17 Plaintiffs or whether DairyAmerica engaged in independent wrongful conduct.  Significantly,

18 Defendants assert one ground for dismissal that Plaintiffs do not appear to address directly.

19 Defendants contend that Plaintiffs' FAC does not allege actual disruption of any economic

20 relationship between Plaintiffs and any third party.  The court has reviewed each of Defendants'

21 contentions regarding Plaintiffs' negligent interference claim and concludes that the failure to

22 allege actual interference is the central problem with Plaintiffs' claim.

23 The time period in which Defendants' alleged misreporting of NFDM prices occurred –

24 from 2000 to 2008 -- entirely predated this action.  During this time period the FAC alleges no

25 changes in relationships between Plaintiffs and USDA or any other third party.  This action was

26 not instituted until DairyAmerica's misreporting of data came to light in late 2008 at which time

27 DairyAmerica was obliged to bring its weekly reporting into conformity with FMMO

28 requirements subject to audit by NASS.  In the meantime, the alleged effect of Defendants

1  misreporting was not interference with any of the relationships of parties with USDA or with each

2  other, rather the effect was a distortion of distribution of proceeds from the producers' settlement

3  fund in favor of the milk Handlers.  The FAC does not allege any change to procedures or

4  mechanisms established by the AMAA as modified by the DMEA or to relationships with

5  Handlers or other Producers.  In particular, misreporting by DairyAmerica could not have

6  influenced or interfered with the relationship between USDA and Plaintiffs because USDA and

7  its subdivisions are neutral intermediaries administering a program that continued to function as

8  designed throughout the time period relevant to this action.  As Defendants note, a claim for

9  negligent interference will not lie where third parties complete their duties and the only result of

10  alleged interference is additional cost.  See San Luis Obispo County v. Abalone Alliance, 178

11  Cal.App.3d 848, 861-862 (2nd Dist. 1986) (no interference where defendant protestors required

12  additional law enforcement expenditures but all required additional duties were performed).

13       The Plaintiffs' claim for negligent interference with *prospective* economic advantage is

14  also hampered by the fact there is absolutely nothing about the claim that is prospective.

15  Plaintiffs do not seek to remedy what the name of the tort suggests – that they suffered and

16  impairment of a *future* business relationship.  The entirety of Plaintiff's damages alleged in the

17  FAC were incurred prior to the institution of this action.  Given the 2008 changes to the DMEA, a

18  situation giving rise to *prospective* loss is highly improbable.

19       The court finds that Plaintiffs' have failed to adequately plead a claim for negligent

20  interference with prospective economic advantage.  Defendants motion to dismiss will therefore

21  be granted with respect to Plaintiffs' second claim for relief.

22       ***C. Claim for Violation of California Unfair Business Practices Act***

23       Under California's Unfair Business Practices statute, Business & Professions Code §

24  17200, a private cause of action is provided for "any unlawful, unfair or fraudulent business act or

25  practice . . . ."  Because the types of unfair business practices are listed in the disjunctive, section

26  17200 provides a cause of action for "three varieties of unfair competition."  People ex rel.

27  Lockyer v. Fremont Life Ins. Co., 104 Cal.App.4th 508, 515 (Cal.App. 2002).  Plaintiffs allege

28  Defendants have violated section 17200 under both the unlawful prong and the fraudulent prong.

A business practice is "fraudulent" if "'members of the public are likely deceived.' [Citation]." Nat'l Rural Telecomms Co-op v. DIRECTV, Inc., 319 F.Supp.2d 1059, 1077 (C.D. Cal. 2003) (quoting Committee on Children's Television v. Gen. Foods. Corp., 35 Cal.3d 197, 214 (1983)).   It is "'necessary under the "fraudulent" prong [of the UCL] to show deception to some members of the public, or harm to the public interest, and not merely to the direct competitor or other non-consumer party to a contract.'" Watson Labs. Inc. v. Rhone–Poulenc Rorer, Inc., 178 F.Supp.2d 1099, 1121 (C.D.Cal.2001).  Defendants contend that Plaintiffs have failed to allege a claim for relief under the fraudulent prong of section 17200 because they have not, and cannot, allege that any member of the public was deceived or that the public interest was harmed.  The court agrees.  Although the court has concluded that Plaintiffs have adequately stated a claim for negligent misrepresentation, the public was not privy to the misrepresentation and the public suffered no alleged direct harm.  As noted above, the facts of this case show that Defendants' alleged misrepresentation resulted in a distortion of the fair distribution of funds as between the Producers and Handlers but no increase in price to consumers is alleged.

Plaintiffs also allege Defendants are liable under the unlawful prong of section 17200 because they committed the common law torts of negligent misrepresentation, negligent interference with prospective economic advantage, and violated the terms of the DMEA.  The first two of these cannot serve as a basis for liability under section 17200; negligent misrepresentation will not serve because, as discussed, the fraud involved did not involve the public, and the second will not serve because the court has determined that Plaintiffs have failed to state a claim for negligent interference.  That leaves violation of the DMEA as the sole possible basis for Defendants' liability under the DMEA.  As will be discussed in more detail infra at subpart (A) of part II, the court agrees with Plaintiffs' contention that Plaintiffs only remaining individual claim – negligent misrepresentation – is independent of any violation of the DMEA. Since the only remaining claim cannot serve as a basis for a claim under section 17200 for the reasons stated and because that claim does not allege a violation of the DMEA, there is no qualifying predicate violation upon which Plaintiffs can allege violation of California's unfair business practices statute.  Plaintiffs' claim under section 17200 will therefore be dismissed.

1

### D. Unjust Enrichment

2      Plaintiffs' third claim for relief alleges unjust enrichment against Defendants.  Defendants

3 contend that California common law does not recognize a stand-alone claim for unjust

4 enrichment.  Defendants are correct in their contention.

5      Under California law, "[u]njust enrichment is not a cause of action ... or even a remedy,

6 but rather a general principle, underlying various legal doctrines and remedies. It is synonymous

7 with restitution."  McBride v. Boughton, 123 Cal.App.4th 379, 387 (Cal.App.2004) (citing

8 Melchior v. New Line Prods., Inc., 106 Cal.App.4th 779, 793 (Cal.App.2003)); see also McKell

9 v. Wash. Mut., Inc., 142 Cal.App.4th 1457, 1490 (Cal.App.2006) ("There is no cause of action

10 for unjust enrichment. Rather, unjust enrichment is a basis for obtaining restitution based on

11 quasi-contract or imposition of a constructive trust.") (citation omitted). "[R]estitution may be

12 awarded where the defendant obtained a benefit from the plaintiff by fraud, duress, conversion, or

13 similar conduct. In such cases, the plaintiff may choose not to sue in tort, but instead to seek

14 restitution on a quasi-contract theory...." Id. at 388 (citations omitted).

15      Plaintiffs do not seek restitution under a theory of quasi contract.  While unjust

16 enrichment may be a guiding principle in any damages that may ultimately be claimed by

17 Plaintiffs, the court agrees with Defendants' contention that unjust enrichment cannot be the basis

18 for a separate and free-standing claim for relief under the facts of this case.

19 **II. General Defenses**

20      Defendants originally contended that Plaintiffs could not allege state claims against

21 Defendants because: (1) the claims were barred by the "filed rate doctrine;" (2) Plaintiffs' claims

22 are dependent on claims of violation of the terms of the DMEA and there is no private right of

23 action under the DMEA; (3) Plaintiffs failed to join USDA, an indispensable party to this action;

24 (4) at the time relevant to this action, the DMEA did not have the force of law; and (5) Plaintiffs'

25 state law claims are preempted by the DMEA.  As previously noted, Defendants' first contention

26 – that Plaintiffs' claims are barred by the filed rate doctrine – is disposed of by the decision in

27 Carlin.  The court will consider the remainder of Defendants' general defenses in order.

28      ### A. No Private Right of Action Under DMEA

17

Defendants make two arguments with regard to the lack of a private right of action under DMEA.  First, Defendants argue at some length that DMEA does not authorize any private right of action for a party that is injured by the actions of another.  Second, Defendants argue that Plaintiffs cannot conceal an action for violation of DMEA within a state common law tort claim.  Plaintiffs, on the other hand, do not contend that DMEA authorizes a private right of action.  Plaintiffs argue instead that they do not seek to recover damages under the authority of the DMEA, they seek recovery solely on their state-based common law claims which are not prevented by the DMEA.

As noted above, the court has concluded that of the four claims for relief that are alleged in Plaintiffs' FAC, only the claim for negligent misrepresentation is adequately pled.  As noted, the elements of negligent misrepresentation are: (1) the defendant made a false representation as to a past or existing material fact; (2) the defendant made the representation without reasonable ground for believing it to be true; (3) in making the representation, the defendant intended to deceive the plaintiff; (4) the plaintiff justifiably relied on the representation; and (5) the plaintiff suffered resulting damages.  West, 214 Cal.App.4th at 792.  Essentially, Defendants' contention rests on their assertion that each of the elements of Plaintiffs' negligent misrepresentation claim allege a violation of the DMEA in different words.  The court disagrees.  As previously discussed, there are two representations potentially at issue here.  The first is DairyAmerica's volume and pricing data for NFDM for the time period at issue.  The second representation, and one the court has determined is more material, is DairyAmerica's representations on the Annual Validation Worksheets that the data submitted excluded pricing and volume inputs from forward contracts.  What makes DairyAmerica's Validation Worksheets false is not the DMEA, it is the fact that they contain information derived from data that Dairy America asserted it did not use.  In other words, the "Annual Validation Worksheets" were not misrepresentations because they were submitted in compliance or non-compliance with the DMEA; they were misrepresentations because they stated a fact that was not true – that the data that had been collected and submitted during the prior year had been collected without inclusion of forward contract data when, in fact that was not the case.

As noted above, the materiality of the Annual Validation Worksheets lies not in the

1    structure or regulations set forth in the DMEA or, for that matter, in the AMAA; rather, the

2    materiality lies in the reassurance the worksheets provide for the producers who, because of the

3    confidential nature of the weekly reports, are required to rely on the integrity of the information

4    submitted by handlers and on their good will in preparing the weekly reports.  Similarly, the

5    falsity of the Annual Validation Worksheets submitted by DairyAmerica is not dependent on

6    regulations set forth in the DMEA; the falsity is in the Validation Worksheets themselves.  The

7    Validation Worksheets do not ask whether the weekly reports were prepared in accordance with

8    DMEA requirements, they ask whether the handler could, and did, exclude price and volume

9    from forward sales.  It was the "yes" answer to that question on the Annual Validation

10   Worksheets that was the material misrepresentation of fact that lies at the center of Plaintiffs'

11   claim for negligent misrepresentation.  The court concludes that neither the materiality or falsity

12   of the allegedly misrepresented fact are dependent on the DMEA.  The court therefore concludes

13   that, contrary to Defendants' characterization of Plaintiffs' negligent misrepresentation claim, the

14   claim is not an attempt to state a claim for violation of the DMEA in the guise of a state common

15   law tort claim.  The court finds that the fact that the DMEA does not provide for a private right of

16   action is irrelevant to Plaintiff's claim for negligent misrepresentation.

17           ***B.  USDA as Indispensable Party***

18           Defendants make two arguments regarding the indispensability of USDA as a party to this

19   action.  First, Defendants contend USDA sole authority to enforce the terms of the DMEA.

20   Second, Defendants contend that USDA has an interest in the maintenance of the confidentiality

21   of the information submitted to it by Handlers.  Since the court has determined that Plaintiffs'

22   claim for negligent misrepresentation is not a claim under the DMEA, the only ground the court

23   need address is USDA's interest in maintaining the confidentiality of proprietary information

24   supplied by DairyAmerica and other Handlers.

25           Defendants argument regarding USDA's interests in the maintenance of information

26   submitted to it in confidence fails primarily because all the conditions underpinning the argument

27   are entirely speculative at this point.  First, the only information that Defendants allege is

28   confidential is the weekly reports of volume and sales price information submitted by Handlers

1   like DairyAmerica to NASS.  There is no contention that any of the subsequent information

2   generated under USDA authority – including FMMO orders, revised FMMO's, audit information

3   or statements regarding the effect of Defendants' alleged misreporting on FMMO-calculated

4   prices – is confidential.  At this point in the proceedings, there is no indication that Plaintiffs'

5   presentation of their case will require the production of that limited set of materials that is

6   confidential.  Neither is it clear that the production of relevant portions of that limited set of data

7   that is confidential could not be accomplished in a way that does not challenge USDA's interests.

8        Basically, Defendants' argument regarding the indispensable nature of USDA as a party

9   seeks to elevate the sort of evidentiary conflicts normally negotiated during discovery into an

10  argument that the custodian of the records at issue needs to be a party to the action in order to

11  protect their interests.  The court has adequate of means of assuring that USDA's interests are not

12  injured by requests by the parties for production of information in their custody.  The court finds

13  that Defendants' argument that USDA is a necessary party to this action is without merit.

14          ***C. DMEA Lacked Force of Law During Time of Events Relevant to this Action***

15       Defendants next argue that, although the DMEA was enacted in 2002, the enactment left it

16  to the Secretary to establish by way of rulemaking the procedures and the substantive regulations

17  of the DMEA.  It is not disputed that the procedures and regulations were not effective until

18  August 2, 2007.  Defendants also assert, without dispute, that the DMEA as originally enacted by

19  Congress did not make any provision for the exclusion of forward contract information from price

20  and volume surveys.

21       Defendants' argument fails because, as discussed above, Plaintiffs do not seek to enforce

22  the terms of the DMEA.  It is not relevant to Plaintiffs' action whether the exclusion of forward

23  contract price information was a regulation having the force of law.  As discussed, Defendants

24  liability under the claim for negligent misrepresentation arises from DairyAmerica's repeated

25  assurances in its Annual Validation Statements that forward contract pricing information had

26  been excluded from the information submitted to NASS when, in fact, it had not.  The court

27  concludes that whether the procedural or regulatory aspects of the DMEA had the force of law

28  from 2002 to 2007 is irrelevant to Plaintiffs' claim for negligent misrepresentation.

### D. *Preemption of State Law Claims by DMEA*

Defendants' final general defense contends that DMEA preempts any state law remedy to violation of the terms of the DMEA. Defendants invoke two subspecies of preemption doctrine; field preemption and conflict preemption. Defendants contend that the DMEA entirely occupied the limited and specialized field of reporting wholesale dairy product price and volume data. With regard to conflict preemption, Defendants contend that the DMEA limited participant culpability to wrongful act *willfully* committed. See Doc. # 54 at 39:5-7 (citing 7 U.S.C. § 1637b(c)(4)(A) for proposition that DMEA only prohibits willful misconduct).

Defendants' argument for preemption of Plaintiffs' state law claims is unpersuasive at a number of levels, but perhaps the most conclusive reason the argument fails is that Defendants have shown and Plaintiffs do not deny that the DMEA did not have the force of law during the time relevant to this action. It is elementary that state law cannot be preempted by a federal regulatory scheme that has not been given legal effect. Defendants do not argue the contrary. The court finds Defendants have failed to carry their burden to show that the DMEA had any preclusive effect on Plaintiffs' state law claims during the time period relevant to this action.

## III.  Defenses Particular to California Dairy Association

Defendant California Dairies, Inc. joined DairyAmerica's motion to dismiss and, to the extent DairyAmerica's motion dismiss resulted in dismissal of Plaintiffs' claims for negligent interference with prospective advantage, unjust enrichment and violation of California's Unfair Competition Law, those claims are dismissed as to California Dairies as well. In addition to joining DairyAmerica's motion to dismiss, California Dairies submitted its own motion which asserts that it is shielded from liability arising from DairyAmerica's wrongful acts under California law because DairyAmerica is a cooperative and California Dairies is a member of that cooperative. Plaintiffs counter by contenting that (1) DairyAmerica is an "agent" of California Dairies, and (2) DairyAmerica is a "joint venture" between California Dairies and the other dairy cooperatives that own DairyAmerica. Plaintiffs' contend that California Dairies is therefore liable for the misdeeds of DairyAmerica under either the agency exception or the joint venture exception to normal shareholder protection from liability.

As background, it is not contested that DairyAmerica is an agricultural nonprofit cooperative association organized pursuant to Food & Agriculture Code §§ 54001 et seq.  It is also not contested that DairyAmerica is owned by nine dairy Handler cooperatives, with each cooperative having one vote.  Plaintiffs allege that California Dairies is the "major shareholder in and majority owner of DairyAmerica."  Doc. # 8 at ¶13.  Defendants do not dispute California Dairies' status as majority shareholder, but point out that the articles of incorporation for Dairy America – a document Defendants contend the court may judicially notice because it was referenced by Plaintiffs' FAC – provide that each member of the DairyAmerica cooperative is entitled to equal voting rights (one vote per member) on any matter concerning conduct by Dairy America.  See Doc. # 47 at 8:6-14 (California Dairies cite Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir. 1994) for the proposition that a court may judicially notice a "documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading . . .'").  Plaintiffs do not dispute that the articles of incorporation of DairyAmerica provide one equal vote for each member as to any issue of corporate conduct.  Plaintiffs, in fact, allege that the nine members of DairyAmerica "enjoy a right of joint control" over the actions of DairyAmerica.  Doc. # 62 at 13:15.

California Food & Agriculture Code § 54239[1] provides:

> A member or stockholder is not liable for the debts of the association to an amount which exceeds the sum which remains unpaid on his membership fee or his subscription to the capital stock, including any unpaid balance on any promissory note which is given in payment of the membership fee or the subscription to the capital stock.

Id.

Plaintiffs contend that this section does not shield California Dairies from liability for the misconduct of DairyAmerica.  The court disagrees.  The statutory scheme under which Dairy America is organized creates an entity that is different in significant respects from other forms of principal-subsidiary relationships.  The entities created under §§ 54001 et seq. are non-profit and cooperative in nature.  As such, the corporations created under this statutory scheme are exempt

---

[1]   Any reference to section or subsection numbers hereinafter refer to sections of the California Food and Agriculture Code unless otherwise specified

1    from laws restraining monopolies, § 54038, and antitrust statutes, § 54039, and are exempt from

2    conflicting requirements that would otherwise apply to corporate entities.  § 54040.  It is

3    contemplated by the statutory scheme that cooperative agricultural entities whose business is

4    production of consumer products will themselves form cooperative agricultural entities for

5    purposes of marketing those products.  Thus, California Dairies, itself a dairy handler cooperative

6    formed under this same statutory scheme, is able to form a nonprofit marketing cooperative with

7    other similarly organized Handler cooperatives.  It is also contemplated by the statutory scheme

8    that the cooperative agricultural associations so formed will act as agents for the production,

9    marketing or sale of agricultural products.  § 54173.  Thus, California Dairies acts as the agent for

10   purposes of pooling and marketing the products of a number of dairy Handlers and Dairy

11   America functions as the sales agent for a California Dairies and eight other Handler

12   cooperatives.

13           In this context, the legislative decision to limit member or shareholder liability by means

14   of a specific statutory provision has particular significance.  The court must assume that, where

15   California Legislature saw fit to allow the creation of nonprofit cooperative associations that are

16   expected to function as agents and then limit the liability of the principals of those agents to

17   unpaid dues or un-purchased capital stock, the Legislature was aware of what it was doing and

18   intended that liability would be so limited.  It follows that the label of "agent" which is normally

19   applicable to the relationship between a nonprofit agricultural cooperative and its owners is not

20   sufficient in and of itself to trigger liability of the members for the acts of their "agent."  Were

21   that not the case, the liability-limiting provisions of subsection 54239 would be rendered a

22   practical nullity.  The court concludes that the statutory structure under which both California

23   Dairies and DairyAmerica were organized and the provisions of Cal. Agriculture & Food Code §

24   54239 shields cooperative owners from liability for the wrongful acts of the cooperative when the

25   cooperative association is acting as agent for the owners unless there is a showing of a level of

26   control substantially greater than that implied in the principal-agent relationship for which the

27   cooperative was established.

28           Plaintiffs' FAC fails to allege facts that would show that California Dairies has any more

1    control over the day-to-day conduct of DairyAmerica than any other of DairyAmerica's members.

2    Plaintiffs' allegation that California Dairies' founded, and has majority ownership in, Dairy

3    America has no bearing on California Dairies' control over DairyAmerica's day-to-day conduct

4    given the equal votes of the members when it comes to board decision-making.  Given the

5    nonprofit nature of DairyAmerica, any judgment against it will be born by it is owner-members in

6    proportion to their obligations to the producers' settlement fund.  The FAC alleges no facts to

7    show that California Dairies should be burdened any more or less than their proportional

8    responsibility.

9           Finally, Plaintiffs' contention that section 54239 offers no protection to California Dairies

10   because it limits liability only the "debts" incurred by the association is without merit.  It is

11   elementary that a judgment of money damages against an entity is a debt owed by the entity.

12   Plaintiffs present no authority for the proposition that the term "debts" as used in section 54239 is

13   not inclusive of judgment debts arising from DairyAmerica's misconduct.

14          Plaintiffs' joint venture argument fails for much the same reason as the agency argument.

15   The statutory structure cited above creates an entity that is what the statute defines it to be – a

16   nonprofit agricultural cooperative.  As discussed, the statutory scheme permits the common

17   ownership of a cooperative entity that acts as agent for the owners and that shields the owners

18   from liability in excess of their normal obligation to the cooperative, as well as shielding the

19   owners from any claims of anti-competitive or monopolistic conduct.  Where legislature has

20   carefully and comprehensively crafted a scheme to allow for the creation of a nonprofit

21   agricultural cooperative, the liability limits created by this scheme cannot be circumvented by the

22   simple expedient of calling the entity formed something else – a joint venture.  Simply put,

23   Plaintiffs cannot sue California Dairies under a joint venture theory because under California law,

24   DairyAmerica is not a joint venture.

25          Because the court finds that California Dairies, as co-owner and member of Dairy

26   America is not liable under theories of agency or joint venture, Plaintiffs' claims against

27   California Dairies will be dismissed in their entirety.

28

1   THEREFORE, for the reasons discussed, it is hereby ORDERED that:

2   1.   Defendants' motion to dismiss Plaintiffs' claim for negligent misrepresentation is

3   DENIED.

4   2.   Defendants' motion to dismiss Plaintiffs' claim for negligent interference with

5   Prospective economic advantage is GRANTED,  Plaintiffs' second claim for

6   Relief is DISMISSED with prejudice as to all Defendants.

7   3.   Defendants' motion to dismiss Plaintiffs' claim for violation of California's

8   Unfair Business Practice Act is GRANTED.  Plaintiffs' Third claim for

9   Relief is DISMISSED with prejudice as to all Defendants.

10  4.   Plaintiffs' third claim for relief for unjust enrichment is DISMISSED as a stand-

11  alone claim as to all defendants.

12  5.   California Dairies' motion to be dismissed from this action as to all claims alleged by

13  Plaintiffs is hereby GRANTED.  Defendant California Dairies is hereby DISMISSED as

14  to all claims with prejudice.

15  6.   The motion of DairyAmerica to dismiss the entirety of Plaintiffs' claims on theories of

16  no private right of action under DMEA, failure to join an indispensable party, DMEA

17  lacked force of law, or state law claims preempted by DMEA is DENIED.

18

19

20  IT IS SO ORDERED.

21  Dated:   October 11, 2013   _____

22  SENIOR  DISTRICT  JUDGE

23

24

25

26

27

28

25