1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **GERALD CARLIN, JOHN RAHM, PAUL ROZWADOWSKI AND BRIAN WOLFE, individually and on behalf of themselves and all others similarly situated,**<br><br>    **Plaintiffs,**<br><br>  **v.**<br><br>**DAIRY AMERICA, INC. and CAIFORNIA DAIRIES, INC.,**<br><br>    **Defendants.** | 1:09-cv-0430  AWI GSA<br><br><br><br>**ORDER TO SHOW CAUSE WHY PLAINTIFFS' MOTION TO FILE A SECOND AMENDED COMPLAINT SHOULD NOT BE DENIED**<br><br><br>**Doc. # 160** |

   On October 16, 2013, the court issued an order (hereinafter, the "October 16 Order") granting in part and denying in part Defendants' motion to dismiss Plaintiffs' First Amended Complaint ("FAC").  As a result of the court's October 16 Order, the Plaintiffs' claim for relief based on negligent interference in prospective economic advantage and the claim for violation of California's Unfair Business Practices Act were dismissed.  Plaintiffs' claim for unjust enrichment was also dismissed as a stand-alone claim.  In addition the FAC was dismissed as to defendant California Dairies, Inc.  Currently before the court is Plaintiffs' motion for leave to file a Second Amended Complaint ("SAC") (the "motion to amend").  For the reasons that follow, the

1   court will propose to deny Plaintiffs' motion to amend and will order the parties to show cause

2   why the motion to amend should not be denied.

3                                    **DISCUSSION**

4           Because no pretrial scheduling order has been filed in this case, Plaintiff's motion to

5   amend the complaint to add claims is governed by the terms of Federal Rule of Civil Procedure

6   15(a), which is to be applied liberally in favor of amendments and, in general, leave shall be

7   freely given when justice so requires.  See Janicki Logging Co. v. Mateer, 42 F.3d 561, 566 (9th

8   Cir. 1994).  There is a presumption in favor of granting leave to amend under Rule 15(a).

9   Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003).  However, "a

10   district court need not grant leave to amend where the amendment: (1) prejudices the opposing

11   party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile."

12   Amerisource Bergen Corp. v. Dialysist W., Inc., 465 F.3d 946, 951 (9th Cir. 2006).  Plaintiffs'

13   motion to amend the complaint to add defendant parties is governed by F.R.C.P. 20, which is

14   governed by the same considerations.  See League to Save Lake Tahoe v. Lake Tahoe Reg'l

15   Planning Agency, 558 F.2d 914, 917 (9th Cir. 1997) (Rule 20 regarding permissive joinder is to

16   be construed liberally in order to promote trial convenience and to expedite the final

17   determination of disputes, thereby preventing multiple lawsuits").  "Rule 20(a) imposes two

18   specific requisites for the joinder of parties: (1) a right to relief must be asserted by, or against,

19   each plaintiff or defendant relating to or arising out of the same transaction or occurrence; and (2)

20   some question of law or fact common to all the parties will arise in the action."  Id.

21           As an initial matter, the court notes that Plaintiffs' motion to amend addresses the issues

22   of prejudice, bad faith and the possibility of undue delay but does not address the issue primarily

23   raised by Defendants; the issue of futility of amendment.  In the analysis that follows the court

24   will explain its concerns with regard to the futility of further amendment of the complaint with

25   the intent of providing guidance to Plaintiffs who will have the opportunity to reply.  The court is

26   aware that the overall result of the court's treatment of Plaintiffs' motion to amend is a process

27   more akin to a motion to dismiss.  However, the court finds that prejudice to all parties is avoided

28   and the interests of conservation of judicial resources is served if the court's opinion with regard

1    to Defendant's objections to Plaintiffs' motion to amend is expressed as an order to show cause in

2    light of the court's reasoning.  Upon filing this opinion the court will provide opportunity for

3    Plaintiffs' response to the order to show cause and Defendant's reply as would be the case if the

4    motion under consideration were Defendants' motion to dismiss Plaintiffs' SAC.

5            At 66 pages, Plaintiffs' proposed SAC provides substantially more detail in its allegations

6    concerning Defendant's conduct than the 26-page FAC.  Specifically, Plaintiffs' proposed SAC

7    adds significant detail regarding the individuals who were corporate executives in the member

8    dairy producer corporations and who constituted the leadership of defendant DairyAmerica, detail

9    regarding the communications between these individuals, and detail regarding communications

10   between various regulatory entities and the directors of Dairy America.  Plaintiffs assert, without

11   opposition, that the detail supplied in the proposed SAC is substantially the result of discovery

12   that was conducted following the court's October 16 Order.  As Plaintiffs make clear in their

13   motion to amend, their amendments are intended to address four issues that they contend have

14   arisen as a result of discovery.

15           First, Plaintiffs contend that the communications uncovered during discovery are

16   sufficient to show that Defendant was fully aware of the requirement that prices received for milk

17   products, principally nonfat dry milk ("NFDM"), were not to be included in periodic reports

18   submitted to the National Agricultural Statistical Service ("NASS") if the prices were from

19   forward contracts; that is, contracts whose prices had been set and not modified more than 30

20   days before the date of delivery.  Plaintiffs therefore seek to add claims reflecting Defendant's

21   intentional conduct – a claim for fraud and two claims under the Racketeer Influenced and

22   Corrupt Organizations Act ("RICO").  Second, Plaintiffs' proposed SAC purports to provided

23   more detailed information concerning the relationship (or identity) between the corporate

24   executives of the nine entities that make up Dairy America and the leadership of Dairy America

25   itself in order to support their contention that the proposed additional defendants committed acts

26   that were part of a larger scheme to defraud that was executed by Dairy America and that the nine

27   members are therefore liable for the harms caused by DairyAmerica.  Third, the proposed SAC

28   details the actions of the nine member entities themselves, again to support Plaintiffs' allegations

3

1    that the entities were knowing co-conspirators in DairyAmerica's fraudulent acts.  The fourth

2    issue addressed by Plaintiffs' proposed SAC is Plaintiffs' allegation of fraudulent transfer in

3    violation of the Unfair Fraudulent Transfer Act ("UFTA"),which Plaintiffs contend is evinced by

4    recently discovered email correspondences that indicate the plan or intention of the nine member

5    entities to withdraw their capital investments in DairyAmerica leaving that cooperative of

6    cooperatives without any capital substance and therefore judgment-proof.  The nine dairy

7    producer coops that Plaintiffs seek to add as Defendants pursuant to Rule 20 are: the previously

8    dismissed California Dairies, Inc., Agri-Mark Inc., Dairy Farmers of America, Land O'Lakes,

9    Inc., Lone Star Milk Producers, Inc., Maryland & Virginia Producers Cooperative Association,

10    Inc. O-AT-KA Milk Producers, Inc., St.Albans Cooperative Creamery, Inc., and United

11    Dairymen of Arizona.

12          Plaintiffs' motion to amend requires consideration of two broad issues; first, whether

13    Plaintiffs may add the claims in addition to the claim for negligent misrepresentation that are

14    alleged in the proposed SAC, and second, whether Plaintiffs may add the nine individual entitles

15    making up the Dairy America cooperative as Defendants.  The court will consider these two areas

16    in order.

17    **I.  Proposed Additional Claims**

18          ***A. Intentional Misrepresentation and RICO Claims***

19          "Under California law, the elements for an intentional-misrepresentation, or actual-fraud,

20    claim are (1) misrepresentation; (2) knowledge of falsity; (3) intent to defraud, i.e., to induce

21    reliance; (4) justifiable reliance; and (5) resulting damage." UMG Recording, Inc. v. Bertelsmann

22    AG, 479 F.3d 1078, 1096 (9th Cir.2007).  Defendants oppose Plaintiffs' motion to amend to add

23    a claim for intentional misrepresentation on grounds pertaining both to the status of the proposed

24    additional Defendants and on ground that the fraud claim itself is futile because Plaintiffs have

25    not and cannot allege deceit.  The court will consider the latter ground for dismissal first.  In

26    contrast, the elements for negligent misrepresentation, a "lesser" form of misrepresentation, are:

27    (1) the defendant made a false representation as to a past or existing material fact; (2) the

28    defendant made the representation without reasonable ground for believing it to be true; (3) in

making the representation, the defendant intended to deceive the plaintiff; (4) the plaintiff justifiably relied on the representation; and (5) the plaintiff suffered resulting damages.  See West v. JP Morgan Chase Bank, 214 Cal.App.4th 780, 792 (4th Dist. 2013) (elements are identical to the elements of fraud except that the defendant need not have knowledge the representation is false).  For the reasons that follow, the court will find that Defendants' opposition to Plaintiffs' motion to amend raises substantial concerns regarding the futility of further amendment of the complaint and that Plaintiffs must be provided an opportunity to address Defendants' contentions.

The court begins by observing that, although Plaintiffs' proposed FAC alleges a great deal of quoted and transcribed material in an effort to support the element of intentionality, most of the material is at best ambiguous with regard to the element of intent to defraud, some of the material actually supports the opposite conclusion, and the overall effect is more confusing than helpful. Some examples illustrate the point.  At Paragraph 82 of the Proposed SAC Plaintiffs set out what they contend is an example of Defendants' plans "to withhold pricing information from, or provide false pricing information to, NASS in order to depress raw milk prices."  Doc. # 160-2 at 21:3-4.  In support, Plaintiffs provide the text of an email from then CEO of DairyAmerica to his colleagues proposing that the sale of NFDM would be priced for sale to Colfine "at NASS + .0025/.005 lb" and reported to NASS at that price plus "'reportable' add on – energy surcharge." According to the email proposition, the plan would be for Dairy America to then *invoice* the sale to "Colfine at NASS + .0075/.01 lb. (at a minimum) plus add-ons, to cover our costs of operation and make a profit . . . ."  Doc. # 160-2 at 21:14-18.  What is missing, other an explanation of the significance or identity of "Colfine," is any allegation that the "proposal" was ever implemented.

In a similar vein, at paragraph 112 of the proposed SAC, Plaintiffs present what appears to be an extensive collection of summaries of email correspondences between Rich Lewis (apparently CEO of DairyAmerica) and the Board of Directors of DairyAmerica.  Plaintiffs allege the emails "routinely described how NFDM prices from long-term export contracts were being reported [in violation of NASS directions] and how such reporting practices were artificially depressing NASS prices and, thus, raw milk prices.'"  Doc. # 160-2 at 31:7-9.  The court has reviewed the two pages of email summaries that are intended to support the allegation of

1    intentional false reporting and cannot find anything that unequivocally and obviously indicates

2    malfeasance.  The closest court can find to an indication of impropriety is set forth in the

3    email quoted at the bottom of page 32 of Plaintiffs' proposed SAC which quotes an email

4    between Rick Lewis and the Board of Directors as follows:

5           "Some members are being questioned as to why the NASS and [California
            Weighted Average Price ("CWAP")] are not going to higher levels at a
6           faster rate.  While we are reporting decent volume at spot prices, we still
            have export shipments that were contracted in 2006 to ship in 2006 (of
7           which we had about 17 million lbs. to complete in 2007) and contracted
            volume in Oct. to ship in the first quarter of 2007 with a delivered price
8           range of $.92 lb. . . . Going forward, we will be meeting with Fonterra on
            March 14th to discuss extending our current export orders to discuss future
9           export volume needs, timing and values."

10   Doc. # 160-2 at 32:23-26.  What is left unsaid is the significance of the reference to "Fontera" and

11   whether the "delivered price range" has anything to do with what was or was not properly

12   reported on NASS report forms.  This problem is commonly reflected in Plaintiff's proposed SAC

13   where quoted email exchanges talk about "reported volumes" or "reported prices" without

14   specifying to whom volumes or prices were reported.  The court feels it cannot assume that

15   because a price or volume is referenced in an email as being "reported" that it must necessarily

16   have been reported to NASS or CWAP.

17          A further wrinkle in the information provided by Plaintiffs' proposed SAC is information

18   indicating that forward sales prices through the Dairy Export Incentive Program ("DEIP") *are* to

19   be *included* in NASS reports while other forward sales contract process are not to be reported.

20   See Doc. # 160-2 at 36:12-13 (quoting the NASS directions as providing that the exclusion for

21   forward pricing sales "does not include sales through the [DEIP]").  In addition, Plaintiff's

22   proposed SAC alleges, and Defendants do not dispute, that reports made by California producers,

23   including now-dismissed former Defendant California Dairies, that price and volume reports

24   under CWAP *do not* exclude information for fixed price long term contracts whether for export or

25   not, while contracts for sale of certain types of modified or supplemented NFDM are excluded

26   from all types of price and volume reporting.

27          In sum, Plaintiff's proposed SAC presents a large volume of additional information, a

28   substantial portion of which consists of lengthy quotes or digested comments from email

6

1   correspondences between Dairy America executives and other parties.  The court has spent

2   considerable time reading and rereading these portions of the proposed SAC in a mostly

3   unsuccessful attempt to determine if the quoted or summarized email communications, either

4   collectively or separately, evince wrongdoing.  The court is forced to admit that the added

5   "factual material" presented in the proposed SAC has not helped the court's understanding of the

6   allegations in the proposed SAC and has, in fact, undermined Plaintiffs' claims of intentional

7   misrepresentation.

8        The proposed SAC does make clear some general facts related to the motivations of

9   Defendants.  The purpose behind the formation of Dairy America was the creation of an entity to

10  act as the "exclusive marketer of NFDM for its members."  Doc. # 160-2 at 14:12-13.  As

11  Plaintiffs allege at paragraph 84 of the proposed SAC, "[a] substantial majority of the long-term

12  contracts entered into by DairyAmerica during the [proposed] Class Period were contracts for

13  export.  From January 2006 through April 2007, approximately 90 percent of Dairy America's

14  contracts for the export of NFDM were transacted outside of DEIP and established selling prices

15  more than 30 days before the completion of the transaction."  Id. at 21:27-22:3.  After citing

16  NAAS instructions that direct sales through the DEIP program to be reported, Rich Lewis's email

17  of March 21, 2007, is quoted by Plaintiffs as saying:

18        Those DEIP sales are for exports ONLY and therefore we have ALWAYS
          included reporting of NFDM exported whether the price on those contracts
19        were higher OR lower than the domestic reported market prices.  [¶]  I
          believe this is the correct way to handle those sales because the exports
20        help ALL producers, by moving surplus powder from the market and
          ALWAYS at prices that return more than the alternative – CCC at $.80 lb.,
21        and I don't believe that DA Members should bear the burden of exports
          when export prices are lower than our market prices.  ¶  If this practice is
22        addressed by USDA and they want to change the reporting, then no one
          will want to export unless ALL DA Members (or all producers) agree to
23        "subsidize" exports that are lower than our markets.  I believe in the way
          we are doing the reporting and do not believe it should be changed.
24
25  Doc. # 160-2 at 36:13-20.  Finally, Plaintiffs' proposed SAC sets forth the contents of an email of

26  April 7, 2007, that explains, inter alia DairyAmerica's reasoning in its reporting practices with

27  regard to forward pricing export contracts.  In pertinent part, the portion of email set forth in the

28  proposed SAC provides:

7

There is an opinion by others that Dairy America is wrongfully reporting the exports with fixed prices over 30 days from the beginning of the contract to NASS. The NASS report from we use shows what should and should not be reported. For sales to be excluded it shows

EXCLUDE: . . . .

> Forward pricing sales: Sales in which the selling price was set (and not adjusted) 30 or more days before the transaction was completed. This exclusion does not include sales through the Dairy Export Incentive Program (DEIP).

We have always interpreted the above to mean that any export sales whether subsidized through the DEIP or not WERE to be include in the reporting to NASS. Therefore, we continue to report exports to NASS.

If exports (all exports are over 30 day contracts including exports subsidized under DEIP) were excluded from NASS reporting, the problem the industry would face is, in times that powder is long and exports are above the support price of powder but below the "cost of milk" no one would step up to export. That is the case at this time with the exports at .98 or even at 1.20 lb. – those prices are below current market values AND also below what the current export market is (at the time of contracting these export prices were in the upper range of reported international prices). . . . .

Doc. # 160-2 at 38:4-16.

It is probably not Plaintiffs' intent, and therefore somewhat ironic, that the court finds the additional facts exemplified by those quoted above call into question, rather than establish, Plaintiffs ability to adequately allege the two critical elements of Plaintiffs' fraud-related claims -- Defendants' knowledge of the falsity of its answers on the NASS questionnaire and Defendants' intent to defraud.

### 1. Knowledge of Falsity

The additional facts presented in Plaintiffs' proposed SAC explain clearly the concerns of Defendant and Defendant's constituent dairy handlers when it comes to long term fixed price contracts, particularly contracts for export sales. As Plaintiffs' proposed SAC makes clear, DairyAmerica has/had a dual mandate to "(1) maximize the profits earned by DairyAmerica's members from the sale of NFDM and (2) also increase the FMMO price of raw milk to the benefit of dairy farmers, who own equity in DairyAmerica's member organizations." Doc. # 160-2 at 18:2-4. On one hand, export sales are vital to the economy of both handlers and producers (dairy farmers) because export of NFDM (among other dairy products) prevents accumulation of

1   dairy products exerting downward pressure on milk and milk products.  On the other hand, as the

2   proposed SAC makes clear, both DairyAmerica and its component entities express a deep

3   concern that they will be caught in long term fixed price contracts that will require them to

4   purchase raw milk to fill such contracts at rising prices that will reduce or eliminated the profits

5   that were contemplated when the contracts were executed.  In sum, Plaintiffs' proposed SAC

6   leaves the reader with the clear impression that it is DairyAmerica's overall goal to allow prices

7   for both raw milk and NFDM to rise, but at a moderated pace that prevents excess risk in vital

8   long term export contracts.

9          It is against this backdrop that Defendant, taking into account its view of the policy

10  purposes of allowing the inclusion of prices for the inclusion of long term contract prices in both

11  DEIP sales and in reporting of sales through CWAP, appear to have consciously chosen to

12  interpret the NAAS questionnaire directions to permit the reporting of all contract prices for

13  *export* of NFDM, whether the contracts were for spot or forward sales.  In short, it appears from

14  allegations and evidence presented in the proposed SAC that DairyAmerica made a conscious

15  determination that participating in the NFDM export market only made economic sense if risk

16  was adequately managed by allowing the reporting of all export contracts on NAAS report forms

17  so as to avoid "runaway" price fluctuations for raw milk.  By implication, it follows that

18  DairyAmerica consciously interpreted the NAAS reporting instructions to exclude only domestic

19  long term forward fixed price contracts.

20         What ultimately defeats Plaintiffs' contention that Defendant or the proposed Defendants

21  made knowingly false statements by including volumes and prices from long term export

22  contracts is the fact that there is no regulation cited by Plaintiffs that specifically renders

23  Defendant's interpretation of what is or is not reportable actionably unlawful.  What remains is a

24  difference of opinion based on a rational contemplation of the realities of the NFDM export

25  business rather than a "knowingly false" statement.  That Defendant's interpretation of NAAS

26  survey requirements may have been strained, self-serving or unsupported by subsequent rulings

27  by USDA is of no consequence.  Fraud related claims require the present knowledge of the falsity

28  of the representation at the time it is made.  The additional information provided by Plaintiffs'

1   proposed SAC undermines this element of the claims for fraud and for the two RICO violations.

2              *2. Intent to Defraud*

3          Plaintiff's proposed SAC alleges Defendants fraudulently misrepresented information on

4   the NAAS reports both as a stand-alone claim and as predicate acts for the claims of mail or wire

5   fraud in violation of RICO.  Generally, Intent the defraud is the intent to deceive or cheat for the

6   purpose of either causing financial loss to another or bringing about financial gain to oneself.  See

7   United States v. Lewis, 67 F.3d225, 232-234 (9th Cir. 1995); United States v. Cloud, 872 F.2d

8   846, 852, n.6 (9th Cir. 1989) ("intent to defraud" means "to act willfully, and with the specific

9   intent to deceive or cheat for the purpose of either causing some financial loss to another, or

10  bringing about some financial gain to oneself").

11         The additional facts provided in Plaintiffs' proposed SAC support their contention that

12  Defendant acted consciously and purposefully to exert some level of control over FMMO milk

13  prices by various means, including consciously making a decision to report prices and volumes

14  for fixed price long term forward contracts and consciously deciding to hold or release stocks of

15  NFMD for domestic or export markets in order to maximize member profits.  The court cannot

16  infer from this information an "intent to defraud" as that term is defined in the cases cited above.

17  The essence of facts cited in Plaintiffs' SAC is that Defendant acted according to an

18  acknowledged purpose to maximize the profits of its member entities in the sale of NFDM.

19  Plaintiffs acknowledge that Defendant played a balancing role by trying to minimize risk while

20  trying to assure profits for both MFDM producers and the providers of raw milk; the essence of

21  Plaintiffs' action against Defendant has been and remains that Defendant asserted its balancing

22  influence too forcefully in favor of NFDM producers to the detriment of raw milk providers.  As

23  Defendants point out, there is nothing surprising or unlawful about Defendants' motivations.

24  Likewise, there is nothing about ongoing efforts to manage risk that, by itself, suggests

25  impropriety.  The court finds the quoted or summarized email conversations fall short of evincing

26  an intent to cheat or deceive for the specific purpose of causing financial loss to Plaintiffs.

27  Rather, the information presented in the proposed SAC indicates, at most, that Defendants may

28  have strained the logical limits of rationalizing their policy decision to report sales from long-

1    term fixed-price export contracts.  Again, absent a USDA regulation expressly making

2    Defendants' interpretation unlawful at the time at issue in this action, the court cannot find that

3    Defendant acted according to a specific intent to defraud Plaintiffs.

4         As noted earlier, the elements of knowing falsity of representation and an intent to defraud

5    are necessary elements of Plaintiffs' claims for intentional misrepresentation, as well as the

6    claims for mail and wire fraud under RICO and for conspiracy under RICO.  While there are

7    elements of claims for wire and mail fraud that are in addition to the elements required to sustain

8    a claim for intentional misrepresentation,  the court's finding that the information contained in the

9    proposed SAC does not support an inference of knowing falsity or of intent to defraud is

10   sufficient to defeat each of the proposed fraud-related claims.  The court therefore need not

11   undertake a separate analysis of Plaintiffs' proposed claims under RICO.

12        ***B. Plaintiffs' Claim for Fraudulent Transfer***

13        Pursuant to California Civil Code 3439.04, subsection (a), a transfer from a debtor to a

14   third party is fraudulent as to a creditor "whether the creditor's claim arose before or after the

15   [challenged] transfer was made" "[w]ith actual intent to hinder, delay, or defraud any creditor of

16   the debtor."  Cal. Civ. Code § 3439.04(a)(1).  Subsection (b) of the same statute provides a non-

17   exhaustive list of factors for the court to consider in making a determination whether the transfer

18   is fraudulent.  Pertinent to this discussion, § 3439(b)(4) provides a court may consider "[w]hether

19   before the transfer was made or obligation was incurred, the debtor had been sued or threatened

20   with suit."  Id.

21        Plaintiffs' claim under the Uniform Fraudulent Transfer Act is set forth in the fifth claim

22   for relief the proposed SAC.  In support of this claim Plaintiffs allege "five of the nine members

23   of DairyAmerica have exited DairyAmerica and each has demanded and received a full return of

24   tis pro rata share of all equity and funds in DairyAmerica with the full agreement and cooperation

25   fo DairyAmerica and without agreeing to any obligation to contribute to satisfaction of any

26   judgment rendered in this litigation."  Doc. # 160-2 at 63:14-18.  Plaintiffs' proposed SAC also

27   alleges that any liabilities arising from this action can be paid from any of the capital funds

28   established under DairyAmerica Bylaws – the Revolving Capital Fund, Fixed Capital Fund or

1  Working Capital Fund.

2        Defendant opposes Plaintiffs' claim for fraudulent transfer on a number of grounds.  Of

3  these, the court considers Defendants' contention that DairyAmerica cannot be the target of a

4  claim under the Uniform Fraudulent Transfer Act because relief under the Act permits entry of

5  judgment against the *transferee* where there has been a fraudulent transfer with "actual intent to

6  hinder, delay, or defraud any creditor of the debtor" Cal. Civ. Code § 3439.04(a)(1), to be of the

7  most immediate significance.  For reasons that will be discussed *infra*, the court will propose to

8  order that the individual entities making up DairyAmerica cannot be added under Rule 20(a)

9  because, *inter alia*, the statute of limitations on the proposed claims has run and because the same

10  statute that shields California Dairies, Inc. from liability against DairyAmerica shields the other

11  member dairies as well.  In responding to the court's order to show cause, it will be up to

12  Plaintiffs to make a case that judgment can be had against the members of DairyAmerica, the

13  expected transferees of any fraudulent transfer, in light of these contentions raised by Defendants.

14        A second concern regarding Plaintiffs' proposed fraudulent transfer claim that is perhaps

15  more compelling in the long run is Defendant's contention that there has been no actionable

16  transfer inasmuch as Plaintiffs have misrepresented the nature of the recoverable equity interest in

17  DairyAmerica by its owner-entities.  Defendants allege in their opposition to Plaintiffs' motion to

18  amend that, contrary to Plaintiffs' assertions, the member entities of DairyAmerica "were not able

19  to withdraw funds because of the $10 million Fixed Capital Retain DairyAmerica established to

20  provide for contingent liabilities."  Doc.# 171 at 27:9-10.  The court is aware that such factual

21  disputes are normally addressed in a motion for summary judgment rather than in a motion to

22  dismiss.  However, Plaintiffs are encouraged to address Defendant's contention that the members

23  of DairyAmerica who have withdrawn from DairyAmerica have not, in fact, been able to

24  withdraw a pro rata share of their entire capital interest in DairyAmerica and that the amount

25  DairyAmerica has held in its Fixed Capital Retain fund is somehow insufficient for purposes of

26  contingent liability.

27  **II.  Proposed Additional Defendants**

28        Defendants' oppose Plaintiffs' motion to amend to add new defendants on two grounds.

1   Again, Defendants' ground for opposition is futility of the claims and Plaintiffs have not had the

2   opportunity to respond to Defendants arguments.  First, Defendants contend that the member

3   dairy companies that comprise DairyAmerica are immune from liability incurred by

4   DairyAmerica to the same extent and for the same reason that former Defendant California

5   Dairies, Inc. was determined to be immune from liability.  This issue was discussed at some

6   length in the court's October 16 Order and the court's reasoning for finding that California

7   Dairies was immune from liability under both agency and joint venture theories pursuant to Cal.

8   Agriculture Code § 54239 will not be repeated here.  At present it is sufficient to note that

9   Plaintiffs' proposed SAC continues to assert liability against the member dairies under a theory

10  that may be presumed to be joint venture and there is no argument apparent in the proposed SAC

11  that the liability restrictions provided by section 54239 would not apply with equal effect to the

12  other individual dairy members of DairyAmerica.

13          A second, and perhaps more compelling argument asserted by Defendants is that most, if

14  not all, claims asserted by Plaintiffs against the proposed member Defendants are time barred as

15  Plaintiffs had at least inquiry notice of the existence of the nine members of DairyAmereica since

16  at least 2009 and have understood generally, if not in detail, the connection between the

17  executives of the member dairies and the governance of DairyAmerica.  As the court noted in its

18  October 16 Order, Plaintiffs alleged in their FAC that each member of the DairyAmerica co-op

19  has one equal vote with regard to any issue of corporate conduct.  See Doc. # 141 at 22:14-16

20  (noting that Plaintiffs allege each member has a right of joint control over the conduct of

21  DairyAmerica).  Nothing in the proposed SAC paints a different picture with regard to the joint

22  control of the member dairies over DairyAmerica's actions.  Plaintiffs allege the new information

23  obtained through discovery illuminates a deeper extent of member involvement in, and control

24  over, DairyAmerica.  The court has carefully reviewed the extensive exposition of messages and

25  emails between DairyAmerica and its component dairies and finds that the communications that

26  are summarized or quoted in the proposed SAC add nothing but detail to an understanding of the

27  relationship between DairyAmerica and its members that was clearly understood and set forth in

28  the FAC.  The court, at this point, can see no reason why any limitations period pertaining to the

13

1    proposed claims against the proposed individual member Defendants should be tolled.  If

2    Plaintiffs will seek to add these Defendants to any amended claims, they must explain why the

3    court should consider the tolling of any applicable statutes of limitations.

4         The court proposes to deny Plaintiffs' motion to amend the complaint to add Defendant

5    parties for the reason stated above.  Again, Plaintiffs' will have the opportunity to respond and

6    Defendants will have the opportunity to reply.

7

8         THEREFORE, in accordance with the foregoing discussion, it is hereby ORDERED that

9    Plaintiffs shall SHOW CAUSE why their motion to further amend the complaint to add claims

10   and defendants should not be denied on the ground of futility of amendment in light of the

11   foregoing discussion.  Any response by Plaintiffs to this order to show cause shall be filed and

12   served not later than twenty-one (21) days from the date of service of this order.  Defendant may

13   reply to Plaintiffs' response to this order not later than fourteen (14) days from the date of service

14   of Plaintiffs' response.

15

16   IT IS SO ORDERED.

17   Dated:   November 17, 2014          _____

18                                       SENIOR  DISTRICT  JUDGE

19

20

21

22

23

24

25

26

27

28

                                    14