1
2
3
4
5
6
7
8
9

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **GERALD CARLIN, JOHN RAHM, PAUL ROZWADOWSKI AND BRIAN WOLFE, individually and on behalf of themselves and all others similarly situated,** | **1:09-cv-0430  AWI EPG** |
| **Plaintiffs,** | **ORDER ON PLAINTIFFS' RENEWED MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT** |
| **v.** | |
| **DAIRYAMERICA, INC. and CAIFORNIA DAIRIES, INC.,** | **Doc. # 220** |
| **Defendants.** | |

        On March 19, 2019, the court issued an Order Following Order to Show Cause (the "March 19 Order") that denied the motion of plaintiffs Gerald Carlin, et al. ("Plaintiffs") to file a Second Amended Complaint.  Doc. # 207.  In the process of conducting further discovery, Plaintiffs took the deposition of a person named Douglas White (hereinafter, the "White Dec."), a non-party witness who was formerly Director of Sales of defendant DairyAmerica, Inc. ("DairyAmerica") during the time period of events giving rise to this action.  Primarily as a result of facts testified to in the White Dec., Plaintiffs now renew their motion for leave to further amend the complaint.  For the reasons that follow, the motion for leave to amend will be granted with limiting specifications.

### THE PROPOSED REVISED SECOND AMENDED COMPLAINT

Plaintiffs previously submitted a proposed Second Amended Complaint ("SAC") in conjunction with their prior motion for leave to amend.  Leave to file the proposed SAC was denied by the court's March 19 Order.   In order to avoid any confusion, the proposed Second Amended Complaint submitted in conjunction with the instant motion will be referred to as the proposed "Renewed Second Amended Complaint" ("RSAC"). Plaintiffs' proposed RSAC, like its predecessor, alleges fraud-related claims for intentional misrepresentation (Claim 2), violation of federal civil RICO statute, 18 U.S.C. § 1962(c), (Claim 3) and conspiracy to violate the RICO statute in violation of 18 U.S.C. § 1962(d) (Claim 4).  As was the case with the first proposed SAC, the first claim for relief in the proposed RSAC remains the claim for negligent misrepresentation.  The proposed RSAC omits Plaintiffs' previously alleged claim under California's Uniform Fraudulent Transfer Act.  However, like its predecessor, the RSAC seeks to address the perceived problem of withdrawal of assets from DairyAmerica by its constituent members.  While the SAC sought to accomplish this by alleging a claim for fraudulent transfer, a claim the court held does not provide the relief sought, the RSAC seeks to address the perceived problem by alleging fraud-related claims against each of the handler cooperatives that are or were constituent members of Dairy America at the time of the events giving rise to this action.

### LEGAL STANDARD

Plaintiff's motion to amend the complaint to add claims is governed by the terms of Federal Rule of Civil Procedure 15(a), which is to be applied liberally in favor of amendments and, in general, leave shall be freely given when justice so requires.  See Janicki Logging Co. v. Mateer, 42 F.3d 561, 566 (9th Cir. 1994).  There is a presumption in favor of granting leave to amend under Rule 15(a).  Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003).  However, "a district court need not grant leave to amend where the amendment: (1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile."  Amerisource Bergen Corp. v. Dialysist W., Inc., 465 F.3d 946, 951 (9th Cir. 2006).

2

Plaintiffs' motion to amend the complaint to add defendant parties is governed by F.R.C.P. 20, which is governed by the same considerations.  See League to Save Lake Tahoe v. Lake Tahoe Reg'l Planning Agency, 558 F.2d 914, 917 (9th Cir. 1997) (Rule 20 regarding permissive joinder is to be construed liberally in order to promote trial convenience and to expedite the final determination of disputes, thereby preventing multiple lawsuits").  "Rule 20(a) imposes two specific requisites for the joinder of parties: (1) a right to relief must be asserted by, or against, each plaintiff or defendant relating to or arising out of the same transaction or occurrence; and (2) some question of law or fact common to all the parties will arise in the action."  Id.

In addition, if a party seeks amendment of a complaint after the deadline date for amendment set by the court in a scheduling order has passed, Rule 16(b)(4) of the Federal Rules of Civil Procedure requires that "good cause" be shown by the moving party before leave to amend can be granted.  In the context of a motion to amend outside the limits set by a scheduling order, the "good cause" requirement of Rule 16(b)(4) "primarily considers the diligence of the party seeking the amendment."  Johnson v. Mamoth Recreations, 975 F.2d 604, 609 (9th Cir. 1992).  Defendants contend that Plaintiffs were not diligent in seeking to depose Douglas White and that the White Dec. should therefore be given no consideration and the motion to amend denied.  The court will consider Defendants' Rule 16 objection before considering the substantial issues of futility, prejudice or addition of defendant parties.


### FACTUAL BACKGROUND -- PLAINTIFFS' PROPOSED RSAC

#### A.  *Plaintiff's Overall Theory of the Case*

It should be expected that a district court, in particular this one, might approach the general topic of federally regulated commodity sales with some initial sense of bewilderment.  How soon that bewilderment clears is a product of the complexity of the particular regulatory regime in question, the courts familiarity with the issues involved and, last but far from least, the clarity of the parties' pleadings.  The court observes that it has been something of a struggle on all three fronts.  However, the court observes that Plaintiffs' proposed RSAC, along with the

materials accompanying their renewed motion for leave to amend, makes considerable progress in achieving a clarity that was previously missing.  In particular, the court feels that it can succinctly state the overarching theory of Plaintiffs' action as follows:  Sales of raw milk between dairy farmers ("producers") and entities that receive and process raw milk ("handlers") are federally regulated for the purpose of insulating producers to some extent from the risks of large, disruptive swings in market prices such as have occurred historically causing cycles of loss of productive capacity in the dairy industry.  Federal programs have sought to provide income stability for raw milk producers by establishing a somewhat stabilized single price for raw milk regardless of the consumer product that the milk is used to produce.  Congress promulgated the Agricultural Marketing Agreement Act of 1937 (7 U.S. § 601 et seq.) ("AMAA") for this purpose and empowered the Department of agriculture to administer the Act through the National Agricultural Statics Service ("NASS"), a branch of the Department of Agriculture.

Within the broad purpose of risk reduction for dairy producers and handlers, regulations promulgated under the AMAA allocate risk as between producers and handlers through the use of sales price reporting regulations that establish a certain balance of risk.  The process by which Federal Milk Marketing Orders ("FMMO's"), which set the price to be paid to producers for raw milk, are determined has been reviewed in prior opinions in this case and need not be reviewed here.  See, e.g., Doc. # 141 at 3:4-5:23.  Of particular significance to Plaintiffs motion to amend, it is understood by the parties and now by the court that the *exclusion* of forward wholesale contract[1] prices, as directed by NASS procedures, places the risk of a rising commodity market primarily on the handlers and protects the producers by allowing the price paid for raw milk to rise in proportion to the rise in spot prices for commodity dairy products.  Conversely, if forward contract sales prices are included in NASS reports, the risk of rising dairy commodity prices shifts away from handlers and onto producers due to the damping of the influence of rising spot prices by factoring in long term contracts which uniformly reflect lower prices for commodity dairy products, here nonfat dry milk ("NFDM"), than are reflect in the spot market price for the

---

[1]    A forward sales contract as defined by NASS is a contract for sale of a dairy product, here nonfat dry milk, that sets and does not adjust the sale price more than 30 days before the sale is completed.

same commodity.  This shifting of risk is in contravention of the evident intent of Congress and is made unlawful by the regulations promulgated by the Department.  Plaintiffs' proposed RSAC contends that Defendant Dairy America, a cooperative of handlers, contemplated a rising dairy commodity price environment and deliberately shifted risk of the rising wholesale price environment away from handlers and onto producers in the form of lost profits for produces and increased profits for handlers.  Plaintiffs allege Defendant DairyAmerica accomplished this shifting of risk unlawfully by including pricing data from forward sales contracts in weekly NASS surveys.

### B.   New Factual Allegations and Clarifications

As noted above, the court finds that several gaps in the court's understanding of the factual background of this action are clarified in Plaintiffs' proposed RSAC.  Among these, the court understands at this point that Plaintiffs allege that NASS survey data are collected *weekly* from any producer who sells any of the included dairy products in amounts greater than one million dollars per year on the wholesale market.  Plaintiffs point out that the "surveys conducted by NASS were intended to collect *current* market prices so that dairy farmers ("producers") monthly milk checks reflected up-to-date market dynamics."  Doc. # 223-2 at 3:16-17 (italics in original).  Because the reporting period is short, it is readily apparent that any forward contract (contract for wholesale whose price is set and not adjusted more than 30 days before the transaction is completed) will nearly always reflect a wholesale price that is lower than the average spot price over the same one-week period.  Therefore, the inclusion of forward contract prices in *weekly* NASS surveys will predictably result in FMMO milk prices that are always lower than would have been the case if the forward contract sales price data were properly excluded from the weekly questionnaires in accordance with NASS directions.

Plaintiffs' proposed RSAC also clarifies to some extent the mechanism by which Defendants' inclusion of forward wholesale prices in weekly NASS questionnaires could have a substantial impact on the distribution of risk as between producers and handlers:

> According to Mr. White, in 2006, DairyAmerica entered into forward pricing contracts with Fonterra Cooperative Group, Ltd. ("Fonterra") to export a "substantial and unprecedented quantity of NFDM at

comparatively low prices.  Mr. White explains that soon after entering into those contracts, "there were major shortages in the production of raw milk" and "the prices of raw milk began to rapidly climb."  Mr. White continues, "If DairyAmerica had complied with NASS's instructions an excluded sales figures from long-term non-[Dairy Export Incentive Program] contracts from its weekly reports to NASS, then raw milk prices would have continued to climb unabated, and DairyAmerica would have incurred substantial losses for its cooperative members when it sold NFDM via Fonterra."

Doc. # 223-2 at 5:12-20 (quoting portions of the White Dec.)

Plaintiffs' proposed RSAC does not allege Defendant misconduct that is "new" in the sense the specific misconduct alleged in the RSAC was not alleged in previous iterations of the complaint.  Rather, the dominant feature of the proposed RSAC is the presentation of new *evidence* in the form of the White Dec. that newly supports the previously alleged but unsupported allegations of knowing and purposeful misstatement of facts in the weekly NASS questionnaires.  The White Dec. is essentially a recounting of Deponent's personal conversations with Dairy America's executive officers and a recounting of conversations had or heard by Deponent with the officers of the handler cooperatives that were the directors of DairyAmerica.  The sum and substance of these conversations support the previously unsupported allegation that Defendant DairyAmerica's directors and the directors of the constituent handler cooperatives had actual present knowledge that, under NASS reporting rules, wholesale prices for NFDM in forward sales contracts were not to be reported on the weekly NASS questionnaires.  The White Dec. also supports Plaintiffs' allegation that the directors of Defendant DairyAmerica and the directors of the constituent handler cooperatives had actual present knowledge that the improper reporting of wholesale price data for forward contract sales on the NASS questionnaires would have the effect, particularly in a rising market for raw milk and NFDM, of shifting financial benefit to handlers to the corresponding financial detriment of producers.

With regard to the proposed joining (or re-joining) of DairyAmerica's constituent producer cooperatives as Defendants in Plaintiffs' proposed RSAC, the White Dec. alleges facts that support the allegation that the constituent cooperatives shared responsibility for the decision to submit knowingly false data to NASS equally with current defendant DairyAmerica.  The White Dec. alleges that upon belief supported by conversations "with members of the board and

6

officers of DairyAmerica" that the individual board members of DairyAmerica who were officers

of the constituent handler cooperatives "—including Kieth Gomes, Joe Heffington, Keith

Murfield, Joel Clark, David Parrish, William Schreiber, William Neary, Craig Alexander, Richard

Mosemann, Jim Baird and Richard Stammer – understood that the instructions supplied by the

NASS for the weekly reporting of data from the sale of NFDM required that DairyAmerica

exclude figures from non-[Dairy Export Incentive Program]  [forward contracts sales]."  Doc. #

223-2 at ¶ 18.  In addition, in the White Dec., Declarant states that the same list of individual

officers from the constituent handler cooperatives "jointly" made the decision to improperly

include data from forward NFDM sales contracts "and thus limit and prevent the rise of raw milk

prices."  Doc. # 223-2 at ¶ 29.

It is important to note that Plaintiffs' claims for violation of RICO statutes, claims three

and four, are alleged against the "Member Defendants" which Plaintiffs' proposed RSAC defines

as the individual producer cooperatives that made up DairyAmerica during the relevant time

period, but does not allege those claims against DairyAmerica itself.  To avoid confusion, the

court will use the term Defendant and DairyAmerica synonymously.  The court will use the term

"Member Defendants" to refer to the nine handler cooperatives that constituted DairyAmerica

including California Dairies.

**DISCUSSION**

**I.   Plaintiffs' Motion to Amend Meets "Good Cause" Standard of Rule 16(b)(4)**

Defendant's first argument against Plaintiffs' motion to amend is based on the contention

that Plaintiffs have not shown good cause for amendment as required by Rule 16(b)(4) because

they did not timely seek the deposition of Mr. White.  The court finds Defendant's argument non-

persuasive.

The more restrictive "good cause" standard of Rule 16 applies to a motion to amend that

is filed after the deadline established for the submission of motions to amend by a scheduling

order.  O'Connell v. Hyatt Hotels of Puerto Rico, 357 F.3d 152, 154 (1st Cir. 2004); Johnson, 975

F.2d at 609.  As Defendant notes, the scheduling order of January 16, 2014, Doc. # 151, set the

1   deadline for amendment of the complaint to June 30, 2014.  Defendant contends, and Plaintiffs do

2   not disagree, that Plaintiffs' renewed motion to amend, filed on September 25, 2015, was filed

3   considerably after the limitation period established by the scheduling order and is therefore to be

4   decided according to the "good cause" standard of Rule 16.  Rule 16(b)(4) exists to "preserve[]

5   the integrity and effectiveness of Rule 16(b) scheduling orders."  Id. at 155.  Basically, the "good

6   cause" standard forecloses late amendment of a complaint where the amending party displays

7   "indifference" to the deadlines established by scheduling orders.  See id. (noting that indifference

8   "seals off" relief under the good cause standard).  Conversely, the more stringent good cause

9   standard will not prohibit amendment of the complaint where the deadline set by scheduling

10  conference "'cannot be reasonably be met despite the diligence of the party seeking the

11  extension.'"  Id. at 154 (quoting Rule 16(b)(4).

12       Defendant DairyAmerica alleges without opposition that Plaintiffs did not contact Mr.

13  White to schedule a deposition until April of 2015, and did not lodge their proposed RSAC and

14  move for leave to amend until four months later.[2]  Defendant contends that, on those facts,

15  Plaintiffs cannot demonstrate diligence and that "good cause" for amendment of the complaint is

16  therefore lacking.

17       As Plaintiffs point out, the major delay in this action was the appeal of the court's decision

18  in March 2010 dismissing Plaintiffs' complaint on the ground the claims were blocked by

19  application of the filed rate doctrine.  The case remained on appeal until reversed by the Ninth

20  Circuit at the end of September 2012.  As Plaintiffs also point out, full discovery was delayed

21  until October 2013, because the court entered an order staying most discovery, including the

22  taking of any depositions during the pendency of the court's consideration of Defendants' second

23  motion to dismiss.  In lieu of full discovery during the pendency of the second motion to dismiss,

24  Defendant was ordered only to disclose "the names, addresses, and telephone numbers of each

25  individual likely to have discoverable information relevant to the subject matter of this litigation."

26  Doc. # 239 at 9:18-19 (quoting Stipulation and Order Regarding Merits Discovery, Doc. # 123).

27

28  [2]   The court notes the White Dec. is dated June 18, 2015, about midway between the time Mr. White was contacted and the time the RSAC was lodged.

8

Plaintiffs allege that DairyAmerica carried out the ordered disclosure of names and contact information by a letter dated April 26, 2013.  The letter did not contain any mention of Mr. White and Plaintiffs allege that they remained unaware of Mr. White's identity for the remainder of the stay on full discovery, which was not lifted until October 16, 2013.  Plaintiffs allege they submitted document requests on November 15, 2013, and the court scheduled the deadline for amendment of the complaint for June 30, 2014.  Plaintiffs allege that, as a result of the lengthy stay on individual discovery and the time required for processing of subsequent discovery requests, they were not able to access a large volume of Defendant's stored physical documents until April 17, 2014, and not able to access Defendant's electronic records until May 19, 2014.

Plaintiffs indicate Mr. White's identity and his materiality as a potential witness was discovered as a result of review of Defendants' electronic records; which Plaintiffs were not able to complete until after the amendment cutoff date of June 30, 2014.  Further, Plaintiffs' allege that, when they inquired as to whether Mr. White was represented by Defendant's counsel and if Defendant's counsel would accept service of subpoena on behalf of Mr. White, Defendant gave false and misleading answers.  Plaintiffs allege that Defendant falsely informed Plaintiffs on three occasions between September 11, 2014, and May 13, 2015, that Defendant's counsel *did* represent Mr. White and would accept service of process on his behalf when, in fact, neither statement was true.  Plaintiffs' allegations regarding the false and misleading nature of Defendants' communications regarding the representation of Mr. White are supported by the Declaration of George Farah, Doc. # 223-3 and documents attached thereto.

The court finds the record reflects reasonable effort by Plaintiffs to comply with the June 30 deadline for amendment of the complaint but that crucial information upon which the RSAC relies was not and could not have been discovered despite the reasonable efforts of Plaintiffs. Whether Defendant's false representations that they did represent Mr. White and would accept service of subpoena on his behalf was inadvertent or purposeful, the fact remains that the misrepresentation accounts for the time between the deadline established by scheduling order and the time Plaintiffs could reasonably have amended the complaint to include information alleged in

9

1  the White Dec. The court therefore finds that the "good cause" standard imposed by Rule 16

2  does not prevent further amendment of the complaint by Plaintiffs. The court also finds that facts

3  alleged by Plaintiffs show that amendment is not sought in bad faith.

4  **II. Proposed Additional Claim For Intentional Misrepresentation is not Futile**

5      As noted above, Plaintiffs' proposed RSAC alleges negligent misrepresentation in its first

6  claim for relief. Plaintiffs' claim for negligent misrepresentation as alleged in the RSAC is the

7  same as prior claims alleged by Plaintiffs that have been challenged by Defendants and found

8  sufficient by the court. Defendant therefore does not challenge Plaintiffs' claim for negligent

9  misrepresentation. Plaintiffs' second claim for relief alleges intentional misrepresentation (or

10 fraud) against all proposed defendants including DairyAmerica and the "member Defendants."[3]

11 Defendants oppose leave to amend to add claims primarily on the ground the claim for deliberate

12 misrepresentation Plaintiffs seek to add is futile in light of the court's prior rulings on Plaintiffs'

13 efforts to allege the same or similar claim. As noted in prior opinions, a claim is not futile for

14 purposes of a motion to amend if the claim, as stated in the amended pleading, would be

15 sufficient to withstand a motion to dismiss.

16     As the court noted in prior orders, "'the elements for an intentional-misrepresentation, or

17 actual-fraud, claim are (1) misrepresentation; (2) knowledge of falsity; (3) intent to defraud, i.e.,

18 to induce reliance; (4) justifiable reliance; and (5) resulting damage.' UMG Recording, Inc. v.

19 Bertelsmann AG, 479 F.3d 1078, 1096 (9th Cir.2007)." Doc. # 190 at 4:19-22. As the court

20 previously has noted, the elements at issue with regard to Defendants' contention that further

21 amendment of the complaint would be futile are the issues of knowledge of falsity and intent to

22 defraud. See Doc. # 190 at 4:22-5:7. The court will consider those issues in order.

23     *A.   Misrepresentation and Knowledge of Falsity*

24     The court's Order to Show Cause, Doc. # 190, focused considerable attention on the facts

25 alleged in Plaintiffs' original proposed SAC. The court noted that, after careful review, the

26 ---

[3]    The analysis that follows is focused on the question of whether Plaintiffs' proposed RSAC states a claim of
27 deliberate misrepresentation against DairyAmerica that is sufficient to withstand a motion to dismiss under Rule
12(b)(6). This inquiry is sufficient for purposes of determining whether the motion to amend should be granted with
28 respect to the proposed addition of the *claim*. Whether any or all of the "Member Defendants" may be held liable for
deliberate misrepresentation will be discussed *infra*.

inference of knowledge of falsity based on a number of quoted email exchanges that were ambiguous at best represent too much of a stretch in Plaintiffs' favor to find that Plaintiffs' had adequately pled the element.  The court opined that, at most, the facts alleged only allowed the inference that there existed between the parties "a difference of opinion based on a rational contemplation of the realities of the NFDM export business rather than a 'knowingly false' statement [by Defendant]."  Doc. # 190 at 9:23-25.  As noted above, the court finds that Plaintiffs' proposed RSAC has substantially corrected the ambiguity previously expressed in the collection of email exchanges alleged by Plaintiffs in the original proposed SAC,  The court finds that Plaintiffs' unambiguous allegation that the officers of both DairyAmerica and the officers of the constituent handler cooperatives had actual knowledge of the NASS reporting requirements and knowingly elected to disobey the instructions to not report price data from forward contract sales is sufficient to establish knowing falsity.  The court also finds that the White Dec. provides sufficient evidentiary support for Plaintiffs' allegation of knowing falsity to survive a motion to dismiss.

### B.  Intent to Defraud

As the court noted in its OSC, "[g]enerally, intent to defraud is the intent to deceive or cheat for the purpose of either causing financial loss to another or bringing about financial gain to oneself.  See United States v. Lewis, 67 F.3d225, 232-234 (9th Cir. 1995); United States v. Cloud, 872 F.2d 846, 852, n.6 (9th Cir. 1989) ('intent to defraud' means 'to act willfully, and with the specific intent to deceive or cheat for the purpose of either causing some financial loss to another, or bringing about some financial gain to oneself')."  Doc. # 190 at 10:5-10.  The court's prior conclusion that Plaintiffs' proposed SAC failed to adequately allege intent to defraud was based primarily on the ambiguity of the facts (in the form of emails) alleged by Plaintiffs coupled with the courts observation that Defendants' had made a strong rational argument for the proposition that ambiguity in the NASS instructions could justifiably be interpreted in the manner proposed by Defendants.

As discussed in previous opinions in this action, there are two "false statements" at issue in this action that both relate to the single fact of Defendants' inclusion of price data from forward

1    sales contracts on the weekly NASS questionnaires.  The first is the inclusion on the weekly

2    questionnaires themselves of price data from forward contract sales in violation of NASS

3    instruction to the contrary and the second was Defendants' affirmative answer to the question

4    posed on the yearly validation worksheets that sought affirmation from those who filled out the

5    weekly NASS questionnaires that pricing data from forward sales contracts had been omitted

6    from the weekly reports as directed.  Plaintiffs' proposed RSAC alleges two crucial facts with

7    regard to the intent to defraud.  First, as discussed above, Plaintiffs have sufficiently pled that

8    Defendants had actual knowledge that NASS instructions prohibited the inclusion of price data

9    from forward sales contracts.  Second, Plaintiffs' proposed RSAC now makes clear that

10   Defendants were fully aware of the fact that the inclusion of price data from forward sales

11   contract would *always* or nearly always result in reported wholesale prices that were lower for

12   each weekly report period that would have been the case if the forward sales price data were

13   omitted as directed by NASS.  This is particularly true in a strongly increasing wholesale market

14   for NFDM.

15        In the White Dec., Declarant states that Defendants did not undertake the false reporting

16   of wholesale NFDM pricing out of malice toward producers.  While this is no doubt true in some

17   moral sense, consideration of the two above facts could be sufficient basis for a finder of fact to

18   conclude that Defendants acted with the specific knowledge of, and intent to subvert, the apparent

19   purpose of Congress to place most of the burden of risk from a rising market in manufactured

20   dairy products on handlers, not producers.  While Defendants have made a decent case that a

21   more even and balanced business approach might be to include price data from forward contract

22   sales since most NFDM is sold to export markets and most export sales are forward contract

23   sales; the fact remains that Congress did not do it that way.  In short, the facts alleged in

24   Plaintiffs' proposed RSAC are sufficient to support a finding that Defendant DairyAmerica acted

25   with the intent to enrich itself at the corresponding expense of Plaintiffs.

26        For purposes decision on Plaintiffs' motion for further amend, it is sufficient to conclude

27   that Plaintiffs' claim for relief for intentional misstatement or fraud is sufficiently stated because

28   Defendants purposefully acted to shift the burden of risk of rising wholesale prices onto milk

producers and then represented through yearly validation worksheets that they had not done so.  It follows that a finder of fact could conclude that Defendants had deliberately misled milk producers into believing that they were participating in a market environment where they would benefit from rising wholesale milk prices when, in fact, they were they were participating in a market whose risks had been altered to favor handlers at the expense of producers.  In the court's opinion, the facts alleged in Plaintiffs' proposed RSAC state claim for fraud that is sufficient to withstand a motion to dismiss.  The court therefore cannot hold that further amendment of the complaint would be futile as to Plaintiffs' claims for fraud or intentional misrepresentation.

**III.  Addition of "Member Defendants" to Amended Complaint**

Plaintiff's proposed third and fourth claims for relief allege RICO violations against the "Member Defendants" only.  The threshold question raised by Defendant's opposition to the motion to amend is that amendment would be futile as to the Member Defendants because the claims against them are time barred.  The court begins by noting that, except for former defendant California Dairies, the Member Defendants were not proposed as defendant parties until the most recent iteration of the proposed SAC.  "A four-year statute of limitations applies to RICO claims."  A. Stucki Co. v. Buckeye Steel Castings Co., 963 F.2d 360, 364 (Fed. Cir. 1992).  Plaintiffs did not allege claims against the proposed Member Defendants until September 25, 2015. Thus, absent some form of tolling or delay in the accrual of the cause of action against the Member Defendants, Plaintiffs' claims against the Member Defendants must have accrued on or after September 25, 2001.

With regard to Member Defendant California Dairies, there is no issue with regard to time limitations because California Dairies was named as a defendant in Plaintiffs original complaint filed on March 6, 2009.  Although California Dairies was dismissed with prejudice as of the court's order of October 16, 2013, judgment was not entered in favor of Dairy America.  Rule 54(b) of the Federal Rules of Civil Procedure provide in pertinent part that in the absence of entry of judgment, "any order or other decision [except order of judgment] however designated, that adjudicates fewer that all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the

1    entry of a judgment adjudicating all the claim and all the parties' rights and liabilities." Id. Thus,

2    a defense based on any statute of limitations is unavailable to California Dairies.

3              *A.  Accrual of Claims Against Proposed Member Defendants*

4         The parties do not disagree as to the legal framework for a determination of the date of

5    accrual of a claim.  Both cite Nogart v. Upjohn Co., 21 Cal.4th 383 (1999), which holds that a

6    claim accrues when a plaintiff "at least suspects that someone has done something wrong to him,

7    'wrong' being used not in any technical sense, but rather in accordance with its 'lay

8    understanding.'"  Id. at 398-399.  See Doc. # 228 at 19:27-20:1 (quoting the passage).  Plaintiffs

9    rely on California's "delayed discovery rule," which is exemplified in Fox v. Ethicon Endo-

10   Surgery, Inc., 35 Cal.4th (2005) ("Fox").  In Fox, a surgical patient who experienced

11   complications following surgery alleged a medical malpractice claim against the surgeon

12   provider.  During discovery, the plaintiff conducted a deposition of the surgeon and learned that a

13   medical device provided by defendant Ethicon likely malfunctioned and was the cause of the

14   injuries suffered.  The plaintiff amended the complaint to include a products strict liability claim

15   against the medical equipment manufacturer who responded by filing a demurer that asserted a

16   statute of limitations defense.  See, id. at 802-803.  The plaintiff in Fox opposed the demurrer by

17   relying on the delayed discovery rule.  The defendant appealed the trial court's denial of

18   demurrer, holding that the plaintiff's product liability claim had not accrued until she learned or

19   could have learned of the medical device and its role in the causation of damages.  See id.at 802-

20   803.

21        The Fox Court observed that the general rule of accrual is that "a cause of action accrues

22   at 'the time when the cause of action is complete with all of its elements.'"  Id. at 806 (quoting

23   Nogart, 21 Cal.4th at 397).  In practical terms a cause of action accrues when the "plaintiff

24   discovers, or has reason to discover, [a factual basis for the elements of a] cause of action."  Fox,

25   35 Cal.4th at 807.  The Fox court was careful to point out that the "elements of a cause of action"

26   as used in Nogart was intended generically; that is, the cause of action accrues when the plaintiff

27   knows or should have suspicion of the "'generic' elements of wrongdoing, causation and harm."

28   Id.  The Fox court upheld the trial court's denial of demurrer, observing that a claim for product

                                          14

liability under a theory of strict liability is a cause of action distinct from medical malpractice. The court held that the factual basis for the causation element of the new cause of action could not have been known until the deposition of the surgeon defendant revealed the facts of the medical equipment malfunction.  See id. at 811.  In applying the delayed discovery rule in this context, the Fox court was careful to point out that the application of the rule under California law rests on the inability of a plaintiff to discover the facts giving rise to the cause of action *not* on the discovery of the identity of the party or parties responsible.  See Fox, 35 Cal.4th at 807 ("As the court reasoned in Nogart, 'it follows that the failure to discover, or have reason to discover, the identity of the defendant does not postpone the accrual of a cause of action, whereas a like failure concerning the cause of action itself does.'").

"In order to rely on the discovery rule for delayed accrual of a cause of action, 'a plaintiff whose complaint shows on its face that his claim would be barred without the benefit of the discovery rule must specifically plead facts to show (1) the time an manner of discovery *and* (2) the ability to have made earlier discovery despite reasonable .' [Citation.]"  Id. at 809 (quoting McKelvey v. Boeing North American, Inc., 74 Cal.App.4th 151, 160 (1999).  In a section titled "Concealment and Tolling," Plaintiff's proposed RSAC alleges:

> Throughout the Class Period, Defendants affirmatively concealed from Plaintiffs and Class members the misrepresentations alleged herein and the identity of the entities that made such representations.  DairyAmerica misrepresented NFDM prices in confidential reports to USDA that were concealed from public review, and Defendants concealed the contents of the reports throughout the relevant time period.  When USDA – including NASS, AMS and the Inspector General – investigated or announced the misreported NFDM prices, Defendants continued to conceal the identity of the misreporting entities.

> Member Defendants concealed, and continued to conceal, the fact that they made and participated in the misrepresentations to USDA, claiming they were unaware of the misrepresentations to USDA, claiming they were unaware of the misrepresentation until publication of *The Milkweed* article [in March 2007].  Member Defendants concealed, and continued to conceal, the fact that they instructed DairyAmerica to improperly include sales data from forward pricing contacts in weekly reports to NASS, disclaiming any involvement in reporting issues.  Indeed, Member Defendants continued to deny their participation in DairyAmerica's misreporting with their senior executives disclaimed involvement during depositions taken in this litigation.

Doc. # 223-3 at ¶¶ 184, 185.

There are two reasons why Plaintiffs' reliance on the delayed discovery rule is unavailing. First, the delayed discovery rule, as discussed above, delays the accrual of a *cause of action* to the time the plaintiff knew or should have known they were harmed by another's misconduct, *not* to the time he or she discovered *the identity* of the persons committing the misconduct.  In the context of fraud-related claims, "a cause of action for fraud under California law accrues when a plaintiff has inquiry notice, that is, when he or she 'learns, or at least is put on notice that a representation is false.'" Platt Elect. Supply, Inc. v. EOFF Electrical, Inc., 522 F.3d 1049, 1058 (9th Cir. 2008) ("Platt") (quoting Hamilton Materials, Inc. v. Dow Chemicals Corp., 494 F.3d 1203, 1207 (9th Cir. 2007)).   Notwithstanding Plaintiffs' attempt to frame the claims against the Member Defendants as being new and previously undiscovered causes of action; that is, RICO violations, the fact is that the RICO violations alleged are merely an alternate formulation of the generic wrong of deceit with the added element of interstate commerce, a fact known to Plaintiffs from the outset.  As explained in Fox and related cases, a cause of action, for purposes of application of the delayed discovery rule, is based on a non-technical understanding of "cause of action."  The simple reformulation of an already alleged cause of action, here deceit, is not a new cause of action because it merely expresses the previously alleged harm brought about by the same means in a slightly different way.  The court concludes Plaintiffs' claims for RICO violation against the proposed Member Defendants are not subject to the delayed discovery rule and accrued at the same time as Plaintiffs' claims for negligent misrepresentation or other fraud-related claims; that is, at the time of the publication of the article in *The Milkweed* reporting DairyAmerica's misreporting in March of 2007.

The second reason the delayed discovery rule is not applicable to Plaintiffs' RICO claims is that the proposed RSAC does not allege any facts that Plaintiffs did not have at least inquiry

notice of from the outset of the case.  Plaintiffs' original complain expresses a fairly complete understanding of the mechanics of deceit that brought about the harm to Plaintiffs and expresses a complete understanding of the structure and composition of DairyAmerica.  In particular, Plaintiffs have known since the filing of the of the original complaint that DairyAmerica was the creation of the Member Defendants and its board of directors was staffed primarily by executive officers of the proposed Member Defendants.  The court finds that the situation Plaintiffs described in their original complaint constitutes at least inquiry notice that the Member Defendants, through their executive members sitting on the board of directors of DairyAmerica, could be expected to have some role in the harm Plaintiffs suffered as of the same time they learned of DairyAmerica's misreporting.  The court concludes from all of the information available that Plaintiffs had at least inquiry knowledge of potential claims against the proposed Member Defendants and, with the exception of California Dairies, decided as a matter of strategy not to sue them.

The court concludes that Plaintiffs' may not rely on the delayed discovery rule to bring an action against the Member Defendants within the statute of limitations for the alleged RICO claims.  The court finds Plaintiffs' claims against the proposed Member Defendants accrued at the same time as the claims against DairyAmerica; that is in 2007 and were time barred as of the beginning of 2012 at the latest unless the running of the statute of limitations was tolled.

### B.  Fraudulent Concealment

"With respect to actions based on fraud, the statute of limitations is tolled whenever [a] plaintiff is able to show the defendant fraudulently concealed facts which would have led [the plaintiff] to discover his potential cause of action."  Snow v. A.H. Robins Co., Inc., 165 Cal.App.3d 120 127-128 (1999). Fraudulent concealment is not availing to Plaintiffs' efforts to bring their claims against the Member Defendants within the limitations period for much the

same reason that delayed discovery is not availing.  Simply put, nothing crucial to the identities or the causes of action against the Member Defendants was concealed.  As discussed above, Plaintiffs' original complaint reflects a level of knowledge of the existence and identity of the proposed Member Defendants, along with their roles as members of the board of directors of DairyAmerica, that is sufficient to constitute inquiry, if not actual, notice that the Member Defendants could have been complicit in the activities that form the basis for Plaintiffs' claims for deceit.

The portions of the proposed RSAC quoted above allege "concealment" of the roles of the proposed Member Defendants in decisions to misrepresent information to the USDA through the weekly NASS reports, but Plaintiffs' use of the term "concealment" overstates the effect of the Member Defendants' denial of involvement.  Plaintiffs contend the proposed Member Defendants concealed information concerning their role in the misreporting by "claiming they were unaware of the misrepresentations to USDA, claiming they were unaware of the misrepresentation until publication of *The Milkweed* article."  Doc. # 223-3 at ¶ 185.  The fact that a party or potential party denies a fact that the opposing party has the burden to prove does not equate to concealment in the sense intended by the doctrine of fraudulent concealment.  The standard for a "cause of action" within the meaning of a claim for fraudulent concealment is the same as the standard within the context of a claim for delayed discovery.  See Platt, 522 F.3d at 1056-1057 (discussing "cause of action" in the context of claim of fraudulent condealment).  From the outset of this action, Plaintiffs have expressed the knowledge that the proposed Member Defendants had knowledge that the inclusion of forward price contracts in the weekly NASS reports would lower wholesale prices for raw milk.  Plaintiffs have also expressed knowledge from the outset of this action that the proposed Member Defendants had a financial motive to carry out the misreporting and had at least proximity to the making of any decision to misreport.

As with Plaintiffs claim for delayed discovery, the court concludes that the statute of limitations on Plaintiffs RICO claims against the proposed Member Defendants cannot be tolled under the doctrine of fraudulent concealment because no facts critical to Plaintiffs' ability to allege those claims against the proposed Member Defendants were concealed.

The court concludes that the claims for RICO violation alleged in the proposed RSAC are futile with regard to each of the proposed Member Defendants *except* California Dairies because the claims are barred by the applicable statute of limitations.

**IV. California Food & Agriculture Code § 54239 and Claims Against California Dairies**

Defendant contends that Plaintiffs' proposed claims against California Dairies for violation of RICO and conspiracy to violate RICO are futile because Cal. Food & Agric. Code § 54239 holds agricultural producers not liable for the debts of cooperative entities to which the producers belong.  In its Order Following Order to Show Cause, Doc. # 207, the court discussed the nature of immunities granted by section 54239.  The court concluded that Plaintiffs had not alleged any conduct against the Member Defendants that was not contemplated by the power of agricultural producers to form cooperatives under Food & Ag. Code § 54001, and that the proposed Member Defendants were therefore shielded from liability for the conduct of DairyAmerica under section 54239.  See Doc. # 207 at p.p. 8-10.

With regard to Plaintiffs' proposed RICO claims against California Dairies, Defendant contends the claims are barred by section 54239 and Plaintiffs contend the opposite because; (1) section 54239 does not shield California Dairies from *its own* tortious conduct, and (2) because the Supremacy Clause precludes state defenses with regard to RICO claims based on federal predicate acts.  Plaintiffs' first contention is uncontested.  Logically and textually section 54239 does not shield an agricultural producer from liability for its own acts.  As a consequence, section 54239 offers no benefit to California Dairies for any liability under Plaintiffs' claim for

19

*conspiracy* to violate RICO pursuant to Plaintiff's proposed fourth claim for relief.

With regard to Plaintiffs' proposed claim for RICO violation, claim 3, Defendants contend that while the Supremacy Clause does bar state defenses for RICO claims based on federal predicate offenses, state defenses are availing against RICO claims based on state predicate offenses.  Defendant does not dispute that the Supremacy Clause bars state law defenses where violations of federal law are the predicate acts, but contends that Plaintiffs' claim for violation of RICO is based on a predicate offense of fraud, a violation of California state common law. Plaintiffs respond by contending that the predicate offenses alleged with regard to claims 3 and 4 are *wire* fraud and *mail* fraud, both federal offenses.  The court finds that Plaintiffs' contention is correct.  As will be discussed in more detail *infra*, the RICO statute, 18 U.S.C. § 1961(a), defines racketeering activity as consisting of conduct that violates any of an enumerated list of federally defined offenses *or* the "collection of unlawful debt."   Thus, while there could conceivably be a situation where predicate violations could be based on the collection of debts that are unlawful under state law, the predicate offenses that Plaintiffs' proposed RSAC alleges are both offenses defined by federal statute -- mail fraud, 18 U.S.C. § 1341, and 18 U.S.C. § 1343 (wire fraud). Neither mail fraud nor wire fraud rely on state law for their definitions.  See 18 U.S.C. §1346 (defining "scheme or artifice to defraud" for purposes of mail and wire fraud statutes as "a scheme to deprive another of the intangible right to honest services").  The court concludes that the Supremacy Clause operates with regard to Plaintiffs' proposed claim for civil violation of RICO such that the claims are not barred by Cal. Food & Ag. Code § 54239.

## V.   Plaintiffs' Proposed RICO Claims – Factual Sufficiency

Having determined that the Member Defendants other than California Dairies are immune from suit because the statute of limitations has run on RICO claims against them, the scope of the discussion in regard to the focus of the factual claims for RICO violation is somewhat limited.

1   The court recognizes that Plaintiffs can reasonably be expected to desire to reformulate the

2   proposed RSAC before it is filed to accommodate the fact that all of the proposed Member

3   Defendants except California Dairies cannot be named in any amended complaint.  In addition,

4   given that the court is of the opinion that further amendment of the complaint is generally

5   warranted, the court is of the opinion that the causes of conservation of scarce judicial resources

6   and the timely progression of this case to resolution may be benefitted if Plaintiffs take the

7   opportunity to restate their claims for RICO violation (if any) to make them specific to the

8   remaining parties.  With this in mind, the court will undertake a brief discussion on the general

9   requirements to state a RICO claim and the court's opinion as to whether the facts of this case as

10  so far alleged will likely support either or both of the RICO claims alleged in the proposed RSAC

11  against either of the remaining defendants.

12              *A.  Elements and Structure of RICO*

13          The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et

14  seq., prohibits "any person employed by or associated with any enterprise engaged in, or the

15  activities of which affect, interstate or foreign commerce, [from conducting or participating]

16  directly or indirectly in the conduct of such enterprise's affairs through a pattern of racketeering

17  activity or collection of unlawful debt."  18 U.S.C. § 1962(c).  Any person who is injured through

18  such "racketeering activity" may recover treble damages and attorney's fees in the proper district

19  court.  See 18 U.S.C. § 1964(c).  Acts that constitute "racketeering activity" are enumerated in 18

20  U.S.C. § 1961(a).  Among the acts listed are acts constituting violation of 18 U.S.C. § 1341 (mail

21  fraud) and acts in violation of 18 U.S.C. § 1343 (wire fraud).  These are the "predicate acts"

22  alleged by Plaintiffs' proposed RSAC as constituting "racketeering activity" in violation of RICO

23  statutes.  See Doc. # 223-2 at ¶ 224.  A "'pattern of racketeering activity' requires at least two

24  acts of racketeering activity, one of which occurred after the effective date of this chapter and the

25  last of which occurred within ten years [. . .] after the commission of a prior act of racketeering

26  activity."  18 U.S.C. §1961(5).  In summary, the elements of violation of the RICO statute are: (1)

27  the commission of at least two "predicate acts" within the statutory time period and within 10

28

1  years of each other, (2) by a person employed by or associated with an enterprise, (3) that affects

2  interstate or foreign commerce.

3  ### *1.   Predicate Offenses – Mail and Wire Fraud*

4  The elements of mail and wire fraud are the same except for the communication modality

5  used.  See United States v. Stapleton, 293 F.3d 1111, 1114 (9th Cir. 2002) (setting forth elements

6  of both offenses).  "The only essential elements of mail [or wire] fraud under 18 U.S.C. s 1341

7  [or 18 U.S.C. § 1342] are that the defendant devised a scheme to defraud and that for the purpose

8  of executing this scheme he used the mails [or wire modalities] or caused the mails [or wire

9  modalities] to be used. 18 U.S.C. § 1341."  United States v. Outpost Dev. Co., 552 F.2d 868, 870

10  (9th Cir. 1977).  "The words 'to defraud' in the mail [or wire] fraud statute[s] have the 'common

11  understanding' of 'wronging one in his property rights by dishonest methods or schemes,' and

12  'usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.'"

13  Carpenter v. United States, 484 U.S. 19, 27 (1987) (internal quotes and citation omitted).

14  "'Although a mailing must occur in the execution of the scheme—that is, as a step in [the] plot—

15  the mailing need not be an essential element of the scheme. Rather, it is sufficient if the mailing is

16  incident to an essential part of the scheme.'"  United States v. Panthaky, 232 F. App'x 645, 648

17  (9th Cir. 2007) (quoting United States v. Lo, 231 F.3d 471, 478 (9th Cir.2000).

18  The Intentional or fraudulent misreporting alleged in Plaintiffs' second claim for relief

19  satisfies the "predicate offenses" requirement of the mail and wire fraud statutes.  As discussed

20  above, the facts alleged in the White Dec. constitute a basis upon which a finder of fact could

21  conclude that Defendant's methods were dishonest and sought to deprive Plaintiffs of something

22  of value – in this case profits from rising prices for raw milk – by means, in this case, of deceit

23  and/or overreaching; that is, by deliberately and purposefully submitting false data to frustrate the

24  regulatory purpose of maintaining the risk of rising raw milk prices on milk handlers.  While it is

25  true that the use of mail or wire communications modalities was not central to the scheme to

26  defraud, there is no question that the weekly questionnaires and the yearly validation worksheets

27  had to be and were transmitted to NASS by means of both mail and wire.  For purposes of

28  satisfying the elements of mail or wire fraud, the use of wire or mail communications is

22

sufficiently connected to the scheme to defraud if the scheme, taken as a whole, would reasonably lead to the expectation that mail or wire communications would be used.  See United States v. Soto, 799 F.3d 68, 92 (1st Cir. 2015) (noting that the "in furtherance" prong of mail fraud is satisfied if the perpetrator knows or reasonably foresees that the mail will be used in the "ordinary course of business").  In this case the court finds that Plaintiffs' proposed RSAC adequately alleges the predicate offenses of mail and wire fraud because the submission of fraudulent weekly and yearly reports to NASS necessarily gives rise to the expectation that mail or wire communications would be used.

### 2.   Action by Employee of Enterprise and Effect on Interstate Commerce

With regard to DairyAmerica, Plaintiffs' proposed RSAC clearly alleges that employees of DairyAmerica, particularly Mr. Lewis, were instrumental in perpetrating the alleged scheme to suppress raw milk prices.  Further, it has never been disputed that the setting of Federal Milk Marketing Orders ("FMMO's") using formulas dependent on NASS weekly questionnaires has an effect on the interstate and international commerce in dairy products.  The court concludes that the interstate commerce and employee of the enterprise elements are satisfied by the facts set forth in Plaintiffs' proposed RSAC.

### 3.   Causation

Defendant DairyAmerica contends in its opposition to Plaintiffs' motion to amend that Plaintiffs' claim for violation of RICO is futile because Plaintiffs cannot allege proximate causation inasmuch as the allegedly fraudulent submissions were directed to NASS, not Plaintiffs. Defendant contends that Defendant's allegedly fraudulent submissions, having been directed to NASS, do not satisfy the RICO element requiring that the defendant's wrongful acts be "'the proximate cause of harm to the victim.'"  Doc. # 228 at 26:10-11 (quoting Eclectic Props. E., LLC v. Marcus &Millichap, 751 F.3d 990, 997 (9th Cir. 2014).  Presuming the legal validity of Defendant's contention that a violation under RICO requires a relationship between the alleged unlawful act and the plaintiff's harm that is closer than mere "but for" causation, the court still finds Defendant's opposition unpersuasive.  Contrary to Defendant's characterization of the role

of NASS, the court is of the opinion that the role filled by NASS with regard to price setting is that of a mere price-calculating intermediary in the relationship between producers and handlers. As discussed in prior opinions, there is no indication that NASS has any discretionary role with regard to the setting of prices.  Based on current and prior pleadings, it is the court's understanding that NASS merely collects and aggregates data from the weekly reports and mechanistically applies the aggregated results to pre-set formulae that turn out wholesale prices for raw milk.  According to the most recent iteration of the complaint, it is the court's understanding that there is a direct one-to-one relationship between the extent to which the inclusion of data from forward pricing contracts lowers the reported per pound price of NFMD and the extent to which the computed price for raw milk is depressed.  Since there is no evidence that NASS plays anything other than a pre-set formulaic role in price setting, the court concludes that Plaintiffs' proposed RSAC alleges sufficient facts to conclude that Defendant's alleged misreporting is the proximate cause of the wrongful depression of prices paid to producers and that NASS is merely a pass-through intermediary through which the scheme was conducted.

### B.   Conspiracy to Violate RICO

To prove that a defendant entered into a conspiracy to violate RICO, the plaintiff must show "(1) the existence of enterprise affecting interstate commerce, (2) that the defendant knowingly joined the conspiracy to participate in the conduct of the affairs of the enterprise, (3) that the defendant participated in the conduct of the affairs of the enterprise, and (4) that the defendant did so through a pattern of racketeering activity by agreeing to commit, or in fact committing, two or more predicate offenses."   Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1561 (1st Cir. 1994).  Under this definition, it is not necessary that the defendant herself or himself actually committed the predicate acts, but only that the alleged conspirator "agreed with one or more others that two predicate offenses be committed."   Id.  Plaintiff's proposed RSAC does not say much about California Dairies specifically.  The court will not express an opinion as to Plaintiffs' ability to sate such claim at this point.  The elements are set forth here so the parties have notice of the facts that must be pled to state a claim for conspiracy to commit RICO violation.

**VI.  Delay and Prejudice**

Given that the parties to any further amendment of the complaint will be the same parties that were originally named in the complaint and given that the claim or claims that may be alleged in any further amendment of the complaint are variant expressions of claims that have been alleged previously, the court concludes that further amendment of the complaint will result in neither prejudice to any party nor significant delay in the resolution of this action.

**CONCLUDION AND ORDER**

The court finds that Plaintiffs have shown just cause for further amendment of the complaint.  Plaintiffs' motion to amend is therefore GRANTED with the following instructions:

1.   Claims against any of the proposed "Member Defendants" except proposed Member Defendant California Dairies shall not be alleged.

2.  Plaintiffs further amended complaint shall allege only those legal theories for relief that have been alleged in Plaintiffs proposed Revised Second Amended Complaint.  Plaintiffs may allege or not allege particular claims against either or both DairyAmerica or/and California Dairies.

3.  Any further amended complaint shall be designated "Third Amended Complaint" and shall be filed and served not later than twenty-one (21) days from the date of filing of this order.

IT IS SO ORDERED.

Dated:   January 19, 2016      _____
                              SENIOR  DISTRICT  JUDGE