1   BENJAMIN D. BROWN (SBN 202545)
    bbrown@cohenmilstein.com
2   **COHEN MILSTEIN SELLERS & TOLL, PLLC**
    1100 New York Avenue, N.W.
3   Suite 500, West Tower
    Washington, DC 20005
4   Telephone: (202) 408-4600
    Facsimile: (202) 408-4699
5
    *Counsel for Plaintiffs and the Proposed Class*
6
    [Additional Counsel listed on signature page]
7

8               **UNITED STATES DISTRICT COURT**

9             **EASTERN DISTRICT OF CALIFORNIA**

10                    **FRESNO DIVISION**

11

12  GERALD CARLIN, JOHN RAHM, PAUL          Case No. 1:09 CV 00430 (AWI)
    ROZWADOWSKI and DIANA WOLFE,
13  individually and on behalf of themselves  **CLASS ACTION**
    and all others similarly situated,
14                                           **THIRD AMENDED CLASS ACTION**
                   Plaintiffs,               **COMPLAINT**
15
    v.
16                                           **DEMAND FOR JURY TRIAL**
    DAIRYAMERICA, INC. and
17  CALIFORNIA DAIRIES, INC.,

18                 Defendants.

19

20

21

22

23

24

25

26

27

28

Individual and Representative Plaintiffs Gerald Carlin, John Rahm, Paul Rozwadowski and H. Diana Wolfe, on behalf of themselves and all others similarly situated, allege:

1.    This class action is brought on behalf of dairy farmers in the United States who sold raw milk that was priced according to a Federal Milk Marketing Order ("FMMO") during the period January 1, 2002 through April 30, 2007 ("Class Period").

2.    During the Class Period, Plaintiffs and tens of thousands of other dairy farmers received a milk check each month for the sale of their raw milk. The prices in the monthly milk checks paid to those dairy farmers were set using FMMO formulas that factor in dairy product prices obtained by the National Agricultural Statistics Service ("NASS"), a division of the United States Department of Agriculture ("USDA").

3.    One of the dairy product prices used by NASS to calculate the price of raw milk was nonfat dry milk ("NFDM"). During the Class Period, NASS obtained NFDM prices by conducting weekly surveys of firms that annually sell one million or more pounds of NFDM. The higher the NFDM prices reported in the surveys, the higher the raw milk prices that dairy farmers received.

4.    The surveys conducted by NASS were intended to collect *current* market prices so that dairy farmers' monthly milk checks reflected up-to-date market dynamics. As a result, the instructions on the surveys required the exclusion of sales data from long-term contracts, which contain future prices rather than current prices. Specifically, the weekly surveys conducted by NASS to obtain NFDM pricing data directed reporting firms to exclude: "Forward pricing sales: sales in which the selling price was set (and not adjusted) 30 or more days before the transaction was completed. This exclusion does not include sales through the Dairy Export Incentive Program (DEIP)."

5.    One of the largest sellers of NFDM surveyed by NASS was DairyAmerica, Inc. ("DairyAmerica"). DairyAmerica is a joint marketing venture that was created by the predecessors to the cooperative California Dairies, Inc. ("California Dairies") to market and sell NFDM. California Dairies is the second largest dairy processing cooperative in the United States, manufacturing approximately 40 percent of the NFDM in the United States and earning more

than $4 billion in annual sales.

6.      During the Class Period, DairyAmerica marketed and sold approximately 75 percent of all the NFDM produced in the United States and exported NFDM to over 40 countries worldwide. With control over such a dominant share of the NFDM market, DairyAmerica could shape raw milk prices by modifying its reporting procedures.

7.      During the Class Period, DairyAmerica was entirely controlled and operated by California Dairies and eight other cooperatives, each of which were members of DairyAmerica and held positions on its board of directors.  DairyAmerica's mission was to maximize profits for California Dairies and its eight other member cooperatives.

8.      During the Class Period, DairyAmerica sold the vast majority of NFDM manufactured by California Dairies and the eight other cooperative members of DairyAmerica. DairyAmerica also sold NFDM and other powder products manufactured by third-party processors.

9.      During the Class Period, DairyAmerica, California Dairies and seven other cooperative members of DairyAmerica conspired to fraudulently misreport NFDM prices to NASS. Specifically, they conspired to instruct and instructed DairyAmerica to systematically include prices and volumes from forward pricing contracts in weekly reports to NASS, in contravention of the clear instruction on the survey form to exclude such data.  DairyAmerica included prices and volumes from forward pricing contracts in weekly reports to NASS even while repeatedly and explicitly assuring USDA that it was excluding such information.

10.      DairyAmerica, California Dairies and seven other members of DairyAmerica conspired to misreport, and intentionally misreported, NFDM prices and volume for the specific purpose of artificially depressing raw milk prices and protecting their profits. Raw milk prices are the principal cost input for manufacturing NFDM. When DairyAmerica entered into forward pricing contracts, it locked in NFDM sales prices for a significant duration of time. Thus, if raw milk prices rose considerably during that time period, DairyAmerica's members, including California Dairies, would lose profits. In order to prevent such losses, DairyAmerica, California Dairies and seven other members of DairyAmerica conspired to unlawfully defy USDA's

instructions and include sales figures from forward pricing contracts in DairyAmerica's weekly reports to NASS. By doing so, they were able to leverage DairyAmerica's dominant market share to depress raw milk prices whenever forward pricing contracts reflected below-market NFDM values. This misreporting scheme allowed DairyAmerica's members, including California Dairies, to avoid losses even when they misread the long-term market, by forcing dairy farmers to receive artificially depressed raw milk prices.

11.     In a sworn declaration, Ralph Douglas White ("Doug White"), DairyAmerica's former Director of Sales, who was employed in that capacity during the entire Class Period, admitted that the company intentionally misreported sales data to USDA and that DairyAmerica's cooperative members, including California Dairies, specifically instructed it to do so.  Doug White, who reported directly to DairyAmerica's CEO and regularly attended board meetings, swears that: (1) he warned both DairyAmerica's CEO and Controller that the company was failing to comply with USDA's instruction to exclude forward pricing sales from weekly reports to NASS; (2) he advised both DairyAmerica's CEO and Controller to halt the misreporting of forward pricing sales in the weekly reports; (3) nonetheless, DairyAmerica's CEO and eight cooperative members, including California Dairies, *jointly* decided that DairyAmerica should continue to misreport forward pricing sales data to USDA; (4) DairyAmerica's CEO and eight cooperative members, including California Dairies, *jointly* instructed DairyAmerica to misreport sales data to USDA for the specific purpose of lowering monthly raw milk prices that were paid to farmers; and (5) several cooperatives exited DairyAmerica in part to avoid paying a judgment in this case.

12.     In his declaration, Mr. White describes the most injurious example of DairyAmerica's misreporting. According to Mr. White, in 2006, DairyAmerica entered into forward pricing contracts with Fonterra Cooperative Group Ltd. ("Fonterra") to export a "substantial and unprecedented quantity of NFDM at comparatively low prices." Mr. White explains that soon after entering into those contracts, "there were major shortages in the production of raw milk" and "the prices of raw milk began to rapidly climb." Mr. White continues, "If DairyAmerica had complied with NASS's instructions and excluded sales figures

from long-term non-DEIP contracts from its weekly reports to NASS, then raw milk prices would have continued to climb unabated, and DairyAmerica would have incurred substantial losses for its cooperative members when it sold NFDM via Fonterra." Mr. White states that to "avoid incurring substantial losses for its cooperative members, DairyAmerica chose to report these sales to NASS regardless of NASS's instructions." According to Mr. White, the "decision by DairyAmerica in 2006 to improperly include, in its weekly reports to NASS, figures from non-DEIP sales of NFDM in which the selling price was set (and not adjusted) 30 or more days before the transaction was completed, and thus limit and prevent the rise of raw milk prices, was taken jointly by [CEO] Richard Lewis and several executives from cooperatives that were members of DairyAmerica," including California Dairies. Mr. White states that "executives at cooperatives that were members of DairyAmerica decided in 2006 to disobey NASS's instructions and include, in DairyAmerica's weekly reports to NASS, figures from non-DEIP, long-term contracts."

13. A substantial share of the NFDM prices and volumes that DairyAmerica misreported to NASS was derived from forward pricing contracts for export. From January 2006 through April 2007, approximately 90 percent of DairyAmerica's contracts for the export of NFDM were transacted outside of DEIP and established selling prices more than 30 days before the completion of the transaction.

14. As a direct result of DairyAmerica's fraudulent misreporting, the raw milk prices set by the FMMOs were lower than they should have been, and Plaintiffs and the other members of the proposed class of dairy farmers were deprived of millions of dollars of income. Meanwhile, California Dairies and the other members of DairyAmerica profited substantially from their misreporting of NFDM prices to NASS.

15. In March 2007, a publication called *The Milkweed* alleged that DairyAmerica had been improperly including forward pricing contracts in its weekly reports to NASS. The article prompted USDA to launch an investigation of DairyAmerica's reporting practices. In April 2008, USDA issued a report verifying that DairyAmerica had failed to comply with the instruction to exclude forward pricing contracts and that farmers had been deprived of millions of dollars in income. Secretary of Agriculture Charles F. Connor described DairyAmerica's misreporting as a

1  "significant lapse" in following "clearly articulated instructions."

2      16.    Plaintiffs filed their first complaint in this action on March 6, 2009. �_▄▄▄

3  ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

4  ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

5  ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

6  ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

7  ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

8  ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

9      17.    Direct evidence makes clear that DairyAmerica, California Dairies and seven other

10  members of DairyAmerica intentionally lied to USDA and deprived thousands of farmers of

11  millions of dollars in income. Those farmers now seek to recover damages from DairyAmerica

12  and California Dairies ("Defendants"). Plaintiffs seek, on behalf of themselves and all others

13  similarly situated, compensatory, consequential, treble and punitive damages, and injunctive

14  relief.

15                 **JURISDICTION AND VENUE**

16      18.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d) in that

17  Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds

18  the value of $75,000, exclusive of interest and costs. This Court has personal jurisdiction over all

19  Defendants in that both DairyAmerica and California Dairies are incorporated in, and have their

20  principal place of business in, the State of California and they engaged in misconduct alleged

21  herein in the State of California.

22                     **THE PLAINTIFFS**

23      19.    Individual and representative Plaintiff Gerald Carlin is a dairy farmer and a

24  resident of Meshoppen, Pennsylvania. Mr. Carlin sold raw milk that was priced according to

25  FMMO formulas during the period January 1, 2002 through April 30, 2007.

26      20.    Individual and representative Plaintiff John Rahm is a dairy farmer and a resident

27  of Versailles, Ohio. Mr. Rahm sold raw milk that was priced according to FMMO formulas

28  during the period January 1, 2002 through April 30, 2007.

21.    Individual and representative Plaintiff Paul Rozwadowski is a dairy farmer and a resident of Stanley, Wisconsin. Mr. Rozwadowski sold raw milk that was priced according to FMMO formulas during the period January 1, 2002 through April 30, 2007.

22.    Individual and representative Plaintiff H. Diana Wolfe is a dairy farmer and a resident of Rome, Ohio. Ms. Wolfe sold raw milk that was priced according to FMMO formulas during the period January 1, 2002 through April 30, 2007.

23.    The Plaintiffs and other members of the proposed Class have not purchased raw milk or other goods or services from the Defendants.

## THE DEFENDANTS

24.    Defendant DairyAmerica is a not-for-profit corporation organized and existing under the laws of the State of California with its principal place of business in Fresno, California. During the Class Period, DairyAmerica marketed and sold approximately 75 percent of all the NFDM produced in the United States and exported NFDM to over 40 countries worldwide. Since 1998, DairyAmerica has reported dairy product prices to NASS. DairyAmerica is financed, controlled and operated by California Dairies and other member cooperatives.

25.    Defendant California Dairies is a for-profit corporation organized and existing under the laws of the State of California with its principal place of business in Visalia, California. California Dairies is the second largest dairy processing cooperative in the United States and earns more than $4 billion in annual sales.  California Dairies owns six milk processing plants that produce NFDM, butter, buttermilk powder and cheddar cheese. It ships over 18 billion pounds of milk to be processed, and it manufactures approximately 40 percent of the NFDM in the United States.  It sells dairy products in all 50 states and around the world.  The predecessors to California Dairies created DairyAmerica.  Since its inception, California Dairies has been a member of DairyAmerica.  In conjunction with other DairyAmerica members, California Dairies directed and controlled the activities of DairyAmerica during the Class Period.

## DEFENDANTS' CO-CONSPIRATORS AND AGENTS

26.    Seven cooperatives not named as Defendants herein participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof.

During the Class Period, those seven cooperatives were members of DairyAmerica and their executives served on DairyAmerica's Board of Directors. Those seven cooperatives include: Agri-Mark Inc. ("Agri-Mark"), Dairy Farmers of America ("DFA"), Land O'Lakes Inc. ("Land O'Lakes"), Lone Star Milk Producers, Inc. ("Lone Star"), Maryland & Virginia Milk Producers Cooperative Association, Inc. ("Maryland & Virginia"), O-AT-KA Milk Producers Inc. ("O-AT-KA"), and United Dairymen of Arizona ("UDA"). Those seven cooperatives are hereafter referred to as "Co-Conspirators."

27.     Defendants and Co-Conspirators conspired to fraudulently misreport NFDM prices to NASS. Specifically, they conspired to instruct and instructed DairyAmerica to systematically include prices and volumes from forward pricing contracts in weekly reports to NASS, in contravention of the clear instruction on the survey form to exclude such data.  Defendants are jointly and severally liable for the acts of Co-Conspirators whether named or not named as Defendants in this Complaint. Each Defendant and each Co-Conspirator acted as the agent of, and joint venturer for, Defendants and Co-Conspirators with respect to the acts, violations, and common course of conduct alleged herein.

## CLASS ACTION ALLEGATIONS

28.     Plaintiffs seek to bring this case as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of themselves and all others similarly situated. The proposed class (the "Class") is defined as follows: All dairy farmers located in the United States who sold raw milk that was priced according to a Federal Milk Marketing Order during the period January 1, 2002 through April 30, 2007. Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest, and their legal representatives, heirs, and successors.

## NUMEROSITY

29.     The proposed class is so numerous and geographically dispersed that joinder of all of its members is impractical. Tens of thousands of dairy farmers are members of the proposed class and sold raw milk at prices set according to a FMMO.

## COMMON QUESTIONS OF LAW AND FACT

30.     Virtually all of the issues of law and fact in this class action are common to the

Class and include at least the following:

    a.      whether Defendants and/or Co-Conspirators misrepresented dairy product prices to NASS;

    b.      whether Defendants and/or Co-Conspirators intentionally misrepresented dairy product prices to NASS;

    c.      whether Defendants and/or Co-Conspirators failed to exercise reasonable care when reporting dairy product prices to NASS;

    d.      whether Defendants and/or Co-Conspirators made misrepresentations to lower raw milk prices paid to dairy farmers;

    e.      whether Defendants and/or Co-Conspirators made misrepresentation to obtain financial gain;

    f.      whether Defendants and/or Co-Conspirators engaged in a pattern of racketeering activity;

    g.      whether Defendants' and/or Co-Conspirators' misrepresentations of dairy product prices deprived income from dairy farmers;

    h.      the nature of relief available by reason of Defendants' and/or Co-Conspirators' violations of law.

31.    Plaintiffs' claims are typical of the Class members' claims. Plaintiffs and all other members of the Class have sustained monetary damages arising out of Defendants' and/or Co-Conspirators' violations of common and statutory law as alleged herein.

## ADEQUACY OF REPRESENTATION

32.    Plaintiffs can and will fairly and adequately represent and protect the interests of the Class and have no interests that conflict with or are antagonistic to the interests of Class members. Plaintiffs have retained attorneys competent and experienced in class actions. No conflict exists between the Plaintiffs and Class members.

## SUPERIORITY

33.    A class action is superior to any other available method for the fair and efficient adjudication of this controversy and common questions of law and fact predominate over any

individual questions that may arise.

34.     In the absence of a class action, dairy farmers will be deprived of income they should have received.

## FACTUAL ALLEGATIONS

### A.     Pricing of Raw Milk

35.     FMMOs were first established in 1937 by the Agricultural Marketing Agreement Act, and ten FMMOs govern different regions of the country. FMMOs establish the minimum prices for the sale of raw, Grade A milk from the dairy farmer to the processor or manufacturer. Approximately 65 percent of all raw milk marketed in the United States is marketed under FMMOs, and approximately 50,000 dairy farmers sell raw milk at prices set by FMMOs.

36.     According to USDA, one of the major objectives of FMMOs is to provide adequate producer prices to ensure an adequate current and future Grade A milk supply.

37.     FMMOs employ a four-tiered, classified pricing system to set monthly minimum milk prices based upon the intended use of the raw milk. The four classes of milk are: Class I, for beverage products; Class II, for soft manufacturing products such as ice cream, cottage cheese, sour cream, and yogurt; Class III, for hard cheese and cream cheese; and Class IV, for butter and dry milk products.

38.     FMMO formulas tie the monthly minimum prices for each class of raw milk to wholesale market prices of particular dairy products, which are collected by NASS. NASS obtains the dairy product prices by conducting a weekly survey of dairy firms that sell one million or more pounds of manufactured dairy products.

39.     Class III and Class IV values are calculated based on FMMO formulas that directly rely on the weekly price data published by NASS. The Class III pricing formula incorporates NASS survey prices for cheese, butter, and dry skim whey, and the Class IV pricing formula incorporates NASS survey prices for NFDM and butter. The formulas for Class III and Class IV milk prices incorporate the monthly averages of weekly NASS survey prices that are released prior to the fifth of the following month. For example, NASS survey data from October 23 to October 28 that was released on November 3 would be used in the October price calculation

for Class III and Class IV milk.

40.     Class I prices are determined by adding a differential value to the higher of either an advanced Class III or Class IV skim milk value, plus a multiple of butterfat prices. Class II prices are basically calculated by adding a differential of $0.70 per hundred pounds of milk to the advanced Class IV skim milk price, plus a multiple of butterfat prices.

41.     Class II, III and IV prices are the same across each of the ten FMMOs.

42.     Although raw milk is priced by FMMOs according to its use, dairy farmers are paid a weighted average or ''blend'' price for the sale of milk priced according to FMMOs. The blend price is derived by pooling all classes of milk sold in the same marketing area or by the same dairy cooperative. Mathematically, this process involves calculating the weighted average value of milk based on the proportion of total milk pooled from each of the four classes. Under this pricing system, each dairy farmer within the same FMMO or dairy cooperative receives an equal share of each class of milk and is indifferent to the actual class for which his particular milk was used.

43.     Thus, approximately fifty thousand (50,000) dairy farmers are paid for their raw, Grade A milk according to formulas with a limited number of inputs, and NFDM is one of those key inputs.

44.     Some regions of the country fall outside of the geographic scope of the ten FMMOs. In those regions, several states have established their own program to calculate minimum milk prices for in-state farmers. For example, the California Weighted Average Price ("CWAP") is California's separate milk marketing program to establish minimum prices for dairy farmers that pool their milk in California. Just as in the federal program, California's program obtains dairy product prices through surveys and plugs those figures into formulas to generate class prices.

**B.  Weekly NASS Survey**

45.     The Dairy Market Enhancement Act of 2000 mandated the establishment of a program that would require each manufacturer of one million or more pounds of dairy products to report the price, quantity, and moisture content of the dairy products sold by the manufacturer.

46.     On a weekly basis, NASS surveys these dairy firms and publishes dairy product prices in the *Dairy Products Prices* report. NASS does not ask dairy firms to report the prices of raw milk; the information collected by NASS and published in the *Dairy Products Prices* report consists of prices of dairy products made from raw milk that have already been sold. The dairy product prices published in the *Dairy Products Prices* report are used by USDA's Agriculture Marketing Service ("AMS") to calculate components of the FMMO formulas.

47.     Each reporting dairy firm submits its weekly NASS survey information using either a paper questionnaire or an electronic reporting system. The instructions section for both of these reporting methods contains a list of items that are to be included and excluded. The instructions exclude any information from sales contracts in which the selling price was set 30 days or more before completion of the sales transaction, except for sales conducted via the Dairy Export Incentive Program. Specifically, the instructions list the following as an exclusion: "Forward pricing sales: sales in which the selling price was set (and not adjusted) 30 or more days before the transaction was completed. This exclusion does not include sales through the Dairy Export Incentive Program (DEIP)."

**INSTRUCTIONS:**

**Sale:**     When a transaction is completed (i.e., nonfat dry milk is "shipped out" and title transfer occurs).

Report sales of USDA Extra Grade and USPH Grade A, non fortified nonfat dry milk.
Price is **f.o.b.** processing plant/storage center.
Report prices and quantities for all 25-kilogram bags, 50-pound bags, tote and tanker sales.
Report sales quantities in total pounds.

**Include:**     Nonfat dry milk manufactured using a low or medium heat process.
Total volume sold and total dollars received or price per pound.
CME Sales: Initial manufacturer sales only.
CCC purchases under the Dairy Price Support and related programs.

**Exclude:**     Transportation and clearing charges from price.
Sales of nonfat dry milk more than 180 days old.
Nonfat dry milk manufactured using high heat process.
Sales of instant nonfat dry milk.
Sales of dry buttermilk products.
Intra-company sales.
Resales of purchased nonfat dry milk.
Forward pricing sales: Sales in which the selling price was set (and not adjusted) 30 or more days before the transaction was completed. This exclusion does not include sales through the Dairy Export Incentive Program (DEIP).

48.     NASS also requires firms that report pricing data each week to complete an Annual Validation Worksheet. The Annual Validation Worksheet requires reporting firms to certify each year that they excluded forward pricing sales from their weekly reports to NASS.

## C.  Clarity of Instruction to Exclude Forward Pricing Contracts

49.     The NASS reporting instructions are not difficult to understand. The USDA's

Office of the Inspector General conducted an investigation of DairyAmerica's misreporting of dairy product prices and found that "the wording on the data collection instrument is clear." Mr. White states in his declaration that the "instructions provided by NASS in the questionnaires during the period 2002 through February 2007 were entirely clear and in plain, understandable English."

50.    The particular instruction in the NASS survey to exclude forward pricing contracts is clear. An April 2007 press release issued by NASS states that the "guidelines explicitly exclude the reporting of forward pricing sales in which the selling price was set 30 days or more before the transaction was completed." Secretary of Agriculture Charles F. Connor described DairyAmerica's misreporting as a "significant lapse" in following "clearly articulated instructions."

51.    In his declaration, Mr. White states that "in clear and unambiguous written terms, the instructions from NASS on how to fill out the weekly questionnaires instructed DairyAmerica to exclude figures from the sale of NFDM in which the selling price was set (and not adjusted) 30 or more days before the transaction was completed, unless those sales were transacted through" DEIP.

52.    In his declaration, Mr. White explains that the instruction to exclude forward pricing contracts "was intuitive and logical. NASS prices are designed to reflect current market prices. Accordingly, it made perfect sense that NASS would require the exclusion of inputs from long-term contracts."

### D. **Structure and Operation of DairyAmerica**

53.    One of the entities surveyed by NASS during the Class Period was DairyAmerica.

54.    DairyAmerica was formed in 1995 by two predecessors to California Dairies (California Milk Producers and Danish Creamery Association) and Dairyman's Cooperative Creamery Association to jointly market their powdered milk.  In 1999, California Milk Producers

1   and Danish Creamery Association merged to form California Dairies.

2       55.     When DairyAmerica was first formed, its management and staff were provided by

3   Challenge Dairy Products, Inc., which is a wholly-owned subsidiary of California Dairies.  For

4   example, John D. Whetten, President and CEO of Challenge Dairy Products, Inc., served as CEO

5   of DairyAmerica, and S. Alan Maag, CFO of Challenge Dairy Products, Inc., served as the

6   Assistant Secretary of DairyAmerica.

7       56.     California Dairies is the major shareholder in and majority owner of

8   DairyAmerica.  During the Class Period, California Dairies was the largest shareholder of

9   DairyAmerica.

10      57.     During the Class Period, nine cooperatives were members of, and exclusively

11  controlled, DairyAmerica: Agri-Mark, California Dairies, DFA, Land O'Lakes, Lone Star,

12  Maryland & Virginia, O-AT-KA, St. Albans Cooperative Creamery ("St. Albans"), and UDA.

13      58.     DairyAmerica was an agent of, and a joint venture among, its member

14  cooperatives, including California Dairies. In comments submitted to USDA on September 4,

15  2007, DairyAmerica wrote, "DairyAmerica operates as a marketing agent on behalf of all of its

16  members." Member DFA described DairyAmerica as "a joint venture to market non-fat dry milk,

17  domestically and internationally."

18      59.     ███████████████████████████████

19  ████████████████████████████████████

20  ███████████████████████

21      60.     During the Class Period, DairyAmerica was governed by a board of directors. The

22  Board of Directors was comprised exclusively of senior executives and representatives from each

23  of the nine cooperatives that were members of, and sold their NFDM through, DairyAmerica. For

24  example, the following senior executives and representatives of California Dairies held positions

25  on DairyAmerica's governing Board of Directors: Gary Korsmeier, then President and CEO of

26  California Dairies; Richard Cotta, then President and CEO of California Dairies; Jim Gomes, then

27  Senior Vice President of Marketing for California Dairies; Keith Gomes, then Senior Vice-

28  President and COO of California Dairies; Joe Heffington, then Senior Vice-President and CFO of

1   California Dairies; Stephen D. Maddox, then Secretary of California Dairies; Gerben
2   Leyendekker, then Treasurer and Executive Committee Member of California Dairies and Duane
3   Matheron, then Treasurer of California Dairies.  Several board members of California Dairies also
4   simultaneously served as board members of DairyAmerica, including Jay TeVelde.

5          61.    Additionally, during the Class Period, executives of California Dairies and Co-
6   Conspirators served as the officers of DairyAmerica. For example, Gary Korsmeier, who served
7   as President and CEO of California Dairies from the onset of the Class Period until December 31,
8   2006, served as President of DairyAmerica; Richard Cotta, who succeeded Korsmeier as
9   President and CEO of California Dairies, served as President of DairyAmerica (and later
10  Chairman of the Board of Directors of DairyAmerica); and Keith Gomes served simultaneously
11  as Senior Vice-President and COO of California Dairies and President of DairyAmerica.

12         62.    The Board of Directors exerted total and absolute control over DairyAmerica, and
13  it was involved in all significant decisions regarding DairyAmerica, including determining
14  whether to export NFDM, whether to enter into forward pricing contracts and whether to report
15  pricing information to USDA.

18         63.

21         64.

25         65.    The Board of Directors of DairyAmerica financed, governed and operated the
26  marketing agency for the sole purpose of maximizing profit from the sale of NFDM. Even though
27  DairyAmerica was a nonprofit corporation, DairyAmerica's singular purpose was commercial: to
28  maximize the profit of its nine members. In comments submitted to USDA on September 4, 2007,

DairyAmerica wrote that it "owes a duty to its members to maximize overall profit."

66.    During the Class Period, DairyAmerica marketed and sold the vast majority of the NFDM produced by its member cooperatives, including California Dairies.

67.    During the Class Period, DairyAmerica also entered into multiple contracts with other major processors to sell their NFDM and other powder products.

68.

69.    The Board of Directors hired Richard Lewis to serve as CEO of DairyAmerica during the Class Period.

70.

1

2

### E. **Role of Ralph Douglas White**

3

4     71.    From 1998 until 2011, Doug White served as Director of Sales at DairyAmerica.

5     72.    While employed as Director of Sales at DairyAmerica, Mr. White's

6 responsibilities included identifying and interacting with domestic customers that purchased

7 NFDM, determining the prices at which to sell NFDM to those customers, negotiating and

8 entering into contracts for the sale of NFDM,

9

10

11     73.    Mr. White was heavily involved in discussions regarding the reporting of sales

12 data to USDA and its impact on milk prices, including the reporting of forward pricing contracts.

13

14

15

16

17     74.

18

19

20

21

### F. **Knowledge of DairyAmerica's Executives and Board of Directors**

22     75.    During the Class Period, executives and board members of DairyAmerica,

23 including senior executives of California Dairies and Co-Conspirators, understood that the

24 instructions for completing the weekly surveys for NASS required the exclusion of forward

25 pricing sales.

26     76.    According to Mr. White's declaration, during the period 2002 through February

27 2007, he read the instructions supplied by NASS for completing the weekly reports on "multiple

28 occasions." On each such occasion that he read the instructions, he "understood the instructions to

mean exactly what they state," including that "when submitting weekly reports to NASS, DairyAmerica should exclude figures from non-DEIP sales of NFDM in which the selling price was set (and not adjusted) 30 or more days before the transaction was completed."

77.    Accordingly, in his declaration, Mr. White states that "during the period 2002 through February 2007, when DairyAmerica filled out weekly reports to NASS and included figures from non-DEIP sales of NFDM in which the selling price was set (and not adjusted) 30 or more days before the transaction was completed," he believed that "DairyAmerica was not complying with the clear text of NASS's instructions and was violating the spirit of NASS's instructions."

78.    During the period 2002 through February 2007, Mr. White had multiple conversations with CEO Richard Lewis, Controller Jean McAbee and Office Manager Annette Smith about the instructions supplied by NASS for completing the weekly reports. Based on those conversations, Mr. White concluded that Mr. Lewis, Ms. McAbee and Ms. Smith read the NASS instructions during the period 2002 through February 2007 and "understood those instructions to mean that DairyAmerica should exclude figures from non-DEIP sales of NFDM in which the selling price was set (and not adjusted) 30 or more days before the transaction was completed."

79.    Mr. White also had multiple conversations with members of the Board of DairyAmerica, including senior executives of California Dairies and Co-Conspirators, about the NASS reporting instruction. Based on those conversations, Mr. White concluded that prior to February 2007 "several members of the board and officers of DairyAmerica – including Keith Gomes, Joe Heffington, Keith Murfield, Joel Clark, David Parrish, William Schreiber, William Neary, Craig Alexander, Richard Mosemann, Jim Baird, and Richard Stammer – understood that the instructions supplied by NASS for the weekly reporting of data from the sale of NFDM required that DairyAmerica exclude figures from non-DEIP sales of NFDM in which the selling price was set (and not adjusted) 30 or more days before the transaction was completed." During that time period, Keith Gomes and Joe Heffington were senior executives of California Dairies.

1    Keith Gomes served as Senior Vice-President and COO of California Dairies and also

2    simultaneously served as President of DairyAmerica. Joe Heffington served as Senior Vice-

3    President and CFO of California Dairies.

4        80.

12   Mr. White explained to the Board of Directors that fixed price contracts

13   without price adjustment should be limited to one month because NASS instructions prohibit the

14   reporting of data from fixed price contracts in which the price was set and not adjusted 30 or

15   more days in advance.

16       81.

21       82.    According to Mr. White, during the period 2002 through February 2007, many

22   industry players that regularly interacted with DairyAmerica – including traders of NFDM,

23   competitors of DairyAmerica, customers of DairyAmerica and even DairyAmerica's export

24   partner Fonterra – "understood that the instructions supplied by NASS for the weekly reporting of

25   data from the sale of NFDM required that DairyAmerica exclude figures from non-DEIP sales of

26   NFDM in which the selling price was set (and not adjusted) 30 or more days before the

27   transaction was completed."

28       83.

84.

85.

NASS requires dairy firms that annually sell more than one million pounds of NFDM, cheese, butter or dry whey to complete weekly questionnaires.

Importantly, the instructions on those questionnaires contained an explicit instruction to exclude data from forward pricing sales – specifically, sales in which the price was set and not adjusted 30 or more days before the transaction was completed. Thus, those cooperatives, including multiple Co-Conspirators, were intimately familiar with the instruction to

exclude forward pricing contracts when DairyAmerica improperly included such data in its weekly reports to USDA.

86.

### G. Mr. White Warns DairyAmerica's CEO and Controller

87.     During the Class Period, Mr. White warned both CEO Richard Lewis and Controller Jean McAbee to halt the misrepresentations in DairyAmerica's weekly reports to USDA.

88.     During the period 2002 through 2006, Doug White had multiple conversations with Richard Lewis in which he "asked Richard Lewis whether DairyAmerica was improperly including figures in the reports from non-DEIP sales of NFDM in which the selling price was set (and not adjusted) 30 or more days before the transaction was completed." During those conversations, Mr. White told Mr. Lewis that he "did not think we should continue to include those figures in the reports to NASS because DairyAmerica was defying NASS's instructions and because the figures reported to NASS were intended to reflect current market prices, not future prices derived from long-term contracts."

89.     In response to Mr. White's warnings, "Richard Lewis asserted that DairyAmerica should continue to include in its weekly reports to NASS sales figures from non-DEIP sales of NFDM in which the selling price was set (and not adjusted) more than 30 days before the transaction was completed." According to Mr. White, "Richard Lewis stated that sales data from

1   exports should be reported to NASS regardless of whether they were part of long-term contracts

2   and regardless of whether doing so contradicted the instructions from NASS."

3       90.     Mr. White also warned Controller Jean McAbee that DairyAmerica should halt the

4   misreporting of NFDM sales to USDA. During the period 2002 through 2006, Mr. White had

5   multiple conversations with Ms. McAbee in which he discussed "whether DairyAmerica was

6   improperly including figures from non-DEIP sales of NFDM in which the selling price was set

7   (and not adjusted) 30 or more days before the transaction was completed." Furthermore, Mr.

8   White told Ms. McAbee that he "did not think we should continue to include those figures in the

9   reports to NASS because DairyAmerica was defying NASS's instructions and because the figures

10  reported to NASS were intended to reflect current market prices, not future prices derived from

11  long-term contracts."

12      91.     Mr. White was not the only person who warned Mr. Lewis and Ms. McAbee to

13  halt the misreporting to USDA. Between 2002 and 2006, "several other individuals – including

14  traders, Fonterra employees and other DairyAmerica employees – questioned Richard Lewis

15  about whether DairyAmerica was or was not complying with NASS's instructions for submitting

16  weekly reports and about whether DairyAmerica was improperly including figures from non-

17  DEIP sales of NFDM in which the selling price was set (and not adjusted) 30 or more days before

18  the transaction was completed."

19  **H.  USDA Warns DairyAmerica**

20      92.     In his declaration, Mr. White states that USDA also warned DairyAmerica to

21  comply with the instruction to exclude forward pricing contracts from its weekly reports.

22  According to Mr. White, between the period 2002 and 2006, USDA officials met with Richard

23  Lewis "to ensure that it was complying with, and would continue to comply with, NASS's

24  instructions for completing and submitting weekly reports, including the instruction that requires

25  the exclusion of figures from non-DEIP sales of NFDM in which the selling price was set (and

26  not adjusted) 30 or more days before the transaction was completed."

27      93.

28

94.     According to Lowell Randel, a director of USDA's Research, Education and Economics Mission Area, NASS representatives reminded DairyAmerica representatives of "what to include in these reports and what to exclude from these reports" every year.

95.     On April 20, 2007, NASS issued a press release that states, "NASS guidelines explicitly exclude the reporting of forward pricing sales in which the selling price was set 30 days or more before the transaction was completed. As part of an annual effort to ensure proper reporting, NASS reiterated these guidelines with all participating plants in October 2006. At that time, the plants indicated they were in compliance."

**I.   DairyAmerica Misreported NFDM Prices to NASS**

96.     From January 2002 through April 2007, DairyAmerica improperly reported volumes and prices of NFDM to NASS. In its weekly reports to NASS, DairyAmerica systematically included volumes and prices from the sale of NFDM in contracts in which the selling price was set more than thirty (30) days before the completion of the transaction. DairyAmerica included these prices even though the sales contracts were transacted outside of the DEIP.

97.     A substantial share of the NFDM prices and volumes that DairyAmerica misreported to NASS were derived from contracts for export. From January 2006 through April 2007, approximately 90 percent of DairyAmerica's contracts for the export of NFDM were transacted outside of DEIP and established selling prices more than 30 days before the completion of the transaction.

98.     The NFDM prices from long-term contracts that DairyAmerica improperly reported to NASS were often lower than the NFDM prices that were properly reported to NASS. As a result, DairyAmerica's improper reporting of NFDM prices artificially reduced the value of raw milk prices set by FMMOs.

99.     The NFDM prices reported by DairyAmerica between January 1, 2002 and April 14, 2007 were aggregated with data from other dairy firms and published in the weekly *Dairy Products Prices* report. Once the data were published by NASS, they were utilized by AMS as a component in its formula for establishing FMMO prices during the Class Period.

100.     The NFDM prices reported by DairyAmerica between January 1, 2002 and April 14, 2007 were not verified, approved or audited by NASS, AMS or any other agency of the federal government. The Inspector General of USDA wrote, "AMS did not have the authority to audit a reporting firm's books when this dairy firm's reporting errors occurred." NASS and AMS were first provided with the authority to verify the accuracy of and audit the dairy product prices reported to NASS on August 2, 2007, several months after the end of the Class Period.

101.     In addition to making misrepresentations in its weekly reports to NASS, DairyAmerica also inaccurately completed Annual Validation Worksheets. Each year during the Class Period, DairyAmerica was instructed by NASS to complete an Annual Validation Worksheet. In each of the six Annual Validation Worksheets that it completed during the Class Period, DairyAmerica responded "yes" to the following question: "When reporting nonfat dry milk sales data to NASS, did you or can you: exclude forward pricing sales (sales in which the selling price is established, and not adjusted, 30 or more days before the transaction is completed)?"

1

**J.   Defendants and Co-Conspirators Had No Reasonable Basis For Their Misrepresentations**

2

102.    DairyAmerica had no reasonable grounds for misunderstanding USDA's

3

instruction to exclude forward pricing sales from weekly reports. Mr. White maintains that

4

"during the period 2002 through February 2007, there was no reasonable grounds for believing

5

that the instructions from NASS for completing and submitting the weekly reports permitted the

6

inclusion of figures from non-DEIP sales of NFDM in which the price was set 30 or more days

7

before the transaction was completed."

8

103.    Mr. White further notes that, during the period 2002 through February 2007,

9

"when DairyAmerica filled out weekly reports to NASS, the employees, officers and board

10

members of DairyAmerica had no reasonable grounds for believing that DairyAmerica complied

11

with NASS's instructions to exclude figures from non-DEIP sales of NFDM in which the selling

12

price was set (and not adjusted) 30 or more days before the transaction was completed."

13

104.    Mr. White's assertions are bolstered by the fact that other reporting firms complied

14

with the instruction to exclude forward pricing sales. On January 30, 2008, after conducting an

15

audit of reporting by firms over a 51-week period, Joe Reilly, the Administrator of NASS, wrote,

16

"Our review of resubmitted reports for the earlier 51-week period showed that incorrect reporting

17

was not a widespread problem. The problem was narrowly isolated . . ." Similarly, NASS's

18

Advisory Committee on Agriculture Statistics characterized DairyAmerica's misreporting as "an

19

isolated event."

20

**K.   Defendants and Co-Conspirators Conspired to Intentionally Misreport NFDM Sales in Order to Lower Raw Milk Prices**

21

22

105.    Defendants and Co-Conspirators conspired to misreport and intentionally

23

misreported NFDM sales data to NASS during the Class Period. In his declaration, Mr. White

24

explains why the Defendants and Co-Conspirators intentionally made the misrepresentations: to

lower raw milk prices.

25

106.

26

27

28

DairyAmerica entered into forward pricing contracts, it locked in NFDM sales prices for a significant duration of time.

107.    Raw milk prices are the principal cost input for manufacturing NFDM. If raw milk prices rose considerably during the term of a forward pricing contract, DairyAmerica's members, including California Dairies, could lose profits or incur losses. In order to prevent such losses, Defendants and Co-Conspirators chose to defy USDA's instructions and include sales figures from forward pricing contracts in DairyAmerica's weekly reports to NASS. By doing so, Defendants and Co-Conspirators could leverage DairyAmerica's dominant market share to ensure that raw milk prices would be depressed whenever forward pricing contracts reflected below-market NFDM values. This misreporting scheme allowed Defendants and Co-Conspirators to avoid losses even when they misread the market.

108.    On August 1, 2007, in response to news reports of DairyAmerica's misconduct, nine United States Senators signed a letter to the Secretary of Agriculture that states, "There seems to have been a potential financial motive to misreport the relatively low NDM prices of the fixed price contracts and therefore lessen the increases in input costs for the NDM producers."

109.

110.    In his declaration, Mr. White describes the most injurious example of DairyAmerica misreporting to protect the profits of its members. According to Mr. White, in 2006, DairyAmerica entered into contracts negotiated by Fonterra to export a "substantial and unprecedented quantity of NFDM at comparatively low prices." Those contracts "involved the sale of NFDM at prices that were set (and not adjusted) more than 30 days before the transaction was completed."

111.    Mr. White explains, "Soon after DairyAmerica entered into these long-term export contracts with Fonterra, there were major shortages in the production of raw milk. As a result of these reductions in the supply of raw milk, the prices of raw milk began to rapidly climb. If DairyAmerica had complied with NASS's instructions and excluded sales figures from long-term

non-DEIP contracts from its weekly reports to NASS, then raw milk prices would have continued to climb unabated, and DairyAmerica would have incurred substantial losses for its cooperative members when it sold NFDM via Fonterra."

112.    Mr. White continued, "To avoid incurring substantial losses for its cooperative members, DairyAmerica chose to report these sales to NASS regardless of NASS's instructions and, when submitting weekly reports to NASS, improperly included sales data from non-DEIP contracts in which prices were set (and not adjusted) more than 30 days before the transaction was completed. By doing so, DairyAmerica reported below market prices for NFDM from long-term contracts to NASS."

113.    According to Mr. White, "DairyAmerica knew that the figures it reported to NASS from long-term, non-DEIP contracts were intended to be, and would be, used by the USDA to calculate the prices for raw milk. Consequently, DairyAmerica's inclusion of sales data from long-term export contracts in its reports to NASS caused raw milk prices to be lowered and thus prevented DairyAmerica and its cooperative members from losing substantial sums of money."

114.    █████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████

115.    █████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████



116.

117.

118.

119.

120.    Lower raw milk prices for dairy farmers, whether or not they were members of cooperatives participating in DairyAmerica, was not a mere consequence of the misreported sales data, but rather was the motivating purpose behind the misreporting. Defendants and Co-Conspirators sought to manage the economic risk of forward pricing sales by artificially depressing monthly raw milk prices to the detriment of farmers.

121.

**L.    California Dairies and Co-Conspirators Instructed DairyAmerica to Misreport in Order to Lower the Price of Raw Milk**

122.    In his declaration, Mr. White states that California Dairies and Co-Conspirators instructed DairyAmerica to misreport to USDA. According to Mr. White, the "decision by DairyAmerica in 2006 to improperly include, in its weekly reports to NASS, figures from non-DEIP sales of NFDM in which the selling price was set (and not adjusted) 30 or more days before the transaction was completed, and thus limit and prevent the rise of raw milk prices, was taken *jointly* by Richard Lewis *and several executives from cooperatives that were members of DairyAmerica*." (emphasis added). Those executives included senior executives from California Dairies, including Keith Gomes, then Senior Vice-President and COO of California Dairies.

123.    Mr. White explains that when "the executives at cooperatives that were members

of DairyAmerica decided in 2006 to disobey NASS's instructions and include, in DairyAmerica's weekly reports to NASS, figures from non-DEIP, long-term contracts," those executives, including executives from California Dairies and Co-Conspirators, did so in order "to shield their cooperatives from sizable losses that would stem from the sale of NFDM through the long-term export contracts executed by Fonterra."

124.

125.

**M. Defendants and Co-Conspirators Intended for their Misrepresentations to be Transmitted to Dairy Farmers in the Form of Lower Milk Prices**

126.     The dairy product prices misreported by DairyAmerica to NASS were intended to guide dairy farmers in their business transactions. The misreported prices were key components

1    of the FMMO formulas that determined the price of raw milk for dairy farmers across the

2    country.

3         127.    Defendants and Co-Conspirators conspired to misreport and misreported NFDM

4    prices to NASS with the full knowledge and intention that USDA would, in turn, incorporate

5    those misrepresentations in published raw milk prices relied upon by Plaintiffs. Defendants and

6    Co-Conspirators knew that the NFDM prices reported by DairyAmerica to NASS were intended

7    to be, and would be, used in FMMO formulas to set the prices that were paid to Class members

8    for the purchase of raw milk.

9         128.    The sole purpose of collecting NFDM pricing data from DairyAmerica was for

10   USDA to calculate and set raw milk prices paid to farmers. In comments submitted to USDA on

11   September 4, 2007, DairyAmerica wrote, "The issue of what contracts will be reportable to NASS

12   is not academic. Prices reported to NASS are used by AMS to establish and announce minimum

13   prices paid by handlers pursuant to 7 C.F.R. §§ 1000.50 and 1000.53. There is a direct

14   relationship between the NASS prices reported and the prices announced by AMS for regulated

15   minimum price purposes."

16        129.    Defendants and Co-Conspirators exploited this direct relationship to protect their

17   profits by improperly reporting below market NFDM sales. Defendants and Co-Conspirators

18   intended for DairyAmerica's misreporting of NFDM data to reduce compensation to Class

19   members by incorporation of the misrepresentations into FMMO formulas that established

20   minimum prices at which Class members would sell their raw milk. Defendants and Co-

21   Conspirators made the misrepresentations for the specific purpose of depressing raw milk prices

22   on which Plaintiffs relied.

23        130.    When introducing the Dairy Market Enhancement Act of 2000, which makes

24   reporting of dairy product prices to NASS mandatory, Congressman Ron Kind said: "This

25   legislation will foster a more accurate price and inventory reporting system for dairy products and

26   enable farmers to base business decisions on the most accurate information."

27

28

**N.** **Defendants and Co-Conspirators Intended for their Misrepresentations to Reduce Payments to Dairy Farmers**

131.    Defendants and Co-Conspirators understood during the Class Period that lower raw milk prices calculated by USDA would injure all dairy farmers who pooled on FMMOs, even if such prices served the interests of cooperative-owned processing plants.

132.

133.

134.    It is a fiction that cooperatives are always making decisions that serve the interests of their farmer members. Just as shareholder-owned companies may defraud shareholders, cooperatives may defraud their farmer members. The compensation structure of cooperatives in the dairy industry makes them particularly susceptible to engaging in conduct antagonistic to farmers' interests. Farmers governed by FMMOs are paid on a monthly basis for their sale of raw

milk, and the values in their milk checks are primarily calculated by USDA formulas. Importantly, the revenue earned by cooperatives from processing plants and joint ventures is not included in the monthly payments to farmers. Instead, the management of cooperatives has the discretion to spend revenue earned from their processing plants and joint ventures on salaries, bonuses, investments, equipment and other expenditures. Even when management distributes revenue from processing plants and joint ventures to members, that distribution – called a patronage dividend – is made annually (rather than monthly) and often in the form of equity (rather than cash) that farmers cannot access until a much later date, typically retirement.

135.   Thus, dairy farmers directly benefit from and prefer higher monthly milk prices, rather than lower monthly milk prices that increase profits from processing plants and joint ventures. Meanwhile, cooperative managers may prefer to limit monthly milk prices in order to increase revenue from processing plants and joint ventures and thus increase the funds available to management. This is particularly true for cooperatives with substantial ownership interests in processing plants and joint ventures, such as the members of DairyAmerica.

136.

137.

138.

139.

140.

141.

**O.** **Defendants and Co-Conspirators Also Intended for Their Misrepresentations to Reduce Payments to Independent Farmers and Other Farmers Unaffiliated with DairyAmerica**

142.   A substantial percentage of the Class is comprised of farmers who were either independent or members of cooperatives unaffiliated with DairyAmerica. Those farmers had no relationship with California Dairies or Co-Conspirators and, thus, were not eligible to receive any patronage dividends associated with DairyAmerica's forward pricing contracts that the

cooperatives may have paid out.

143.   Defendants and Co-Conspirators sought to shift projected losses from forward pricing contracts onto farmers who were independent or members of cooperatives unaffiliated with DairyAmerica. Through misreporting of NFDM sales, Defendants and Co-Conspirators established a system whereby they retained the profits earned from forward pricing contracts, but externalized losses from such contracts onto independent farmers and farmers associated with other cooperatives in the form of lower raw milk prices. Rather than accept losses when forward pricing contracts reflected below market values, Defendants and Co-Conspirators misreported sales data and reduced their losses by spreading them to all farmers who pool on FMMOs, whether they belonged to a DairyAmerica member cooperative or not.

**P.   Defendants and Co-Conspirators Tracked the Effects of their Misreporting on Milk Prices**

144.



145.

**Q.**  **Government Investigation**

146.    An article in the March 2007 issue of *The Milkweed* broke the story of DairyAmerica improperly reporting forward pricing contracts to USDA. The USDA's Office of the Inspector General concluded that the misreporting "was only discovered because of the

impact of the article in *The Milkweed* and that the error was not detected by NASS' existing survey and estimation process."

147.    *The Milkweed* article prompted DairyAmerica's CEO to contact NASS to discuss the company's reporting of NFDM sales. An April 11, 2007 discussion between NASS and the CEO confirmed that DairyAmerica had improperly included forward pricing sales in its weekly NASS submissions. According to USDA, April 11, 2007 is "the date that [the government] determined that there was in fact a price reporting error."

148.    On April 20, 2007, NASS issued a press release that states, "NASS has determined that one nonfat dry milk plant erroneously included some long-term, fixed prices sales data in its weekly reports. NASS guidelines explicitly exclude the reporting of forward pricing sales in which the selling price was set 30 days or more before the transaction was completed."

149.    The USDA's Inspector General subsequently launched an investigation of DairyAmerica's reporting errors. The Inspector General conducted site visits, interviews and document reviews. On February 14, 2008, the Inspector General issued a report that found:

> A large dairy firm inappropriately included long-term forward contracted nonfat dry milk volume and price information in their weekly submissions to NASS. We found that this dairy firm has been including data for sales of this type since 2002. NASS then aggregated the misreported data from this large dairy firm with the weekly data submitted by other dairy firms for the same reporting period. This caused inaccurate nonfat dry milk aggregated volume and price statistics to be published weekly. . . . Given that incorrect nonfat dry milk prices were factored into the FMMO formula, the published FMMO prices were also incorrect. . . . A representative from the large dairy firm has stated that long-term forward contract sales began in 2002 and that they inappropriately included data relating to these sales in their weekly submissions to NASS.

150.    The Inspector General's report made five recommendations to alter reporting procedures in order to prevent misreporting in the future. None of those recommendations entailed changing the instruction to exclude forward pricing contracts. Indeed, the report found that "the wording on the data collection instrument is clear."

151.    Notably, in the press releases published in April 2007 and in the Inspector General's report published in February 2008, USDA and its divisions did not identify which "large dairy firm" had misreported NFDM prices to NASS.

152.    In February 2008, NASS's Advisory Committee on Agriculture Statistics revealed

the identity of the misreporting firm for the first time. Minutes of the February 2008 meeting of NASS's Advisory Committee state, "Carol worked with the Inspector General (IG), and she informed the Inspector General's Office that this was a confidential survey, and she would not release the name of the firm that had misreported. The misreported firm did identify themselves to IG. The IG Office mentions the name of the firm in their report." The only dairy firm named in the Inspector General's report is DairyAmerica. The Inspector General's report quotes the following sentence from the March 2007 *Milkweed* article: "The major seller of nonfat dry milk–DairyAmerica–has improperly reported values of weekly nonfat dry milk sales for the past six months to USDA."

### R.  USDA Revisions of Misreported NFDM Prices

153.   On April 12, 2007, AMS requested that DairyAmerica revise its NFDM submissions for the previous four-week period (the weeks of March 10, 17, 24, 31) by excluding any data from forward pricing contracts. The next day, AMS published revised NFDM prices for the four-week period.

154.   On or about April 20, 2007, NASS requested that all 39 firms that had reported NFDM review their submissions for the period April 29, 2006 through April 14, 2007 and submit revisions within 45 days. A press release issued by NASS stated, "After confirming that one dairy product plant made errors in its weekly reporting of price data for nonfat dry milk, USDA's National Agricultural Statistics Service (NASS) will ask 39 plants to review and revise weekly price data and sales volumes reported over the past 52 weeks. . . . Based on this information, NASS will issue any needed revisions to previously published weekly prices and volumes for nonfat dry milk. This process will provide producers and the marketplace with a clearer understanding of the overall impact of the incorrect reports."

155.   DairyAmerica subsequently provided revised reports for the requested period to NASS. In comments submitted to USDA in 2007, DairyAmerica wrote that 25 percent of all the NFDM reported to NASS during the revision period – April 29, 2006 through April 14, 2007 – was improperly reported to NASS as a result of DairyAmerica's misreporting.

156.   On June 28, 2007, based on revised data received from reporting dairy firms,

NASS published "revised prices and sales volume" for NFDM for each week during the period April 29, 2006 through April 14, 2007.

157.   That same day, using the revised prices and sales volume published by NASS, AMS issued a report titled "Impacts of NASS Nonfat Dry Milk Price and Sales Volume Revisions on Federal Order Prices." In that report, AMS calculated the impact of the errors in the reporting of NFDM prices on FMMO prices for the period April 29, 2006 through April 14, 2007. For example, AMS calculated that the revisions, on average, increased the Class II skim milk price by $0.19 per hundredweight; increased the Class IV nonfat solids price by $0.0216 per pound; increased the Class IV skim milk price by $0.17 per hundredweight; and increased the Class IV nonfat solids price by $0.0191 per pound.

158.   On August 1, 2007, nine United States Senators issued a press release which stated, "We were concerned to learn that the misreporting of NDM was so significant and long-lasting. In the recent NASS and AMS reports, there was not a single weekly report that did not require correction and for the most part the corrections were significant. Forty-six weeks out of the past year had misreporting of over one million pounds of NDM, with one week's discrepancy at over 13 million pounds. The misreported volume averaged over 22 percent of the originally reported volume and in one week exceeded 40 percent."

159.   The February 2008 report issued by the Inspector General recommended that NASS instruct all reporting dairy firms to review their previously submitted data for the period January 2002 through April 22, 2006 and provide necessary revisions. The Inspector General's report explained that "AMS will then be able to utilize accurate information in its milk pricing formulas to calculate corrected FMMO prices for the entire period when misreporting occurred."

160.   Following the issuance of the Inspector General's report, NASS sent letters to dairy firms that reported NFDM sales data and requested that they provide revised reports for the period January 4, 2002 and April 22, 2006. NASS had planned to summarize the results in a special report to be released on June 19, 2008, but DairyAmerica failed to provide the corrected data                                              and NASS did not issue a special report. As a result, USDA was unable to publish revised NFDM data or revised FMMO prices for

the period January 4, 2002 and April 22, 2006.

**S.  Impact of Misreporting on Dairy Farmers**

161.    Defendants' and Co-Conspirators' misreporting of NFDM sales data directly resulted in dairy farmers receiving lower payments for the sale of raw milk. Defendants' and Co-Conspirators' improper inclusion of data from forward pricing contracts in weekly reports to NASS resulted in lower prices for Class I, II and IV milk sold by dairy farmers across the country.

162.    Because DairyAmerica marketed and sold approximately 75 percent of the NFDM produced in the United States during the Class Period, and because NFDM was and is a critical component of Class I, II and IV milk prices, Defendants and Co-Conspirators were uniquely positioned to artificially depress raw milk prices paid to dairy farmers by misreporting NFDM prices to NASS.

163.    On June 28, 2007, AMS calculated that during the period April 29, 2006 through April 14, 2007, the value of milk regulated under the FMMO program had been understated by $49,782,219. The report issued by the Inspector General in February 2008 states, "AMS determined that the errors in nonfat dry milk prices for the period of April 29, 2006, through April 14, 2007 had affected 14 months of minimum FMMO prices, resulting in a $50 million loss to producers." USDA and its divisions were unable to calculate the losses incurred by dairy farmers prior to April 29, 2006 because DairyAmerica failed to provide the agency with the revised data for that time period,

164.    When DairyAmerica finally halted the misreporting of NFDM sales data in the spring of 2007, the monthly prices of raw milk established by FMMO formulas increased substantially.

165.    Despite USDA's conclusion that DairyAmerica's misreporting deprived farmers of millions of dollars in income, DairyAmerica has audaciously argued that the misreporting actually assisted dairy farmers. DairyAmerica claims that it would not have exported NFDM had it been unable to report those sales to NASS.

166.

167.

**T.  Impact of Misreporting on Defendants and Co-Conspirators**

168.    As a result of improperly reporting forward pricing contracts to NASS, Defendants and Co-Conspirators benefitted financially. The lower NFDM prices improperly reported by Defendants and Co-Conspirators reduced the prices that they paid to manufacture and/or acquire NFDM and thus increased their profits from the sale of NFDM. Had Defendants and Co-Conspirators complied with NASS reporting instructions, raw milk prices would have been higher and they would have earned less profit from the sale of NFDM through forward pricing contracts.

**U.  USDA Lacks Remedy To Compensate Farmers**

169.    On August 1, 2007, nine Senators issued a press release expressing concern that dairy farmers had not been compensated for DairyAmerica's misreporting errors. The press release states: "[W]e remain concerned that the financial burden continues to be completely borne by dairy farmers who are not responsible for the erroneous data. . . . Besides noting in one report that the milk marketing orders are unable to provide compensation for this underpayment, USDA

has not indicated whether compensation from other funds is being contemplated. With dairy farmers bearing the entire burden of the misreported prices, are there plans to compensate dairy farmers for the underpayments?"

170.    USDA did not and does not have a mechanism to compensate dairy farmers who were deprived of income as a result of DairyAmerica's misreporting. The Dairy Marketing Enhancement Act does not provide USDA with the authority to compensate dairy farmers for inaccurate reports to NASS.

171.    The February 2008 report issued by the Inspector General states, "All of the funds in the FMMO pools for the 14-month period covered by NASS' revision had previously been disbursed to the milk producers, and corrective disbursements to producers were no longer possible. The FMMO program does not currently include any mechanisms to provide restitution to the milk producers adversely impacted by the reporting error."

## V.  Establishment Of Verification And Approval Procedures

172.    As a result of, and in the aftermath of, DairyAmerica's misreporting of NFDM prices, USDA established a system to verify the accuracy of dairy product prices reported to NASS.

173.    On April 20, 2007, Lowell Randel, director of USDA's Research, Education and Economics Mission Area, said, "NASS and other USDA agencies are firmly committed to taking all necessary steps to ensure that the data is reported accurately in the future, and as a part of this process, AMS is moving on the rule-making process to establish data verification for mandatory price reporting program for dairy products."

174.    On July 3, 2007, AMS published an interim final rule that provided for audits of dairy product price reporting:

> [T]he use of reliable market prices for dairy products will help assure that milk producers are paid an equitable price for their milk and that milk processors are paying a competitive price for their milk supply. . . . AMS is aware that inaccurate reporting of nonfat dry milk price information to NASS in 2007 resulted in a reduction in prices paid to producers. . . . An audit-based program of dairy price reporting would substantially reduce the likelihood of such errors in reporting.

175.    As part of the verification procedure established by USDA in 2007, AMS auditors

1  are required to conduct annual visits of dairy firms that account for 80 percent of the reported

2  NFDM volume, and to visit dairy firms that produce the remaining 20 percent of NFDM volume

3  at least once every two years. During each visit, AMS auditors verify that, consistent with the

4  instructions, eligible sales transactions were reported to NASS and that ineligible sales

5  transactions were excluded from reports to NASS.

6       176.    On August 6, 2007, AMS auditors began making data verification visits to plants.

7  The first plant visited was DairyAmerica. During the first five months of implementing the audit

8  program, AMS auditors visited each of the reporting dairy firms. The February 2008 report issued

9  by the Inspector General states, "AMS officials informed OIG that they have implemented a plan

10  to verify the accuracy of the price information submitted by various dairy product manufacturing

11  plants in accordance with the mandatory program. . . . Had the audit program been implemented

12  earlier, the misreporting by the large dairy firm would have been discovered during AMS' annual

13  audit of the firm, reducing the negative monetary impact on producers."

14  **W. Defendants' and Co-Conspirators' Fraudulent Transfer**

15       177.

18       178.

24       179.

180.   Mr. White states that part of the reason the cooperatives exited DairyAmerica was "that they wanted to avoid having to pay a judgment in this case." Mr. White specifically recalls "statements by several executives from member cooperatives that exited DairyAmerica, including Maryland & Virginia Milk Producers Cooperative Association, Inc. and Lone Star Milk Producers, in which they stated that they were exiting DairyAmerica in part to avoid liability or paying damages in this case. These statements were made at board meetings of DairyAmerica."

181.

182.

183.

184.

185.

186.

**CONCEALMENT AND TOLLING**

187.    Throughout the Class Period, Defendants and Co-Conspirators affirmatively concealed from Plaintiffs and Class members the misrepresentations alleged herein and the identity of the entities that made such misrepresentations. DairyAmerica misrepresented NFDM prices in confidential reports to USDA that were concealed from public review, and Defendants and Co-Conspirators concealed the contents of the reports throughout the relevant time period. When USDA – including NASS, AMS and the Inspector General – investigated or announced the misreported NFDM prices, Defendants and Co-Conspirators continued to conceal the identity of the misreporting entities.

188.

189.

190.    As a result of Defendants' and Co-Conspirators' concealment, any applicable statute of limitations affecting the rights of Plaintiffs and Class members has been tolled. Plaintiffs exercised due diligence to learn of their legal rights, and, despite the exercise of due diligence, did not discover and could not have discovered the unlawful conduct alleged herein at the time it occurred.

191.    On or after March 9, 2007, *The Milkweed* published a story alleging that DairyAmerica had misreported NFDM sales data to USDA. The publishing of the article was the first time that allegations of DairyAmerica's misreporting were made public.

192.    Plaintiffs did not have actionable claims until USDA issued a report on June 28, 2007 and rejected FMMO prices that it previously published. Prior to USDA's rejection of FMMO prices on June 28, 2007, any complaint filed by the Plaintiffs would have been dismissed on the basis of the filed rate doctrine. As the Ninth Circuit made clear when granting Plaintiffs' appeal in this case, Plaintiffs' claims could not have proceeded in the absence of USDA's

rejection of FMMO prices. Accordingly, the statute of limitations that affect the rights of Plaintiffs and Class members was tolled until June 28, 2007.

193.    Before May 2015, when Plaintiffs were first permitted to speak with Mr. White, they did not have access to evidence that provides the factual basis for this complaint. Without the evidence provided by Mr. White, Plaintiffs could not possibly have known the facts necessary to bring viable claims against California Dairies and Co-Conspirators or a viable claim for intentional misrepresentation against DairyAmerica. Accordingly, until May 2015, the statute of limitations had not started to run for all causes of action in this complaint except for a negligent misrepresentation claim against DairyAmerica.

194.    Notably, Plaintiffs were substantially delayed in communicating with Mr. White due to misrepresentations by defense counsel. On three occasions beginning on September 11, 2014, defense counsel claimed to represent Mr. White, thereby precluding Plaintiffs from contacting him directly. Each of those statements was false. Mr. White has never been represented by defense counsel, and he refused their request to represent him. Had Plaintiffs known that Mr. White was unrepresented, they would have communicated with him earlier and secured the declaration from him approximately nine months earlier.

## **FIRST CAUSE OF ACTION**

### **(Negligent Misrepresentation as to both Defendants)**

195.    Plaintiffs reallege each allegation in each of the paragraphs above as if fully set forth herein.

196.    At all relevant times, DairyAmerica reported to NASS the price and volume of the NFDM it sold in weekly questionnaires. NASS provided explicit instructions for reporting such information. The instructions required DairyAmerica to exclude sales in which the selling price was set (and not adjusted) 30 or more days before the transaction was completed, unless the sale was transacted through the DEIP.

197.    During the Class Period, Defendants and Co-Conspirators negligently and in violation of the NASS instructions included volume and price information from non-DEIP, forward pricing sales in DairyAmerica's weekly submissions to NASS.

198.    During the Class Period, Defendants and Co-Conspirators conspired to instruct and instructed DairyAmerica to include volume and price information from non-DEIP, forward pricing sales in its weekly submissions to NASS.

199.    When including volume and price information from non-DEIP, forward pricing sales in DairyAmerica's weekly submissions to NASS, Defendants and Co-Conspirators failed to exercise reasonable care. Defendants and Co-Conspirators had no reasonable ground for believing that they were complying with the NASS instruction to exclude sales data from forward pricing contracts.

200.    Defendants and Co-Conspirators intended for and knew that the NFDM prices that DairyAmerica reported to NASS would be used in FMMO formulas to set the prices that were paid to Plaintiffs and the other Class members for the purchase of raw milk.

201.    The NFDM prices improperly reported by Defendants and Co-Conspirators had the direct effect of lowering the raw milk prices set by USDA using FMMO formulas.

202.    Plaintiffs and the other members of the Class justifiably and reasonably relied to their detriment on the prices set by USDA under the FMMOs as being the price calculated based on the correct reporting of prices and volumes to NASS. Such reliance was foreseeable and intended by Defendants and Co-Conspirators.

203.    As a direct and proximate result of Defendants' and Co-Conspirators' negligent conduct and statements, Plaintiffs and the other Class members have suffered and are entitled to compensatory and consequential damages, in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### (Intentional Misrepresentation as to both Defendants)

204.    Plaintiffs reallege each allegation in each of the paragraphs above as if fully set forth herein.

205.    At all relevant times, DairyAmerica reported to NASS the price and volume of the NFDM it sold in weekly questionnaires. NASS provided explicit instructions for reporting such information. The instructions required DairyAmerica to exclude sales in which the selling price was set (and not adjusted) 30 or more days before the transaction was completed, unless the sale

was transacted through the DEIP.

206.   During the Class Period, Defendants and Co-Conspirators intentionally and in deliberate defiance of the NASS instructions included volume and price information from non-DEIP, forward pricing sales in DairyAmerica's weekly submissions to NASS.

207.   During the Class Period, in deliberate defiance of the NASS instructions, Defendants and Co-Conspirators conspired to instruct and instructed DairyAmerica to include volume and price information from non-DEIP, forward pricing sales in its weekly submissions to NASS.

208.   When Defendants and Co-Conspirators conspired to instruct and instructed DairyAmerica to include volume and price information from non-DEIP forward pricing sales in its weekly submissions to NASS, they knew that inclusion of that volume and price information in DairyAmerica's weekly submissions was contrary to the explicit reporting instructions from NASS.

209.   When DairyAmerica included volume and price information from non-DEIP forward pricing sales in its weekly submissions to NASS, Defendants and Co-Conspirators knew that inclusion of that volume and price information in DairyAmerica's weekly submissions was contrary to the explicit reporting instructions from NASS.

210.   Defendants and Co-Conspirators instructed DairyAmerica to make the misrepresentations in its weekly reports to NASS, and they were each aware of the falsity of those misrepresentations at the time they were made.

211.   Defendants and Co-Conspirators knew that the prices that DairyAmerica reported to NASS were intended to be, and would be, used in FMMO formulas to set the prices that were paid to Plaintiffs and the other Class members for the purchase of raw milk and that reporting forward contracted sales transacted outside of DEIP would artificially depress the prices paid to Plaintiffs and other Class members for the purchase of raw milk.

212.   Defendants and Co-Conspirators intentionally made the misrepresentations of NFDM prices and volume in weekly reports to NASS for the purposes of lowering the raw milk prices that were paid to Class members and of protecting the profits of Defendants and Co-

Conspirators. When misreporting NFDM sales data to USDA, Defendants and Co-Conspirators intended to cause financial loss to Class members and to obtain financial gain for Defendants and Co-Conspirators.

213.    The NFDM prices improperly reported by Defendants and Co-Conspirators had the direct effect of lowering the raw milk prices set by USDA using FMMO formulas.

214.    Plaintiffs and the other members of the Class justifiably and reasonably relied to their detriment on the prices set by USDA under the FMMOs as being the price calculated based on the correct reporting of prices and volumes to NASS. Such reliance was foreseeable and intended by Defendants and Co-Conspirators.

215.    As a direct and proximate result of Defendants' and Co-Conspirators' intentional conduct and statements, Plaintiffs and the other Class members have suffered and are entitled to compensatory, consequential, and punitive damages, in an amount to be proven at trial.

## THIRD CAUSE OF ACTION

### (Violation of RICO, 18 U.S.C. § 1962(c), as to California Dairies)

216.    Plaintiffs reallege each allegation in each of the paragraphs above as if fully set forth herein.

217.    At all relevant times, Defendants, Co-Conspirators, Plaintiffs, and the members of the Class each constituted a "person" within the meaning of 18 U.S.C. § 1961(3), as each was capable of holding a legal or beneficial interest in property.

218.    At all relevant times, the corporation DairyAmerica constituted an "Enterprise" within the meaning of 18 U.S.C. § 1961(4).

219.    The Enterprise engaged in and affected interstate and foreign commerce during the Class Period. Among other things, the Enterprise advertised, marketed, and sold NFDM throughout the United States, and it transacted business through the use of the United States mails and interstate telephone wires. The NFDM figures reported by the Enterprise to USDA established minimum monthly pay prices for thousands of dairy farmers located around the country, and those figures also guided the terms of domestic and global sales of NFDM.

220.    California Dairies and Co-Conspirators are each separate entities, distinct from the

Enterprise itself, which unlawfully used the Enterprise as a vehicle through which unlawful activity was committed.

221. The common and shared purpose of the Enterprise was to artificially depress raw milk prices regulated by the FMMO by knowingly and intentionally reporting to NASS ineligible forward pricing contracts transacted outside of DEIP for the sale of NFDM.

222. The Enterprise had an ongoing organization with a framework for making decisions, functioned as a continuing unit, and had an ascertainable structure and system of authority guiding its operations, separate and apart from the pattern of racketeering in which the Enterprise was engaged.

223. California Dairies and Co-Conspirators each participated in the operation and management of the Enterprise and perpetrated particular racketeering acts in furtherance thereof. California Dairies and Co-Conspirators participated in the Enterprise through their control of DairyAmerica.

224. During the Class Period, California Dairies and each of the Co-Conspirators, through their employees, had three seats on DairyAmerica's Board of Directors, which exerted active and absolute control over the Enterprise, including deciding whether to export NFDM, whether to enter into forward pricing contracts and whether to report pricing information to USDA. Through their positions on the Board of Directors, California Dairies and each of the Co-Conspirators instructed DairyAmerica to repeatedly misreport NFDM sales data to USDA, which constitutes a pattern of racketeering activity. The Board of Directors participated in the conduct of the Enterprise through quarterly board meetings, frequent conference calls, regular email discussions, and additional in-person meetings.

225. In particular, California Dairies is a member of DairyAmerica and, in conjunction with Co-Conspirators, directed and controlled the activities of DairyAmerica during the Class Period. California Dairies directly participated in the operation and management of the Enterprise, including through the following senior employees and representatives:

a) Keith Gomes served as Senior Vice-President and COO of California Dairies and also served as President of DairyAmerica and as a member of DairyAmerica's Board;

b) Gary Korsmeier served as President and CEO of California Dairies and also served as President of DairyAmerica and as a member of DairyAmerica's Board;

c) Richard Cotta served as President and CEO of California Dairies and also served as President of DairyAmerica and as chairman of DairyAmerica's Board;

d) Joe Heffington served as Senior Vice-President and CFO of California Dairies and also served on DairyAmerica's Board;

e) Jim Gomes served as Senior Vice President of Marketing for California Dairies and also served on DairyAmerica's Board;

f) Duane Matheron served as Treasurer of California Dairies and also served on DairyAmerica's Board.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ nonetheless, senior executives of California Dairies knowingly instructed DairyAmerica to repeatedly misreport NFDM sales data to USDA in defiance of the NASS instructions.

226.    In addition, Co-Conspirators participated in the conduct of the Enterprise in the following manner:

a) **Agri-Mark**. Agri-Mark is a member of DairyAmerica and, in conjunction with California Dairies and other Co-Conspirators, directed and controlled the activities of DairyAmerica during the Class Period. Through its employees—including at least Richard Stammer, Peter Gutierrez and George Goodwin—Agri-Mark directly participated in the operation and management of the Enterprise. Agri-Mark knowingly directed the Enterprise to repeatedly misreport NFDM sales data to USDA in defiance of the NASS instructions.

b) **DFA**. DFA is a member of DairyAmerica and, in conjunction with California Dairies and other Co-Conspirators, directed and controlled the activities of DairyAmerica during the Class Period. Through its employees—including at least Dave Parrish, Joel Clark, John Wilson, John Collins and David Jones —DFA directly participated in the

operation and management of the Enterprise. DFA knowingly directed the Enterprise to repeatedly misreport NFDM sales data to USDA in defiance of the NASS instructions.

c) **Land O' Lakes**. Land O' Lakes is a member of DairyAmerica and, in conjunction with California Dairies and other Co-Conspirators, directed and controlled the activities of DairyAmerica during the Class Period. Through its employees—including at least William Schreiber, William Neary, Alan Pierson and Manuel Maciel—Land O' Lakes directly participated in the operation and management of the Enterprise. Land O' Lakes knowingly directed the Enterprise to repeatedly misreport NFDM sales data to USDA in defiance of the NASS instructions.

d) **Lone Star**. Lone Star is a member of DairyAmerica and, in conjunction with California Dairies and other Co-Conspirators, directed and controlled the activities of DairyAmerica during the Class Period. Through its employees—including at least Jim Baird, Travis Campsey and Bill Armstrong—Lone Star directly participated in the operation and management of the Enterprise. Lone Star knowingly directed the Enterprise to repeatedly misreport NFDM sales data to USDA in defiance of the NASS instructions.

e) **Maryland & Virginia**. Maryland & Virginia is a member of DairyAmerica and, in conjunction with California Dairies and other Co-Conspirators, directed and controlled the activities of DairyAmerica during the Class Period. Through its employees—including at least Richard Mosemann, Jay Bryant, Michael John and David Blake—Maryland & Virginia directly participated in the operation and management of the Enterprise. Maryland & Virginia knowingly directed the Enterprise to repeatedly misreport NFDM sales data to USDA in defiance of the NASS instructions.

f) **O-AT-KA**. O-AT-KA is a member of DairyAmerica and, in conjunction with California Dairies and other Co-Conspirators, directed and controlled the activities of DairyAmerica during the Class Period. Through its employees—including at least Craig Alexander, Richard Edelman and Michael Patterson—O-AT-KA directly participated in the operation and management of the Enterprise. O-AT-KA knowingly

directed the Enterprise to repeatedly misreport NFDM sales data to USDA in defiance of the NASS instructions.

g) **UDA**. Defendant UDA is a member of DairyAmerica and, in conjunction with California Dairies and other Co-Conspirators, directed and controlled the activities of DairyAmerica during the Class Period. Through its employees—including at least Keith Murfield, Jim Boyle and Paul Rovey—UDA directly participated in the operation and management of the Enterprise. UDA knowingly directed the Enterprise to repeatedly misreport NFDM sales data to USDA in defiance of the NASS instructions.

227.   During the Class Period, California Dairies and Co-Conspirators engaged in a pattern of racketeering activity through DairyAmerica. Under the direction and at the express instruction of California Dairies and Co-Conspirators, DairyAmerica repeatedly and knowingly transmitted misrepresentations of NFDM sales to USDA via mail and wires. Specifically, each week for multiple years, DairyAmerica submitted reports containing misrepresentations to USDA using either a paper questionnaire or an electronic reporting system.

228.   During the Class Period, California Dairies and Co-Conspirators associated together for the purpose of, among other things, executing a scheme to defraud through a pattern of racketeering consisting of distinct predicate acts.

229.   The "predicate acts" which constitute the alleged "pattern of racketeering activity" pursuant to 18 U.S.C. § 1961(5) involve two categories of "racketeering activity" set out in 18 U.S.C. § 1961(1): mail fraud in violation of 18 U.S.C. § 1341; and wire fraud in violation of 18 U.S.C. § 1343.

230.   *Mail Fraud.* Each of the acts indictable under 18 U.S.C. § 1341 (mail fraud) involved California Dairies and Co-Conspirators knowingly causing a matter or thing to be sent or delivered by the Postal Service or a commercial interstate mail carrier with specific intent and for the purpose of executing a scheme or artifice to defraud in that each was material and incidental to an essential element of the scheme. The scheme to defraud included California Dairies and Co-Conspirators knowingly and intentionally reporting NFDM prices to NASS which were ineligible for submission, as set out above, for the fraudulent purpose of artificially

depressing raw milk prices regulated by the FMMOs and depriving Plaintiffs and the Class of money and property by trick, deceit, chicane, or overreaching.

231. *Wire Fraud.* Each of the acts indictable under 18 U.S.C. § 1342 (wire fraud) involved California Dairies and Co-Conspirators knowingly causing the use of wire communication to transmit with specific intent and for the purpose of executing a scheme or artifice to defraud in that each was material and incidental to an essential element of the scheme. The scheme to defraud included California Dairies and Co-Conspirators knowingly and intentionally reporting NFDM prices to NASS which were ineligible for submission, as set out above, for the fraudulent purpose of artificially depressing raw milk prices regulated by the FMMOs and depriving Plaintiffs and the Class of money and property by trick, deceit, chicane, or overreaching.

232. The scheme to defraud included California Dairies and Co-Conspirators instructing DairyAmerica to misreport NFDM pricing and volume data to NASS – using either a paper questionnaire delivered through interstate mail or an electronic reporting system transmitted by wire – on each and every week during the period January 4, 2002 through April 22, 2006, including on or about the following dates:

| |
|---|
| 04/12/07 |
| 04/03/07 |
| 03/28/07 |
| 03/21/07 |
| 03/14/07 |
| 03/07/07 |
| 02/28/07 |
| 02/21/07 |
| 02/14/07 |
| 02/07/07 |
| 01/31/07 |
| 01/24/07 |
| 01/17/07 |
| 01/10/07 |
| 01/03/07 |
| 12/27/06 |
| 12/20/06 |
| 12/13/06 |

| |
|---|
| 12/06/06 |
| 11/29/06 |
| 11/22/06 |
| 11/15/06 |
| 11/08/06 |
| 11/01/06 |
| 10/25/06 |
| 10/18/06 |
| 10/11/06 |
| 10/04/06 |
| 09/27/06 |
| 09/20/06 |
| 09/13/06 |
| 09/06/06 |
| 08/30/06 |
| 08/23/06 |
| 08/16/06 |
| 08/09/06 |
| 08/02/06 |
| 07/26/06 |
| 07/19/06 |
| 07/12/06 |
| 07/05/06 |
| 06/28/06 |
| 06/21/06 |
| 06/14/06 |
| 06/01/06 |
| 06/07/06 |
| 05/24/06 |
| 05/17/06 |
| 05/10/06 |
| 05/03/06 |

233.    The pattern of racketeering activity described above is believed to have begun no later than January 1, 2002, and was open-ended and would have continued indefinitely into the future, absent discovery and disclosure by the periodical *The Milkweed* of the activity in its March 2007 issue.

234.    The Enterprise's submission of fraudulent weekly reports to NASS gave rise to the expectation by California Dairies and Co-Conspirators that mail and wire communications would be employed when executing the scheme to defraud through a pattern of racketeering.

235.   The predicate acts underlying the pattern of racketeering activity were designed to work in conjunction with each other to assist California Dairies and Co-Conspirators in artificially depressing NASS prices and lowering their costs of acquiring raw milk regulated by the FMMOs.

236.   California Dairies and Co-Conspirators engaged in and directed the pattern of racketeering with the knowledge of the falsity of the Enterprise's misrepresentations to USDA, and they operated the Enterprise with the specific intent to deceive and defraud dairy farmers and obtain financial gain.

237.   California Dairies and Co-Conspirators received substantial financial benefits from their participation in the Enterprise. In particular, the racketeering activity described above artificially depressed raw milk prices such that the primary cost of manufacturing and/or acquiring NFDM for marketing and sale by DairyAmerica was lower than it would have been but for the racketeering activity. The lower NFDM prices improperly reported by the Enterprise reduced the prices that California Dairies and Co-Conspirators paid to manufacture and/or acquire NFDM and thus increased their profits. As a result, California Dairies and Co-Conspirators earned more profits from the sale of NFDM during the Class Period than they otherwise would have absent the racketeering activity.

238.   Based on the foregoing, California Dairies and Co-Conspirators have violated 18 U.S.C. § 1962(c).

239.   As a direct and proximate result of California Dairies' and Co-Conspirators' racketeering activities, Plaintiffs and the Class have been injured in their business and property in an amount to be proven at trial. These injuries are a direct result of California Dairies' and Co-Conspirators' violations of 18 U.S.C. § 1962. Plaintiffs and the Class were the intended targets of California Dairies' and Co-Conspirators' violations of 18 U.S.C. § 1962, and their injuries were reasonably foreseeable consequences thereof. There are no independent causes which have intervened between the alleged violations of 18 U.S.C. § 1962 and the injuries of Plaintiffs and the Class.  NASS does *not* exercise discretion in setting raw milk prices based on NFDM reports; NASS collects and aggregates data from the weekly reports and mechanistically applies the

1  aggregated results to pre-set formulae that turn out FMMO raw milk prices. There is a direct one-

2  to-one relationship between the extent to which the inclusion of data from forward pricing

3  contracts lowers the reported price of NFDM and the extent to which the computed FMMO price

4  for raw milk is depressed.

5       240.    Pursuant to 18 U.S.C. § 1964(c), California Dairies is jointly and severally liable

6  for three times the damages that Plaintiffs and the Class have suffered, plus the costs of bringing

7  this suit (including attorneys' fees).

8  **FOURTH CAUSE OF ACTION**

9  **(Violation of RICO, 18 U.S.C. § 1962(c), as to both Defendants)**

10  **(Pled in the Alternative to the Third Cause of Action)**

11       241.    Plaintiffs reallege each allegation in each of the paragraphs above as if fully set

12  forth herein, except for paragraphs 216 through 240.

13       242.    At all relevant times, Defendants, Co-Conspirators, Plaintiffs, and the members of

14  the Class each constituted a "person" within the meaning of 18 U.S.C. § 1961(3), as each was

15  capable of holding a legal or beneficial interest in property.

16       243.    At all relevant times, Defendants and Co-Conspirators (including their directors,

17  employees and agents) together constituted an "Enterprise" within the meaning of 18 U.S.C.

18  § 1961(4), as they were associated in fact to accomplish a joint purpose, namely to artificially

19  depress raw milk prices paid to dairy farmers.

20       244.    The Enterprise engaged in and affected interstate and foreign commerce during the

21  Class Period.  Among other things, the Enterprise advertised, marketed, and sold NFDM

22  throughout the United States, and it transacted business through the use of the United States mails

23  and interstate telephone wires.  The NFDM figures reported by the Enterprise to USDA

24  established minimum monthly pay prices for thousands of dairy farmers located around the

25  country, and those figures also guided the terms of domestic and global sales of NFDM.

26       245.    DairyAmerica, California Dairies and Co-Conspirators are each separate entities,

27  distinct from the Enterprise itself, which unlawfully used the Enterprise as a vehicle through

28  which unlawful activity was committed.

246.   The common and shared purpose of the Enterprise was to artificially depress raw milk prices regulated by the FMMO by knowingly and intentionally reporting to NASS ineligible forward pricing contracts transacted outside of DEIP for the sale of NFDM.

247.   The Enterprise had an ongoing organization with a framework for making decisions, functioned as a continuing unit, and had an ascertainable structure and system of authority guiding its operations, separate and apart from the pattern of racketeering in which the Enterprise was engaged.

248.   DairyAmerica, California Dairies and Co-Conspirators each participated in the operation and management of the Enterprise and perpetrated particular racketeering acts in furtherance thereof.

249.   During the Class Period, DairyAmerica, California Dairies and each of the Co-Conspirators, through their employees, exerted active and absolute control over the Enterprise, including deciding whether to report pricing information to USDA.  DairyAmerica, California Dairies and each of the Co-Conspirators directed the Enterprise to repeatedly misreport NFDM sales data to USDA, which constitutes a pattern of racketeering activity.  Employees of DairyAmerica, California Dairies and Co-Conspirators participated in the conduct of the Enterprise through frequent conference calls, regular email discussions, and attendance at in-person meetings, including quarterly meetings of DairyAmerica's Board of Directors.

250.   In particular, DairyAmerica, in conjunction with California Dairies and Co-Conspirators, directed and controlled the activities of the Enterprise during the Class Period. DairyAmerica directly participated in the operation and management of the Enterprise, including through the following senior employees:

   a)  Richard Lewis, who served as COO and CEO of DairyAmerica;

   b)  Jean McAbee, who served as Controller of DairyAmerica.

nonetheless, they knowingly directed the Enterprise to repeatedly misreport NFDM sales data to USDA in defiance of the NASS instructions.

251.   In addition, California Dairies is a member of DairyAmerica and, in conjunction with DairyAmerica and Co-Conspirators, directed and controlled the activities of the Enterprise during the Class Period. California Dairies directly participated in the operation and management of the Enterprise, including through the following senior employees and representatives:

a)   Keith Gomes served as Senior Vice-President and COO of California Dairies and also served as President of DairyAmerica and as a member of DairyAmerica's Board;

b)   Gary Korsmeier served as President and CEO of California Dairies and also served as President of DairyAmerica and as a member of DairyAmerica's Board;

c)   Richard Cotta served as President and CEO of California Dairies and also served as President of DairyAmerica and as chairman of DairyAmerica's Board;

d)   Joe Heffington served as Senior Vice-President and CFO of California Dairies and also served on DairyAmerica's Board;

e)   Jim Gomes served as Senior Vice President of Marketing for California Dairies and also served on DairyAmerica's Board;

f)   Duane Matheron served as Treasurer of California Dairies and also served on DairyAmerica's Board.

nonetheless, senior executives of California Dairies knowingly directed the Enterprise to repeatedly misreport NFDM sales data to USDA in defiance of the NASS instructions.

252.   In addition, Co-Conspirators participated in the conduct of the Enterprise in the following manner:

a)   **Agri-Mark**. Agri-Mark is a member of DairyAmerica and, in conjunction with DairyAmerica and California Dairies, directed and controlled the activities of the Enterprise during the Class Period. Through its employees—including at least Richard Stammer, Peter Gutierrez and George Goodwin—Agri-Mark directly participated in the operation and management of the Enterprise. Agri-Mark knowingly directed the

Enterprise to repeatedly misreport NFDM sales data to USDA in defiance of the NASS instructions.

b) **DFA**. DFA is a member of DairyAmerica and, in conjunction with DairyAmerica and California Dairies, directed and controlled the activities of the Enterprise during the Class Period. Through its employees—including at least Dave Parrish, Joel Clark, John Wilson, John Collins and David Jones —DFA directly participated in the operation and management of the Enterprise. DFA knowingly directed the Enterprise to repeatedly misreport NFDM sales data to USDA in defiance of the NASS instructions.

c) **Land O' Lakes**. Land O' Lakes is a member of DairyAmerica and, in conjunction with DairyAmerica and California Dairies, directed and controlled the activities of the Enterprise during the Class Period. Through its employees—including at least William Schreiber, William Neary, Alan Pierson and Manuel Maciel—Land O' Lakes directly participated in the operation and management of the Enterprise. Land O' Lakes knowingly directed the Enterprise to repeatedly misreport NFDM sales data to USDA in defiance of the NASS instructions.

d) **Lone Star**. Lone Star is a member of DairyAmerica and, in conjunction with DairyAmerica and California Dairies, directed and controlled the activities of the Enterprise during the Class Period. Through its employees—including at least Jim Baird, Travis Campsey and Bill Armstrong—Lone Star directly participated in the operation and management of the Enterprise.   Lone Star knowingly directed the Enterprise to repeatedly misreport NFDM sales data to USDA in defiance of the NASS instructions.

e) **Maryland & Virginia**. Maryland & Virginia is a member of DairyAmerica and, in conjunction with DairyAmerica and California Dairies, directed and controlled the activities of the Enterprise during the Class Period. Through its employees—including at least Richard Mosemann, Jay Bryant, Michael John and David Blake—Maryland & Virginia directly participated in the operation and management of the Enterprise. Maryland & Virginia knowingly directed the Enterprise to repeatedly misreport NFDM

sales data to USDA in defiance of the NASS instructions.

f) **O-AT-KA**. O-AT-KA is a member of DairyAmerica and, in conjunction with DairyAmerica and California Dairies, directed and controlled the activities of the Enterprise during the Class Period. Through its employees—including at least Craig Alexander, Richard Edelman and Michael Patterson—O-AT-KA directly participated in the operation and management of the Enterprise. O-AT-KA knowingly directed the Enterprise to repeatedly misreport NFDM sales data to USDA in defiance of the NASS instructions.

g) **UDA**. UDA is a member of DairyAmerica and, in conjunction with DairyAmerica and California Dairies, directed and controlled the activities of the Enterprise during the Class Period. Through its employees—including at least Keith Murfield, Jim Boyle and Paul Rovey—UDA directly participated in the operation and management of the Enterprise. UDA knowingly directed the Enterprise to repeatedly misreport NFDM sales data to USDA in defiance of the NASS instructions.

253.   During the Class Period, DairyAmerica, California Dairies and Co-Conspirators engaged in a pattern of racketeering activity through the Enterprise. Under the direction and at the express instruction of DairyAmerica, California Dairies and Co-Conspirators, the Enterprise repeatedly and knowingly transmitted misrepresentations of NFDM sales to USDA via mail and wires. Specifically, each week for multiple years, the Enterprise submitted reports containing misrepresentations to USDA using either a paper questionnaire or an electronic reporting system.

254.   During the Class Period, DairyAmerica, California Dairies and Co-Conspirators associated together for the purpose of, among other things, executing a scheme to defraud through a pattern of racketeering consisting of distinct predicate acts.

255.   The "predicate acts" which constitute the alleged "pattern of racketeering activity" pursuant to 18 U.S.C. § 1961(5) involve two categories of "racketeering activity" set out in 18 U.S.C. § 1961(1): mail fraud in violation of 18 U.S.C. § 1341; and wire fraud in violation of 18 U.S.C. § 1343.

256.   *Mail Fraud*. Each of the acts indictable under 18 U.S.C. § 1341 (mail fraud)

involved DairyAmerica, California Dairies and Co-Conspirators knowingly causing a matter or thing to be sent or delivered by the Postal Service or a commercial interstate mail carrier with specific intent and for the purpose of executing a scheme or artifice to defraud in that each was material and incidental to an essential element of the scheme. The scheme to defraud included DairyAmerica, California Dairies and Co-Conspirators knowingly and intentionally reporting NFDM prices to NASS which were ineligible for submission, as set out above, for the fraudulent purpose of artificially depressing raw milk prices regulated by the FMMOs and depriving Plaintiffs and the Class of money and property by trick, deceit, chicane, or overreaching.

257.   *Wire Fraud.* Each of the acts indictable under 18 U.S.C. § 1342 (wire fraud) involved DairyAmerica, California Dairies and Co-Conspirators knowingly causing the use of wire communication to transmit with specific intent and for the purpose of executing a scheme or artifice to defraud in that each was material and incidental to an essential element of the scheme. The scheme to defraud included DairyAmerica, California Dairies and Co-Conspirators knowingly and intentionally reporting NFDM prices to NASS which were ineligible for submission, as set out above, for the fraudulent purpose of artificially depressing raw milk prices regulated by the FMMOs and depriving Plaintiffs and the Class of money and property by trick, deceit, chicane, or overreaching.

258.   The scheme to defraud involved DairyAmerica, California Dairies and Co-Conspirators directing the Enterprise to misreport NFDM pricing and volume data to NASS – using either a paper questionnaire delivered through interstate mail or an electronic reporting system transmitted by wire – on each and every week during the period January 4, 2002 through April 22, 2006, including on or about the following dates:

| |
|---|
| 04/12/07 |
| 04/03/07 |
| 03/28/07 |
| 03/21/07 |
| 03/14/07 |
| 03/07/07 |
| 02/28/07 |
| 02/21/07 |

| | |
|---|---|
| 1 | 02/14/07 |
| | 02/07/07 |
| 2 | 01/31/07 |
| 3 | 01/24/07 |
| | 01/17/07 |
| 4 | 01/10/07 |
| 5 | 01/03/07 |
| | 12/27/06 |
| 6 | 12/20/06 |
| 7 | 12/13/06 |
| | 12/06/06 |
| 8 | 11/29/06 |
| 9 | 11/22/06 |
| | 11/15/06 |
| 10 | 11/08/06 |
| | 11/01/06 |
| 11 | 10/25/06 |
| 12 | 10/18/06 |
| | 10/11/06 |
| 13 | 10/04/06 |
| 14 | 09/27/06 |
| | 09/20/06 |
| 15 | 09/13/06 |
| 16 | 09/06/06 |
| | 08/30/06 |
| 17 | 08/23/06 |
| 18 | 08/16/06 |
| | 08/09/06 |
| 19 | 08/02/06 |
| 20 | 07/26/06 |
| | 07/19/06 |
| 21 | 07/12/06 |
| 22 | 07/05/06 |
| | 06/28/06 |
| 23 | 06/21/06 |
| | 06/14/06 |
| 24 | 06/01/06 |
| 25 | 06/07/06 |
| | 05/24/06 |
| 26 | 05/17/06 |
| 27 | 05/10/06 |
| | 05/03/06 |
| 28 | |

259.   The pattern of racketeering activity described above is believed to have begun no later than January 1, 2002, and was open-ended and would have continued indefinitely into the future, absent discovery and disclosure by the periodical *The Milkweed* of the activity in its March 2007 issue.

260.   The Enterprise's submission of fraudulent weekly reports to NASS gave rise to the expectation by DairyAmerica, California Dairies and Co-Conspirators that mail and wire communications would be employed when executing the scheme to defraud through a pattern of racketeering.

261.   The predicate acts underlying the pattern of racketeering activity were designed to work in conjunction with each other to assist DairyAmerica, California Dairies and Co-Conspirators in artificially depressing NASS prices and lowering the costs of acquiring raw milk regulated by the FMMOs.

262.   DairyAmerica, California Dairies and Co-Conspirators engaged in and directed the pattern of racketeering with the knowledge of the falsity of the Enterprise's misrepresentations to USDA, and they operated the Enterprise with the specific intent to deceive and defraud dairy farmers and obtain financial gain.

263.   DairyAmerica, California Dairies and Co-Conspirators received substantial financial benefits from their participation in the Enterprise. In particular, the racketeering activity described above artificially depressed raw milk prices such that the primary cost of manufacturing and/or acquiring NFDM for marketing and sale by DairyAmerica was lower than it would have been but for the racketeering activity. The lower NFDM prices improperly reported by the Enterprise reduced the prices that DairyAmerica, California Dairies and Co-Conspirators paid to manufacture and/or acquire NFDM and thus increased their profits. As a result, DairyAmerica, California Dairies and Co-Conspirators earned more profits from the sale of NFDM during the Class Period than they otherwise would have absent the racketeering activity.

264.   Based on the foregoing, DairyAmerica, California Dairies and Co-Conspirators have violated 18 U.S.C. § 1962(c).

265.    As a direct and proximate result of the racketeering activities of DairyAmerica, California Dairies and Co-Conspirators, Plaintiffs and the Class have been injured in their business and property in an amount to be proven at trial. These injuries are a direct result of the violations of 18 U.S.C. § 1962 committed by DairyAmerica, California Dairies and Co-Conspirators. Plaintiffs and the Class were the intended targets of those violations of 18 U.S.C. § 1962, and their injuries were reasonably foreseeable consequences thereof. There are no independent causes which have intervened between the alleged violations of 18 U.S.C. § 1962 and the injuries of Plaintiffs and the Class.  NASS does *not* exercise discretion in setting raw milk prices based on NFDM reports; NASS collects and aggregates data from the weekly reports and mechanistically applies the aggregated results to pre-set formulae that turn out FMMO raw milk prices. There is a direct one-to-one relationship between the extent to which the inclusion of data from forward pricing contracts lowers the reported price of NFDM and the extent to which the computed FMMO price for raw milk is depressed.

266.    Pursuant to 18 U.S.C. § 1964(c), DairyAmerica and California Dairies are jointly and severally liable for three times the damages that Plaintiffs and the Class have suffered, plus the costs of bringing this suit (including attorneys' fees).

## **FIFTH CAUSE OF ACTION**

### **(Conspiracy to Violate RICO: Violation of 18 U.S.C. § 1962(d), as to California Dairies)**

267.    Plaintiffs reallege each allegation in each of the paragraphs above as if fully set forth herein, except for paragraphs 241 through 266.

268.    At all relevant times, the corporation DairyAmerica constituted an "Enterprise" within the meaning of 18 U.S.C. § 1961(4).

269.    Beginning no later than January 1, 2002, California Dairies and Co-Conspirators each knowingly and intentionally conspired to violate 18 U.S.C. § 1962(c). The object of this ongoing conspiracy was to conduct or participate in, directly or indirectly, the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

270.    California Dairies conspired with each Co-Conspirator to direct and conduct the Enterprise to knowingly and intentionally transmit to NASS, by mail or wire, fraudulent price

information—*i.e.*, by including forward pricing contracts transacted outside of DEIP for the sale of NFDM, known by California Dairies and Co-Conspirators to be ineligible for reporting—for the common purpose of artificially depressing raw milk prices regulated by the FMMOs. These actions constitute mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively, and serve as predicate acts to a pattern of racketeering activity pursuant to 18 U.S.C. §§ 1961(1) and (5).

271.    At the time this price information was transmitted to NASS, California Dairies and Co-Conspirators knew that forward pricing contracts transacted outside of DEIP for the sale of NFDM were ineligible for reporting, and that doing so would artificially depress the prices for raw milk regulated by the FMMOs.

272.    California Dairies and Co-Conspirators agreed, among and between them, to purposefully and intentionally report to NASS prices for NFDM that were sold through forward pricing contracts transacted outside of DEIP.

273.    California Dairies and Co-Conspirators received substantial financial benefits from their participation in the Enterprise. In particular, the racketeering activity described above artificially depressed raw milk prices such that the primary cost of manufacturing and acquiring NFDM marketed by DairyAmerica was lower than it would have been but for the racketeering activity. The lower NFDM prices improperly reported by DairyAmerica reduced the prices that were paid to purchase raw milk from dairy farmers and thus increased the profits of California Dairies and Co-Conspirators. As a result, California Dairies and Co-Conspirators earned more profits from the sale of NFDM during the Class Period than they otherwise would have absent the racketeering activity.

274.    California Dairies and Co-Conspirators adopted the goal of furthering or facilitating the criminal endeavor of the Enterprise by agreeing to facilitate some of the acts leading to the substantive offenses, and directly by, as described above, engaging in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including instructing the Enterprise to misreport NFDM sales data to USDA in contravention of explicit NASS instructions.

275.   California Dairies and Co-Conspirators knew that the weekly misreporting of NFDM sales data to USDA, by mail or wire, constituted a pattern of racketeering activity.

276.   Based on the foregoing, California Dairies and Co-Conspirators have violated 18 U.S.C. § 1962(d).

277.   As a direct and proximate result of California Dairies' and Co-Conspirators' racketeering activities, Plaintiffs and the Class have been injured in their business and property in an amount to be proven at trial. These injuries are a direct result of California Dairies' and Co-Conspirators' violations of 18 U.S.C. § 1962. Plaintiffs and the Class were the intended targets of California Dairies' and Co-Conspirators' violations of 18 U.S.C. § 1962, and their injuries were reasonably foreseeable consequences thereof. There are no independent causes which have intervened between the alleged violations of 18 U.S.C. § 1962 and the injuries of Plaintiffs and the Class.  NASS does *not* exercise discretion in setting raw milk prices based on NFDM reports; NASS collects and aggregates data from the weekly reports and mechanistically applies the aggregated results to pre-set formulae that turn out FMMO raw milk prices. There is a direct one-to-one relationship between the extent to which the inclusion of data from forward pricing contracts lowers the reported price of NFDM and the extent to which the computed FMMO price for raw milk is depressed.

278.   Pursuant to 18 U.S.C. § 1964(c), California Dairies is jointly and severally liable for three times the damages that Plaintiffs and the Class have suffered, plus the costs of bringing this suit (including attorneys' fees).

## SIXTH CAUSE OF ACTION

### (Conspiracy to Violate RICO: Violation of 18 U.S.C. § 1962(d), as to both Defendants)
### (Pled in the Alternative to the Fifth Cause of Action)

279.   Plaintiffs reallege each allegation in each of the paragraphs above as if fully set forth herein, except for paragraphs 216 through 240 and for paragraphs 267 through 278.

280.   At all relevant times, Defendants and Co-Conspirators (including their directors, employees and agents) together constituted an "Enterprise" within the meaning of 18 U.S.C. § 1961(4), as they were associated in fact to accomplish a joint purpose, namely to artificially

depress raw milk prices paid to dairy farmers.

281.   Beginning no later than January 1, 2002, DairyAmerica, California Dairies and Co-Conspirators each knowingly and intentionally conspired to violate 18 U.S.C. § 1962(c). The object of this ongoing conspiracy was to conduct or participate in, directly or indirectly, the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

282.   Each Defendant and Co-Conspirator conspired with other Defendants and Co-Conspirators to direct and conduct the Enterprise to knowingly and intentionally transmit to NASS, by mail or wire, fraudulent price information—*i.e.*, by including forward pricing contracts transacted outside of DEIP for the sale of NFDM, known by Defendants and Co-Conspirators to be ineligible for reporting—for the common purpose of artificially depressing raw milk prices regulated by the FMMOs. These actions constitute mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively, and serve as predicate acts to a pattern of racketeering activity pursuant to 18 U.S.C. §§ 1961(1) and (5).

283.   At the time this price information was transmitted to NASS, Defendants and Co-Conspirators knew that forward pricing contracts transacted outside of DEIP for the sale of NFDM were ineligible for reporting, and that doing so would artificially depress the prices for raw milk regulated by the FMMOs.

284.   Defendants and Co-Conspirators agreed, among and between them, to purposefully and intentionally report to NASS prices for NFDM that were sold through forward pricing contracts transacted outside of DEIP.

285.   Defendants and Co-Conspirators received substantial financial benefits from their participation in the Enterprise. In particular, the racketeering activity described above artificially depressed raw milk prices such that the primary cost of manufacturing and acquiring NFDM marketed by DairyAmerica was lower than it would have been but for the racketeering activity. The lower NFDM prices improperly reported by the Enterprise reduced the prices that were paid to purchase raw milk from dairy farmers and thus increased the profits of Defendants and Co-Conspirators. As a result, Defendants and Co-Conspirators earned more profits from the sale of NFDM during the Class Period than they otherwise would have absent the racketeering activity.

286.   Defendants and Co-Conspirators adopted the goal of furthering or facilitating the criminal endeavor of the Enterprise by agreeing to facilitate some of the acts leading to the substantive offenses, and directly by, as described above, engaging in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including instructing the Enterprise to misreport NFDM sales data to USDA in contravention of explicit NASS instructions.

287.   Defendants and Co-Conspirators knew that the weekly misreporting of NFDM sales data to USDA, by mail or wire, constituted a pattern of racketeering activity.

288.   Based on the foregoing, Defendants and Co-Conspirators have violated 18 U.S.C. § 1962(d).

289.   As a direct and proximate result of Defendants' and Co-Conspirators' racketeering activities, Plaintiffs and the Class have been injured in their business and property in an amount to be proven at trial. These injuries are a direct result of Defendants' and Co-Conspirators' violations of 18 U.S.C. § 1962. Plaintiffs and the Class were the intended targets of Defendants' and Co-Conspirators' violations of 18 U.S.C. § 1962, and their injuries were reasonably foreseeable consequences thereof. There are no independent causes which have intervened between the alleged violations of 18 U.S.C. § 1962 and the injuries of Plaintiffs and the Class. NASS does *not* exercise discretion in setting raw milk prices based on NFDM reports; NASS collects and aggregates data from the weekly reports and mechanistically applies the aggregated results to pre-set formulae that turn out FMMO raw milk prices. There is a direct one-to-one relationship between the extent to which the inclusion of data from forward pricing contracts lowers the reported price of NFDM and the extent to which the computed FMMO price for raw milk is depressed.

290.   Pursuant to 18 U.S.C. § 1964(c), Defendants are jointly and severally liable for three times the damages that Plaintiffs and the Class have suffered, plus the costs of bringing this suit (including attorneys' fees).

## **PRAYER FOR RELIEF**

WHEREFORE, Individual and Representative Plaintiffs, on behalf of themselves and all others similarly situated, request of this Court the following monetary and equitable relief:

A.      An order certifying that the action may be maintained as a class action and appointing Plaintiffs and Plaintiffs' undersigned counsel to represent the Class;

B.      Compensatory and consequential damages suffered by Plaintiffs and members of the Class in an amount to be determined at trial, including any damages as may be provided for by statute;

C.      Punitive damages;

D.      Treble damages;

E.      Restitution and disgorgement of ill-gotten monies

F.      Reasonable attorneys' fees;

G.      Costs of suit;

H.      Pre- and post-judgment interests;

I       Preliminary injunctive relief, including but not limited to an order freezing assets and an accounting;

J.      Injunctive relief; and

K.      Such other and further relief as this Court may deem necessary or proper.

///

///

///

1

**JURY DEMAND**

2

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demands a trial by jury on all

3

issues so triable.

4

DATED: February 10, 2016                    Respectfully submitted,

5

6

_/s/ Benjamin D. Brown_
Benjamin D. Brown (SBN 202545)

7

**COHEN MILSTEIN SELLERS
& TOLL, PLLC**

8

1100 New York Avenue, N.W.
Suite 500, West Tower

9

Washington, DC 20005
Telephone:    (202) 408-4600

10

Facsimile:    (202) 408-4699
Email: bbrown@cohenmilstein.com

11

George F. Farah

12

**COHEN MILSTEIN SELLERS
 & TOLL, PLLC**

13

88 Pine Street
14th Floor

14

New York, NY 10005
Telephone: (212) 838-7797

15

Facsimile: (212) 838-7745
Email: gfarah@cohenmilstein.com

16

Joseph J. Tabacco, Jr. (SBN 75484)

17

Christopher T. Heffelfinger (SBN 118058)
Chowning Poppler (SBN 272870)

18

**BERMAN DeVALERIO**
425 California Street, Suite 2100

19

San Francisco, CA 94104
Telephone: (415) 433-3200

20

Facsimile: (415) 433-6382
Email: jtabacco@bermandevalerio.com

21

cheffelfinger@bermandevalerio.com
aphillips@bermandevalerio.com

22

Lynn L. Sarko

23

Mark A. Griffin
Juli E. Farris

24

Cari Campen Laufenberg
**KELLER ROHRBACK L.L.P.**

25

1201 Third Avenue, Suite 3200
Seattle, WA 98101

26

Telephone: (206)-623-1900
Facsimile: (206)-623-3384

27

Email: lsarko@kellerrohrback.com
mgriffin@kellerrohrback.com

28

jfarris@kellerrohrback.com
claufenberg@kellerrohrback.com

1

2
Ron Kilgard
**KELLER ROHRBACK L.L.P.**
3
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
4
Telephone: (602)-248-0088
Facsimile: (602)-248-2822
5
Email: rkilgard@kellerrohrback.com

6
*Counsel for Plaintiffs and the Proposed Class*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28