DAVIS WRIGHT TREMAINE LLP

1 | Allison A. Davis (State Bar No. 139203)
2 | Sanjay M. Nangia (State Bar No. 264986)
DAVIS WRIGHT TREMAINE LLP
3 | 505 Montgomery Street, Suite 800
San Francisco, California 94111
4 | Telephone:    (415) 276-6500
Facsimile:    (415) 276-6599
5 | Email:    allisondavis@dwt.com
sanjaynangia@dwt.com
6 |
7 | Charles M. English, *pro hac vice*
DAVIS WRIGHT TREMAINE LLP
8 | 1919 Pennsylvania Avenue, N.W., Suite 800
Washington, D.C. 20006-3402
9 | Telephone: (202) 973-4200
Facsimile: (202) 973-4499
10 | Email:    chipenglish@dwt.com
11 |
Attorneys for Defendant DairyAmerica, Inc.
12 |
13 |
14 |
15 | IN THE UNITED STATES DISTRICT COURT
16 | THE EASTERN DISTRICT OF CALIFORNIA
17 | FRESNO DIVISION
18 |

| | |
|---|---|
| GERALD CARLIN, JOHN RAHM, PAUL RAZWADOWSKI and DIANA WOLFE, individually and on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>DAIRYAMERICA, INC.<br><br>Defendant. | Case No. 1:09-cv-00430-AWI (EPG)<br><br>**DAIRYAMERICA, INC.'S MOTION TO DISMISS THIRD AMENDED COMPLAINT**<br><br>Date:        May 16, 2016<br>Time:        1:30 p.m.<br>Judge:       Hon. Anthony W. Ishii<br>Courtroom:  2, 8th Floor<br>Action Filed: March 6, 2009 |

**REDACTED VERSION OF DOCUMENT SEALED BY ORDER OF COURT**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................................1

II.   BACKGROUND ..................................................................................................2

    A.    PROCEDURAL HISTORY ........................................................................2

    B.    FACTUAL BACKGROUND ......................................................................5

III.  LEGAL STANDARD ..........................................................................................6

IV.   ARGUMENT ......................................................................................................8

    A.    DairyAmerica Is Not Liable Under RICO Statute Because It Is Not Distinct From The Enterprise ................................................................8

    B.    There Is No "Scheme or Artifice To Defraud" As Required Under RICO............11

        1.    In the absence of bribery or kickbacks, there is no "deprivation of honest services" ......................................................11

        2.    There was no "scheme to defraud" because there are no allegations that DairyAmerica had a fiduciary or statutory duty ...............12

    C.    Plaintiffs Cannot Allege "Intent To Defraud" To Support Their RICO And Intentional Misrepresentation Claims ...................................12

        1.    DairyAmerica could not realize financial gain from its manner of reporting under NASS ......................................................13

        2.    Plaintiffs fail to meet the fraud standard of 9(b) because they only allege neutral facts.............................................................14

            a.    A plausible alternative to fraud exists ...........................14

            b.    DairyAmerica required a crystal ball to benefit its members..........16

            c.    The claims are based on misinterpretation; no law or regulation was violated.................................................17

            d.    The White Declaration does not support fraud allegations .............20

    D.    Filed Rate Doctrine Limits the Damages Period....................................23

V.    CONCLUSION ..................................................................................................25

DAVIS WRIGHT TREMAINE LLP

DAIRYAMERICA'S MOTION TO DISMISS THIRD AMENDED COMPLAINT

Case No. 1:09-cv-00430-AWI (EPG)

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft* v. *Iqbal*,
    556 U.S. 662 (2009) ...................................................................6, 7, 14, 20

*Atkinson v. Anadarko Bank & Trust Co.*,
    808 F.2d 438 (5th Cir. 1987)...................................................................10

*Atl. Gypsum Co. v. Lloyds Int'l. Corp.*,
    753 F. Supp. 505 (S.D.N.Y. 1990) ......................................................13, 14

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ...................................................................................6, 8

*Black v. United States*,
    561 U.S. 465 (2010) .......................................................................................12

*Branch v. Tunnell*,
    14 F.3d 449 (9th Cir. 1994)...........................................................................8

*Carlin v. DairyAmerica, Inc.*,
    705 F.3d 856 (9th Cir. 2013)..........................................3, 5, 18, , 23, 24, 25

*Carlin v. DairyAmerica, Inc.*,
    1:09-cv-0430(AWI)(GSA) , October 16, 2013 ("Order on Defendants'
    Renewed Motion to Dismiss Plaintiffs' First Amended Complaint"), Document
    141 ...................................................................1, 3, 5, 6, 12, 18

*Carlin v. DairyAmerica, Inc.*,
    1:09-cv-0430(AWI)(GSA) , November 17, 2014 ("Order To Show Cause Why
    Plaintiffs' Motion to File a Second Amended Complaint Should Not be
    Denied"), Document 190................................................................. *passim*

*Carlin v. DairyAmerica, Inc.*,
    1:09-cv-0430(AWI)(GSA) ,March 19, 2015 ("Order Following Order to Show
    Cause…"), Document 207 .......................................................4, 5, 15, 16, 20, 22

*Carlin v. DairyAmerica, Inc.*,
    1:09-cv-0430(AWI)(EPG), January 20, 2016, ("Order on Plaintiffs'
    Motion For Leave to File a Second Amended Complaint"), Document 240.............5, 8, 13, 20

*Cedric Kushner Promotions, Ltd. v. King*,
    533 U.S. 158 (2001) ...................................................................................8

DAVIS WRIGHT TREMAINE LLP

DAVIS WRIGHT TREMAINE LLP

*Clegg v. Cult Awareness Network*,
   18 F.3d 752 (9th Cir. 1994) ...............................................................................22

*Daniels-Hall v. Nat'l Educ. Ass'n*,
   629 F.3d 992 (9th Cir. 2010) ................................................................................8

*Davis v. HSBC Bank Nevada, N.A.*,
   691 F.3d 1152 (9th Cir. 2012) ..............................................................................8

*Eclectic Properties East, LLC v. Marcus & Millichap Co.*
   (9th Cir. 2014) 751 F.3d 990 ...............................................13, 14, 15, 20, 22

*Fitzgerald v. Chrysler Corp.*,
   116 F.3d 225 (7th Cir. 1997) ................................................................................9

*Galbraith v. Cty. of Santa Clara*,
   307 F.3d 1119 (9th Cir. 2002) ..............................................................................8

*In re Century Aluminum Co. Sec. Litig.*,
   729 F.3d 1104 (9th Cir. 2013) ............................................................................14

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Products Liab. Litig.*,
   826 F. Supp. 2d 1180 (C.D. Cal. 2011) ....................................................9, 10, 11

*In re Transpacific Passenger Air Transp. Antitrust Litig.*,
   No. C 07-05634 CRB, 2011 U.S. Dist. LEXIS 49853 (N.D. Cal., May 9, 2011) .......................7

*In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*,
   903 F. Supp. 2d 880 (C.D. Cal. 2012) ...........................................................7, 11, 14

*Kaplan v. Rose*,
   49 F.3d 1363 (9th Cir. 1994) ................................................................................7

*Kearns v. Ford Motor Co.*,
   567 F.3d 1120 (9th Cir. 2009) ......................................................................13, 20

*LiMandri v. Judkins*,
   52 Cal. App. 4th 326, 60 Cal. Rptr. 2d 539 (1997) ............................................13

*Meyer v. One W. Bank, F.S.B.*,
   91 F. Supp. 3d 1177, 1184 (C.D. Cal. 2015) ................................................12, 22

*Milgard Tempering, Inc. v. Selas Corp. of America*,
   902 F.2d 703 (9th Cir. 1990) ................................................................................7

*Nascent Wine Company, Inc. et al. v. Pasani, S.A. et al.*,
   No. 3:2010-cv-01349, 2011 U.S. Dist. LEXIS 23970 (S.D. Cal. Mar. 9, 2011) .......................21

*Newcal Indus., Inc. v. Ikon Office Sol.*,
   513 F.3d 1038 (9th Cir. 2008) ............................................................................13

DAVIS WRIGHT TREMAINE LLP

*Pit River Home & Agric. Coop. Ass'n v. U.S.*,
  30 F.3d 1088 (9th Cir. 1994) ..............................................................................7

*Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*,
  30 F.3d 339 (2d Cir. 1994) ..............................................................................9, 10

*S.E.C. v. Reys*
  (W.D. Wash. 2010) 712 F. Supp. 2d 1170 ..........................................................22

*Skilling v. United States*,
  561 U.S. 358 (2010) ........................................................................................11

*Sprewell v. Golden State Warriors*,
  266 F.3d 979 (9th Cir.) *opinion amended on denial of reh'g*,
  275 F.3d 1187 (9th Cir. 2001) ..............................................................21, 22, 23

*Stearns v. Select Comfort Retail Corp.*,
  763 F. Supp. 2d 1128 (N.D. Cal. 2010) ...............................................................7

*Townsend v. Columbia Operations*,
  667 F.2d 844 (9th Cir. 1982) .............................................................................8

*United States v. Cloud*,
  872 F.2d 846 (9th Cir. 1989) .............................................................................4

*United States v. Corinthian Colleges*,
  655 F.3d 984 (9th Cir. 2011) .............................................................................8

*United States v. Lewis*,
  657 F.3d 225 (9th Circ. 1995) ............................................................................4

*United States v. Woods*,
  335 F.3d 993 (9th Cir. 2003) ............................................................................12

*Walter v. Drayson*,
  496 F. Supp. 2d 1162 (D. Haw. 2007)
  aff'd, 538 F.3d 1244 (9th Cir. 2008) ...........................................................21, 22

*Western Radio Servs. Co. v. Espy*,
  79 F.3d 896 (9th Cir. 1996) ..............................................................................18

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009), *as amended* (Feb. 10, 2009) ....................................21

**Statutes**

7 U.S.C. § 601 et seq. .......................................................................................3

7 U.S.C. §1637 ...............................................................................................3

DAIRYAMERICA'S MOTION TO DISMISS THIRD AMENDED COMPLAINT

Case No. 1:09-cv-00430-AWI (EPG)

18 U.S.C.
   § 1346............................................................................................................................11
   § 1962(c) ........................................................................................................................8

Cal. Food & Ag. Code § 54239...............................................................................................3

Cal. Food & Ag. Code § 54040.............................................................................................11

**Rules**

Fed. R. Civ. Proc. § 9(b) ............................................................................................... *passim*

Fed. R. Civ. Proc. § 12(b)(6)...............................................................................................6, 8

**Regulations**

7 C.F.R. pt. 1170 (2012)...........................................................................................................3

7 C.F.R. pts. 1001-1131 (2016)...........................................................................................14

**Other Authorities**

Declaration of D. White ..................................................................................Appendix A

USDA Office of Inspector General Report, February 2008............................. Appendix B

DAVIS WRIGHT TREMAINE LLP

**PRIOR DECISIONS OF THIS COURT RELEVANT TO THIS BRIEF**

- *Carlin v. DairyAmerica, Inc.*, 1:09-cv-0430(AWI)(GSA), October 16, 2013 ("Order on Defendants' Renewed Motion to Dismiss Plaintiffs' First Amended Complaint"), Document 141 ("Doc. 141")

- *Carlin v. DairyAmerica, Inc.*, 1:09-cv-0430(AWI)(GSA), November 17, 2014 ("Order To Show Cause Why Plaintiffs' Motion to File a Second Amended Complaint Should Not be Denied"), Document 190 ("Doc. 190")

- *Carlin v. DairyAmerica, Inc.*, 1:09-cv-0430(AWI)(GSA), March 19, 2015 ("Order Following Order to Show Cause…"), Document 207 ("Doc. 207")

- *Carlin v. DairyAmerica, Inc.*, 1:09-cv-0430(AWI)(EPG), January 20, 2016, ("Order on Plaintiffs' Renewed Motion For Leave to File a Second Amended Complaint"), Document 240 ("Doc. 240")

DAVIS WRIGHT TREMAINE LLP

DAIRYAMERICA'S MOTION TO DISMISS THIRD AMENDED COMPLAINT

Case No. 1:09-cv-00430-AWI (EPG)

## I.     INTRODUCTION

DairyAmerica, Inc. ("DairyAmerica") seeks dismissal of Plaintiffs' intentional misrepresentation and Racketeer Influenced and Corrupt Organizations ("RICO") claims (the Second, Fourth and Sixth Causes of Action in Plaintiffs' Third Amended Complaint ("TAC")) for several independent legal grounds noted below.  DairyAmerica also seeks, under the filed rate doctrine, dismissal of all claims to the extent they are based on conduct outside the time frame where USDA allegedly rejected its rates (April 29, 2006 through April 14, 2007).

*First*, Plaintiffs' RICO claims are fraught with error.  With its roots in organized crime, RICO only punishes those individuals (defined under statute as "persons") who use otherwise legitimate businesses ("enterprises") to conduct a pattern of illegal activity.  Yet the TAC alleges that DairyAmerica was both the "person" and a member of the "enterprise" – an approach consistently rejected by courts.  Further, courts routinely dismiss claims where, as here, the alleged "enterprise" had a purpose that was identical to DairyAmerica's normal business.

*Second*, as further independent reasons for dismissal, Plaintiffs fail to allege a "scheme or artifice to defraud" under mail/wire fraud because there was no bribery or kickback scheme and DairyAmerica had no statutory duty to Plaintiffs.  Plaintiffs' RICO claims against DairyAmerica – pled in the alternative and not previously asserted in the motion to amend – fail to meet critical requirements and should be dismissed.

*Third*, Plaintiffs' RICO and intentional misrepresentation claims fail because there was no intent to defraud.  Courts have found that a defendant must have the ability to profit in order to adequately allege intent to defraud.  But DairyAmerica did not (and could not) realize financial gain from the misreporting.  DairyAmerica is a "nonprofit agricultural cooperative association that functions as a sales agent" brokering nonfat dry milk ("NFDM") for its members, including named defendant, California Dairies, Inc. ("California Dairies").  *Carlin v. DairyAmerica, Inc.*, 1:09-cv-0430(AWI)(GSA), October 16, 2013 ("Order on Defendants' Renewed Motion to Dismiss Plaintiffs' First Amended Complaint"), ("Doc. 141") at 3 (emphasis added).  It receives a flat rate per sale that is independent of the price received or whether the sale was reported to NASS.  Further, as this Court has previously recognized, DairyAmerica's "overall goal [was] to allow

DAIRYAMERICA'S MOTION TO DISMISS THIRD AMENDED COMPLAINT

DAVIS WRIGHT TREMAINE LLP

prices for both raw milk and NFDM to rise, but at a moderated pace" – not to obtain profits or harm farmers. *Carlin v. DairyAmerica, Inc.*, 1:09-cv-0430(AWI)(GSA), November 17, 2014 ("Order To Show Cause Why Plaintiffs' Motion to File a Second Amended Complaint Should Not be Denied") ("Doc. 190") at 9.

The TAC fails to exclude – as it must – plausible alternative explanations for DairyAmerica's conduct. Plaintiffs' alleged "scheme" impossibly required DairyAmerica to predict when raw milk prices would rise, and then structure the execution of forward contracts accordingly. But if DairyAmerica wrongly guessed the timing, and prices instead declined, it would bring financial harm to its members. A more reasonable, alternative explanation is that DairyAmerica believed it was complying with the law because: (1) reporting was entirely *voluntary* and no law or regulation prohibited reporting forward contracts; (2) the reporting instructions were ambiguous (e.g., the validation form asked "did you *or* can you?" exclude forward contracts); (3) certain types of forward contracts were to be included in federal and state reporting; and, (4) DairyAmerica consistently reported all exports to NASS regardless of length of contract (even to its members' financial detriment). Additionally, an alternative explanation for DairyAmerica's forward contract with Fonterra is that DairyAmerica believed it was helping its members and all farmers (including those comprising its members): there was an oversupply of NFDM powder threatening to lower all milk prices. Unexpectedly, however, immediately after DairyAmerica executed this agreement, inclement weather drove production down and manufactured milk product prices up. USDA's and Office of Inspector General's Report, cited extensively by the TAC, supports this explanation and undermines any fraudulent intent.

*Fourth*, Plaintiffs' alleged damages period (January 1, 2002 through April 30, 2007) is overly broad. The Ninth Circuit held that the filed rate doctrine bars all claims except where USDA rejected its rates through its recalculation, which was April 29, 2006 through April 14, 2007. Accordingly, all of Plaintiffs' claims should be limited to that time frame.

## II.     BACKGROUND

### A.     PROCEDURAL HISTORY

Plaintiffs filed their initial complaint March 6, 2009, and the case since then has a lengthy

DAVIS WRIGHT TREMAINE LLP

2

history, which this Court set out in its order of October 16, 2013.  Doc. 141 at 3-5.

This Court granted Defendants DairyAmerica's and California Dairies' motion to dismiss Plaintiffs' First Amended Complaint ("FAC") on the filed rate doctrine on February 9, 2010 (Doc. 83), which order Plaintiffs appealed to the Ninth Circuit.  The Ninth Circuit held that the filed rate doctrine generally applied to minimum prices for milk and milk products set by the United States Department of Agriculture ("USDA") under the Agricultural Marketing Agreement Act of 1937 (7 U.S.C. § 601 et seq.).  *Carlin v. DairyAmerica, Inc.*, 705 F.3d 856, 864 (9th Cir. 2013). Importantly, as the appellate court noted, on June 28, 2007, AMS[1] issued a report calculating the static monthly differences in milk prices resulting from errors in the reporting of nonfat dry milk prices for the limited time period April 29, 2006 through April 14, 2007.  According to the Ninth Circuit, this specific price recalculation for 50 weeks amounted to a limited repudiation of the recalculated prices, and that for this time period, Plaintiffs' claims were not barred.  *Id.* at 879.

Upon remand, DairyAmerica renewed its remaining grounds to dismiss the FAC.  This Court granted the motion in part by dismissing all causes of action except negligent misrepresentation.  Doc. 141.  Importantly, this Court found that the NASS[2] procedures and regulations under the DMEA[3] were not effective until August 2, 2007, ***after*** the alleged misreporting.  *Id.* at 20 ("It is not disputed that the procedures and regulations were not effective until August 2, 2007.").  The Court also found that the remaining claim was not dependent upon whether the procedures and regulations under the DMEA, including the exclusion of forward contract price information, had the force of law.  Doc. 141 at 20.  The Court dismissed California Dairies from the action with prejudice, finding all causes of action asserted were barred by California Food & Agriculture Code § 54239.  Doc. 141 at 24.

Nearly a year later, in June 2014, Plaintiffs brought a motion to amend the FAC, asserting intentional misrepresentation and RICO claims against DairyAmerica and its members.  In

---

[1] Agriculture Marketing Service is an agency of USDA.

[2] National Agricultural Statistic Service is an agency within USDA.

[3] The Dairy Market Enhancement Act of 2000, 7 U.S.C. §1637, et seq. authorized USDA to promulgate regulations making reporting dairy product information mandatory. but the regulations were not implemented until 2008.  *See Carlin*, 705 F.3d at 862; 7 C.F.R. Part 1170 (2012).

DAIRYAMERICA'S MOTION TO DISMISS THIRD AMENDED COMPLAINT

DAVIS WRIGHT TREMAINE LLP

considering that new complaint (the second amended complaint or "SAC"), the Court found "substantial concerns regarding the futility of further amendments of the complaint" in part because Plaintiffs could not allege deceit and issued an order to show cause to permit Plaintiffs to address the futility issue.  Doc 190 at 4.

The Court held that the intent necessary for fraud "is the intent to deceive or cheat for the purpose of either causing financial loss to another or bringing about financial gain to oneself." Doc. 190 at 10 (citing *United States v. Lewis*, 657 F.3d 225, 232-234 (9th Circ. 1995); *United States v. Cloud*, 872 F.2d 846, 852, n. 6 (9th Cir. 1989) ("intent to defraud" means "to act willfully, and with the specific intent to deceive or cheat for the purpose of either causing some financial loss to another, or bringing about some financial gain to oneself.")  The Court agreed with DairyAmerica that "there is nothing surprising or unlawful about Defendants' motivation. Likewise, there is nothing about ongoing efforts to manage risk that, by itself, suggests impropriety."  Doc. 190 at 10.  The Court found that the SAC's allegations fell short of showing an intent to cheat or deceive for the specific purpose of causing financial loss to Plaintiffs, but rather were legitimate business decisions, and in the absence of an enforceable USDA regulation, could not demonstrate specific intent to defraud.  *Id*. at 11.

After further briefing, the Court ultimately concluded that any amendment based upon Plaintiffs' lengthy allegations was futile and denied the motion to amend.  *Carlin v. DairyAmerica, Inc.*, 1:09-cv-0430(AWI)(GSA), March 19, 2015 ("Order Following Order to Show Cause…") ("Doc. 207") at 7.  The Court found that DairyAmerica's purpose was not to cause financial loss to producers or to enrich handlers at the expense of producers, "but to moderate the risk of long-term contracts so as to encourage participation by DairyAmerica's foreign customer and domestic handlers in order to clear excess NFDM from domestic markets." *Id*. at 6.  Most importantly, the Court found and it is undisputed that, DairyAmerica's "inclusion of price information from long term forward contract[s] was ***consistent*** whether the contract price was above or below market price at the actual time of sale."  *Id*. at 6 (emphasis added).  The Court found that the Plaintiffs' attempts to allege actual fraud or RICO violation were futile with regards to the SAC because "the alleged facts are inconsistent with that proposition."  *Id*. at 7.  As will be

4

1    shown below, Plaintiffs have not overcome that barrier with their TAC.

2        **B.    FACTUAL BACKGROUND**

3        The explanation of how the FMMOs work, and their significance is stated in detail in both

4    the Ninth Circuit case, *Carlin*, 705 F.3d at 856, and in this Court's Order of October 16, 2013.  *See*

5    Doc. 141 at 3-5.  Significantly, the DMEA, passed in 2000, provided USDA with the authority to

6    collect product price data to support USDA's decision to change the inputs for FMMO pricing

7    from monthly average prices on the Chicago and New York Mercantile Exchanges to wholesale

8    price inputs collected by NASS through weekly surveys of "Handlers."[4]  Doc. 141 at 4.  While

9    passage of DMEA facilitated the mechanics of USDA's pricing, "the regulations implementing the

10   DMEA…were not promulgated until 2008."  *Carlin*, 705 F.3d at 862.

11       The prohibition against reporting long-term forward contracts was not absolute.  Both

12   contracts made under the Dairy Export Incentive Program ("DEIP") and sales made to the

13   Commodity Credit Corporation ("CCC") were exempt from the 30-day guidance.  *See*

14   DairyAmerica's Request for Judicial Notice in Support of Motion to Dismiss ("RJN"), Exhibits

15   ("Exhs.") 2 and 3 (weekly and annual NASS Forms).  Additionally, because California does not

16   participate in FMMOs, DairyAmerica also reported certain sales (e.g., NFDM produced by

17   California Dairies) under a regime known as CWAP (California Weighted Average Price).  In

18   contrast to FMMOs, CWAP instructed handlers to ***include*** forward contracts.  Doc. 190 at 6.  In

19   examining the origin of the misreporting and finding no trace of intentionality, the Office of

20   Inspector General (OIG) also cited these inconsistent rules.  *See* Appendix ("App.") B, "Inspection

21   Report," U.S. Department of Agriculture, Office of Inspector General, February 2008, at 3

22   (Findings), Doc. 204-2 (granted judicial notice at Doc. 206) ("OIG's Report").

23       In Plaintiffs' prior attempt to amend their complaint to allege fraud based upon factual

24   evidence including emails, this Court found that to allow any amendment would be futile because

25   the alleged facts were inconsistent with the proposition that DairyAmerica committed fraud or a

26   RICO violation.  Doc. 207 at 7 ("The court concludes that Plaintiffs' attempt to allege actual fraud

27

28   ─────────────────
[4] Handlers "receive and handle the raw milk for the purpose of producing dairy consumer products such as liquid milk, ice cream, cheese, butter , and other milk products."  Doc. 141 at 3.

DAVIS WRIGHT TREMAINE LLP

DAIRYAMERICA'S MOTION TO DISMISS THIRD AMENDED COMPLAINT

Case No. 1:09-cv-00430-AWI (EPG)

DAVIS WRIGHT TREMAINE LLP

1    or RICO violation are futile because the alleged facts are inconsistent with that proposition.").

2         Plaintiffs' TAC asserts the same legal theories and same core conduct as its prior SAC, but

3    instead of using the emails, it relies on the declaration of Mr. White ("White Declaration")

4    attached to this motion as App. A; *see also* Doc. 223-1.[5]  The TAC's theories are:

5    (1) DairyAmerica knew of the NASS reporting requirements and purposefully (and fraudulently)

6    reported forward export contracts; (*see* TAC, ¶¶5-10, 96-101, 105-121); (2) that the member

7    cooperatives also knew about the NASS requirements and encouraged or agreed with

8    DairyAmerica that it should report export contracts outside of DEIP (*see, e.g.*, TAC, ¶¶9-10, 17,

9    85, 122-143) and had their own fraudulent intention that this should be done (*see, e.g.*, TAC,

10   ¶¶102-136).  Again, Plaintiffs allege RICO claims and intentional misrepresentation, seeking

11   punitive damages and attorneys' fees.  TAC, Second, Fourth and Sixth Causes of Action.

12                    **III.    LEGAL STANDARD**

13         Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a motion to dismiss can be

14   based upon the failure to allege a cognizable legal theory or the failure to allege sufficient facts

15   under a cognizable legal theory.  Fed. R. Civ. Proc. § 12(b)(6); Doc. 141 at 5.  A defendant

16   prevails on a motion to dismiss if the plaintiff fails to allege "enough facts to state a claim to relief

17   that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The "facial

18   plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer

19   possibility that a defendant has acted unlawfully."  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).

20         "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

21   accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678

22   (quoting *Twombly*, 550 U.S. at 570).  Factual content must allow the "court to draw the reasonable

23   inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (quoting

24   *Twombly*, 550 U.S. at 556).  When a plaintiff has "not nudged [his] claims across the line from

25   conceivable to plausible, [his] complaint must be dismissed."  *Twombly*, 550 U.S. at 570.  In

26   _____

27   [5] The Court refers to Mr. White's "deposition" and calls him the "Deponent" but Mr. White had not been deposed by anyone at the time of the Court's Order.  *See* references in Doc. 240.

28   Plaintiffs objected to DairyAmerica taking Mr. White's deposition to resolve the intent arguments raised in this motion as "procedurally unsound."  Joint Status Report, Document 241 at 5.

6

undertaking this analysis, the Court need not accept conclusory statements; rather, meaningful factual matter is required. *Iqbal*, 556 U.S. at 678. The "tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. *Id.*, 556 U.S. at 677-79 (citing *Twombly*, 550 U.S. at 555); *In re Transpacific Passenger Air Transp. Antitrust Litig.*, No. C 07-05634 CRB, 2011 U.S. Dist. LEXIS 49853, at *39 (N.D. Cal., May 9, 2011) (citing *Twombly*, 550 U.S. at 556). Thus, to the extent the White Declaration contains legal conclusions or general statements, it does not provide a basis to allege fraud. Further, to the extent the TAC's paraphrasing of the White Declaration does the same, it, too, can be ignored.

What is more, a heightened pleading standard applies to the challenged causes of actions. Under Rule 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting the fraud or mistake." *Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir. 1994). A complaint must precisely state the time, place, and nature of each alleged misleading statement, misrepresentation, or specific act of fraud. *Id.* "[T]he elements of knowing falsity of representation and an intent to defraud are necessary elements of Plaintiffs' claims for intentional misrepresentation, as well as the claims for mail and wire fraud under RICO and for conspiracy under RICO." Doc. 190 at 11. Thus, while RICO is not subject to a heightened pleading standard, predicate acts alleging fraud, including mail and wire fraud, must be pleaded with particularity. *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 903 F. Supp. 2d 880, 913 (C.D. Cal. 2012); *see also* Fed. R. Civ. Proc. §9(b).

Although matters outside the pleadings are generally not considered on a motion to dismiss, DairyAmerica's citation of and this Court's own reliance upon its prior orders and conclusions is proper in the context of the instant motion to dismiss. *Stearns v. Select Comfort Retail Corp.*, 763 F. Supp. 2d 1128, 1140 n. 5 (N.D. Cal. 2010); *see also Pit River Home & Agric. Coop. Ass'n v. U.S.*, 30 F.3d 1088, 1097 (9th Cir. 1994) ("The law of the case doctrine is a discretionary one created to maintain consistency and avoid reconsideration, during the course of a single continuing lawsuit, of those decisions that are intended to put a matter to rest"); *Milgard Tempering, Inc. v. Selas Corp. of America*, 902 F.2d 703, 715 (9th Cir. 1990) ("Under the doctrine, a court is generally precluded from reconsidering an issue previously decided by the

DAVIS WRIGHT TREMAINE LLP

same court, or a higher court in the identical case.").

Plaintiffs, in their renewed attempt to allege fraud, rely upon four documents to show "fraud" by DairyAmerica.  First, they refer to both the weekly and annual NASS guidance and forms.  *See* RJN, Exhs. 2 and 3.  Secondly, Plaintiffs rely on but do not attach the White Declaration or the OIG Report.  App. A and B.  "We hold that documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss.  Such consideration does 'not convert the motion to dismiss into a motion for summary judgment.'" *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994) *overruled on other grds. in Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002); in accord, *United States v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992 (9th Cir. 2010) (quoting *Branch v. Tunnell*).  A document is not "outside" a complaint if the complaint specifically refers to the documents, and if its authenticity is not in dispute.  *Townsend v. Columbia Operations*, 667 F.2d 844, 848-49 (9th Cir. 1982).  Rather, these requirements prevent a plaintiff with a legally deficient claim from surviving a motion to dismiss simply by failing to attach a dispositive document on which it relied.  *See Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1160 (9th Cir. 2012).  The Court may thus review the USDA documents and the White Declaration, and consider them in conjunction with DairyAmerica's Motion to Dismiss.

## IV.   ARGUMENT

### A.   DairyAmerica Is Not Liable Under RICO Statute Because It Is Not Distinct From The Enterprise

The RICO statute prohibits "any ***person*** employed by or associated with any ***enterprise***" from conducting the affairs of that enterprise through a pattern of racketeering.  *Carlin v. DairyAmerica, Inc.*, 1:09-cv-0430(AWI)(GSA), January 20, 2016, ("Order on Plaintiffs' Renewed Motion For Leave to File a Second Amended Complaint"), Document 240 ("Doc. 240") at 21; *see also* 18 U.S.C. § 1962(c) (emphasis added).  Thus, to establish RICO liability, plaintiffs must allege that the "person" and the "enterprise" are two distinct entities.  *See, e.g.*, *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001) ("one must allege and prove the existence of two

DAVIS WRIGHT TREMAINE LLP

8

distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name.").  At the pleading stage, because "mere legal labels lack the requisite 'factual content' that *Iqbal* and *Twombly* require," Plaintiffs must do more than make conclusory allegations assigning "person" and "enterprise" labels.  *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Products Liab. Litig*., 826 F. Supp. 2d 1180, 1202-03 (C.D. Cal. 2011) ("*Toyota*").

As between the person and the enterprise, RICO does not punish the enterprise, but the bad actor who misuses it.  *See Cedric*, 533 U.S. at 162 (describing the enterprise as the "tool" or "vehicle" for conducting racketeering activity); *Toyota*, 826 F. Supp. at 1202-03 (finding that RICO was enacted "[t]o 'protect[ ] a legitimate 'enterprise' from those who would use unlawful acts to victimize it"); *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 227 (7th Cir. 1997) ("The prototypical RICO case is one in which a person bent on criminal activity seizes control of a previously legitimate firm and uses the firm's resources ... to perpetrate more, and less easily discovered, criminal acts than he could do in his own person").

Plaintiffs attempt to evade RICO's person-enterprise distinction by making conclusory allegations that DairyAmerica is a liable "person" distinct from the alleged "enterprise" by including DairyAmerica's member cooperatives in the definition of "enterprise."  TAC ¶¶ 242-243.[6]  But Courts regularly dismiss attempts to plead around the person/enterprise distinction through the use of corporate affiliates.  *See, e.g.*, *Fitzgerald*, 116 F.3d at 226 (rejecting plaintiff's theory that the Chrysler Corporation is the RICO person and the "Chrysler family," consisting of Chrysler and any combination of its subsidiaries, dealers, affiliates or agents, is the distinct RICO enterprise); *Toyota*, 826 F. Supp. 2d at 1203 (finding that four Toyota entities could not be both the defendant persons and together, the enterprise); *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.,* 30 F.3d 339, 343 (2d Cir. 1994) (finding that the evidence did not establish that the alleged enterprise, consisting of bank corporation and its officers, was distinct from the

---

[6] Plaintiffs also identify themselves and other class members as "persons" but nowhere in the TAC do Plaintiffs even imply that they or other class members used the alleged enterprise to conduct a pattern of racketeering.  Plaintiffs cannot simply insert themselves as "persons" to create a distinction between the alleged persons and the alleged enterprise.

9

DAVIS WRIGHT TREMAINE LLP

corporation that allegedly participated in the affairs of enterprise); *Atkinson v. Anadarko Bank & Trust Co.*, 808 F.2d 438, 440 (5th Cir. 1987) (rejecting the claim that Anadarko Bank, its holding company, and three employees were an enterprise separate and distinct from Anadarko Bank).

Additionally, Plaintiffs fail to allege the "enterprise" is engaged in activities distinct from DairyAmerica's primary business.  Plaintiffs allege the "the Enterprise advertised, marketed, and sold NFDM throughout the United States" and reported NFDM figures to NASS.  TAC ¶ 244. Yet these are the exact activities attributed to DairyAmerica earlier in the TAC.  *See* TAC ¶¶ 5, 6, 9; *see also Riverwoods Chappaqua Corp.*, 30 F.3d at 343-44 (dismissing RICO claim where alleged associated-in-fact enterprise merely carried on the business of one of the entities comprising the association-in-fact).  At its core, Plaintiffs' distinction fails because, as acknowledged in the TAC, only DairyAmerica reported NFDM sales to NASS, thus it is the only "vehicle" through which any alleged racketeering activity could have been conducted.  *See* TAC ¶¶ 7, 9 (alleging DairyAmerica and its member cooperatives "instructed ***DairyAmerica*** to systematically include prices and volumes from forward pricing contracts in weekly reports to NASS") (emphasis added).

Plaintiffs' only apparent explanation is that the "enterprise" is a distinct entity from DairyAmerica because of the enterprise's "common and shared purpose … to artificially depress raw milk prices" through fraudulent reporting.  TAC ¶ 246.  Plaintiffs' bare assertion that the "enterprise" had a fraudulent purpose separate and apart from DairyAmerica is insufficient to satisfy the distinctiveness requirement.  In *Toyota*, plaintiffs brought RICO claims against Toyota Motor Corporation and its three American subsidiaries, and alleged the existence of an associated-in-fact enterprise consisting of these four Toyota entities.  *Toyota*, 826 F. Supp. 2d at 1199.  The Court dismissed the claims because plaintiffs failed to sufficiently allege the distinctiveness of the defendants as RICO persons and the associated-in-fact enterprise they formed.  *Id.* at 1202.  It held, "Plaintiffs allege that the RICO person and the tool [i.e., the enterprise] are the same entities and, therefore, Plaintiffs have not met the distinctness requirement... the SAC alleges ***no more than that Defendants' primary business activity***—the design, manufacture, and sale or lease of Toyota vehicles—***was conducted fraudulently***."  *Id.* at 1202-1203 (emphasis added).  Plaintiffs

DAVIS WRIGHT TREMAINE LLP

make the same error here by asserting that DairyAmerica and the alleged enterprise are engaged in the same business of selling NFDM, but that the alleged enterprise is distinct from DairyAmerica because it engaged in the same business with the fraudulent purpose to "artificially depress raw milk prices."  TAC ¶ 246.  Under *Toyota*, however, Plaintiffs cannot satisfy the distinctiveness requirement merely by alleging the DairyAmerica's only business activity was conducted fraudulently.

**B.    There Is No "Scheme or Artifice To Defraud" As Required Under RICO**

**1.    In the absence of bribery or kickbacks, there is no "deprivation of honest services"**

To state a claim for the predicate offenses of mail and wire fraud, a plaintiff must plead: "(1) a scheme or artifice devised with (2) the specific intent to defraud and (3) use of the United States mail or interstate telephone wires in furtherance thereof."  *In re WellPoint, Inc.*, 903 F. Supp. 2d at 913.  Importantly, the Court found that a state immunity statute[7] could not insulate DairyAmerica's members from RICO claims because the scheme or artifice to defraud alleged here relies on a ***federal*** statute.  This federal statute requires deprivation of "honest services."  Doc. 240 at 20 ("Neither mail fraud nor wire fraud rely on state law for their definitions.  *See* 18 U.S.C. § 1346 (defining 'scheme or artifice to defraud' for purposes of mail and wire fraud statutes as 'a scheme to deprive another of the intangible right to honest services.')") (citations and quotations in original).

The Supreme Court recently narrowed the doctrine of honest services fraud to only encompass "bribery and kickback schemes."  *See Skilling v. United States*, 561 U.S. 358, 365 (2010); *Black v. United States*, 561 U.S. 465, 471 (2010).  Undisclosed conflicts of interest, or undisclosed self-dealing, is not sufficient.  *Skilling*, 561 U.S. at 409-10.  There is no "deprivation of honest services" RICO violation here because Plaintiffs do not allege any bribes or kickbacks.  *See* TAC ¶¶ 230-32, 256-58 (The scheme to defraud involved some combination of DairyAmerica, California Dairies and/or Co-Conspirators knowingly and intentionally reporting or directing another entity to report allegedly ineligible NFDM prices to NASS).

---

[7] This statute is Cal. Food & Ag. Code § 54040.

DAIRYAMERICA'S MOTION TO DISMISS THIRD AMENDED COMPLAINT

Here, Plaintiffs' allege that misrepresentations were made to government officials at NASS, not that any "thing of value" was exchanged for favorable treatment or other official action. *See Skilling,* 561 U.S. at 413, n. 45 (defining kickbacks and bribery as an exchange of any "thing of value" for the purpose of improperly obtaining favorable treatment from government officials). Because Plaintiffs do not and cannot allege the occurrence of any bribes or kickbacks, they cannot show that DairyAmerica engaged in deprivation of honest services.

> **2.   There was no "scheme to defraud" because there are no allegations that DairyAmerica had a fiduciary or statutory duty**

As another independent reason for dismissal, Plaintiffs have not alleged that DairyAmerica engaged in any other "scheme to defraud" under the mail and wire fraud statutes for its alleged failure to disclose its inclusion of forward export sales in the NASS surveys. A scheme to defraud requires "at least some nondisclosure in violation of an independent duty to disclose or fraudulent omission reasonably calculated to deceive." *Meyer v. One W. Bank, F.S.B.*, 91 F. Supp.3d 1177, 1184 (C.D. Cal. 2015) (finding no misrepresentations); *see also United States v. Woods*, 335 F.3d 993, 1001 (9th Cir. 2003) (a scheme to defraud may be based on a nondisclosure when there exists an independent duty that has been breached by the person so charged. This independent duty may exist in the form of a fiduciary duty to third parties, or may derive from an independent explicit statutory duty created by legislative enactment).[8]

DairyAmerica had no fiduciary duty, and none have been alleged, to the Plaintiffs to explain how it voluntarily reported to NASS, and it is undisputed that the NASS guidance in the weekly and annual forms did not have the force of law. Doc. 141 at 20.

> **C.   Plaintiffs Cannot Allege "Intent To Defraud" To Support Their RICO And Intentional Misrepresentation Claims**

Plaintiffs' RICO and Intentional Misrepresentation claims fail because they cannot

---

[8] Plaintiffs' intentional misrepresentation claim also fails under this reasoning. *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336-37, 60 Cal. Rptr. 2d 539, 543 (1997) ("'[W]here material facts are known to one party and not to the other, failure to disclose them is not actionable fraud unless there is *some relationship* between the parties which gives rise to a duty to disclose such known facts.' As a matter of common sense, such a relationship can only come into being as a result of some sort of *transaction* between the parties.") (internal citation omitted) (emphasis in original).

DAVIS WRIGHT TREMAINE LLP

DAVIS WRIGHT TREMAINE LLP

adequately allege intent to defraud under Rule 9(b).[9]  First, DairyAmerica did not (and could not) realize financial gain from the misreporting.  Second, Plaintiffs merely allege neutral facts.

### 1.   DairyAmerica could not realize financial gain from its manner of reporting under NASS

The Court clarified that Plaintiffs' new claims require "intent to deceive or cheat for the purpose of . . . ***bringing about financial gain to oneself***."  Doc. 240 at 11 (emphasis added); *see also Newcal Indus., Inc. v. Ikon Office Sol., 513 F.3d 1038, 1056 (9th Cir. 2008)* (finding specific intent where the defendant "did in fact profit from the fraud").  In interpreting RICO, courts have found that an ability to profit is necessary to show the requisite intend to defraud.  *See, e.g., Atl. Gypsum Co. v. Lloyds Int'l. Corp.*, 753 F. Supp. 505, 514 (S.D.N.Y. 1990) ("Plaintiffs' view of the facts defies economic reason, and therefore does not yield a reasonable inference of fraudulent intent.").  *Atlantic Gypsum* was a civil RICO case based upon wire and mail fraud, where the court dismissed the complaint for failure to meet the standard of FRCP 9(b).  In that case, a borrower sued the facilitator, lenders and others after a dispute arose regarding the construction of a manufacturing plant.  The borrower accused the defendants of fraud and conspiracy alleging that the loan transaction was a scheme to gain control of the manufacturing venture.  The court found the allegations regarding the "scheme" not to be "economically reasonable."  *Id*. at 514.

Likewise, the "scheme" alleged by plaintiffs here yielded no financial gain for the two defendants.  Neither DairyAmerica nor California Dairies had a financial interest in any alleged misreporting. ██████████████████████████████████████████████ ███████████████████████████████████████████ *See* Doc. 173 at page 3 (filed under seal); *see also* Doc. 205 (filed under seal). █████████████ ████████████████████████████████████████ ███████████  Additionally, California Dairies had no financial interest in NASS prices because

---

[9] Intent is one of the elements in both intentional misrepresentation and for the predicate wrong underlying the RICO causes of action.  *See Eclectic Properties East, LLC v. Marcus & Millichap Co.* 751 F.3d 990, 997 (9th Cir. 2014) ("Plaintiffs' [wire/mail] fraud theory requires them to show more than a business deal gone bad for economic and non-fraudulent reasons.  They must establish that Defendants had the specific intent to defraud."); *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1126 (9th Cir. 2009) (finding that the elements for a misrepresentation claim must also be plead with particularity under 9(b)).

DAVIS WRIGHT TREMAINE LLP

1   it did not participate in any FMMO that was impacted by the misreporting.  7 C.F.R. Parts 1001-

2   1131 (2016).  The Court has already noted that DairyAmerica's only "goal [was] to allow prices

3   for both raw milk and NFDM to rise" moderately.  Doc. 190 at 9.  This was reinforced by

4   DairyAmerica **consistently** reporting forward sales prices throughout the time period at issue.  *Id.*

5   Accordingly, there was no intent to defraud.[10]  *Atlantic Gypsum Co., Inc.*, 753 F. Supp. at 514

6   ("Plaintiffs' theory of an alleged scheme to defraud defies logic.")

        **2.**      **Plaintiffs fail to meet the fraud standard of 9(b) because they only**
7
                    **allege neutral facts**
8
9        As explained further below, the TAC fails to allege intent to defraud because it does not

10   exclude a plausible and innocuous alternative explanation.  This alternative explanation is that

11   DairyAmerica was concerned about excess NFDM powder oversupplying the markets.  Unless

12   such powder was exported, dairy farmers – who were the ultimate owners of DairyAmerica's

13   members – would be financially injured.  While Plaintiffs' allege that DairyAmerica intentionally

14   misreported long-term export contracts, this would have required DairyAmerica to (1) hurt its

15   members' own farmers; and (2) predict *when* raw milk prices would rise and time the execution of

16   such contracts accordingly.

17           **a.**      **A plausible alternative to fraud exists**

18        Plaintiffs' fraudulent intent allegations are insufficient by themselves because they do not

19   "exclude a plausible and innocuous alternative explanation."  *See Eclectic Properties*, 751 F.3d at

20   996-98 ("'[w]hen faced with two possible explanations, only one of which can be true and only

21   one of which results in liability, plaintiffs cannot offer allegations that are merely consistent with

22   their favored explanation but are also consistent with the alternative explanation."); *see also In re*

23   *Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) ("Here, plaintiffs'

24   _____

[10] Likewise, ██████████████████████████████

25 ████████████████████████████████████████

26 ████████████████████████████████████████

27 ██████████████ Plaintiffs are thus accusing these members of a conspiracy against
  their own owners, without alleging any specific facts that explain why the members would want to
28   do such a thing.  *In re WellPoint, Inc.*, 903 F. Supp. at 913 (higher pleading standard applies to
  predicate acts alleging fraud); *Iqbal*, 556 U.S. at 678.

allegations remain stuck in 'neutral territory' … plaintiffs' explanation is merely ***possible*** rather than plausible.  To render their explanation plausible, plaintiffs must do more than allege facts that are merely consistent with both their explanation and defendants' competing explanation.").  Plaintiffs must offer more, "such as facts tending to exclude the possibility that the alternative explanation is true." *Eclectic Properties*, 751 F.3d at 996 (emphasis in original).

In *Eclectic Properties* the Court dismissed plaintiffs' complaint for failure to plead adequate factual allegations to plausibly infer that defendants specifically intended to defraud.  *Id.*  The Court found that it could not infer intent to defraud by the rapid increases in the price of properties at the time of plaintiffs' purchase or by defendants' portrayal of the at-issue investments as "safe and secure" because: (1) the plaintiffs plead no facts that would tend to show that this increase was not typical, appropriate, or the product of legitimate market forces and relying on common sense, real estate values can be variable; and (2) the plaintiffs' representations about the risk involved could be ordinary "puffing" or opinion common in sales.  *Id.* at 996.  In other words, the Court could not infer intent to defraud when each of plaintiffs' allegations had an equally plausible and non-fraudulent explanation.

In this case, the Court has previously found that there are "plausible and innocuous" alternative explanations for DairyAmerica's price reporting practices, which the White declaration and Plaintiffs' TAC allegations do not address.  *See, e.g.*, Doc. 207 at 6 ("The essence of facts cited in Plaintiffs' SAC is that Defendant … played a balancing role by trying to minimize risk while trying to assure profits for both NFDM producers and the providers of raw milk…Likewise, there is nothing about ongoing efforts to manage risk that, by itself, suggests impropriety."); Doc. 190 at 6 (acknowledging that forward sales prices ***were*** to be included for sales transacted through DEIP and in price and volume reports under CWAP); *see also* discussion at Doc. 207 at 6.

Importantly, not all forward sales contracts were to be excluded from the NASS reporting:

> [I]nformation indicating that forward sales prices through the [DEIP] ***are*** to be ***included*** in NASS reports while other forward sales contracts process are not to be reported.  ….  In addition, ….reports made by California producers…that price and volume reports under CWAP ***do not*** exclude information for fixed price long term contracts whether for export or not….

DAIRYAMERICA'S MOTION TO DISMISS THIRD AMENDED COMPLAINT

DAVIS WRIGHT TREMAINE LLP

DAVIS WRIGHT TREMAINE LLP

Doc. 190 at 6 (emphasis in original).  DairyAmerica sold excess NFDM under long-term arrangements to the federal government under the CCC program, which were also reportable.  *See* RJN at Exhs. 2 and 3 (NASS Forms).  That the act of reporting the export contracts was an interpretation (*see* Doc. 190 at 9) is further evidenced by the fact that DairyAmerica consistently reported throughout the relevant time period.  Doc 207 at 6 ("[D]efendants' inclusion of price information from long term [export] forward contract was consistent whether the contract price was above or below market price at the actual time of sale"); *see also* OIG's Report at App. B at 3 ("long-term forward contracted nonfat dry milk was consistently included in [DairyAmerica's] reporting to NASS").  Plaintiffs do not allege ***facts*** explaining why DairyAmerica did not ***exclude*** forward sales prices when doing so would lower raw milk prices.  Aside from Plaintiffs' conclusory allegations that DairyAmerica "intentionally misreported NFDM sales data to NASS" to lower raw milk prices, as in *Eclectic Properties*, Plaintiffs do not allege facts that exclude alternative explanations for DairyAmerica's practices.  751 F.3d at 996.

### b.    DairyAmerica required a crystal ball to benefit its members

Basic economic theory reinforces that the misreporting could not have been intentional. Under the fraud theory alleged in the TAC, DairyAmerica would need to predict the fluctuations of raw milk prices.  The inclusion of forward contracts in NASS reporting could only benefit DairyAmerica's members if raw milk prices "rose considerably" during the term of the forward contract.  TAC at ¶ 107 ("If raw milk prices rose considerably during the term of a forward pricing contract, DairyAmerica's members, including California Dairies, could lose profits or incur losses. . .").  But if raw milk prices *decreased*, DairyAmerica would risk financial harm to its members.[11]

---

[11] An explanation for this is as follows: DairyAmerica reported current *market* sales of NFDM, or those where the price was set 30 or less days prior to shipment.  Under the theories expressed in the TAC, the inclusion of long-term forward sales in NASS reporting had two effects.  When forward sales prices were less than market sales prices of NFDM, the misreporting ultimately lowered the overall price of NFDM sales reported to NASS, resulting in depressed minimum price of raw milk.  Conversely, when prices for forward sales were greater than market sales of NFDM, the opposite was true: the alleged misreporting (i.e., inclusion of forward sales) increased the overall price of NFDM sales reported to NASS and therefore increased minimum raw milk prices. Additionally, under the TAC, an increase in the price of raw milk would cause a corresponding rise in market sale prices of NFDM (because raw milk is a necessary input of NFDM).  TAC ¶ 107 ("Raw milk prices are the principal cost input for manufacturing NFDM").  Taken together, a rise in raw milk prices above previously set forward pricing – which typically factored for the market

---

16

With the foregoing in mind, the alleged misreporting could not have been purposeful.  In order to benefit its members (and avoid financial harm), DairyAmerica would have to predict if and when raw milk prices would rise.  These prices were impacted by a myriad of factors, such as economic conditions, weather patterns, and production yields.  Such a guessing game is the equivalent of predicting the rise and fall of the stock market.  Additionally, the TAC alleges *consistent* misreporting starting in January 1, 2002 (through 2007).  *Id*. at ¶¶ 76-78.  Plaintiffs offer no explanation (nor could they) *why* one could expect the raw milk price to suddenly increase in 2002.  Nor does the TAC suggest that the price did rise in 2002.  The TAC's reliance on DairyAmerica's misreported forward contract (with Fonterra) also does not establish any intentionality.  *Id*. at 12.  There, according to *The Milkweed* – the news source that studies dairy markets and broke the story on the misreporting – DairyAmerica was "[w]orried about a long-term build-up of surplus nonfat dry milk."  *See* RJN, Exh. 4 (*The Milkweed*, March 2007).  Its only alternative was to export the surplus or sell it at a much lower price under the CCC program (which was reportable to NASS).  But extreme weather and global market constriction caused a rise in raw milk prices soon after the agreement was executed:

> [A]lmost as soon as the ink was dry on that [Fonterra] export contract, reality changed. An intense heat wave baked the U.S. dairy industry—especially California—in the second half of July 2006. Globally, dairy production has also constricted. Global prices for nonfat dry milk (and other dairy proteins, such as whey derivatives) skyrocketed. DairyAmerica reportedly exported 100 million pounds of milk powder (or similar dairy proteins) to Fonterra in July-August 2006. That move, in tandem with lower U.S. milk powder output due to bad weather, suddenly "shorted" supplies of nonfat dry milk for users of the product. Prices for nonfat dry milk in the U.S. zoomed up.

*Id*.  Thus, Plaintiffs have not excluded an alternative, plausible explanation for the misreporting and have not shown intent to defraud.

### c.   The claims are based on misinterpretation; no law or regulation was violated

Plaintiffs' case continues to rely on the guiding instructions for "NASS reporting," but, at

---

price at the time the forward contract was entered – would allegedly benefit DairyAmerica's members.  But a fall in raw milk prices had the opposite effect.

DAIRYAMERICA'S MOTION TO DISMISS THIRD AMENDED COMPLAINT

DAVIS WRIGHT TREMAINE LLP

the relevant time, NASS instructions were not regulations, and did not have the force of law. *Western Radio Servs. Co. v. Espy*, 79 F.3d 896, 901 (9th Cir. 1996) ("Manual 'does not rise to the status of a regulation'") (internal quotations and citations omitted). The NASS procedures and regulations under the DMEA were not effective until after the misreporting at issue. Doc. 141 at 20 ("It is not disputed that the procedures and regulations were not effective until August 2, 2007."); Doc. 190 at 9.

The weekly NASS form and its guidance was thus entirely *voluntary*. RJN, Exh. 2. Furthermore, there was no certification language in the weekly report. There was understandable confusion when NASS instituted the reporting. Some contracts, including DEIP, sales under CCC, and then the separate long-standing and audited CWAP reports, all included forward pricing contracts. Prior to that time, DairyAmerica reported pricing solely to CWAP, which included the forward pricing contracts. Doc. 190 at 6. The annual NASS validation form and its confusing guidance have already been discussed by this Court. *Carlin*, 705 F.3d at 863; RJN, Exh. 3. It contains the "could you or did you?" language, which DairyAmerica answered truthfully, if technically correct. In fact, in the aftermath of the misreporting, the OIG recommended that both the reporting form and the validation form be modified for clarity. App. B at 5, 7. The instructions are still confusing today, as the USDA contains no less than eight questions relating to the NASS instructions on its website. *See* RJN, Exh. 1.

Additionally, this Court concluded in the OSC that this lack of an enforceable law defeated a claim that DairyAmerica's interpretation was fraudulent:

> What ultimately defeats Plaintiffs' contention that Defendant or the proposed Defendants made knowingly false statements by including volumes and prices from long term export contracts is the fact that ***there is no regulation cited by Plaintiffs that specifically renders Defendant's interpretation of what is or is not reportable actionably unlawful.*** What remains is a difference of opinion based on a rational contemplation of the realities of the NFDM export business rather than a "knowingly false" statement. That Defendant's interpretation of NAAS survey requirements may have been strained, self-serving or unsupported by subsequent rulings by USDA is of no consequence. Fraud related claims require the present knowledge of the falsity of the representation at the time it is made.

DAIRYAMERICA'S MOTION TO DISMISS THIRD AMENDED COMPLAINT

Case No. 1:09-cv-00430-AWI (EPG)

DAVIS WRIGHT TREMAINE LLP

Doc. 190 at 9 (emphasis added). "Again, absent a USDA regulation expressly making Defendants' interpretation unlawful at the time at issue, the court cannot find that Defendant acted according to a specific intent to defraud Plaintiffs." *Id*. at 11; Doc. 207 at 6.

This Court analyzed this information in concluding DairyAmerica was interpreting the NASS instructions, and not intentionally defrauding anyone. Doc. 190 at 9. "Taking into account its view of the policy purposes of allowing the inclusion of prices for the inclusion of long term contract prices in CCC and DEIP sales and in reporting of sales through CWAP, DairyAmerica appears to interpret the NASS questionnaire directions to permit the reporting of all contract prices for export of NFDM, whether the contracts were for spot or forward sales." *Id*. And, "that DairyAmerica made a conscious determination that participating in the NFDM export market only made economic sense if risk was adequately managed by allowing the reporting of all export contracts on NASS report forms so as to avoid 'runaway' price fluctuations for raw milk. By implication, it follows that DairyAmerica consciously interpreted the NASS reporting instructions to exclude only domestic long term forward fixed price contracts." *Id*.

The OIG Report also buttresses the conclusion that the reporting was based on misinterpretation. After interviewing employees from DairyAmerica, NASS, and AMS (App. B at i) and reviewing sales data, OIG found no indications of intentional misreporting. *Id.* at 3. Importantly, the OIG linked the misreporting to DairyAmerica initially only conducting export sales through DEIP but gradually shifting to exports outside this program. DairyAmerica continued to treat all exports as falling under the DEIP exclusion, in a manner consistent with CWAP reporting rules. *Id.*[12]

While the Court notes in its Order on the Renewed Motion, the TAC "clarifies ***to some extent*** the mechanism by which Defendants' inclusion of forward wholesale prices in weekly NASS questionnaires ***could have*** a substantial impact on the distribution of risk as between

---

[12] App. B at 3 ("[The] conditions permitting the error to occur originated in 2000, when [DairyAmerica] began exporting [] under [DEIP]…During 2002, however, international markets became more competitive with domestic markets, and [DairyAmerica] began exporting [] outside of DEIP. The percentage of the firm's sales outside of DEIP steadily increased, and by September 2004, all of firm's [exports] were outside of DEIP. C[WAP] and NASS reporting requirements differ . . .").

DAIRYAMERICA'S MOTION TO DISMISS THIRD AMENDED COMPLAINT

Case No. 1:09-cv-00430-AWI (EPG)

DAVIS WRIGHT TREMAINE LLP

producers and handlers," (Doc. 240 at 5 (emphasis added)), Plaintiffs' theory of deceit becomes less plausible if, as explained above, DairyAmerica was trying to clear excess powder through exports (which helped raise domestic prices for farmers),[13] could not profit from the alleged misreporting scheme, and would risk financial harm to its members if raw milk prices declined. Accordingly, the TAC does not rule out equally plausible alternative explanation for DairyAmerica's conduct, which was to clear excess powder to help dairy farmers. *Eclectic Properties*, 751 F.3d at 996-98. Its only alternative to exports was to sell under the CCC program at even lower prices. The CCC sales are reportable to NASS and would have depressed raw milk prices further. In sum, Plaintiffs' claims continue to rely on a misinterpretation; not an actual violation of law.[14]

### d.    The White Declaration does not support fraud allegations

Plaintiffs allege that DairyAmerica, California Dairies and the co-conspirators "knowingly and intentionally reported NFDM prices to NASS which were ineligible for submission….for the fraudulent purpose of artificially depressing raw milk prices regulated by the FMMOs and depriving Plaintiffs and the class of money and property by trick, deceit, chicane, or overreaching." TAC at ¶256. This conclusory statement regarding intent is unsupported by facts in the TAC. Rule 9(b) requires that when fraud is alleged, a party must state with particularity the circumstances constituting fraud—averments must be accompanied by "the who, what, when, where, and how" of the misconduct charged. *Kearns*, 567 F.3d at 1124. Put differently, " a party alleging fraud must set forth ***more*** than the neutral facts necessary to identify the transaction …"

---

[13] *See* Doc. 207 at 10 (acknowledging that "export contracts are a very significant part of the business.")

[14] Although the Court noted in its Order on Plaintiffs' Renewed Motion, that the reporting of forward export contracts was "in contravention of the evident intent of Congress and is made unlawful by the regulations promulgated by the Department" (Doc. 240 at 5), USDA had not promulgated the regulations prior to the alleged misreporting and participation was voluntary. Moreover, Congress never articulated a prohibition on the reporting of long-term contracts; it left the reporting requirements to be determined through USDA regulation. Because the law was not self-executing, Congress' intent was for the USDA to adopt regulations, and that "intent" was not manifested until the USDA adopted the regulations in 2008. Thus, there were no "unlawful" acts. *See Carlin*, 688 F.3d at 1123 ("[DMEA] was enacted in part to give the USDA the authority to make the reporting of dairy product information mandatory.")

DAIRYAMERICA'S MOTION TO DISMISS THIRD AMENDED COMPLAINT

Case No. 1:09-cv-00430-AWI (EPG)

DAVIS WRIGHT TREMAINE LLP

1    and "[a]ny averments which do not meet that standard should be 'disregarded,' or 'stripped' from

2    the claim for failure to satisfy Rule 9(b)."  *Id.* (emphasis in original).[15]

3         The White Declaration generally relies on what Mr. White "believed" others "believed"

4    more than a decade ago, which does not support fraudulent intent.  *See, e.g.,* App. A, ¶¶16-19 ("I

5    believe they understood those instructions;" "I believe…several members of the board and officers

6    of DairyAmerica …understood…the instructions"); ¶33 (DairyAmerica was not complying with

7    the "clear text" of NASS' instructions and "violating the spirit" of NASS' instructions); *see Zucco*

8    *Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009), *as amended* (Feb. 10, 2009)

9    (refusing to infer intent from allegations based on "vague hearsay," where plaintiff contended that

10   other individuals decided to leave based on their beliefs that management was unethical.); *see,*

11   *e.g.*, *Nascent Wine Company, Inc. et al. v. Pasani, S.A. et al.*, No. 3:2010-cv-01349, 2011 U.S.

12   Dist. LEXIS 23970 (S.D. Cal. Mar. 9, 2011) (finding that Plaintiffs' allegations fell short of Rule

13   9(b)'s particularity requirement because they were based on a declarant's "belief" that Defendants

14   never intended to fully perform the terms of the agreement: "[a]llegations or evidence to the effect

15   that Plaintiffs believe" that the Defendants did not intent to perform are insufficient, "Plaintiffs

16   must go beyond identifying their belief…").

17        Mr. White opines that from 2002 to 2007, he understood that the NASS forms were "clear

18   and unambiguous," (App. A, ¶9), "intuitive and logical," (App. A, ¶10), and that DairyAmerica

19   had "no reasonable grounds" for being confused by the instructions (App. A, ¶11) because they

20   "mean exactly what they state" (App. A, ¶13).  These opinions and beliefs are not "factual

21   evidence" that can support allegations in a complaint.  *See Sprewell v. Golden State Warriors*, 266

22   F.3d 979, 988 (9th Cir.) *opinion amended on denial of reh'g,* 275 F.3d 1187 (9th Cir. 2001) ("Nor

23   is the court required to accept as true allegations that are merely conclusory, unwarranted

24   deductions of fact, or unreasonable inferences."); *see also Walter v. Drayson*, 496 F. Supp. 2d

25   1162, 1168 (D. Haw. 2007) aff'd, 538 F.3d 1244 (9th Cir. 2008) (rejecting conclusory factual

26

27   ───────────────
     [15] The TAC's paraphrasing of the White Declaration using loaded words not in the Declaration
     such as "warned," "advised," "misreport" and "intentionally lied" (*see, e.g.,* TAC at ¶11, 12 and
28   17) does not substitute for what Mr. White actually said, and should be disregarded.  *Iqbal*, 556
     U.S. at 678 ("the court need not accept conclusory statements in the complaint").

DAVIS WRIGHT TREMAINE LLP

deductions, such as the allegation, without any factual support, that a party was acting in her capacity as an individual rather than as counsel).  The White Declaration repeatedly recites the instructions on the NASS weekly form and his opinion regarding that form, none of which is evidence that supports fraud.  *Sprewell*, 266 F.3d at 988.  Mr. White disagreed with DairyAmerica management as to how to fill out the NASS form and found their interpretation was questionable. But this does not establish fraud or deceit; merely a difference of interpretation.  *Id*. at ¶¶20-23; *see also Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994). ("[T]he court is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged."); *see also Walter*, 496 F. Supp. 2d at 1171 (finding that factual allegations based on indefensible legal conclusions are undeserving of acceptance).  The truth is, as the Court noted in its OSC order and recognized by USDA and OIG, the NASS guidance was not that clear.  Doc. 190 at 9-10;[16] *see also* RJN, Exh. 1; App. B at 3, 5, 7.

The White Declaration contains economic opinions without factual basis, which DairyAmerica contends is the subject of expert testimony, and because Mr. White is not an expert in the reporting of export sales and prices (he never claims that he participated in the NASS reporting because he worked in domestic sales), the opinion should be disregarded.  App. A at ¶¶5, 25-27; *see Eclectic Properties*, 751 F.3d at 999 (declining to accept the conclusory assertions of property values as facts because "[t]he complaint does not cite any documents or sources for this value, nor does it explain the methodology by which this value was derived."); *see* Doc. 190 at 6, 9-11, Doc 207 at 6.

Paragraph 24 of the White Declaration (and the TAC) does not identify who came from the USDA ("USDA officials") such as how many, male or female, when they came and who they talked to -- no details whatsoever -- even though he purports to know the reason for their visit -- and is too vague to support fraud under FRCP 9(b).  *Id*. at ¶24; s*ee S.E.C. v. Reys* 712 F. Supp. 2d 1170, 1178 (W.D. Wash. 2010) (finding paragraph "too vague to satisfy the requirements of Rule 9(b)").  Neither USDA nor the Inspector General, whose investigative report the TAC relies on,

---

[16] Note Mr. White states he worked in "domestic sales" (App. A at ¶5) and he never states that NASS reporting was his responsibility.  *See* generally App. A.

DAVIS WRIGHT TREMAINE LLP

DAVIS WRIGHT TREMAINE LLP

1    has ever suggested that these meetings, if they occurred, should have clarified DairyAmerica's

2    understanding.  In fact, the OIG's Report specifically found that there was no intentional

3    misreporting ("Based on this review, the inaccurate statistics do not appear to have been reported

4    intentionally") App. B at 3 (Findings of the OIG).

5         Mr. White then backtracks on all his prior statements when he states that DairyAmerica, in

6    filling out the weekly NASS reports, did not intend to "personally profit" or cause "malicious …

7    economic injury to farmers" or to defraud anyone.  App. A, ¶¶30-32.  He then states that "it was

8    **questionable** whether or not DairyAmerica was complying with NASS instructions," which

9    dilutes his prior statements.  App. A, ¶¶34-35 (emphasis added).  Believing something is

10   "questionable" is simply a difference of opinion and does not rise to fraud.  *Sprewell*, 266 F.3d at

11   988 (the court need not accept conclusory allegations or unreasonable inferences.).  Thus, there

12   was no "scheme to defraud," but only a disagreement as to the interpretation of the instructions.

13   This is what the Court concluded as to Plaintiffs' prior allegations when it found no fraud and the

14   conclusion here.  *See* Doc. 190 at 10; Doc. 207 at 7.

15        **D.    Filed Rate Doctrine Limits the Damages Period.**

16        DairyAmerica seeks to limit the alleged damages period.[17]  The TAC fails to account for

17   the Ninth Circuit's decision holding that the filed rate doctrine bars all claims except for the

18   limited time period where USDA rejected its rates through its recalculation.  *Carlin*, 705 F.3d at

19   873-874 and 879.  "[T]he filed rate doctrine is applicable in the ***present*** AMAA situation."  *Id.* at

20   873 (emphasis added).  The Ninth Circuit's conclusion that the filed rate doctrine did not preclude

21   all claims rests on two factual conclusions unique to a limited time period: "(1) the NASS issued

22   retroactive revised prices for ***part*** of the relevant period after DairyAmerica acknowledged its

23   erroneous reporting, and (2) AMS calculated the increases in prices of NFDM for the period

24   between April 29, 2006 and April 14, 2007."  *Id.* at 874 (emphasis added).  The only logical

25   conclusion is that if USDA had never issued both sets of revisions, the court could not have found

26   that the agency recognized "that its issued rates are in error due to the misconduct of the enriched

27   ───────────────────────────────

[17] Due to the procedural developments, this Court has never had an opportunity to hear arguments

28   on this dispute.  Specifically, after the Ninth Circuit remanded the case, the Court ruled on motion
to dismiss arguments that DairyAmerica raised prior to the Ninth Circuit opinion.

party."[18]  It is thus obvious that the only rates that may not be subject to the filed rate doctrine are the rates purportedly rejected by USDA through issuing those two reports.

The Ninth Circuit discussed the issue of AMS' rejection of rates at some length, emphasizing that it was the recalculation of rates for the limited time period that it found to be a rejection, although AMS did not call it that.  "While the USDA's recalculation of minimum dairy prices was not expressly called a rejection, the agency recognized that earlier filed rates were incorrect at the time they were filed and imposed significant and improper costs on producers." *Id.* at 879.  That recognition of incorrect rates is directly linked to USDA's recalculation of prices for 14 months[19] only.  Further, the Ninth Circuit recognized the difference between a wholesale (and not time limited) rejection versus a speculative exercise.  "While plaintiffs seek to characterize these revisions as a wholesale repudiation and defendants a mere speculative exercise, the reality is that AMS did recognize and attempt to estimate the impact of DairyAmerica's misstatements." *Id.*  That recognition and attempt to estimate impacts applies only to the 14 month period for which AMS issued its report.

It was also the existence of those two reports affecting 14 months of prices that permitted the Ninth Circuit to conclude that the filed rate doctrine's concern over speculative damages did not apply, but again only as to those 14 months.  *See id.* at 879 n. 21.  No other revised prices were submitted to USDA and thus USDA did not and could not reject any other filed rates because it was unable to reach any conclusion about those other time periods.  *Id.* at 865 and fn. 7.  The Ninth Circuit noted in discussing the "rejected" rates "[t]hat USDA took no further action, noting that '[a]ll of the funds in the FMMO pools for the 14-month period covered by the NASS' revision had previously been disbursed to the milk producers, and corrective disbursements to producers were no longer possible.' But the USDA recognized that *the* rates that were filed were incorrect at the time they were filed." *Id.* at 879 (emphasis added).  "The rates" referred to can and only be the 14-month period that USDA actually did review.

---

[18] DairyAmerica was not enriched as discussed above.

[19] The data rejected was for the time period April 29, 2006 to April 14, 2007, but that data affected prices in 14 months because Class III/IV is backward looking (affected April 2006) and Class I/II pricing is forward looking (May 2007).  App. B at 2.

DAVIS WRIGHT TREMAINE LLP

1  Subsequent to the Ninth Circuit's January 11, 2013 decision, AMS on March 22, 2013

2  issued its own public statement regarding its June 28, 2007 report.  RJN, Exh. 5.  AMS expressly

3  stated that the June 28, 2007 report "was not issued to reject or change any of the . . . prices."  If

4  AMS did not mean to recant the rates for the 14-month period covered by the report, it certainly

5  did not recant or reject any other prices for which the filed rate doctrine should continue to apply.

6  Thus, according to the Ninth Circuit, the only rates the USDA "rejected" were the rates

7  recalculated for the weeks "between April 29, 2006, and April 14, 2007."  *Id*. at 879, fn. 21.  And

8  any liability for alleged misreporting of NFDM prices to USDA can, at best, be for the period for

9  which there are revised Federal Milk Marketing Order (FMMO) calculations provided by USDA –

10  that is, the 14 months of FMMO prices.

11  **V.    CONCLUSION**

12  For the reasons stated above, DairyAmerica requests that this Court grant its motion to

13  dismiss and limit the time period of the action under the filed rate doctrine.

14  DATED this 23 day of March 2016.

15  Respectfully submitted,
   DAVIS WRIGHT TREMAINE LLP

16  By:    */s/Allison A. Davis*

17

18  Allison A. Davis (State Bar No. 139203)
   Sanjay M. Nangia (State Bar No. 264986)

19  505 Montgomery Street, Suite 800
   San Francisco, California 94111

20  Telephone:   (415) 276-6500
   Facsimile:    (415) 276-6599

21  Email:      allisondavis@dwt.com
                sanjaynangia@dwt.com

22

23  Charles M. English, *pro hac vice*
   1919 Pennsylvania Avenue, N.W., Suite 800

24  Washington, D.C. 20006-3402
   Telephone: (202) 973-4200

25  Facsimile: (202) 973-4499
   Email:      chipenglish@dwt.com

26

27  Attorneys for DairyAmerica, Inc.

28

DAVIS WRIGHT TREMAINE LLP

25
DAIRYAMERICA'S MOTION TO DISMISS THIRD AMENDED COMPLAINT
Case No. 1:09-cv-00430-AWI (EPG)

APPENDIX A

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| GERALD CARLIN, JOHN RAHM, PAUL ROZWADOWSKI and DIANA WOLFE, individually and on behalf of themselves and all others similarly situated, | Case No. 1:09 CV 00430-AWI (GSA) **CLASS ACTION** |
| Plaintiffs, | |
| v. | |
| DAIRYAMERICA, INC. and CALIFORNIA DAIRIES, INC., | |
| Defendants. | |

### DECLARATION OF RALPH DOUGLAS WHITE

I, Ralph Douglas White, declare as follows:

1.      I have personal knowledge of all the facts stated herein.

2.      I reside at 3220 Dallas Street, Fort Smith, Arkansas, 72903.

3.      From 1998 until 2011, I was employed at DairyAmerica, Inc. ("DairyAmerica"). During that period of time, I was employed as Director of Sales at DairyAmerica.

4.      During the 13 years that I served as Director of Sales at DairyAmerica, I reported directly to Richard Lewis, the Chief Executive Officer of DairyAmerica.

5.      While employed as Director of Sales at DairyAmerica, my responsibilities included identifying and interacting with domestic customers that purchased non-fat dry milk ("NFDM") from DairyAmerica, determining the prices at which DairyAmerica would sell NFDM to its domestic customers, negotiating and entering into contracts for the sale of NFDM by DairyAmerica, and implementing the terms of those contracts.

\*\*\*\*\*

6.     While I was employed at DairyAmerica, during the period 2002 through February 2007, the National Agricultural Statistics Service ("NASS"), a division of United States Department of Agriculture ("USDA"), instructed DairyAmerica to fill out and submit questionnaires each week containing figures from the sale of NFDM.

7.     The questionnaires provided by NASS during the period 2002 through February 2007 contained explicit instructions to DairyAmerica on exactly how to fill out the weekly reports.

8.     The instructions provided by NASS in the questionnaires during the period 2002 through February 2007 were entirely clear and in plain, understandable English.

9.     During the period 2002 through February 2007, in clear and unambiguous written terms, the instructions from NASS on how to fill out the weekly questionnaires instructed DairyAmerica to exclude figures from the sale of NFDM in which the selling price was set (and not adjusted) 30 or more days before the transaction was completed, unless those sales were transacted through the Dairy Export Incentive Program ("DEIP").

10.    During the period 2002 through February 2007, the written instruction from NASS to exclude figures from non-DEIP sales of NFDM in which the price was set 30 or more days before the completion of the transaction, was intuitive and logical.  NASS prices are designed to reflect current market prices.  Accordingly, it made perfect sense that NASS would require the exclusion of inputs from long-term contracts.

11.    While I was employed at DairyAmerica, during the period 2002 through February 2007, there was no reasonable grounds for believing that the instructions from NASS for

completing and submitting the weekly reports permitted the inclusion of figures from non-DEIP sales of NFDM in which the price was set 30 or more days before the transaction was completed.

\*\*\*\*\*

12.     During the period 2002 through February 2007, on multiple occasions, I read the instructions supplied by NASS for completing and submitting the weekly reports of data from the sale of NFDM.

13.     During the period 2002 through February 2007, on each occasion that I read the instructions supplied by NASS for the weekly reporting of data from the sale of NFDM, I understood the instructions to mean exactly what they state.

14.     During the period 2002 through February 2007, on each occasion that I read the instructions supplied by NASS for the weekly reporting of data from the sale of NFDM, I understood the instructions to mean that, when submitting weekly reports to NASS, DairyAmerica should exclude figures from non-DEIP sales of NFDM in which the selling price was set (and not adjusted) 30 or more days before the transaction was completed.

15.     During the period 2002 through February 2007, while I was employed at DairyAmerica, I understood the instructions from NASS to mean that DairyAmerica should exclude from its reports figures from non-DEIP sales of NFDM in which the price was set 30 or more days before the transaction was completed.

16.     During the period 2002 through February 2007, several other employees of DairyAmerica – including Richard Lewis, Jean McAbee and Annette Smith – read the instructions supplied by NASS for the weekly reporting of data from the sale of NFDM. I base this statement on conversations that I had directly with Richard Lewis, Jean McAbee, Annette Smith and other DairyAmerica employees about the NASS instructions.

17.    During the period 2002 through February 2007, when DairyAmerica employees Richard Lewis, Jean McAbee and Annette Smith read the instructions supplied by NASS for the weekly reporting of data from the sale of NFDM, I believe they understood those instructions to mean that DairyAmerica should exclude figures from non-DEIP sales of NFDM in which the selling price was set (and not adjusted) 30 or more days before the transaction was completed. I base this statement on conversations that I had directly with Richard Lewis, Jean McAbee, Annette Smith and other DairyAmerica employees about the NASS reporting requirements.

18.    I believe that prior to February 2007, several members of the board and officers of DairyAmerica – including Keith Gomes, Joe Heffington, Keith Murfield, Joel Clark, David Parrish, William Schreiber, William Neary, Craig Alexander, Richard Mosemann, Jim Baird, and Richard Stammer – understood that the instructions supplied by NASS for the weekly reporting of data from the sale of NFDM required that DairyAmerica exclude figures from non-DEIP sales of NFDM in which the selling price was set (and not adjusted) 30 or more days before the transaction was completed. I base this statement on conversations that I was a part of with members of the board and officers of DairyAmerica about the NASS reporting requirements.

19.    During the period 2002 through February 2007, other industry participants, including competitors, traders and customers, such as Fonterra Co-Operative Group ("Fonterra"), understood that the instructions supplied by NASS for the weekly reporting of data from the sale of NFDM required that DairyAmerica exclude figures from non-DEIP sales of NFDM in which the selling price was set (and not adjusted) 30 or more days before the transaction was completed. I base this statement on conversations that I had directly with competitors, traders and customers, including employees of Fonterra, about the NASS reporting requirements.

*****

20.     Between the period 2002 and 2006, on multiple occasions, I discussed whether DairyAmerica was complying with NASS's instructions for submitting weekly reports with Richard Lewis.  During that time period, we had many conversations about the issue.  During those conversations, I questioned Richard Lewis about whether DairyAmerica was complying with NASS's instructions for submitting weekly reports.   Specifically, during those conversations, I asked Richard Lewis whether DairyAmerica was improperly including figures in the reports from non-DEIP sales of NFDM in which the selling price was set (and not adjusted) 30 or more days before the transaction was completed.  I suggested to Richard Lewis that I did not think we should continue to include those figures in the reports to NASS because DairyAmerica was defying NASS's instructions and because the figures reported to NASS were intended to reflect current market prices, not future prices derived from long-term contracts.

21.     In response to my statements raising concerns about DairyAmerica's non-compliance with NASS's instructions, Richard Lewis asserted that DairyAmerica should continue to include in its weekly reports to NASS sales figures from non-DEIP sales of NFDM in which the selling price was set (and not adjusted) more than 30 days before the transaction was completed.  Richard Lewis stated that sales data from exports should be reported to NASS regardless of whether they were part of long-term contracts and regardless of whether doing so contradicted the instructions from NASS.  Richard Lewis argued that USDA's reporting system did not distinguish between DEIP and non-DEIP contracts and, further, that the manufacturing plants of DairyAmerica's cooperative members would be best served by reporting procedures that did not distinguish between DEIP and non-DEIP contracts.

22.     Between the period 2002 and 2006, several other individuals – including traders, Fonterra employees and other DairyAmerica employees – questioned Richard Lewis about whether DairyAmerica was or was not complying with NASS's instructions for submitting weekly reports and about whether DairyAmerica was improperly including figures from non-DEIP sales of NFDM in which the selling price was set (and not adjusted) 30 or more days before the transaction was completed.  I base this statement on the conversations I had directly with traders, Fonterra employees and other DairyAmerica employees about the NASS reporting requirements.

23.     Between the period 2002 and 2006, on several occasions, I discussed whether DairyAmerica was complying with NASS's instructions for submitting weekly reports with Jean McAbee, the Controller of DairyAmerica.  During those conversations, I discussed with Jean McAbee whether or not DairyAmerica was complying with NASS's instructions for submitting weekly reports.  Specifically, during those conversations, I discussed with Jean McAbee whether DairyAmerica was improperly including figures from non-DEIP sales of NFDM in which the selling price was set (and not adjusted) 30 or more days before the transaction was completed.  I suggested to Jean McAbee that I did not think we should continue to include those figures in the reports to NASS because DairyAmerica was defying NASS's instructions and because the figures reported to NASS were intended to reflect current market prices, not future prices derived from long-term contracts.

24.     Between the period 2002 and 2006, employees of the USDA visited DairyAmerica to meet with Richard Lewis.  Part of the reason the USDA officials visited DairyAmerica was to ensure that it was complying with, and would continue to comply with, NASS's instructions for completing and submitting weekly reports, including the instruction that

requires the exclusion of figures from non-DEIP sales of NFDM in which the selling price was set (and not adjusted) 30 or more days before the transaction was completed.

*****

25.     In 2006, DairyAmerica entered into contracts negotiated by New Zealand-based Fonterra to export a substantial and unprecedented quantity of NFDM at comparatively low prices.  Those non-DEIP contracts involved the sale of NFDM at prices that were set (and not adjusted) more than 30 days before the transaction was completed.

26.     Soon after DairyAmerica entered into these long-term export contracts with Fonterra, there were major shortages in the production of raw milk.  As a result of these reductions in the supply of raw milk, the prices of raw milk began to rapidly climb.  If DairyAmerica had complied with NASS's instructions and excluded sales figures from long-term non-DEIP contracts from its weekly reports to NASS, then raw milk prices would have continued to climb unabated, and DairyAmerica would have incurred substantial losses for its cooperative members when it sold NFDM via Fonterra.

27.     To avoid incurring substantial losses for its cooperative members, DairyAmerica chose to report these sales to NASS regardless of NASS's instructions and, when submitting weekly reports to NASS, improperly included sales data from non-DEIP contracts in which prices were set (and not adjusted) more than 30 days before the transaction was completed.  By doing so, DairyAmerica reported below market prices for NFDM from long-term contracts to NASS.

28.     DairyAmerica knew that the figures it reported to NASS from long-term, non-DEIP contracts were intended to be, and would be, used by the USDA to calculate the prices for raw milk.  Consequently, DairyAmerica's inclusion of sales data from long-term export contracts

in its reports to NASS caused raw milk prices to be lowered and thus prevented DairyAmerica and its cooperative members from losing substantial sums of money from the export contracts with Fonterra.

29.     The decision by DairyAmerica in 2006 to improperly include, in its weekly reports to NASS, figures from non-DEIP sales of NFDM in which the selling price was set (and not adjusted) 30 or more days before the transaction was completed, and thus limit and prevent the rise of raw milk prices, was taken jointly by Richard Lewis and several executives from cooperatives that were members of DairyAmerica.  Those executives may have included Keith Gomes, Joe Heffington, Keith Murfield, Joel Clark, David Parrish, William Schreiber, William Neary, Craig Alexander, Richard Mosemann, Jim Baird, and Richard Stammer.

30.     When the executives at cooperatives that were members of DairyAmerica decided in 2006 to disobey NASS's instructions and include, in DairyAmerica's weekly reports to NASS, figures from non-DEIP, long-term contracts, those executives did not do so in order to personally profit.  Rather, they made the decision to shield their cooperatives from sizable losses that would stem from the sale of NFDM through the long-term export contracts executed by Fonterra.

31.     When the executives at DairyAmerica decided to include, in DairyAmerica's weekly reports to NASS, figures from non-DEIP, long-term contracts, those executives did not do so in order to personally profit.  Rather, they made the decision to protect DairyAmerica's cooperatives members from sizable losses that would stem from the sale of NFDM through the long-term export contracts executed by Fonterra.

32.     During my time at DairyAmerica, I never witnessed Richard Lewis or any other employee of DairyAmerica, or any director or officer of DairyAmerica, choose to report figures to NASS for the malicious purpose of causing economic injury to farmers.

*****

33.     During the period 2002 through February 2007, when DairyAmerica filled out weekly reports to NASS and included figures from non-DEIP sales of NFDM in which the selling price was set (and not adjusted) 30 or more days before the transaction was completed, I believed that DairyAmerica was not complying with the clear text of NASS's instructions and was violating the spirit of NASS's instructions.

34.     During the period 2002 through February 2007, when DairyAmerica filled out weekly reports to NASS and included figures from non-DEIP sales of NFDM in which the selling price was set (and not adjusted) 30 or more days before the transaction was completed, several employees of DairyAmerica – including Richard Lewis, Jean McAbee and Annette Smith – knew that it was questionable whether or not DairyAmerica was complying with NASS's instructions.  I base this statement on the conversations I had directly with Richard Lewis, Jean McAbee, Annette Smith and other DairyAmerica employees about the NASS reporting requirements.

35.     Prior to February 2007, when DairyAmerica filled out weekly reports to NASS and included figures from non-DEIP sales of NFDM in which the selling price was set (and not adjusted) 30 or more days before the transaction was completed, several board members and officers of DairyAmerica – including Keith Gomes, Joe Heffington, Keith Murfield, Joel Clark, David Parrish, William Schreiber, William Neary, Craig Alexander, Richard Mosemann, Jim Baird, and Richard Stammer – knew that it was questionable whether or not DairyAmerica was complying with NASS's instructions.  I base this statement on the conversations I had directly with board members and officers of DairyAmerica about the NASS reporting requirements.

36.     During the period 2002 through February 2007, when DairyAmerica filled out weekly reports to NASS, the employees, officers and board members of DairyAmerica had no reasonable grounds for believing that DairyAmerica complied with NASS's instructions to exclude figures from non-DEIP sales of NFDM in which the selling price was set (and not adjusted) 30 or more days before the transaction was completed.

*****

37.     After the USDA conducted an investigation of DairyAmerica, and after this lawsuit was filed in California, five cooperative members of DairyAmerica exited the organization, reducing the membership from nine members to four members.

38.     One of the reasons provided by several cooperatives when they exited DairyAmerica was that they no longer needed DairyAmerica to obtain customers that would purchase NFDM. These cooperatives claimed that, due to changes in the market, they were able to find their own customers or develop alternative uses for their raw milk.

39.     Another reason provided by cooperatives when they exited DairyAmerica was that they wanted to avoid having to pay a judgment in this case. I specifically recall statements by several executives from member cooperatives that exited DairyAmerica, including Maryland & Virginia Milk Producers Cooperative Association, Inc. and Lone Star Milk Producers, in which they stated that they were exiting DairyAmerica in part to avoid liability or paying damages in this case. These statements were made at board meetings of DairyAmerica.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on **June 18th 2015**.

Ralph Douglas White

# APPENDIX B



**U.S. Department of Agriculture**



**Office of Inspector General**
**Office of Inspections and Research**

# Inspection Report

# Survey and Estimation Internal Controls for Nonfat Dry Milk and the *Dairy Products Prices* Report

.

**Report No.  26901-01-IR**
**February 2008**

OFFICE OF INSPECTOR GENERAL
Washington, DC 20250

February 14, 2008

REPLY TO
ATTN OF:     26901-01-IR

TO:          Joseph T. Reilly
             Acting Administrator
             National Agricultural Statistics Service

FROM:        Rod DeSmet  /s/
             Assistant Inspector General
              for Inspections and Research

SUBJECT:     Review of Nonfat Dry Milk Prices

This report presents the results of our review of the misreporting of nonfat dry milk price
and quantity data by a dairy firm and the subsequent ramifications. The incorrect data
were aggregated with data from other firms and published by the National Agricultural
Statistics Service (NASS) in its weekly *Dairy Products Prices* report. Once the data
were published by NASS, they were utilized by AMS as a component in its formula for
establishing federal milk marketing order (FMMO) prices. Given that incorrect nonfat
dry milk prices were factored into the FMMO formula, AMS has stated that its published
FMMO prices were incorrect. According to AMS, this caused the total value of milk to
be understated by $50 million between April 29, 2006 and April 14, 2007.

Your response to our draft, dated January 30, 2008, is included in its entirety in Exhibit
A, with excerpts incorporated into the Findings and Recommendations section of the
report. Based on your response, we were able to reach management decision on the
report's five recommendations. Please follow your internal agency procedures for
reporting final action to the Chief Financial Officer.

Please note that Departmental Regulation 1720-1 requires final action to be completed
within 12 months of management decision.

We appreciate the courtesies and cooperation extended to us during the inspection.

cc:
Administrator
Agricultural Marketing Service

## Executive Summary

**Results in Brief**
The Office of Inspector General (OIG) received requests from several Senators on May 9, 2007, and August 1, 2007, asking that OIG review the events leading up to the April 2007 discovery of the error in the reporting of nonfat dry milk prices in the National Agricultural Statistics Service's (NASS) *Dairy Products Prices* report.

To determine what had happened, OIG met with officials from NASS, the Agricultural Marketing Service (AMS), and a large dairy firm; conducted site visits and interviews; and reviewed documents and processes.  We found:

- A large dairy firm inappropriately included long-term forward contracted nonfat dry milk volume and price information in their weekly submissions to NASS.  We found that this dairy firm has been including data for sales of this type since 2002.

- NASS then aggregated the misreported data from this large dairy firm with the weekly data submitted by other dairy firms for the same reporting period.  This caused inaccurate nonfat dry milk aggregated volume and price statistics to be published weekly.  The internal controls for the survey and estimation process used by NASS for the *Dairy Products Prices* report were inadequate, as this error went undetected from 2002 until April 2007.

- NASS' published nonfat dry milk price statistics are utilized by AMS as a component of its formula for establishing federal milk marketing order (FMMO) prices.  Given that incorrect nonfat dry milk prices were factored into the FMMO formula, the published FMMO prices were also incorrect.  AMS issued a report on June 28, 2007 stating: "The total classified value of milk regulated under the FMMO program for the period covered by the NASS revision was understated by $50 million…" covering the period between April 29, 2006, and April 14, 2007.

OIG then reviewed the actions taken by NASS and AMS to reduce the potential for data reporting errors to occur undetected in the future.  We found:

- NASS reviewed the methodology used to gather data and prepare the *Dairy Products Prices* report.  NASS

stated that it has improved the charts and analyses utilized by its field offices; it has also instructed adjoining State field offices to utilize each others' data to enhance pricing consistency and to conduct telephone follow-up discussions to resolve inconsistencies. NASS will also visit each plant to complete the Annual Validation Worksheet.

- AMS did not have the authority to audit a reporting firm's books when the misreporting occurred. The authority was included in the Dairy Marketing Act of 2000, but the rulemaking necessary to implement a program of audits was not completed until July 2007. AMS began performing audits on August 6, 2007. Between August 6, 2007, and September 30, 2007, AMS visited seven plants reporting nonfat dry milk volume and price statistics. Based on these visits, AMS notified NASS of reporting discrepancies at six of the plants. NASS contacted these plants and explained the proper reporting criteria.

Once AMS and NASS implement their plans for improved oversight of the reporting processes, these internal control enhancements should substantially reduce the potential for errors of the sort made by a large dairy firm as it prepared its data for submission to NASS. The most significant improvement in the survey process will be the ability for AMS to audit the data that dairy product producing firms are reporting to NASS. We emphasize that these internal controls will only be effective if adequate resources (both staff and funding) are provided to ensure that the controls are fully implemented, effective, and consistently applied.

**Recommendations in Brief**

We recommend that NASS take the following actions:

1. Request that all reporting firms review their previously submitted data and provide revisions, when appropriate, for the period covering January 4, 2002, through April 22, 2006.

2. Review and modify the questions on the Annual Validation Worksheet to solicit an accurate, clear, and concise response for each question.

3.  Verify that all field offices have implemented NASS' plan to complete the Annual Validation Worksheet for all reporting firms during a site visit.

4.  Modify the weekly data collection instruments by requiring data providers to confirm that they fully understand the requirements they must meet to accurately report their firm's data.

5.  Verify that changes to strengthen the internal controls associated with the *Dairy Products Prices* report have been implemented.  The internal controls must assure the appropriateness and accuracy of the information collected so that data reporting irregularities are identified and corrected as they occur.

**Agency Response**     NASS has agreed to implement the recommendations made in this report.

**OIG Position**     We concur with the agency's response and have reached management decision for all five recommendations within this report.

# Table of Contents

Executive Summary……………………………………………………i

Abbreviations Used in This Report…………………………………….v

Background………………………………………………………1

Discovery of Misreported Data…………………………………...1

Actions by NASS and AMS after Learning of the
Source of the Reporting Error……………………………………..2

Findings and Recommendations…………………………………….3

     Recommendation 1…………………………………………4

Annual Validation Worksheet………………………………………5

     Recommendation 2…………………………………………5
     Recommendation 3…………………………………………6

NASS Data Collection Instrument……………………………………7

     Recommendation 4…………………………………………7

Failure of NASS' Survey Process Internal Controls……………………..8

     Recommendation 5…………………………………………8

The Audit Process………………………………………………...9

Conclusions………………………………………………………10

Exhibit A – NASS Response………………………………………...11

**Abbreviations Used in This Report**

AMS       Agricultural Marketing Service
CDFA      California Department of Food and Agriculture
CEO       Chief Executive Officer
DEIP      Dairy Export Incentive Program
FMMO      Federal Milk Marketing Order
NASS      National Agricultural Statistics Service
OIG       Office of Inspector General
OMB       Office of Management and Budget
USDA      U.S. Department of Agriculture

# Background and Objective

**Background**

In November 2000, Public Law 106-532 was passed, which required the mandatory reporting of products (price and volume) used to establish minimum milk prices. Each week, NASS contacts plants that commercially produce one million or more pounds of manufactured dairy products to determine current market prices. Nonfat dry milk prices published by NASS are used by AMS to calculate nonfat solids pricing factors, which are components of the FMMO program formulas. These formulas set minimum classified prices that milk handlers must pay producers for milk pooled in the federal order system. The *Dairy Products Prices* report, released by NASS each Friday, includes nonfat dry milk volume and price statistics for the most recent week and the prior four-week period. The most recent week's statistics are published for the first time and statistics for the prior four weeks are revised, as necessary, and republished. Revisions are necessary when NASS receives a producer's submission too late for inclusion when the specific week was initially published or when a reporting firm finds an error in its original submission, resulting in a change to its volume and/or price statistics.

**Discovery of Misreported Data**

NASS officials were first alerted to the possibility of an error in the reporting of nonfat dry milk prices on February 22, 2007, when AMS officials contacted them about a growing difference between the published price for nonfat dry milk in the *Dairy Products Prices* report and the *Dairy Market News*. NASS officials stated that the observed gap was possibly due to methodology differences in the processes used to calculate the prices that became more pronounced as the price of milk increased. NASS assured AMS that the data being published in the *Dairy Products Prices* report were correct.

An article in the March 2007 issue of *The Milkweed*, a dairy industry publication, entitled "USDA's Milk-Pricing Fails: Producers Lose Half a Billion Dollars" stated: "The major seller of nonfat dry milk–DairyAmerica–has improperly reported values of weekly nonfat dry milk sales for the past six months to USDA. In turn, USDA uses formulas incorporating these dairy commodity prices to establish farm milk prices under the complex federal milk market order program." This article prompted a large dairy firm's Chief Executive Officer (CEO) to contact NASS to clarify the reporting requirements for nonfat dry milk. An April 11, 2007, discussion between NASS and the CEO confirmed that the firm

was improperly including long-term forward contract volume and price data in its weekly submissions.  It is significant to note that this error in NASS' weekly estimates was only discovered because of the impact of the article in *The Milkweed* and that the error was not detected by NASS' existing survey and estimation process.

**Actions by NASS and AMS after Learning of the Source of the Reporting Error**

On April 12, 2007, NASS asked the dairy firm to revise its nonfat dry milk submissions for the previous four-week period (the weeks of March 10, 17, 24, 31) by excluding any long-term forward contracted product data.  NASS issued a press release on April 20, 2007, announcing that " … one dairy product plant made errors in its weekly reporting of price data for nonfat dry milk …" and, based on a request by NASS, the firm promptly revised its nonfat dry milk volume and price data.  The press release also announced that NASS was requesting all 39 firms in the survey to review their data for the past year within 45 days and submit any necessary revisions.  All of the firms complied.  On June 28, 2007, NASS released a report covering updated and revised weekly results for the period of April 29, 2006, through April 14, 2007.  The report detailed the impact of NASS' revised nonfat dry milk data on AMS' federal order price calculations.  AMS determined that the errors in nonfat dry milk prices for the period of April 29, 2006, through April 14, 2007 had affected 14 months of minimum FMMO prices, resulting in a $50 million loss to producers.[1]  All of the funds in the FMMO pools for the 14-month period covered by NASS' revision had previously been disbursed to the milk producers, and corrective disbursements to producers were no longer possible. The FMMO program does not currently include any mechanisms to provide restitution to the milk producers adversely impacted by this reporting error.

---

[1] OIG did not attempt to validate the $50 million loss as it was beyond the scope of this review.

# Findings and Recommendations

**Review Findings**     OIG contacted NASS on June 28, 2007, to determine which firm in
NASS' sample provided the inaccurate statistics.  NASS officials
stated that data provided by third parties were confidential and may
not be released without the consent of the party supplying the data.
Therefore, NASS asked the dairy firm to contact OIG; OIG
subsequently met with the firm's legal representative on
July 9, 2007.  OIG reviewed the firm's documentation related to
both the original and revised data for inappropriate activity–i.e.,
whether there was any indication of intentional reporting of
inaccurate statistics.  The documentation showed that the firm had
consistently included long-term forward contract information in
their weekly submissions to NASS for the period of
April 29, 2006, through March 31, 2007.   OIG also reviewed data
for random weeks between January 8, 2005, and April 29, 2006,
and found that long-term forward contracted nonfat dry milk was
consistently included in their reporting to NASS.  Based on this
review, the inaccurate statistics do not appear to have been
reported intentionally.  The long-term forward contract data were
consistently included in the firm's weekly submissions with no
exclusions.

Although the error in a large dairy firm's reporting appears to have
begun in 2002, the conditions permitting the error to occur
originated in 2000, when the firm began exporting nonfat dry milk
under the Dairy Export Incentive Program (DEIP)[2].  Long-term
forward contracted nonfat dry milk marketed through DEIP is
required to be included in the volume and price statistics reported
to both the California Department of Food and Agriculture
(CDFA) and NASS.  During 2002, however, international markets
became more competitive with domestic markets, and a large dairy
firm began exporting nonfat dry milk using long-term forward
contracts outside of DEIP.  The percentage of the firm's sales
outside of DEIP steadily increased, and by September 2004, all of
firm's nonfat dry milk exports using long-term forward contracts
were outside of DEIP.   CDFA and NASS reporting requirements
differ in that nonfat dry milk sold outside of DEIP, using long-term
forward contracts, is required to be included in data reported to
CDFA, but must be excluded from data reported to NASS.  A large
dairy firm failed to adhere to this latter requirement, resulting in
the submission of erroneous data to NASS.  NASS' internal
controls failed to identify that a large dairy firm had included

---

[2] 15 U.S.C. §§ 713a-14.

inappropriate data on long-term forward contracted nonfat dry milk sold outside of DEIP in their data submissions since such sales began in 2002.

A representative from the large dairy firm has stated that long-term forward contract sales began in 2002 and that they inappropriately included data relating to these sales in their weekly submissions to NASS.  NASS has requested and received revisions from this dairy firm excluding the inappropriate long-term forward contracted sales data from their estimates dating back to April 29, 2006.

**Recommendation 1**   NASS should request that all reporting firms review their submitted data, and provide revisions when appropriate for the period covering January 4, 2002 through April 22, 2006.  NASS should then publish revised weekly nonfat dry milk quantity and price data.  This will ensure that the publicly available data series is based on accurate information.  AMS will then be able to utilize accurate information in its milk pricing formulas to calculate corrected FMMO prices for the entire period when misreporting occurred.  This calculation will allow AMS to determine the total dollar impact of the misreporting error on producers and may result in an adjustment to AMS' current estimate of $50 million which is based on the April 29, 2006, through April 14, 2007 period of misreporting.

**NASS Response**   NASS has agreed to implement a two-step approach for contacting the firms that previously reported nonfat dry milk data and to collect the appropriate revisions.  NASS will send a letter which defines the AMS reporting specifications for nonfat dry milk.  This letter will provide the producers with a detailed list of which nonfat dry milk products are to be included and excluded when submitting their data.  The producers will then acknowledge whether or not they correctly reported their nonfat dry milk data for the January 4, 2002 through April 22, 2006 period.  If they did not properly report during this period, NASS will send them their previously reported data for revision.

February 12, 2008 - NASS will mail out a letter to all nonfat dry milk firms concerning possible revisions.

February 27, 2008 - Response from nonfat dry milk firms due back to NASS.

March 5, 2008 - NASS will mail data to any firm requesting a review of their reported data.

April 25, 2008 - Revised firm data due back to NASS.

May 16, 2008 - NASS analysis of changes is completed.

May 19, 2008 - Data series is turned over to AMS for computation of prices.

June 19, 2008 - AMS completes analysis and releases results. NASS releases a special report containing any revised data.  The release of AMS and NASS results should coincide.

**OIG Position**          We concur with the agency response for this recommendation and have reached management decision.

**Annual Validation Worksheet**          The Annual Validation Worksheet is used by NASS to confirm with each reporting firm what is to be included and excluded when the firm submits its weekly reports.  Since 1998, NASS has required firms that provide data for the *Dairy Products Prices* report to complete an Annual Validation Worksheet.

Annual Validation Worksheet Questionnaire Wording

The Nonfat Dry Milk section of the Annual Validation Worksheet includes the yes/no question, "When reporting nonfat dry milk sales data to NASS, did you or can you: exclude forward pricing sales (sales in which the selling price is established, and not adjusted, 30 or more days before the transaction is completed)?"  A large dairy firm has consistently responded 'yes' to this question when completing the worksheet.  The question, as worded, can be correctly answered 'yes' with multiple, different outcomes—

- I did exclude
- I can exclude
- I can and I did exclude
- I can or I did exclude

**Recommendation 2**          NASS needs to modify this question to state, "When reporting nonfat dry milk sales data to NASS, did you exclude forward pricing sales (sales in which the selling price is established, and not adjusted, 30 or more days before the transaction is completed)?"  This modification changes the context of the question to better solicit an accurate, clear, and concise response.  NASS needs to

review all of the questions contained in the Annual Validation Worksheet and eliminate any ambiguities.

**NASS Response**      NASS is currently modifying the Annual Validation Worksheet to make it more clear and concise. Plans are to have this accomplished prior to the May 2008 annual validation process. However, the Office of Management and Budget (OMB) must approve questionnaire changes. Their approval process could impact NASS' implementation date. The form will be submitted for OMB approval in February 2008.

**OIG Position**      We concur with the agency response for this recommendation and have reached management decision.


Annual Validation Worksheet Completion Process

NASS' field office staff performed site visits to complete the worksheet for all of the firms that were new to the survey. However, NASS used two different methods for completing the Annual Validation Worksheet for firms already familiar with the reporting process.

1. The worksheet was completed during a site visit by NASS field office staff.
2. The worksheet was mailed to the firm, and NASS field office staff followed up via telephone.

Prior to the discovery of the misreported data, NASS had visited the misreporting dairy firm once to personally oversee the completion of the worksheet. In other years, the worksheet was sent by mail, filled out by the dairy firm's staff, and then staff from the dairy firm and NASS discussed the worksheet via telephone.

Annual Validation Worksheet Corrective Actions

NASS stated that it has modified the process for completing the Annual Validation Worksheet. Under NASS' revised procedures, the Annual Validation Worksheet for all reporting firms will be completed by field office staff during a site visit.


**Recommendation 3**      NASS needs to verify that it has implemented its plan to conduct site visits to all reporting firms. During this visit, NASS staff needs to work with the firms to complete the Annual Validation

Worksheet to ensure that each firm understands its reporting requirements for the *Dairy Products Prices* report.

**NASS Response**        All NASS Field Offices will be required to keep a record of firms visited during the annual validation process.  If a plant is not visited, the Field Office will need to document the reason and provide a plan to visit the plant in the near future.  This information will be supplied to NASS Headquarters for review.

**OIG Position**        We concur with the agency response for this recommendation and have reached management decision.

**NASS Data Collection Instrument**        Each *Dairy Products Prices* reporting firm submits its information weekly using either a paper questionnaire or NASS' electronic reporting system.  The instructions section for both of these reporting methods contains a list of items that are to be included and excluded.  The wording pertaining to nonfat dry milk forward sales on each data collection instrument is "Forward pricing sales: sales in which the selling price was set (and not adjusted) 30 or more days before the transaction was completed.  This exclusion does not include sales through the Dairy Export Incentive Program (DEIP)."  Although the wording on the data collection instrument is clear, it is easy for frequent users to skip over, especially when filling out the electronic version.

**Recommendation 4**        NASS needs to modify both forms of the data collection instrument to include an acknowledgment by the data provider that he/she has read and understood the instructions.  This wording and accompanying acknowledgement check box needs to be added to the data section of the instrument.  This will supply a confirmation by the data provider that he/she fully understands the requirements for accurately reporting the data.

**NASS Response**        NASS will modify the questionnaire as requested and submit it for OMB approval in February 2008.  This will be done to both the paper and electronic versions of the questionnaire.  OMB must approve questionnaire changes and their approval process will dictate when this item is implemented.

**OIG Position**        We concur with the agency response for this recommendation and have reached management decision.

**Failure of NASS'
Survey Process
Internal Controls**

NASS' internal controls failed to identify that a large dairy firm was improperly including long-term forward contracted nonfat dry milk sold outside of DEIP in its data submissions since such sales began in 2002.  Even after NASS was alerted to the possibility of an error, NASS officials erroneously informed AMS that the observed pricing gap in the *Dairy Products Prices* report and the *Dairy Market News* report was due to methodology differences in the processes used to calculate the prices, and that the gap became more pronounced as the price of milk increased. NASS stated that since the development of the difference in the price of long-term forward contracted product in the two reports came about in a very slow manner, it was difficult to recognize.

After the identification of a large dairy firm's reporting error, NASS reviewed the methodology used to gather data and prepare the *Dairy Products Prices* report.  NASS officials told OIG that they had performed a review of the edit and summary system to identify possible improvements in the reporting process and improved the charts and analyses utilized by their field offices. NASS has also instructed neighboring State field offices to utilize each others' data to enhance pricing consistency.  NASS states that additional follow-up will be performed by telephone if issues of inconsistency or other concerns arise.  NASS officials also informed OIG that they are considering modifying the reporting questionnaire so that it more closely resembles a balance sheet. This should enable both dairy producers and NASS staff to more easily identify inconsistencies in the producers' responses.  NASS officials stated that the *Dairy Products Prices* survey's concepts and procedures were discussed during the week of December 3, 2007, at a fall training session for NASS field office staff in Minneapolis, Minnesota.

OIG agrees that if NASS implements their plans for improved oversight of the reporting processes, these new internal controls should significantly reduce the potential for errors of the sort made by the large dairy firm in its data submissions.

**Recommendation 5**

NASS needs to verify that it has implemented sufficient changes to strengthen the internal controls associated with the *Dairy Products Prices* report.  The internal controls must ensure the appropriateness and accuracy of the information collected so that data reporting irregularities are promptly identified and corrected. This may be accomplished by verifying that reporting firms are aware of the requirements for properly completing the weekly

---

reports to NASS, by strengthening the internal review process, and by promptly addressing any discrepancies disclosed by the audits conducted by AMS.

**NASS Response**   NASS has completed the strengthening of internal controls.  Field Offices have been provided with additional charts to view NASS data along with AMS data.  Also, Field Offices have been given the ability to view data collected by other Field Offices so they can look at the relationship between the data in a geographic area.

**OIG Position**   We concur with the agency response for this recommendation and have reached management decision.

**The Audit Process**   AMS did not have the authority to audit a reporting firm's books when this dairy firm's reporting errors occurred.  Such authority for the agency was included in the Dairy Marketing Act of 2000, but the rulemaking necessary to implement a program of audits was not completed until 2007.

NASS began the process to implement the audit program in February 2003, but NASS officials stated that most of NASS' resources were being utilized for the Census of Agriculture.  NASS restarted the process in January 2004 and collaborated with the Office of General Counsel, the Office of Budget and Program Analysis, the Chief Economist, the Office of Civil Rights, and the Office of Management and Budget until May 2006.  In June 2006, AMS took over the rule-making process and, in collaboration with NASS, published an interim final rule on July 3, 2007.  The interim final rule established the Dairy Product Mandatory Reporting Program with an effective date of August 2, 2007.[3]

AMS and NASS Audit Process

AMS officials informed OIG that they have implemented a plan to verify the accuracy of the price information submitted by various dairy product manufacturing plants in accordance with the mandatory program.  During the initial year of verification, AMS officials stated that they intend to visit all of the producing firms' plants at least once.  In subsequent years, AMS will visit larger plants that account for 80 percent of the annual reported product volume.  Plants producing the remaining 20 percent of each product will be visited at least once every two years.  During each visit, AMS will verify that eligible sales transactions agree with the

---

[3] 72 Federal Register 36341, July 3, 2007

information reported to NASS and will check for eligible sales transactions that were not reported.

On August 6, 2007, AMS auditors began making data verification visits to plants, starting with the larger facilities. The large dairy firm which inappropriately included long-term forward contracted nonfat dry milk in their weekly submissions to NASS was the first plant visited. Between August 6 and September 30, 2007, AMS visited seven plants reporting nonfat dry milk volume and price data. Based on these visits, AMS notified NASS of reporting discrepancies at six of the plants. NASS has contacted these plants and explained the proper reporting criteria. Had the audit program been implemented earlier, the misreporting by the large dairy firm would have been discovered during AMS' annual audit of the firm, reducing the negative monetary impact on producers.

**Conclusions**

OIG agrees that if AMS and NASS implement their plans for improved oversight of the reporting processes, these new internal controls should significantly reduce the potential for errors of the sort made by the large dairy firm in its data submissions to NASS. However, the most significant improvement in the survey process will be AMS' ability to audit the data the dairy product producing firms are reporting to NASS. We emphasize that these internal controls will only be effective if adequate resources (both staff and funding) are provided to ensure that the controls are fully implemented, effective, and consistently applied.

# Exhibit A – NASS Response




**United States Department of Agriculture**
National Agricultural Statistics Service
Office of the Associate Administrator

January 30, 2008

TO:    Rod DeSmet
    Assistant Inspector General
    1400 Independence Ave SW. Room 41-W
    Washington, D.C. 20250

ATTN:  26901-01-IR

FROM:  Joe Reilly
    Acting Administrator
    National Agricultural Statistics Service

SUBJECT:  Response to IG Report on the Inspection of the Survey and Estimation Internal
    Controls for Nonfat Dry Milk and the *Dairy Product Prices* Report

We have reviewed the official draft report from the Inspector General's office concerning the above mentioned topic. We find that the report is accurate in its presentation of the facts of this situation. With regard to the five specific recommendations for NASS, we concur with Recommendations 2 through 5, and will begin implementation of these immediately.

We want to express concerns with Recommendation 1, which asks NASS to "Request that all reporting firms review their previously submitted data and provide revisions, when appropriate, for the period covering January 4, 2002, through April 22, 2006." We believe that this recommendation puts undo burden on reporting firms, will result in poor response from those firms, and will provide little additional insight into this issue.

- Public Law 106-532 requires firms to maintain records for a 2-year period. Thus, firms could only be required to submit records for at most 3 months from early 2006. Any further submission would be completely voluntary on the part of these firms.
- Although NASS had good response from firms when we asked them to review and resubmit data from April 29, 2006, through April 14, 2007, we also received many complaints about how burdensome this request was to implement. The new recommendation from the IG would require us to ask for four times the amount of information from these same firms, and require that they review earlier records that might be less accessible.

Room 5041A-South Building · 1400 Independence Avenue, SW · Washington, D.C. 20250-2001
(202) 720-4333 · (202) 720-9013 FAX · www.nass.usda.gov

USDA is an equal opportunity provider and employer.

# Exhibit A — NASS Response

Page 2
Rod DeSmet

- High refusal rates on this request, which we anticipate, will make suspect the quality of any subsequent price revisions based on this review.
- Our review of resubmitted reports for the earlier 51-week period showed that incorrect reporting was not a widespread problem. The problem was narrowly isolated as described in the IG report.
- As the IG report points out, a growing difference between the price information from the *Dairy Product Prices* report and the *Diary Market News* was the early indicator of a reporting problem. The larger deviation of the two prices series began to appear around September 2006. Thus, earlier misreporting had little impact on the price estimates. This is, in fact, what we observed and reported in price revisions published in the *Dairy Products Prices Special Report*. We believe that revising numbers for 4 additional years will be of little informational value.

Regardless of the above reasons, NASS will cooperate with the Office of the Inspector General by taking a two-step approach in contacting the firms that previously reported nonfat dry milk data. NASS will send a letter to all reporters of nonfat dry milk asking them if they followed all the correct inclusions and exclusions for the reporting of the data. The letter will include a listing of the AMS specifications for the reporting of nonfat dry milk for their reference. The reporter will be provided with two options. The first option will be to accept that all reporting was done correctly for the specified time period in question. If the reporter thinks this is correct, they will acknowledge this by checking the box, signing their name, and returning the form to NASS. The second option would be selected if the reporter thinks that the inclusions and exclusions were not followed correctly and that they would like to have NASS send them their data for the time period to verify the dollars and quantity that were reported. If the reporter selects the second option, they will acknowledge this by checking the box, signing their name, and returning the form to NASS. NASS will send the data for the time period specified by OIG for their verification. Upon completion of the verification process, the reporter would return the data to NASS with any corrections. This approach will reduce the respondent burden on the reporters by not requiring all those reporting to verify each specific piece of data.

A tentative plan to implement all five recommendations is attached.

Attachment

cc.     Steven Helmrich
        Director, Financial Management
        Agricultural Research Service

# Exhibit A – NASS Response

Tentative Schedule for Completion of Action Items

**Action Item 1:**

February 12, 2008 — NASS will mail out a letter to all NFDM firms concerning possible revisions.

February 27, 2008 — Response from NFDM firms due back to NASS.

March 5, 2008 — NASS will mail data to any firm requesting a review of their reported data.

April 25, 2008 — Revised firm data due back to NASS.

May 16, 2008 — NASS analysis of changes complete.

May 19, 2008 — Data series is turned over to AMS for computation of prices.

June 19, 2008 — AMS completes analysis and releases results. NASS releases a special report containing any revised data. The release of AMS and NASS results should coincide.

**Action Item 2**

NASS is currently working on modifying the Annual Validation Worksheet to make it more clear and concise. Plans are to have this accomplished for use in the annual validation process in May 2008. However, OMB must approve questionnaire changes. Their approval process could impact NASS' implementation date. The form will be submitted for OMB approval in February 2008.

**Action Item 3**

All NASS Field Offices will be required to keep a record of firms visited during the annual validation process. If a plant is not visited, the Field Office will need to document the reason and provide a plan to visit the plant in the near future. This information will be supplied to NASS Headquarters for review.

**Action Item 4**

NASS will modify the questionnaire as requested and submit for OMB approval in February 2008. This will be done to the paper and electronic versions of the questionnaire. OMB must approve questionnaire changes and their approval process will dictate when this item is put into action.

**Action Item 5**

NASS has completed the strengthening of internal controls. Field Offices (FOs) have been provided with additional charts to view their data with AMS data. Also, FOs have been given the ability to view data collected by other FOs so they can look at the relationship between the data in a geographic area.