# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

GERALD CARLIN, JOHN RAHM, PAUL
ROZWADOWSKI and DIANA WOLFE,
individually and on behalf of themselves
and all other similarly situated,

               **Plaintiffs,**

      **v.**

DAIRYAMERICA, INC., and
CALIFORNIA DAIRIES, INC.

           **Defendants**

CASE NO. 1:09-CV-0430 AWI-EPG

ORDER ON PARTIES' MOTION
TO APPROVE SETTLEMENT AND
REQUEST FOR ATTORNEY FEES

(ECF No. 567, 575, 585)

      In 2009, Plaintiffs, as purported class representatives, brought claims against Defendants DairyAmerica and California Dairies concerning the misreporting of milk prices. ECF No. 1. In September 2018, the parties notified the Court of their intent to settle. ECF No. 552.

      Plaintiffs now move for final approval of the class action settlement, asserting the $40 million settlement fund—for the benefit of almost 26,000 dairy-farmer claimants—is fair, reasonable, and adequate. ECF No. 575. Plaintiffs also move for attorney fees, costs, and service awards. ECF No. 567. Defendants do not oppose. *See Id.*

      The Court will approve the settlement, award 33% of the fund in attorney fees, allow reimbursement of approx. $825,000 in litigation costs, and grant service awards of $45,000 for each current named Plaintiff and $5,000 for the former named Plaintiffs.

# BACKGROUND

## A. Factual Background

Members of the class are dairy farmers who received payment for sales of raw milk, as calculated by Federal Milk Marking Orders ("FMMO's"). ECF No. 513 at p. 2 (Fourth Amended Complaint, the "4AC"). The USDA set the FMMO rates by surveying large milk sellers. *Id.* One organization that provided survey data to the USDA was Defendant DairyAmerica, a marketing association that included Defendant California Dairies. *Id.*

In 2009, Plaintiffs filed suit against Defendants, alleging that between 2002-2007, DairyAmerica "shape[d] the raw milk prices paid to farmers by [fraudulently] modifying the data it reported to the USDA each week" through various schemes and artifices. ECF No. 1. at ¶ 6. Defendants' alleged actions "depressed raw milk prices and protected the co-op members' profits." *Id.* at ¶ 8. Defendants deny these contentions.

In the currently-operative 4AC, Plaintiffs allege claims of negligent misrepresentation, intentional misrepresentation, and RICO conspiracy. *See* ECF No. 513.

## B. Settlement Agreement

After litigating this case for nine years,[1] the parties reached a settlement agreement under guidance from a mediator. The agreement releases all claims against Defendants related to those expressed in the 4AC (and prior complaints), and governs the following proposed class:

> All dairy farmers located in the United States who sold raw milk that was priced according to a Federal Milk Marketing Order during the period January 1, 2002 through April 30, 2007. Excluded from the Class are California Dairies and DairyAmerica, any entity in which California Dairies or DairyAmerica have a controlling interest, and their respective legal representatives, heirs, and successors.

ECF No. 575-1 at ¶ 1.4 (Ex. A, the "Settlement Agreement"). This settlement class includes approx. 84,000 dairy farmers, each of whom was eligible to receive a portion of the $40 million settlement fund—proportional to the amount of milk they sold between 2002-2007. *Id.* at p. 12, 20. In September 2018, the Court preliminarily approved the settlement. ECF No. 559.

---

[1] The procedural history for this case is long, and includes an appeal to the Ninth Circuit, the filing of four separate amended complaints, the dismissing and re-adding of Defendant California Dairies, the discovery of additional fact witnesses, multiple depositions, and numerous discovery disputes.

### C.  Notice to Class, Exclusions, Objections

The Court appointed Rust Consulting to manage the notice procedure and processing of claims. ECF No. 559. In February 2019, Rust notified the Court of the following:

- After compiling and collating a list of every farmer who sold milk under the FMMOs, and after accounting for duplicate addresses, change of addresses, and supplemental information, Rust mailed notice of the class settlement and claim forms to 83,686 class members. Of these, Rust states 77,646 were actually delivered to the intended recipient;
- In late 2018, a summary notice of the settlement was published in both the *Progressive Dairyman* and *American Dairyman*;
- Rust has responded to 1,371 emails and 6,399 phone calls, and maintains the website was visited over 23,000 times;
- As of May 1, 2019, the company received 25,707 completed claim forms and 80 requests for exclusion from the class.

*See* ECF No. 575-2. Additionally, the Court received seven written objections, only three of which were timely. *See* ECF. Nos. 570, 572, 573, 577, 578, 579, and 580.

### D.  Motion for Final Approval and for Attorney Fees, Costs, and Service Awards

Plaintiffs now move for final approval of the settlement, asserting it is fair, reasonable, and adequate. ECF No. 575. Plaintiffs calculate that, assuming a full award of fees, costs and expenses, the net settlement amount distributable will be approx. $26 million, to be distributed on a *pro rata* basis to the 26,000 claimants. *Id*. at pp. 1-2. The amounts distributed to each Approved Claimant is to be determined by dividing:

$$\frac{\text{the volume of the Claimant's total raw Grade A milk produced and pooled on the FMMO's}}{\text{the total volume of raw Grade A milk produced and pooled on the FMMO's}}$$

ECF No. 575-1 at ¶ 8.7. The parties have agreed that any residual amounts left in the settlement fund are to be re-distributed, proportionally, to the Approved Claimants or, if not, then to a *cy pres* beneficiary selected by Plaintiffs' Counsel. *Id*. at ¶ 8.11. Upon final approval, the settlement funds (and interest) will be distributed from an already-established escrow account. *Id*. at ¶ 8.7.

Finally, Counsel for Plaintiffs have requested $13,333,333 in attorney fees, approx. $825,000 in litigation expenses, a $90,000 service award for each named Plaintiff, and a $10,000 service award for each former Plaintiff. ECF No. 567. These awards are payable from the $40 million fund. *See Id*. Defendants have not opposed these fee requests. *See Id*.

### E. Fairness Hearing and Post-Hearing Submissions

On March 18, 2019, the Court held the fairness hearing concerning final approval of the agreement and Plaintiffs' motion for fees, costs, and awards. Plaintiffs indicated additional claims and exclusions had been submitted, and they would provide the Court with a written submission of up-to-date figures shortly. The parties otherwise reiterated their support for the agreement. The Court also requested information concerning the claims administrator's payment, the effort made by named Plaintiffs to justify any service award, and an update on an objector.

On May 1, 2019, Plaintiffs provided the final list of exclusions (80), detailed the claims administrator's process for resolving disputed amounts as well as its request for fees, and submitted declarations from the named Plaintiffs in support of the service award. *See Id.*

## DISCUSSION

### I. Final class certification is appropriate, and the notice given was appropriate.

The Court previously conditionally certified the proposed settlement class and determined that the requirements of Rule[2] 23(a) and (b) had been met. ECF No. 559 at pp. 4-8. The Court also previously stated that "the mailing and publication of the Long Notice and Summary Notice . . . constitute the best notice practicable under the circumstances, are sufficient notice, and comply fully with the requirements of Federal Rule of Civil Procedure 23 and the due process requirements of the Constitution of the United States." *Id.* at p.17.

The Court's findings on these issues have not changed, and no objections to class certification were raised. Accordingly, there is no need for the Court to repeat the analysis on these issues here. *See, e.g., Harris v. Vector Marketing*, 2012 WL 381202 at *3, at *7 (N.D. Cal. Feb. 6, 2012) ("As a preliminary matter, the court notes that it previously certified . . . a Rule 23(b)(3) class . . . . [Thus, it] need not analyze whether the requirements for certification have been met and may focus instead on whether the proposed settlement is fair, adequate, and reasonable."); *In re Apollo Group Inc. Securities Litigation*, 2012 WL 1378677 at *4 (D. Ariz. Apr. 20, 2012) ("The Court has previously certified, pursuant to Rule 23[,] . . . and hereby reconfirms its order certifying a class"). The Court finalizes its certification of the class.

---

[2] Citation to the "Rule" or "Rules" are to the Federal Rules of Civil Procedure, unless otherwise stated.

**II.     The settlement terms are fair, reasonable, adequate, and free from collusion.**

Class action settlements are permitted "only with the court's approval." Rule 23(e).

"Approval under 23(e) involves a two-step process in which the Court first determines whether a

proposed class action settlement deserves preliminary approval and then, after notice is given to

class members, whether final approval is warranted." *Nat'l Rural Telecomms. Coop. v.*

*DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004); *see also In re Bluetooth Headset Prods.*

*Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011). At the final approval stage, the primary inquiry is

whether the proposed settlement is "fair, adequate, and free from collusion." *Lane v. Facebook*,

Inc., 696 F.3d 811, 819 (9th Cir. 2012). This requires the court to balance several factors:

> (1) the strength of the plaintiffs' case;
> (2) the risk, expense, complexity, and likely duration of further litigation [and]
>      the risk of maintaining class action status throughout the trial;
> (3) the amount offered in settlement;
> (4) the extent of discovery completed and the stage of the proceedings;
> (5) the experience and views of counsel . . .;
> (6) the reaction of the class members to the proposed settlement; [and]
> (7) the absence collusion among the negotiating parties.

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998); *Class Plaintiffs v. City of*

*Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992). "It is the settlement taken as a whole, rather than

the individual component parts, that must be examined for overall fairness." *Lane*, 696 F.3d at

818-19.

Having already completed a thorough preliminary examination of the agreement, the

Court reviews it again, mindful that the law favors the compromise and settlement of class action

suits. *See In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008); *Class Plaintiffs*, 955

F.2d at 1276 (reminding that the Ninth Circuit has declared that a strong judicial policy in favor

of settlement of class actions). Ultimately, "the decision to approve or reject a settlement is

committed to the sound discretion of the trial judge because he [or she] is exposed to the litigants

and their strategies, positions, and proof." *Staton v. Boeing Co.*, 327 F.3d 938, 953 (9th Cir.

2003) (quoting *Hanlon*, 150 F.3d at 1026). The district court need only show it has "explored

comprehensively all factors[.]" *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015).

/ / /

*1.     The Strength of Plaintiffs' Case*

Here, the Court should "evaluate objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach these agreements." *Adoma v. Univ. of Phoenix, Inc.*, 913 F. Supp. 2d 964, 975 (E.D. Cal. 2012) (citation omitted). This can include a difficulty of certifying the class, prevailing at summary judgment, prevailing on appeal, as well as the difficulty of satisfying any judgment in favor of the class. *See Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir.2009); *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993). That in mind, the Court need "not reach 'any conclusions regarding the contested issues of fact and law that underlie the merits of th[e] litigation.'" *Brewer v. Salyer*, 2012 WL 2813178, *3 (E.D. Cal. June 29, 2017).

Here, it appears certain aspects of this case strongly support Plaintiffs' misrepresentation and RICO claims. First and foremost, the USDA investigated DairyAmerica's survey responses and confirmed certain data had in fact been misreported. *See* ECF No. 513 at ¶ 100 and ECF No. 509 at ¶ 100 (Plaintiffs' recitation of the USDA Inspector General's report that DairyAmerica's inclusion of forward pricing sales in its survey responses, and DairyAmerica's answer that "the report speaks for itself."). This, coupled with the uniform nature of the payments made to the tens of thousands of farmers—due to the formula set by the FMMO's—weigh both in favor of class certification and in favor of a Plaintiffs' negligent misrepresentation claim against DairyAmerica. *See Glenn K. Jackson Inc. v. Roe,* 273 F.3d 1192, 1200 (9th Cir. 2001) (one element of negligent misrepresentation is that the misrepresentation be of a past or existing material fact). Further, Plaintiffs have uncovered potentially damaging testimony from former employees supporting their recently-alleged intentional misrepresentation and RICO claims. *See* ECF No. 240 (Order on Plaintiff's Motion to Amend to the Third Amended Complaint, detailing the expansion of Plaintiffs' claims).

However, Plaintiffs face significant risks should they continue litigating. Ten years in, the Court has yet to hear class certification arguments (outside of these settlement proceedings) or resolve the statute of limitations issue regarding the negligent misrepresentation claim—issues Defendants would certainly contest in the coming years. *See Ellis v. Costco Wholesale Corp.*,

657 F.3d 970, 980 (9th Cir. 2011) (reminding that a district court's class cert analysis must be "rigorous."), *Adoma,* 913 F. Supp. 2d at 975 ("The legal and factual hurdles . . . weigh in favor of settlement approval."). Further, are multiple evidentiary hurdles for Plaintiffs to overcome—including whether Defendants had reasonable grounds to believe their reporting to the USDA were accurate, whether Defendants intended to defraud (which the USDA apparently had not found in their internal investigation), whether an enterprise exists for the RICO claim, and whether the uncorroborated testimony of Plaintiffs' ex-employee witnesses are credible. *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (affirming district court's approval of settlement agreement where plaintiffs' scienter claims were difficult to prove). Additionally, it appears from the parties' assertions that DairyAmerica has very few assets, and if California Dairies was not found to be liable, any recovery for the class of farmers would be uncertain. *Torrisi,* 8 F.3d at 1376 (finding potential that class may not recover due to lack of assets weighed in favor of settlement). Finally, any decision in favor of the class would surely be appealed, further extending this already decade-old litigation. *See Rodriguez*, 563 F.3d at 966 ("Inevitable appeals would likely prolong the litigation, and any recovery by class members, for years[, favoring] settlement.").

For these reasons, the Court recognizes the boon this settlement provides for all claimants; this factor weighs in favor of settlement.

### 2. The Risk, Expense, Complexity, and likely Duration of Further Litigation and Risk of Maintaining Class Action Status through Trial

"'[I]t must not be overlooked that voluntary conciliation and settlement are the preferred means of dispute resolution [, especially] in complex class action litigation . . . .'" *Syncor*, 516 F.3d at 1101 (quoting *Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of S.F.*, 688 F.2d 615, 625 (9th Cir. 1982)). Thus, "[a]pproval of settlement is preferable to lengthy and expensive litigation with uncertain results." *Munoz v. Giumarra Vineyards Corp.*, 2017 WL 26605075, *9 (E.D. Cal. June 21, 2017).

As the Court expressed in its preliminary approval order, the complexity of this suit is evident. Plaintiffs allege Defendants colluded to misreport data to the USDA using five separate

schemes, each of which would require the support of expert testimony for the jury to understand the conspiracy. To make out the intentional and collusive aspects of their claims, Plaintiffs would be required to present reliable evidence demonstrating Defendants' intent to misreport and deprive the class of deserved payments. *See Mego*, 213 F.3d at 459.

Additionally, this case has been in litigation since 2009, covers conduct between 2002-2007, and is still years from resolution—especially given Plaintiffs intent to depose 42 additional witnesses. *See* ECF No. 542 (Magistrate Judge Grosjean's Order on Discovery Disputes). Considering the parties' litigious history, it is possible this case would not reach a jury until twenty years after the alleged misreporting began. Taking into account delays from appeals, even a favorable judgment for Plaintiffs could delay recovery to the class until years later—assuming Plaintiffs ultimately prevail. The risks and costs of further litigation weigh highly in favor of approval of the settlement agreement. *Syncor*, 516 F.3d at 1101; *Officers for Justice*, 688 F.2d at 625; *see also Oppenlander v. Standard Oil Co.*, 64 F.R.D. 597, 624 (D. Colo. 1974) ("It has been held proper to take the bird in hand instead of a prospective flock in the bush.").

### 3. The Amount Offered in Settlement

The amount offered in settlement is generally considered to be the most important considerations of any class settlement. *See Bayat v. Bank of the West*, 2015 WL 1744342, at *4 (N.D. Cal. Apr. 15, 2015) (citing, among others, *In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1178-79 (9th Cir. 2013). To determine whether that settlement amount is reasonable, the Court must consider the amount obtained in recovery against the estimated value of the class claims if successfully litigated. *Litty v. Merrill Lynch & Co.*, Inc., 2015 WL 4698475, at *9 (C.D. Cal. Apr. 27, 2015) (quoting *Mego* 213 F.3d at 459). Courts regularly approve class settlements where class members recover less than one quarter of the maximum potential recovery amount. *See Bravo v. Gale Triangle, Inc.*, 2017 WL 708766, *10 (C.D. Cal. Feb.16, 2017) (approving a settlement where net recovery to class members was approximately 7.5% of the projected maximum recovery amount); *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 256 (N.D. Cal 2015) (approving a settlement where the gross recovery to the class was approximately 8.5% of the maximum recovery amount). Viewed through this lens, recovery that is more than a

quarter of the class's maximum recovery is weighs heavily in favor of approval. *See In re Toyota Motor Corp.*, 2013 U.S. Dist. LEXIS 94485, *211-212 (C.D. Cal. June 17, 2013) (describing a 42% recovery in settlement as "exceptional").

Defendants contend the amount offered in settlement is 80% of what they believe their exposure is: $50 million. *See* ECF No. 555, at p. 17, fn. 6. They extrapolate this number from an estimate made by the USDA for the April 2006-07 period, which Defendants argue is representative of "the timeframe during which the majority of damages occurred." *Id.*

Plaintiffs, on the other hand, value their case at approximately $83.1 million, based in large part on the advice given by two economic experts. *Id.* at p. 16. Thus, using Plaintiffs calculations, a $40 million settlement represents a 48% recovery for the class as a whole, and close to full recovery for all actual claimants. Plaintiffs support their 48% assertion via the declarations and reports of two experts, each of which speak specifically to the issue of damages. *See* ECF No. 575-3 and -4 (Ex. C "Fortenberry Report" and Ex. D "Glauber Report"). Dr. Fortenberry lists his extensive qualifications, including his 30+ years of experience as "a professional economist working in the fields of agricultural economics, energy economics, and agribusiness," and his current employment as the chair of the School of Economic Sciences at Washington State University. ECF No. 575-3. Dr. Fortenberry states Plaintiffs requested his analysis of both the USDA's original damages estimate from April 2006 to April 2007 and the amount of damages between 2002 and April 2006. *Id.* at p.3. Without belaboring Dr. Fortenberry's well-detailed calculations and methodology, the Court notes the following of his conclusions:

- Damages between April 2006 to April 2007 amount to approx. $53.7 million, which considers the USDA's calculations and DairyAmerica's sales figures;
- Damages between January 2005 and March 2006 are approx. $29.4 million;
- Damages between January 2002 and December 2004 are effectively $0, given the lack of data available from the USDA, the incomplete data available from DairyAmerica's receipts, contracts, accounting materials and other documents provided in discovery, and the market fluctuations in forward pricing sales;
- Plaintiffs' other theories of misreporting (reporting of powder, delayed reporting, artificial discounts, commissions) yielded no additional damages.

*See Id.* at pp. 4-8. Thus, Dr. Fortenberry's analysis confirms Plaintiffs' initial damages estimate

9

of approx. $83.1 million. Dr. Glauber also details his extensive resume, which includes current employment as a senior research fellow at the International Food Policy Institute in Washington, DC, and former employment as an economist at the USDA between 1984-2014. ECF No. 575-4 at p. 1. Dr. Glauber's expert report confirms the calculations of Dr. Fortenberry, that the damages for this class of farmers due to any misreporting is approx. $83.1 million. *Id*. at p.3.

The Court finds these expert reports to be credible, and so takes the potential recovery amount to be approx. $83.1 million. A 48% recovery for the class—and near full recovery for all actual claimants—weighs heavily in favor of approval. *See Toyota Motor*, 2013 U.S. Dist. LEXIS 94485 at *211-212.

4. *The Extent of Discovery Completed and Stage of Proceedings*

The Court should favor settlement where a considerable amount of discovery has been conducted, "because it suggests that the parties arrived at a compromise based on a full understanding of the legal and factual issues surrounding the case." *Adoma*, 913 F. Supp. 2d at 977; *DIRECTV*, 221 F.R.D. at 528 ("A settlement following sufficient discovery and genuine arms-length negotiation is presumed fair.").

The parties have litigated this action for almost a decade, have engaged in numerous discovery disputes, and have deposed many witnesses (on both sides). Plaintiffs' complaint has seen four revisions, one of which coming after a successful appeal to the Ninth Circuit. Plaintiffs also assert they have "searched through a warehouse containing hundreds of thousands of paper-documents, reviewed more than 300,000 electronic documents, served and responded to hundreds of requests for admission and interrogatories, and . . . retained two of the nation's leading agricultural economists to evaluate and calculate class-wide damages." ECF No. 575 at p.18. One only need examine the docket in this case to find ample support for these assertions. *See* ECF Nos. 1-580. Thus, the Court finds the parties have engaged in enough discovery to have a solid understanding of the legal and factual issues underlying this action. This factor weighs in favor of settlement. *Adoma*, 913 F. Supp. 2d at 977; *DIRECTV*, 221 F.R.D. at 528; *see also In re Linkedin User Privacy Litig.*, 309 F.R.D. 573, 588 (N.D. Cal. 2015) (extensive discovery after three years of litigation and consultation with mediator favored settlement).

### 5.    *The Experience and Views of Counsel*

The recommendation of counsel—who are most closely acquainted with the facts of the underlying litigation—is to be considered. *DIRECTV*, 221 F.R.D. at 528; *see also Turk v. Gale/Triangle, Inc.*, 2017 U.S. Dist. LEXIS 154631, at *7 (E.D. Cal. Sept. 21, 2017); *West v. Circle K Stores, Inc.*, 2006 U.S. Dist. LEXIS 76558, at *17–18 (E.D. Cal. Oct. 19, 2006). This is because "[p]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in the litigation." *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995); *but see Smith v. American Greetings Corp.*, 2016 WL 2909429, *5 n.5 (N.D. Cal. May 19, 2016) ("Although a court might give weight to the fact that counsel for the class or the defendant favors the settlement, the court should keep in mind that the lawyers who negotiated the settlement will rarely offer anything less than a strong, favorable endorsement."). Thus, "the trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel." *DIRECTV*, 221 F.R.D. at 528.

Counsel for both parties "uniformly believe the Settlement is fair, reasonable, and adequate, and strongly recommend its approval." ECF No. 575 at p.19. The previous Magistrate Judge determined that appointed Class counsel were more than adept at spearheading this kind of litigation. *See* ECF No. 44, at p. 3-4.[3] Defense Counsel are equally experienced. The positive recommendation from these counsel supports approval of the agreement.

### 6.    *The Reaction of the Class Members to the Proposed Settlement*

The absence of a large number of objections to a class settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *DIRECTV*, 221 F.R.D. at 529; *Wren v. RGIS Inventory Specialists*, 2011 WL 1230826, at *11 (N.D. Cal. Apr.1, 2011) (noting "minimal number of objections filed strongly supports approval of the settlement"); *see also Mego*, 213 F.3d at 459 (affirming district court's approval of settlement where there were "only a handful of objectors at the fairness hearing").

---

[3] From the appointment order: "[T]here is no dispute that Cohen Milstein has 'adequate experience in class actions and complex litigation, adequate knowledge of the applicable law and abundant resources' and that Berman Tabacco and Keller Rohrback 'are equally experienced and knowledgeable.'" "Cohen Milstein 'has done a majority of the preparation work leading to the filing of these actions, including investigation into the alleged misconduct and identification of the legal theory of the case.'"

Here, the class administrator sent notice by mail to over 77,000 class members, as identified by the FMMO's and other documents. ECF No. 575-2 at ¶ 16. Rust received 25,707 completed claim forms and 80 requests for exclusion. *Id.* at ¶¶ 20, 22. Three timely and four late objections were filed.[4] *See* ECF Nos. 570, 572, 573, 577, 578, 579, and 580).

The Court held the final fairness hearing on March 18, 2019. Both parties reaffirmed their intention to enter into the agreement, expressing their belief that this settlement is in the best interests of the class. The Court pressed queried the following outstanding issues:

- Whether all requests for exclusion had been processed;
- What efforts the claims administrator made to send a notice of the settlement and claim form to class member and objector Mr. Bulinski; and
- The status of any outstanding claim forms (the parties believed Rust had approx. 250 claims requiring resolution) and, more generally, the final total of all submitted claim forms.

Plaintiffs asserted they would investigate these concerns and update the Court. The Court stated its intent to take under submission the motion for approval of the settlement, motion for fees, costs, and awards, and all objections.

On May 1, 2019, Plaintiffs submitted a supplemental memo, stating:

- The final list of exclusions sat at 80; these included any requests for exclusion received on or before the date of the final fairness hearing (March 18, 2019). *See* Ex. A to this order.
- The Claims Administrator attempted to contact one objector, Mr. Bulinski, to discern his intent whether to submit a claim form (see section c below);
- 90% of all claimants (23,111 claims) accepted the amount calculated by Rust per the FMMO's
- Of the remaining claims disputed by the claimants (2,596 claims):
  - Rust accepted documentation of a higher amount in 78% of claims (approx. 2025 claims);
  - Rust accepted a higher-claimed amount without documentation—due to an irregularity in one FMMO in another 10% of claims (approx. 260 claims);
  - 10% of disputes were rejected (approx. 260 claims) due to lack of documentation—meaning the claimants would receive the amount calculated from the FMMOs; and

---

[4] Though the Court is not required to entertain late objections, it will do so in an effort to give all absent class members a chance to voice their concerns. *See Moore v. PetSmart, Inc.*, 728 Fed. Appx. 671, 674 (9th Cir. 2018) (finding no error in the district court's entertaining of procedurally defective objection); *see also* 4 Newberg on Class Actions § 13:29 (5th ed.) ("Arguably, courts need not consider untimely objections [to class action settlements], but they have the discretion to do so, and most courts typically will do so").

○ Rust would continue to investigate the remaining 2% (approx. 52 claims) and update the Court.

All told, the high response rate from actual claimants (31%), proportionally-low exclusion rate (80 of 77,000 potential claimants) and handful of objections weigh in favor of settlement. *See DIRECTV*, 221 F.R.D. at 529; *Wren,* 2011 WL 1230826, at *11; *Mego*, 213 F.3d at 459; *see also Reyes v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 281 F. Supp. 3d 833, 848 (N.D. Cal. 2017) ("[C]lass members' positive reaction to a settlement weighs in favor of settlement approval."). For posterity, the Court now recites the substance of the objections received, and resolves each in turn.[5]

---

[5] Six of the seven objectors (Mr. Spooner, Mr. Buchanon, Mr. Bulinski, Mr. Furner, Mr. Hafelin, and Mr. Myers) each stated their inability to attend the hearing personally, and requested the Court allow Mr. Joshua Haar, a New York attorney, to speak on their behalf.

On March 13, 2019, Mr. Haar confirmed with the Court his intent to appear and speak on behalf of these objectors. The Court informed Mr. Haar that because he is not a member of the California bar, he should submit his *pro hac vice* application, as per the Court's rules publicly available on its website. *See* "Pro Hac Vice Application" and "Pro Hac Vice Application Instructions," http://www.caed.uscourts.gov/caednew/index.cfm/forms/civil/; *see also Keirsey v. eBay, Inc,* 2013 WL 5755047, at *6 (N.D. Cal. Oct. 23, 2013) ("Class Members **or their attorneys intending to make an __appearance at the Fairness Hearing__** must include a statement of intention to appear in the written objection filed with the Court and delivered to Class Counsel, and eBay's Counsel, and only those Class Members who include such a statement may speak at the Fairness Hearing.") (emphasis added). Mr. Haar stated that he had been aware of the *pro hac vice* requirement for some time, but had not yet acted to fulfill the requirements. On March 14, Mr. Haar informed the Court that he intended to solicit local counsel to sponsor his application. However, as of the day of the fairness hearing, no such *pro hac vice* application had been submitted because Mr. Haar had failed to secure local counsel. Despite this, Mr. Haar appeared at the fairness hearing requesting to speak on behalf of the six objectors; the Court refused his request for the following reasons.

First, the Court reiterated this district's rules concerning *pro hac vice* requests. The Local Rule of this district states the __mandatory__ requirement that in any *pro hac vice* application:

> The attorney **shall** also designate in the application a member of the Bar of this Court with whom the Court and opposing counsel may readily communicate regarding that attorney's conduct of the action and upon whom service shall be made. The attorney shall submit with such application the name, address, telephone number, and consent of such designee.

E.D. Cal. Local Rule 180(b)(ii) (emphasis added). The Court confirmed that Mr. Haar had not submitted his application, and thus found that Mr. Haar could not be allowed to speak in a representative fashion—lest the Court countenance the unauthorized practice of law. *United States v. Hvass*, 355 U.S. 570, 575 ("Local rules are laws of the United States,") (1958); *Marshall v. Gates*, 44 F.3d 722, 724 (9th Cir. 1995); *see also Pellegrini v. Fresno County*, 2016 U.S. Dist. LEXIS 163732, *1 (E.D. Cal. Nov. 28, 2016) (denying *pro hac vice* request for failure to follow the local rules) (*subsequent dismissal vacated and remanded on other grounds by Pellegrini v. Fresno Cty.,* 742 Fed. Appx. 209 (9th Cir. 2018).

Second, given that Mr. Haar could not appear in a representative fashion, the Court could not allow him to speak on his own behalf because he is not a member of the class. *See Marro v. New York State Teachers' Retirement System*, 2017 WL 6398014, *1 (6th Cir. 2017) (stating in dicta that "the district court determined that four of the individuals were not class members and did not have standing to object."); *Gould v. Alleco, Inc.*, 883 F.2d 281, 284 (4th Cir. 1989) ("The plain language of Rule 23(e) clearly contemplates allowing only class members to object to settlement proposals."); *Miller v. Ghirardelli Chocolate Company*, 2015 WL 758094, *10 (N.D. Cal. Feb. 20, 2015) (collecting cases stating the proposition that an individual must have standing in order to object to the settlement).

Finally, the Court reiterated to Mr. Haar that, despite his inability to speak on behalf of the objectors, the substance of the objections (as expressed in the objectors' letters) would be fully considered.

###### a.     *Objections to the amount of the settlement*

Four class members (Mr. Post, ECF 570; Mr. Spooner, ECF 572; Mr. Buchanon, ECF 577; Mr. Furner, ECF 579) each lodged objections to the amount of the settlement. Mr. Spooner, for instance, questioned that if the USDA "calculated the lost prices at $50 million for the one year," then "why does the settlement provide only $40 million to cover five years of misreporting?" *See* ECF No. 572. However, as the Court has noted above, Plaintiffs' two damages experts asserted the damages would not be not equal over the five-year period; the Court has found their reports to be credible. *See* Section II.6, above. These objectors provide no alternative evidence for their damages assertions, and so their objections will be overruled as speculative. *See Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) ("[T]he very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes."); *Officers for Justice*, 688 F.2d at 625 ("The proposed settlement is not to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators.").

Further, three of these four objectors seem to place a greater blame on DairyAmerica for the financial downturn faced by U.S. dairy farmers. While the Court sympathizes with any hardships faced by these individuals and businesses, the scope of Plaintiffs' claims only covers misrepresentations in the survey process. Should these dairy farmers have a basis for other claims against Defendants that they believe harmed them in some way, the release in this settlement would not preclude them bringing a separate case. *Linkedin.*, 309 F.R.D. at 583 ("[T]he proper standard for approval of the proposed settlement is whether it is fair, reasonable, adequate, and free from collusion—not whether the class members could have received a better deal in exchange for the release of their claims."); *see also Officers for Justice*, 688 F.2d at 625 ("[T]he settlement hearing is not meant to be conducted as a trial or rehearsal for trial on the merits.").

Thus, the Court overrules these objections.

/ / /

/ / /

### b. *Objection to the scope of release and the lack of injunctive relief for any future misreporting*

The Court reads two objectors (Mr. Bulinski, ECF 573; Mr. Buchanon, ECF 577) as asserting their belief that the misreporting is ongoing, and reads the objections as questioning the lack of any injunctive relief set forth in the agreement. However, the Court notes that in 2007, Congress instructed the USDA to adopt new rules to prevent misreporting, complete with regular audits, of organizations like DairyAmerica. *See* 7 C.F.R. § 1170.13; *see also* U.S. Department of Agriculture, Office of the Inspector General, Report No. 26901-01-IR "Survey and Estimation Internal Controls for Nonfat Dry Milk and the *Dairy Products Prices* Report," February 2008, at p.10 ("Had the audit program been implemented earlier, the misreporting by the large dairy firm would have been discovered during [Agricultural Marketing Service's] annual audit of the firm, reducing the negative monetary impact on producers."). Additionally, the Court notes that the scope of the release only covers up through the effective date, so if these objectors believe—after a reasonable inquiry into the facts—that the misreporting is truly ongoing, nothing in this settlement would preclude another such suit from being brought (assuming Congress's action in 2007 would allow for such a suit).

The Court similarly reasons through the objections of Mr. Spooner (ECF 572) and Mr. Myers (ECF 580) as to the scope of the release. Mr. Myers objects to his being barred from "any lawsuits," and Mr. Spooner questions why the release has been "tailored to cover conduct up to the present day." However, courts will only sustain objections to releases where the agreement bars additional, unrelated claims; the release in this agreement is specifically tailored to the misrepresentation and RICO claims concerning Defendants' misreporting, and does not bar other lawsuits against Defendants. *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 327 (N.D. Cal. 2018) ("[T]he Ninth Circuit allows federal courts to release not only those claims alleged in the complaint, but also claims 'based on the identical factual predicate as that underlying the claims in the settled class action.'") (quoting *Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010).

The Court overrules these objections.

/ / /

*c.*     *Objections as to the lack of notice*

Mr. Bulinski (ECF 573) objects on the ground that he never received notice of the class settlement. However, as the Court noted in its order preliminarily approving the settlement, absent class members are entitled not to perfect notice, but to the "best notice practicable." *See* ECF No. 559 at p.17; *see also Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994) (actual notice not required under Rule 23(b)(3)); *In re: Cathode Ray Tube (Crt) Antitrust Litig.*, 2016 WL 3648478, at *17 (N.D. Cal. July 7, 2016) (overruling objections that class members did not receive notice, where the notice plan was the best practicable). Rust Consulting states it did in fact send a notice and claim form to Mr. Bulinski in late November, and confirmed his address after he filed this objection. Further, the Court notes that Mr. Bulinski must have received notice of the settlement in some way, as his objection was filed with the Court prior to the claims deadline. *See* ECF No. 573. Finally, counsel for Plaintiffs attempted to reach out to Mr. Bulinski after the fairness hearing, but were told to cease contacting him. ECF. No. 585.

Accordingly, this objection is overruled.

*d.*     *Objections to the amount of attorney fees and service awards*

Mr. Spooner (ECF 572) objects to the amount requested in attorney fees and service awards for named plaintiffs, comparing the "couple hundred dollars" each farmer gets to the $90k for the class representatives and millions for the attorneys. The Court will address Mr. Spooner's concerns in Section III, below—as his concerns speak to Plaintiffs' separate motion for fees and costs, not to the settlement itself.

For this reason, any objection Mr. Spooner raises on these grounds as to the terms of the settlement itself is overruled.

*e.*     *Miscellaneous Objections*

The Court received Mr. Hafelin's untimely objection (ECF 578), which states he "objects on procedural and substantive grounds." Mr. Hafelin does not elaborate further. This objection is frivolous and does not require a response. *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 895 F.3d 597, 613 (9th Cir. 2018) ("Weese's objections were frivolous, and so did not demand a response from the district court.").

### 7. *Absence of Collusion or Preferential Treatment*

Finally, before approving a class-action settlement, the Court must consider whether the settlement agreement itself is the product of collusion. *Hanlon*, 150 F.3d at 1026; *Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D. 443, 453–54 (E.D. Cal. 2013). The goal is to ensure that the class representatives and their counsel do not receive a disproportionate benefit "at the expense of the unnamed plaintiffs who class counsel had a duty to represent." *Lane*, 696 F.3d at 819.

To that end, the Ninth Circuit in *Bluetooth* identified three "subtle signs that class counsel have allowed pursuit of their own self-interests . . . infect the negotiations": "when counsel receive a disproportionate distribution of the settlement;" "when the parties negotiate a 'clear sailing' arrangement" (i.e., an arrangement where defendant will not object to a certain fee request by class counsel); and when the parties create a possible reversion of unclaimed fees to the defendant. *Allen*, 787 F.3d at 1224 (quoting *Bluetooth*, 654 F.3d at 947); *see also Staton*, 327 F.3d at 960 (stating the collusion inquiry addresses "overt misconduct by the negotiators" or improper incentives of some class members at the expense of others). However, as recently held by the Ninth Circuit: "[f]or all these factors, considerations, 'subtle signs,' and red flags, . . . the underlying question remains this: Is the settlement fair?" *Volkswagen*, 895 F.3d at 611.

The Court has overseen this litigation since its inception, and as expressed above is acutely aware of its history, Plaintiffs' claims, and the many discovery disputes between the parties. Thus, the Court took a favorable view of the parties' willingness to mediate in mid-2018. The parties have asserted those negotiations took place under the direction of an experienced JAMS mediator. ECF No. 575 at p.20. This weighs in favor of approval of the settlement. *Bluetooth*, 654 F.3d at 948 (stating that settlement under a mediator is not dispositive, but is "a factor weighing in favor of a finding of non-collusiveness").

Further, the Court finds none of the hallmarks of collusion to be present. While the requested attorney fees are higher than the benchmark for this district, and while the costs and service awards are high, ultimately the Court will approve due to the protracted nature of this dispute. *See* Section III, below. Thus, the awarding of these fees is not "disproportionate" to the distributable fund. *Bluetooth*, 654 F.3d at 948. Also, the Court finds the absence of a reverter

provision to support settlement. In sum, this settlement agreement appears to be primarily for the benefit of the class, and should not be denied on this factor. *See Bellinghausen*, 303 F.R.D. at 621 (finding the absence of a reversion to defendant of any unclaimed funds supported finding that parties bargained in good faith, thereby weighing in favor of approval of the agreement).

*Conclusion – The settlement is fair, adequate, and free of collusion.*

The Court is convinced that the above factors, considerations, and lack evidence of collusion weigh in favor of settlement. *Lane*, 696 F.3d at 819; *Bluetooth*, 654 F.3d at 946; *Hanlon*, 150 F.3d at 1026; *Class Plaintiffs*, 955 F.2d at 1276; *see also In re Heritage Bond Litig.*, 2005 WL 1594403, at *19 (C.D. Cal. June 10, 2005) (approving settlement of California state law claims "[b]ecause the standard for finding a good faith settlement as contemplated in Cal. Code Civ. Pro. § 877.6 is substantially similar to [that of] Rule 23(e) . . . .").

**III.     The attorney fees, costs, and service awards are appropriate, as modified.**

*A.     Attorney Fees*

In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement. Rule 23(h). A lawyer who recovers "a common fund for the benefit of persons other than himself or his client" is entitled to reasonable attorney fees from the fund as a whole. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Staton*, 327 F.3d at 967. The Supreme Court has explained the rationale underlying the "common fund doctrine" as follows:

> [P]ersons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense. Jurisdiction over the fund involved in the litigation allows a court to prevent this inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit.

*Van Gemert*, 444 U.S. at 478 (citation omitted). The Court "ha[s] an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *Bluetooth*, 654 F.3d at 941. Where, as here, fees are to be paid from a common fund, the relationship between the class members and class counsel "turns adversarial." *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994). As a result

the district court must assume a fiduciary role for the class members in evaluating a request for an award of attorney fees from the common fund. *Id.*; *see also Rodriguez v. Disner*, 688 F.3d 645, 655 (9th Cir. 2012).

In the Ninth Circuit, the benchmark for percentage of recovery awards is 25 percent of the total settlement award, which may be adjusted up or down. *Hanlon*, 150 F.3d at 1029; *see also Mangold v. California Pub. Utilities Comm'n*, 67 F.3d 1470, 1478 (9th Cir. 1995) (In diversity cases, the court applies the forum state law in determining not only the right to fees, but also in the method of calculating the fees); *Spann v. J.C. Penney Corp.*, 211 F. Supp. 3d 1244, 1262 (9th Cir. 2016) (In California, courts have discretion to choose between the "percentage" method or the "lodestar" method. The former method "is typically used where a common fund is created." "The 25% benchmark rate, although a starting point for analysis, may be inappropriate in some cases. Selection of the benchmark or any other rate must be supported by findings that take into account all of the circumstances of the case." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002); *see also Richardson v. THD At-Home Servs., Inc.*, 2016 WL 1366952, at *7 (E.D. Cal. Apr. 6, 2016) (California courts do not prescribe a benchmark starting point to evaluate fee requests, but the Ninth Circuit's 25% benchmark can be "a helpful assessment tool in evaluating the requested fee award."). Under the Ninth Circuit model, the 25% benchmark can be adjusted depending on (1) the result obtained; (2) the risk involved in the litigation; (3) the contingent nature of the fee; (4) counsel's efforts, experience, and skill; and (5) awards made in similar cases. *Vizcaino*, 290 F.3d at 1048-50. A court may also cross-check its percentage calculation against the lodestar method to determine the reasonableness of the award. *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 949 (9th Cir. 2015); *Spann*, 211 F. Supp. 3d at 1264-65; *see also Laffitte*, 1 Cal. 5th at 504. Whatever the method, the Ninth Circuit counsels only that the fee award be reasonable under the circumstances. *Rodriguez*, 563 F.3d at 967.

Plaintiffs' Counsel have requested attorney fees as a percentage of the common fund at 33.3%—approx. $13.3 million. They assert this fee is reasonable given the considerable recovery for the class, the amount of time counsel spent litigating this action, and the risks associated with

the litigation. Plaintiffs further argue that a 33.3% award amounts to less than what they would be eligible for under a lodestar calculation, and so the cross-check supports the $13.3 million award. The Court will utilize the *Vizcaino* factors to determine the reasonableness of Counsels' request.

### 1.    *Results Obtained*

In evaluating the reasonableness of an attorney fee request, courts have consistently recognized that the "degree of success obtained" is "the most critical factor." *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983); *see also Vizcaino*, 290 F.3d at 1048 ("Exceptional results are a relevant circumstance.").

Here, the Court finds such exceptional results in this settlement agreement. After a decade of litigation, and facing many years more to come, the parties worked under the purview of a JAMS mediator to agree on a settlement of $40 million. As discussed above, this amounts to 48% of what Plaintiffs' reputable experts believe the damages could have been, and 80% of what the USDA calculated as the discrepancy between the prices set under the FMMO's and the prices as they should have been absent the misreporting. *See* Section II.3, above. The agreement provides that all funds go to those claimants who submitted claim forms, with no reverter for Defendants. *See Id*. Plaintiffs' success in achieving a high settlement amount for the class weighs in favor of a higher-than-benchmark award of fees. *See Anthem,* 2018 WL 3960068 at *9-10 (holding that a 14.5% recovery justified a greater-than-benchmark percentage fee of 27%); *Heritage*, 2005 WL 1594403 at *19 (a 36% recovery for the class justified granting a 33% attorney fee request).

The exceptional recovery for class members weighs heavily in favor of a greater-than-benchmark award of attorney fees for Plaintiffs' Counsel.

### 2.    *Risk of Litigation*

Risk is a relevant circumstance. *Vizcaino*, 290 F.3d at 1048 (citing *Pac. Enter*, 47 F.3d at 379 (holding fees justified "because of the complexity of the issues and the risks")).

Here, Counsel asserts, and the Court agrees, that there were multiple risks involved with taking on this case. First, Plaintiffs' misrepresentation claim had the potential to end before it

began due to the filed rate doctrine—which prohibits private actions that challenge rates established by federal agencies. *See E. & J. Gallo Winery v. Encana Corp*, 503 F.3d 1027, 1033 (9th Cir. 2007) ("The [filed rate] doctrine is a judicial creation that arises from decisions interpreting federal statutes that give federal agencies exclusive jurisdiction to set rates . . . ."). Indeed, this Court initially dismissed Plaintiffs' claims under this doctrine. ECF No. 83. However, Counsel for Plaintiffs successfully argued for reinstatement of their claims at the Ninth Circuit. *See* ECF No. 109. Thus, four years in and many attorney-hours in, Plaintiffs were finally able to move forward with their suit. *See* ECF Nos. 1-109. *See Millan*, 2016 WL 3077710 at *10 (uncertainty of the legal landscape justified a higher-than-benchmark award of attorney fees).

Nonetheless, the case has taken many turns in the six years since its return from the Ninth Circuit. *See* ECF Nos 110-580. The Court has discussed much of the litigation's history in Section II above, but will reiterate a few highlights, for posterity. Counsel for Plaintiffs have made considerable efforts sifting through hundreds-of-thousands of documents, conducting multiple depositions (with plans for 42 more to come), and arguing for their clients in the many discovery disputes. *See* ECF Nos. 567-2, -3, -4, -5, and -6 (decl. Class Counsel). The complaint has now seen four amendments, including the latest addition of intentional misrepresentation and RICO claims. *See* ECF Nos. 1, 8, 245, 513 (complaints). Plaintiffs' Counsel have done this work, and appear prepared to litigate further, all on a contingency basis and facing the prospect that DairyAmerica may not have assets to pay any adverse judgment. *See Millan*, 2016 WL 3077710 at *10 ("Class counsel has borne the risk of non-payment in this matter [for four years, weighing] in favor of granting the requested fee award."). As discussed in Section II.2 above, success for Plaintiffs is far from guaranteed. *See Toyota Motor*, 2013 U.S. Dist. LEXIS 94485 at *213-215 (vigorous opposition of claims, argued by "exceptionally skilled [Defense] counsel," in complex litigation with unresolved legal issues supported $200 million attorney fee award).

For these and many of the reasons stated in Section II above, the Court finds this factor supports an increase in the benchmark rate. *Pac. Enter.*, 47 F.3d at 379; *Heritage*, 2005 WL 1594403 at *20 ("Courts have recognized that the novelty, difficulty and complexity of the issues involved are significant factors in determining a fee award.").

### 3. Contingent Nature of the Fee

This factor considers "the burdens class counsel experienced while litigating the case (e.g., cost, duration, foregoing other work)." *Online DVD-Rental*, 779 F.3d at 955. A higher-than-benchmark award exists to reward counsel for investing "substantial time, effort, and money, especially in light of the risks of recovering nothing." *Wash. Pub. Power*, 19 F.3d at 1299-300; *Vizcaino*, 290 F.3d at 1051 ("[C]ourts have routinely enhanced the lodestar to reflect the risk of non-payment in common fund cases.").

Counsel for Plaintiffs attest that they "invested millions of dollars in attorney time and $823,904.04 in out-of-pocket costs to litigate this case, with the understanding that they would only be compensated if they succeeded in recovering substantial damages for the Settlement Class." *See* ECF No. 567 at Exhibit A ¶¶ 4, 8; Exhibit B ¶¶ 4, 8; Exhibit C ¶¶ 4, 8; Exhibit D ¶¶ 4, 7; Exhibit E ¶¶ 4, 7. The Court recognizes the financial risk Counsel undertook, given the risks of litigation, the substantial amount of time they needed to invest in moving this suit closer to trial, and possibility of non-payment. *See Vizcaino*, 290 F.3d at 1050 (endorsing upward adjustment of the fee when "counsel's representation of the class—on a contingency basis— extended over eleven years, entailed hundreds of thousands of dollars of expense, and required counsel to forgo significant other work, resulting in a decline in the firm's annual income.").

Thus, the Court finds this factor also supports an upward adjustment from the Ninth Circuit's 25% benchmark. *See Barbosa v. Cargill Meat Sols. Corp.*, 297 F.R.D. 431, 449 (E.D. Cal. 2013). ("[W]here recovery is uncertain, an award of one-third of the common fund as attorneys' fees has been found to be appropriate.").

### 4. Counsel's Efforts, Experience, and Skill

The "prosecution and management of a complex national class action requires unique legal skills and abilities." *Heritage*, 2005 WL 1594403 at *19. Thus, if Counsel has represented "intimate knowledge of the case," and applied their unique skills to obtain favorable results, this factor should weigh in favor of an increase in the benchmark rate. *See Id*.; *accord Ross v. Bar None Enterprises, Inc.*, 2015 WL 1046117, at *9 (E.D. Cal. Mar. 10, 2015).

This is not the first time the Court has discussed Plaintiffs' Counsels' skill at litigating complex class action cases such as this. *See, e.g.,* ECF No. 44. The Court's position on Class Counsel has not changed. *See* Section II.5, above. Suffice to say, the Court takes a favorable view of the breadth and depth of experience of Plaintiffs' Counsel, recognizes the extraordinary efforts they made on behalf of the class, and (as stated above) finds the settlement amount extraordinary. This factor weighs in favor of an upward departure from the 25% benchmark. *Heritage*, 2005 WL 1594403 at *20 ("[t]he experience of Class Counsel also justifies the fee award requested.").

### 5. *Awards in Similar Cases*

Finally, district courts are to consider whether the fee request is within the norm, as compared to similar cases with analogous procedural postures and comparable results.

The Court here has made effort to demonstrate what it sees as the highly favorable terms for class members, and show analogous cases, in the sections above. The Court will not repeat each of these references here, but generally finds that analogous cases strongly support an upward departure from the benchmark, and support Counsel's request for a 33.3% award from the common fund. *See, e.g., Syed v. M-I, L.L.C.*, 2017 WL 3190341, at *4, 6-8 (E.D. Cal. July 26, 2017) (awarding one-third in fees when the common fund represents 35% of damages); *Millan v. Cascade Water Servs.*, 2016 WL 3077710, at *11 (E.D. Cal. May 31, 2016) (awarding 33% in fees when the common fund was at least 35% of the maximum damages); *Richardson*, 2016 WL 1366952, *12 (awarding 30% of the gross fund amount as attorneys' fees where the per-class member award was substantial); *Boyd v. Bank of Am. Corp.*, 2014 WL 6473804, at *9-12 (C.D. Cal. Nov. 18, 2014) (awarding one-third in fees when the common fund represents 36% of damages); *Moreyra v. Fresenius Med. Care Holdings, Inc.*, 2013 WL 12248139, at *3-4 (C.D. Cal. Aug. 7, 2013) (awarding one-third in fees when the common fund represents 32% of damages); *Barbosa*, 297 F.R.D. at 450 (collecting cases in this district that have granted approximately 33% of the gross fund). The same holds true for California cases of similar complexity. *See Smith v. CRST Van Expedited, Inc.*, 2013 WL 163293, at *5 (S.D. Cal. Jan. 14, 2013) ("Under the percentage method, California has recognized that most fee awards based on

23

either a lodestar or percentage calculation are 33 percent.") (citing *In re Consumer Privacy Cases*, 175 Cal. App. 4th at 556 n. 13 (2009)).

Thus, these and other cases cited above support an award of 33% of the fund, and an upward departure from a Ninth Circuit's 25% benchmark.

### 6. *Lodestar Comparison*

Given the significant departure from the advised 25% benchmark, the Court will perform a lodestar cross-check of the amount to confirm its reasonableness. *See Vizcaino*, 290 F.3d at 1050 ("Calculation of the lodestar . . . provides a check on the reasonableness of the percentage award. Where such investment is minimal, as in the case of an early settlement, the lodestar calculation may convince a court that a lower percentage is reasonable. Similarly, the lodestar calculation can be helpful in suggesting a higher percentage when litigation has been protracted."). To do so, the Court must first calculate the lodestar "by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." *Bluetooth*, 654 F.3d at 941. "Where, as here, the lodestar is being used as a cross-check, courts may do a rough calculation "with a less exhaustive cataloging and review of counsel's hours." *Anthem*, 2018 WL 3960068 at *16, *see also Laffitte*, 1 Cal. 5th at 505*; Bellinghausen,* 306 F.R.D. at 264 (stating that in a cross-check scenario, the court may "rely on summaries submitted by the attorneys and need not review actual billing records."). After the lodestar is calculated, the Court is to apply the appropriate multiplier, based on a number of factors. *See Monterrubio v. Best Buy Stores, L.P.*, 2013 U.S. Dist. LEXIS 166021 at *21 (E.D. Cal. Nov. 20, 2013). "Multipliers in the 3-4 range are common in lodestar awards for lengthy and complex class action litigation." *Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 298 (N.D. Cal. 1995).

Here, a review of the Class Counsel's documents demonstrates an award with a negative multiplier. Class Counsel rendered 23,015 hours litigating this case from its inception in 2009, and asserts an average hourly rate of $580/hour. *See* Exhibit A ¶ 4; Exhibit B ¶ 4; Exhibit C ¶ 4; Exhibit D ¶ 4; Exhibit E ¶ 4. Using this rate, the requested fee of $13,333,333 million is 0.96 of the lodestar. *See Schiller v. David's Bridal, Inc.*, 2012 WL 2117001, at *23 (E.D. Cal. June 11,

1  2012) (a negative lodestar multiplier strongly supports the reasonableness of the fee request); *In*
2  *re Portal Software, Inc. Sec. Litig.*,2007 WL 4171201, at *15 (N.D. Cal. Nov. 26, 2007) (finding
3  that a negative multiplier suggests that "the requested percentage[-]based fee is fair and
4  reasonable"). However, this cross-check does not account for the difference in rates between
5  Class Counsels' rates in their location and the rates for the Eastern District of California, which
6  are decidedly lower. *See Monterrubio*, 291 F.R.D. at 460 (noting the prevailing hourly rates in
7  the Eastern District of California are lower than the Northern or Central Districts). Substituting
8  in the prevailing rates for attorneys in Fresno, a rough cross-check thus indicates that the total
9  lodestar amount would increase from 0.96 to approx. 1.40. This altered calculation still yields a
10  multiplier within the acceptable range—especially given that courts have approved a 3-4x
11  multiplier for complex cases such as this one. *See Van Vranken*, 901 F. Supp. at 298.

*Conclusion – Attorney Fees*

13       After careful consideration, this Court finds all factors weigh in favor of an upward
14  departure from the 25% benchmark—as allowed by Ninth Circuit and California law. The Court
15  finds a 33.3% award from the common fund of $40,000,000 to be a reasonable percentage, given
16  the complexity of this case, its lengthy procedural history, and the extraordinary results achieved
17  for the class. As such, this Court awards attorney's fees to Class Counsel totaling $13,333,333.
18  *Heritage*, 2005 WL 1594403 at *23 (awarding $9.2 million in attorney fees from a $27.7 million
19  common-fund class action settlement—33.3%).

20       The Court grants this award as a lump sum, to be divided among class counsel as
21  managed by Cohen Milstein Sellers & Toll PLLC. *See Six (6) Mexican Workers v. Ariz. Citrus
22  Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990) ("The Court need not specify what share of the
23  common fund award that each attorney [will] receive."); *Hartless v. Clorox Co.*, 273 F.R.D. 630,
24  646 (S.D. Cal. 2011) ("[F]ederal courts routinely affirm the appropriateness of a single fee award
25  to be allocated among counsel and have recognized that lead counsel are better suited than a trial
26  court to decide the relative contributions of each firm and attorney.").

27  / / /
28  / / /

*B.*     *Costs*

An attorney who has created a common fund for the benefit of the class is entitled to reimbursement of reasonable litigation costs from that fund. *See In re Omnivision Techs.*, 559 F. Supp. 2d at 1048 (citing *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994)). Such expense awards comport with the notion that the district court may "spread the costs of the litigation among the recipients of the common benefit." *Wininger v. SI Mgmt. L.P.*, 301 F.3d 1115, 1121 (9th Cir. 2002). The award "should be limited to typical out-of-pocket expenses that are charged to a fee-paying client and should be reasonable and necessary." *In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1177 (S.D. Cal. 2007) (citing *In re Media Vision Tech. Sec. Litig.*, 913 F. Supp. 1362, 1366 (N.D. Cal. 1996)); These costs can include reimbursements for: (1) meals, hotels, and transportation; (2) photocopies; (3) postage, telephone, and fax; (4) filing fees; (5) messenger and overnight delivery; (6) online legal research; (7) class action notices; (8) experts, consultants, and investigators; and (9) mediation fees." *Torres v. Pick-A-Part Auto Wrecking*, 2018 WL 3570238, at *9 (E.D. Cal. July 23, 2018). The standard of reasonableness of costs "is to be given a liberal interpretation." *Media Vision*, 913 F. Supp. at 1368.

Having reviewed the submissions of Class Counsel, the Court finds that their requests for unreimbursed expenses are reasonable. Class Counsel requested reimbursement in the amount of $823,904.04. See ECF No. 567-1 at p.20. The categories include: filing fees, copying, postage, document storage, depositions, travel, experts, transcripts, computer research, the cost of the mediator, and common-fund contributions. *See* ECF No. 567-2 ¶¶ 7-8; 575-3 at ¶¶ 7-8; 575-4 at ¶¶ 7-8; and 575-6 at ¶ 7. Additionally, the Claims Administrator has requested an additional $118,000 to cover notice costs. These are of the type routinely charged to paying clients and, therefore, will be awarded. *See Harris*, 24 F.3d at 19; *see also Immune Response*, 497 F. Supp. 2d at 1177 (travel costs are reimbursable); *Id.* at 1177-1178 ("Filing fees and and photocopies are reimbursable."); *Toyota Motor*, 2013 U.S. Dist. LEXIS 94485 at *229-230 ("[C]omputerized legal research 'is an essential tool of a modern efficient law office, and the complexity of this case justifies the costs of these services[, as well as contributions to the litigation fund.").

Counsel will be reimbursed $823,904.04 in costs, to be paid from the settlement fund.

*C.      Service Award to Class Representatives*

Incentive awards are "intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez*, 563 F.3d at 958-59. Such payments must be "scrutinize[d] carefully . . . so that they do not undermine the adequacy of the class representatives." *Radcliffe v. Experian Info. Solutions, Inc.*, 2013 WL 1831760, at *3 (9th Cir. 2013) (citing *Staton*, 327 F.3d at 977); *Rodriguez*, 563 F.3d at 959 ("An absence of material conflicts of interest between the named plaintiffs and their counsel with other class members is central to adequacy and, in turn, to due process for absent members of the class."). District courts "must evaluate [the service] awards individually, using 'relevant factors including the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, the amount of time and effort the plaintiff expended in pursuing the litigation and reasonable fears of [] retaliation.'" *Staton*, 327 F.3d at 977 (alterations omitted) (quoting *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998). "[A] court need not award all named plaintiffs the same incentive payment." *In re High-Tech Emp. Antitrust Litig.*, 2015 WL 5158730, at *17-18 (N.D. Cal. Sept. 2, 2015) (citing *Slipchenko v. Brunel Energy, Inc.*, 2015 WL 338358, at *15 (S.D. Tex. Jan. 23, 2015) ("Courts recognize that a differentiation among class representatives based upon the role that each played may be proper in given circumstances.").

In the Ninth Circuit, courts have found that $5,000 is a presumptively reasonable service award. *See Harris v. Vector Marketing Corp.*, 2012 WL 381202, at *7 (N.D. Cal. 2012) ("Several courts in this District have indicated that incentive payments of $25,000 are quite high and/or that, as a general matter, $5,000 is a reasonable amount."); *but see In re Kentucky Grilled Chicken Coupon Mktg. & Sales Practices Litig.*, 2011 U.S. Dist. LEXIS 157910 (N.D. Ill. 2011) (awarding $25,000 in the aggregate for five class representatives and noting that "an empirical study of incentive awards to class action plaintiffs has determined that the average aggregate incentive award within a consumer class action case is $29,055.20, and that the average individual award is $6,358.80").

In "megafund" cases, some courts have granted much higher awards when the relevant factors weigh in favor of higher awards. *See, e.g., In re Titanium Dioxide*, 2013 WL 6577029, at *1 (D. Md. Dec. 13, 2013) (awarding $125,000 to lead class representative and $25,000 to other class rep's out of $163.5 million settlement); *Velez v. Novartis Pharm. Corp.*, 2010 WL 4877852, at *4, *8, *28 (S.D.N.Y. Nov. 30, 2010) (awarding $125,000 to named plaintiffs from $175 million settlement); *High-Tech*, 2015 WL 5158730, at *17 (awarding $120,000 and $80,000 to named plaintiffs from $415 million settlement). When higher amounts are requested, some courts have considered the ratio between the service awards and class members' average recovery to determine the propriety of any amount awarded. *See Hopson v. Hanesbrands Inc.*, 2009 WL 928133, at *10 (N.D. Cal. Apr. 3, 2009) ("To assess whether an incentive payment is excessive, district courts balance the number of named plaintiffs receiving incentive payments, the proportion of the payments relative to the settlement amount, and the size of each payment."); *compare Staton*, 327 F.3d at 948, 975–78 (rejecting settlement where 29 class representatives could receive up to $50,000 compared to $1,000 for unnamed class members); *Nitsch v. DreamWorks Animation SKG Inc.*, 2017 WL 2423161, at *14-16 (N.D. Cal. June 5, 2017) (approving service awards of $100,000 for each named plaintiff); *Kaufman v. Am. Exp. Travel Related Servs. Co.*, 264 F.R.D. 438, 448 (N.D. Ill. 2009) (disapproving $2,500 service awards because they were "125 times greater than the $20 maximum that any similar Class member could recover"); *Van Vranken*, 901 F. Supp. at 299 (awarding service fee to $50,000 to a lead plaintiff—reduced from requested $100,000—in case with $76 million settlement fund), *with In re Capital One Tel. Consumer Prot. Act Litig.*, 2015 WL 605203, at *19 (N.D. Ill. Feb. 12, 2015) (approving $5,000 service awards where class members who made timely claims were entitled to "at least $39.66"); *Lemus v. H & R Block Enters. LLC*, 2012 WL 3638550, at *5–6 (N.D. Cal. Aug. 22, 2012) (approving $15,000 service awards where the average class recovery was about $1,200); *Ross v. U.S. Bank Nat. Ass'n*, 2010 WL 3833922, at *2 (N.D. Cal. Sept. 29, 2010) (finding $20,000 for four class representatives was appropriate service award where the total settlement fund amounted to $1,050,000).

/ / /

Given that service awards are at the discretion of the district court, whatever the method used, the Court must make sure that where there is a "very large differential in the amount of damage awards between the named and unnamed class members," that differential is justified by the record. *Staton*, 327 F.3d at 978; *see also Heritage*, 2005 WL 1594403 at *20 (rejecting $60,000 request based on declaration that named plaintiff attested he worked 300 hours on case and said rate was $200/hr., where no proof of hourly rate existed, and awarding $15,000).

Here, Class Counsel have requested service awards of $90,000 to each of the four named Plaintiffs, as well as $10,000 in service awards to four former named Plaintiffs. ECF No. 567. Plaintiffs assert in their memo supporting the motion for the service award that these amounts are reasonable, given their active participation in the decade-long litigation. *See* ECF No. 567. Plaintiffs state they "prepared for and were subject to lengthy depositions, produced computer hard drives and thousands of pages of documents, responded to more than a hundred interrogatories and requests for admission, identified potential witnesses for investigation, reviewed key liability evidence to help develop the allegations, provided guidance about the market to assist with damages calculations, participated in countless calls and meetings with Class Counsel, and facilitated settlement negotiations." *See Id.* However, without more than Class Counsel's assertions in the motion for fees (ECF No. 567) and general citations to the docket, the Court informed the parties at the fairness hearing that it could not grant such awards. On May 1, 2019, each of the named plaintiffs (current and former) have submitted declarations in support of their quests, detailing the extensive work done on behalf of the class, as asserted by Counsel in the initial motion. *See* ECF Nos. 575-6 and 585-2 to -9.

The Court recognizes the general truth of Plaintiffs' assertions. The case is on its fourth amendment to the complaint, and Mr. Carlin, Mr. Rahm, Mr. Rozwadowski, and Mr./Mrs. Wolfe have been involved since the case's inception.[6] *See* ECF No. 1; *see also* ECF Nos. 8, 245, 513 (amended complaints). The parties are heavily litigious, and the Court does not doubt that the current and former named Plaintiffs were subjected to interrogatories, depositions, and general

---

[6] Mr. Wolfe was the original named plaintiff, but passed during the course of this litigation. Mrs. Wolfe was substituted in March of 2013. *See* ECF No. 118.

document review. *See* ECF Nos. 46, 49, 94, 121, 253, 255, 268 (Defendants' motions to dismiss); Nos. 295, 300, 349, 436-443, 468, 516-517 (filings regarding discovery disputes). *Staton*, 327 F.3d at 978; *Heritage*, 2005 WL 1594403 at *20. The declarations filed by each named plaintiff supports an award higher than the Ninth Circuit average of $5,000. Each current named Plaintiff detailed the substantial amount of time spent actively participating in both the initial investigation and ten-year litigation, as well as the perceived risk each believed they were undertaking in bringing suit against corporate entitles with whom they continued to work closely with. ECF Nos. 585-2 to -5. The former named Plaintiffs also detailed the work they did on behalf of the class, which included responding to discovery requests and attending depositions. ECF Nos. 585-6 to -9.

However, even with the support of this evidence, a $90,000 service award for each the four current named Plaintiffs goes beyond ratios described by the Ninth Circuit, given that the average recovery of unnamed class members is just over $1,000. *See Staton*, 327 F.3d at 948, 975–78; *see also Van Vranken*, 901 F. Supp. at 299 (awarding higher service fee where named plaintiffs demonstrated extra work done on behalf of the class, but reducing award proportional to size of fund); *Nitsch v. DreamWorks Animation SKG Inc.*, 2017 WL 2423161, at *14-16 (N.D. Cal. June 5, 2017) ($100,000 service award approved in protracted litigation where average class recovery was approx. $5,000). The Court finds the logic of *Nitsch* and *Van Vranken* persuasive, and will award $45,000 to each current named Plaintiff: Gerald Carlin, John Rahm, Paul Rozwadowski, and Diana Wolfe.

Further, the evidence presented from the four former named Plaintiffs details their efforts made on behalf of the class. However, the record in this case also shows that Class Counsel made considerable effort to protect these former named Plaintiffs from having to participate in discovery, given the Court's consolidation of these cases early in the litigation and their removal as named Plaintiffs. *See* ECF No. 44 (order consolidating cases, filed three months after the initial complaint was filed). Thus, the Court will award $5,000 to each former named Plaintiff: James Rehberg, Ronald Hayek, Michael K. Schugg, and Timothy L. Rawlings.

/ / /

*D.     Objections to the Fee, Costs and Service Requests*

Mr. Spooner (ECF 572) objects to the amount requested in attorney fees and service awards for named plaintiffs, comparing the "couple hundred dollars" each farmer gets to the $90,000 award for the class representatives and "millions" for Class Counsel. The Court first notes that Mr. Spooner's calculation is incorrect, that the average payment to each farmer is over $1000—and the true payments are based on the amount of milk sold during the relevant period. Further, the Court notes that any remaining amounts in the fund are to be distributed to the claimants on a pro rata basis. Beyond this, the Court has already detailed its extensive rationale for why the requested attorney fees, costs, and revised service awards are reasonable. Thus, Mr. Spooner's objection on this ground is overruled.

## **ORDER**

Based on the foregoing, IT IS HEREBY ORDERED that:

1.      The Court has personal jurisdiction over all Plaintiffs, Settlement Class Members, DairyAmerica and California Dairies, and has subject matter jurisdiction to approve the Settlement Agreement pursuant to Federal Rules of Civil Procedure Rule 23(e);

2.      On September 14, 2018, pursuant to Rule 23 of the Federal Rules of Civil Procedure, the Court preliminarily certified, for purposes of effectuating this Settlement, a Settlement Class defined as follows:

> All dairy farmers located in the United States who sold raw milk that was priced according to a Federal Milk Marketing Order during the period January 1, 2002 through April 30, 2007. Excluded from the Class are California Dairies and DairyAmerica, any entity in which California Dairies or DairyAmerica have a controlling interest, and their respective legal representatives, heirs, and successors.

ECF. No. 559. The Court now grants final approval of this Settlement Class;

3.      The Settlement Class has received Notice in the manner approved by the Court in its Order of September 14, 2018. This Notice: (i) constitutes reasonable notice and the best practicable notice under the circumstances; (ii) constitutes notice that is reasonably calculated, under the circumstances, to apprise Settlement Class Members of the terms of the Settlement, of their right to object to the Settlement and of their right to appear at the fairness hearing;

(iii) constitutes due, adequate and sufficient notice to all persons entitled to receive notice; and (iv) meets the requirements of due process and Rule 23 of the Federal Rules of Civil Procedure;

4. The persons and entities identified in Exhibit A, which is attached hereto and incorporated by reference herein, have timely and validly requested exclusion from the Settlement Class and are hereby excluded from the Settlement Class, are not bound by this Order, and may not make any claim against or receive any benefit from the Settlement, whether monetary or otherwise. Said excluded persons may not pursue any Released Claims on behalf of those who are bound by this Order. Each member of the Settlement Class not appearing in Exhibit A is bound by this Order and will remain forever bound;

5. The Court finds that extensive arm's-length negotiations have taken place in good faith between Class Counsel and counsel for DairyAmerica and California Dairies, resulting in the Settlement Agreement;

6. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the Court hereby finally approves in all respects the Settlement set forth in the Settlement Agreement and finds that the Settlement is, in all respects, fair, reasonable, adequate, free from collusion, and in the best interest of the Settlement Class. The parties are hereby directed to implement and consummate the Settlement according to its terms and provisions of the Settlement Agreement;

7. The Court hereby approves the Distribution Plan of the Settlement Fund as described in the Settlement Agreement. This Distribution Plan provides that the Settlement Fund, which includes interest earned thereon, be distributed to approved Claimants, less any amounts approved by the Court for the costs of notice to the Settlement Class and administration of the Settlement, escrow costs, taxes, payment of attorneys' fees, reimbursement of Litigation Expenses, and service awards to Class Representatives or Former Plaintiffs (the "Net Settlement Funds"); further, that the Net Settlement Funds will be distributed on a *pro rata* basis; and that an approved Claimant's *pro rata* share of the settlement will be determined by dividing (i) the volume of the Claimant's total raw Grade A milk produced and pooled on a Federal Milk Marketing Order during the period January 1, 2002 to April 30, 2007, by (ii) the total volume of

raw Grade A milk produced and pooled on Federal Milk Marketing Orders during the period January 1, 2002 to April 30, 2007 by all members of the Settlement Class;

8.      To determine the volume of each Claimant's total raw Grade A milk produced and pooled on a Federal Milk Marketing Order during the period January 1, 2002 to April 30, 2007, the Claims Administrator will apply the following procedures: (a) if a Claimant accepted the preprinted volume on the Claim Form, that volume will be used; (b) if a Claimant rejected the preprinted volume on the Claim Form and supplied documentation that substantiates an alternate volume that was provided by the Claimant, that alternate volume will be used; (c) if a Claimant produced and pooled raw Grade A milk on Federal Milk Marketing Order other than Federal Milk Marketing Order 30 during the Class Period, and rejected the pre-printed volume on the Claim Form but failed to supply documentation substantiating an alternate volume, the pre-printed volume on the Claim Form will be used; (d) if a Claimant produced and pooled raw Grade A milk on Federal Milk Marketing Order 30 during the Class Period, rejected the pre-printed volume on the Claim Form and provided an alternate volume that is not greater than twice the value of the preprinted volume, the alternate volume will be used; (e) if a Claimant produced and pooled raw Grade A milk on Federal Milk Marketing Order 30 during the Class Period, rejected the pre-printed volume on the Claim Form and provided an alternate volume that is more than twice the value of the pre-printed volume but failed to supply documentation substantiating that alternate volume, the Claims Administrator will contact the Claimant in order to obtain substantiating documentation, and if the Claimant fails to provide such documentation, a volume equal to twice the pre-printed volume will be used;

9.      Plaintiffs' Motion for Attorney Fees, Reimbursement of Litigation Expenses, and Service Awards for the Named Plaintiffs and Former Plaintiffs is GRANTED AS MODIFIED by this Order;

10.     The Court finds that the Notice provided to the Settlement Class regarding Class Counsel's request for an award of attorneys' fees, reimbursement of litigation expenses, and service awards for current and former named Plaintiffs meets the requirements of Rule 23 of the

Federal Rules of Civil Procedure and due process, was the best notice practicable under the circumstances, and constitutes due and sufficient notice to all persons entitled thereto;

11.     Class Counsel are hereby awarded 33.3% of the total Settlement Fund, which amount equals $ 13,333,333, plus any interest that has already accrued or will accrue;

12.     Class Counsel are hereby awarded litigation expenses in the amount of $823,904.04, to be paid from the Settlement Fund;

13.     The awards of attorney fees and expenses shall be allocated among Class Counsel by Cohen Milstein Sellers & Toll PLLC in a manner that, in the firm's good-faith judgment, reflects Class Counsel's contributions of time and money to the institution, prosecution and resolution of the litigation;

14.     Class Counsel and their designees are authorized to expend funds from the Escrow Account to pay Taxes, Tax Expenses and notice and administration costs, as set forth in the Settlement Agreement. Class Counsel and their designees are specifically authorized to expend a total of $418,000 from the Escrow Account to compensate the Claims Administrator for notice and claims administration costs, of which $118,000 remains outstanding due to the initial $300,000 payment made at the end of 2018. The Court retains continuing jurisdiction over any issues regarding the formation or administration of the Escrow Account;

15.     Each of the four current named Plaintiffs, Paul Rozwadowski, Gerald Carlin, John Rahm, and Diana Wolfe, is awarded a service award in the amount of $45,000.00, in addition to any distributions as part of the Settlement Fund to which they may be entitled, to compensate them for their time and efforts in leading this case for the benefit of all Settlement Class Members;

16.     Each of the four former named Plaintiffs—James Rehberg, Ron Hayek, Michael Schugg, and Tim Rawlings, is awarded a service award in the amount of $5,000.00, in addition to any distributions as part of the Settlement Fund to which they may be entitled, to compensate them for their time and efforts in assisting this case for the benefit of all Settlement Class Members;

17.     The above-captioned case is hereby dismissed as to DairyAmerica and California Dairies with prejudice and without costs to any party. Furthermore, finding no just reason for delay, the Court hereby enters a final judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure as to all claims asserted in this case against DairyAmerica and California Dairies;

18.     DairyAmerica and California Dairies, and their predecessors, successors, subsidiaries, insurers, members, former members, owners, attorneys, and any and all past and present officers, directors, employees, managing agents, and Controlling Persons of such entities (the "Released Parties") shall be completely released, acquitted, and forever discharged from any and all claims, complaints, demands, judgments, damages, debts, liabilities, actions, proceedings, remedies, causes of action, or suits, of whatever kind or nature, and whether known or unknown, suspected or unsuspected, asserted or unasserted in the Action, in law or equity, as against the Released Parties, from January 1, 2002 through and including the effective date of the Agreement, and arising from, relating to, or in connection with any matters alleged by Plaintiffs or Former Plaintiffs in any of the complaints filed in the Action, including any such complaints that were dismissed by the Court in the Action (the "Released Claims"). In avoidance of doubt, "Released Claims" encompass any reporting by DairyAmerica of nonfat dry milk prices to USDA from January 1, 2002 through and including the Effective Date of this Agreement, including the involvement, if any, by California Dairies and/or any other DairyAmerica cooperative members in such reporting, but does not encompass claims or potential claims by Settlement Class Members that do not arise out of or are not connected with or do not relate to the same conduct, transactions and/or occurrences described in the complaints filed in the *Carlin* Action;

19.     Nothing in this Order, the Settlement, or the Settlement Agreement is or shall be deemed or construed to be an admission or evidence of any violation of any statute or law or of any liability or wrongdoing;

20.     Without affecting the finality of this Order, the Court retains continuing and

exclusive jurisdiction over all matters relating to administration including, but not limited to, consummation, payment of attorneys' fees and costs, enforcement and interpretation of the Settlement Agreement and of this Order, to protect and effectuate this Order, and for any other necessary purpose;

21.     DairyAmerica, California Dairies, Plaintiffs and each member of the Settlement Class are hereby deemed to have irrevocably submitted to the exclusive jurisdiction of this Court, for any suit, action, proceeding or dispute arising out of or relating to the Settlement Agreement, including the Exhibit thereto. Solely for purposes of such suit, action or proceeding, to the fullest extent they may effectively do so under applicable law, the parties are deemed to have irrevocably waived any claim or objection that they are not subject to the jurisdiction of this Court, or that this Court is, in any way, an improper venue or an inconvenient forum.

IT IS SO ORDERED.

Dated:   May 8, 2019        _____

                            SENIOR  DISTRICT  JUDGE

# EXHIBIT A

REQUESTS FOR EXCLUSION, Pounds

| # | Name | Pounds | # | Name | Pounds |
|---|------|--------|---|------|--------|
| 1 | PAUL OR NANCY OR SCOTT HIEBLER | 281,970 | 41 | DEREK & ANAISE ENGLAND | 3,580,565 |
| 2 | LESTER Z OR RUTH ANN NOLT | 7,634,177 | 42 | ISRAEL BEILER | 3,265 |
| 3 | ALVIN J GLICK | 1,477,792 | 43 | SAM H OR ELAINE ZIMMERMAN | 6,238,068 |
| 4 | LUKE & ARLENE RHODES | 1,172,223 | 44 | AARON EUGENE MARTIN | 480,504 |
| 5 | ARLYN F OR SHIRLEY COLWELL | 1,024,443 | 45 | ADAM PLACE | 5,897,576 |
| 6 | CHARLES L OR MICHELLE ZIMMERMAN | 5,284,525 | 46 | ELWOOD W HIPKINS & T JEAN HIPKINS | 7,407 |
| 7 | TRISSLER FARMS | 6,218,627 | 47 | ELWOOD W HIPKINS (NEW DESIGN ACRES) | 7,487,208 |
| 8 | STEVEN E WILSON | 3,881,451 | 48 | JOHN B STOLTZFUS | 3,880,808 |
| 9 | CHESTER K OR BARBIE K FISHER | 2,614,087 | 49 | CORINNE AND /OR DOUGLAS LULL | 8,052,467 |
| 10 | JOHN L SCHENNING T/A STRAWBERRY HILL FARM | 15,623,228 | 50 | PAMELA H MOSER / WALNUT RIDGE FARM II | 4,819,015 |
| 11 | GIDEON S OR SYLVIA L SWAREY | 3,727,468 | 51 | PAUL M SONNEN | 515,626 |
| 12 | JOHN M KNICELY | 10,921,932 | 52 | RIVER VIEW FARMS | 10,896,397 |
| 13 | CHRISTIAN S KING | 4,312,407 | 53 | SAMUEL F OR SARAH BLANK | 4,135,617 |
| 14 | MANUEL BAHR | 2,304,024 | 54 | SAMUEL S OR MARY L ZOOK | 1,876,473 |
| 15 | ENOS S STOLTZFUS | 3,464,644 | 55 | DALE COVERT | 5,820,294 |
| 16 | RICHARD R & NELSON TROUTMAN | 15,296,028 | 56 | JERROLD F ROHRER | 7,519,729 |
| 17 | E CLINE BRUBAKER | 1,441,966 | 57 | MARK OR THELMA GARMAN | 4,737,799 |
| 18 | J MARTIN OR SANDRA J HARNISH | 4,624,136 | 58 | JONATHAN HAAR | 1,617,383 |
| 19 | LARRY L WISSER | 2,750,852 | 59 | RICHARD PUGH | 8,084,347 |
| 20 | EMANUEL J OR LINDA LANTZ | 5,160,017 | 60 | T M & OR V B MONTEITH | 1,745,888 |
| 21 | SOL S OR FANNIE F KING | 2,582,362 | 61 | JAROUS VOLENEC | 1,060,487 |
| 22 | LINFORD Z OR MABLE I NOLT | 3,604,761 | 62 | LAICE L & JOHN A FOSTER JR | 0 |
| 23 | ELMER R PETERSHEIM | 61,247 | 63 | DANIEL N OR NAOMI M ZIMMERMAN | 5,096,881 |
| 24 | SAMUEL MILLER | 0 | 64 | WEST BRANCH HOLSTEIN | 38,410,380 |
| 25 | SAMUEL F OR BARBIE B LAPP | 3,442,918 | 65 | NEVIN OR ERMA MARTIN | 3,952,282 |
| 26 | ELI O OR SUSIE EBERSOL | 5,005,130 | 66 | DAVID UNGER | 3,762,091 |
| 27 | JACOB B OR KATIE K ZOOK | 2,832,593 | 67 | SNYDER DAIRY FARM | 0 |
| 28 | AMOS L OR KATIE S BEILER | 4,627,698 | 68 | DAVID AND/OR TAMAR WARD | 7,502,818 |
| 29 | AQUILLA R & LYDIA S STOLTZFUS | 6,734,284 | 69 | MERVIN S STOLTZFUS | 4,228,295 |
| 30 | DAVID KLINE | 2,041,459 | 70 | JON MICHAEL EBY | 7,265,527 |
| 31 | DAN OR BONNIE THEISEN | 5,182,164 | 71 | TERRY A INCH | 12,895,306 |
| 32 | JOHN M BURKHOLDER | 0 | 72 | HERBERT FARNEY & SONS | 20,127,656 |
| 33 | KIRK OR PATRICIA HERSE | 5,679,322 | 73 | LOU ANN PARISH | 2,188,922 |
| 34 | CHRIST S OR MARIAN S STOLTZFUS | 4,925,977 | 74 | PATRICK OR BEATRICE BATES | 2,859,647 |
| 35 | ABNER P OR MARY S STOLTZFUS | 5,177,537 | 75 | ELAM K LAPP | 3,604,749 |
| 36 | MATTHEW J HORNING | 8,117,631 | 76 | SHEN-ROCK HOLSTEINS | 14,677,120 |
| 37 | THOMAS E CLATTERBUCK | 2,737,088 | 77 | BLAIR PURDY | 6,827,924 |
| 38 | RANDY D SOWERS | 14,787,806 | 78 | PAUL L & MARION B SHOWALTER | 7,263,803 |
| 39 | ALVIN M STOLTZFUS | 3,692,693 | 79 | SCO GAIL FARM | 6,823,020 |
| 40 | DANIEL A OR GAIL C CURRAN | 1,479,359 | 80 | LARRY & GRACE MILLER | 4,253,356 |